**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KALDEROS, INC. | |
| *Plaintiff*, | |
| v. | Case No. 21-cv-2608 (DLF) |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF KALDEROS, INC.'S MOTION FOR SUMMARY JUDGMENT</u>

Paul J. Zidlicky (D.C. Bar No. 450196)
Elizabeth Hardcastle (*pro hac vice* forthcoming)
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8013
pzidlicky@sidley.com

Trevor L. Wear (*pro hac vice* forthcoming)
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7101
twear@sidley.com

*Counsel for Plaintiff Kalderos, Inc.*

Dated:  February 3, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………….…………… ii

INTRODUCTION AND SUMMARY…………………………………………….. 1

STATUTORY AND REGULATORY BACKGROUND…………………………… 5

STATEMENT OF FACTS…………………………………………………… 11

    A.  The Kalderos Platform Provides a Remedy to Fix the
        340B Program……………………………………………………….. 11

    B.  HRSA's Prohibition of Manufacturer Conditions on
        340B Transactions…………………………………………………15

    C.  Defendant HRSA's Rejection of the Kalderos Platform……………………… 16

LEGAL STANDARDS………………………………………………………… 19

ARTICLE III STANDING……………………………………………………… 20

FINAL AGENCY ACTION…………………………………………….................. 21

ARGUMENT……………………………………………………………………… 22

  I.  *NOVARTIS* FORECLOSES HRSA'S POLICY PROHIBITING
     CLAIMS-DATA REQUIREMENTS…………………………………………… 22

  II.  HRSA'S REJECTION OF THE KALDEROS PLATFORM IS
      CONTRARY TO THE  340B STATUTE AND ARBITRARY AND
      CAPRICIOUS……………………………………………………………… 24

    A.  Defendants' Rejection of the Kalderos Platform Is Contrary
        to the 340B Statute and Exceeds Agency Authority……………………… 24

    B.  HRSA's Rejection of the Kalderos Platform Is Arbitrary
        and Capricious……………………………………………………… 30

CONCLUSION………………………………………………………………….. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action for Child.'s Television v. FCC*,
821 F.2d 741 (D.C. Cir. 1987) ............................................................................31

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ............................................................................31

*Amgen Inc. v. HHS*,
No. 22-cv-03763 (DLF), 2024 WL 4295310 (D.D.C. Sept. 17, 2024) ...................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................19

*\*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ...........................................................................1, 5, 6, 28

*Atl. City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002) ..........................................................................26, 27

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) .................................................................4, 30

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................................21

*Boehringer Ingelheim Pharms. v. Becerra*,
No. 21-cv-02826 (DLF), 2024 WL 4295371 (D.D.C. Sept. 17, 2024) ...................24

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) .........................................................................31

*Cal. Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004) ........................................................................3, 26

*City of Clarksville v. FERC*,
888 F.3d 477 (D.C. Cir. 2018) ...........................................................................24

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ...........................................................................31

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
637 F.3d 408 (D.C. Cir. 2011) ......................................................................21, 22

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)........................................................................................20

*Dickson v. Sec'y of Def.*,
  68 F. 3d 1396 (D.C. Cir. 1995)......................................................................4, 31

*Eagle Pharms., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020)..........................................................................25

*Energy Future Coal. v. EPA*,
  793 F.3d 141 (D.C. Cir. 2015)..........................................................................21

\*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)..........................................................................4, 20, 28, 30

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
  571 U. S. 161 (2014)........................................................................................27

*Ill. Pub. Telecom. Ass'n v. FCC*,
  117 F.3d 555 (D.C. Cir. 1997)........................................................................4, 31

*Isbrandtsen Co. v. United States*,
  211 F.2d 51 (D.C. Cir. 1954)............................................................................26

*Jama v. ICE*,
  543 U.S. 335 (2005)..........................................................................................27

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)....................................................................................19, 29

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..........................................................................................20

*Merck Sharp & Dohme LLC v. HHS*,
  No. 22-cv-01986 (DLF), 2024 WL 4295312 (D.D.C. Sept. 17, 2024)....................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................................4, 20, 32, 33

*Nat. Res. Def. Council, Inc. v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988)........................................................................5, 33

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005)..........................................................................................31

*Nat'l Tire Dealers & Retreaders Ass'n v. Brinegar*,
  491 F.2d 31 (D.C. Cir. 1974)............................................................................31

*Novartis Pharms. Corp. v. Espinosa*,
    No. 21-CV-1479 (DLF), 2021 WL 5161783 (D.D.C. Nov. 5, 2021) ............2, 6, 19, 21, 23, 28

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ..........1, 2, 5, 6, 7, 12, 13, 14, 15, 16, 21, 22, 25, 27, 29, 30, 32

*Patel v. Garland*,
    596 U.S. 328 (2022) ................................................................................................................3, 28

*Pharm. Rsch. & Mfrs. of Am. v. HHS*,
    138 F. Supp. 3d 31 (D.D.C. 2015) ..........................................................................................21, 22

*Phillip Morris USA Inc. v. FDA*,
    202 F. Supp. 3d 31 (D.D.C. 2016) ................................................................................................26

*Prevor v. FDA*,
    895 F. Supp. 2d 90 (D.D.C. 2012) ...............................................................................................32

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) .......................................................................................................................26

*Sanofi Aventis U.S., LLC v. Dep't of Health*,
    58 F.4th 696 (3d Cir. 2023) .......................................................................................15, 16, 22, 25, 29

*SAS Inst. Inc. v. Iancu*,
    584 U.S. 357 (2018) .......................................................................................................................24

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .........................................................................................................................20

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) .......................................................................................................................20

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ...................................................................................................................20

*UCB, Inc. v. Becerra*,
    No. 22-cv-02893 (DLF), 2024 WL 4295351 (D.D.C. Sept. 17, 2024) ..................................24

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ......................................................................................................31

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ......................................................................................................31

*Vonage Holdings Corp. v. FCC*,
    489 F.3d 1232 (D.C. Cir. 2007) ................................................................................................4, 30

## Statutes and Regulations

5 U.S.C. § 706(2) ...........................................................................................................19

21 U.S.C. § 355(a) ..........................................................................................................26

21 U.S.C. § 387j(c)(1)(A)(i) ...........................................................................................26

21 U.S.C. § 360e(a) .........................................................................................................26

42 U.S.C. § 256b ...............................................................................................................5

*42 U.S.C. § 256b(a)(1)......................................................1, 3, 6, 19, 24, 25, 28, 32

42 U.S.C. § 256b(a)(5)(A)(i) ...........................................................................................6

42 U.S.C. § 256b(a)(5) ..................................................................................................1, 7

42 U.S.C. § 256b(d)(1)(B) .............................................................................................6, 7

42 U.S.C. § 256b(d)(3) .....................................................................................................7

42 U.S.C. § 1320f-2(a) ...................................................................................................10

42 U.S.C. § 1320f-2(d) ...................................................................................................10

42 U.S.C. § 1395w-3a(i) .................................................................................................10

42 U.S.C. § 1395w-3a(i)(3)(B)(ii)(I) ..............................................................................10

42 U.S.C. § 1395w-114(b)(1)(B) ....................................................................................11

42 U.S.C. § 1396r-8(a)(1) ................................................................................................5

42 U.S.C. § 1396r-8(a)(5) ................................................................................................5

42 U.S.C. § 1396r-8(c)(1)(C)(i) .......................................................................................5

Pub. L. No. 78-410, 58 Stat. 682 (1944)...........................................................................5

Pub. L. No. 102-585, 106 Stat. 4943 ................................................................................5

42 C.F.R. § 10.11(a)..........................................................................................................6

42 C.F.R. § 10.21(a)..........................................................................................................7

61 Fed. Reg. 55,156 (Oct. 24, 1996).................................................................................7

62 Fed. Reg. 45,823 (Aug. 29, 1997)...........................................................................3, 25

63 Fed. Reg. 35,239 (June 29, 1998) .................................................................13, 25

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................19

**Legislative Materials**

GAO, GAO-20-212, *340B Discount Program: Oversight of the Intersection with
the Medicaid Drug Rebate Program Needs Improvement* (Jan. 2020)......................8

GAO, GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance
at 340B Contract Pharmacies Needs Improvement* (June 2018)........................8, 10

GAO, GAO-15-455T, *Drug Discount Program: Status of GAO Recommendations
to Improve 340B Drug Pricing Program Oversight* (Mar. 2015)...........................10

GAO, GAO-21-107, *Drug Pricing Program: HHS Uses Multiple Mechanisms to
Help Ensure Compliance with 340B Requirements* (Dec. 2020)...................8, 9, 10

H.R. Rep. No. 102-384 (1992)................................................................................5, 29

**Other Authorities**

Mark Campbell, RxBenefits, *What Employers Need to Know about Drug Rebates*
(June 21, 2022), https://www.rxbenefits.com/blogs/understanding-the-role-of-
drug-rebates/ ............................................................................................................13

HHS Off. for Civil Rights, *HIPAA FAQ 455* (Dec. 18, 2024),
https://www.hhs.gov/guidance/document/faq-455-does-privacy-rule-permit-
health-plans-disclose-protected-health-information ...............................................13

HRSA, *340B Drug Pricing Program*, https://www.hrsa.gov/opa (last visited Jan.
30, 2025) ..................................................................................................................19

HRSA, *Program Integrity: FY21 Audit Results* (Oct. 2024),
https://www.hrsa.gov/opa/program-integrity/fy-21-audit-results.............................9

HRSA, *Program Integrity: FY22 Audit Results* (Oct. 2024)
https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results.............................9

HRSA, *Program Integrity: FY23 Audit Results* (Dec. 2024),
https://www.hrsa.gov/opa/program-integrity/fy-23-audit-results.............................9

HRSA, *Program Integrity: FY24 Audit Results* (Dec. 2024),
https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results.............................9

MDRP, *Electronic State Invoice Form CMS-R-144, Data Definitions* (effective
July 1, 2021), https://www.medicaid.gov/medicaid/prescription-drugs/down-
loads/cms-r-144-state-invoice-data-definitions-jul-2021.pdf ...................................................13

## INTRODUCTION AND SUMMARY

Plaintiff Kalderos, Inc. ("Kalderos") seeks summary judgment against Defendants for their actions preventing use of the Kalderos platform to implement the 340B program.

In 1992, Congress created the 340B program so that certain healthcare providers known as "covered entities" could purchase outpatient prescription drugs from participating manufacturers at reduced "ceiling" prices. 42 U.S.C. § 256b(a)(1). Drug manufacturers participate in the 340B program by entering into an agreement with HHS under which they must offer covered entities covered drugs at or below ceiling prices. *Id.*; *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011). The 340B statute prohibits covered entities from (A) requesting a "duplicate" 340B discount on a drug already subject to a Medicaid rebate and (B) engaging in "diversion" by transferring the drug to someone who is not the covered entity's patient. 42 U.S.C. § 256b(a)(5)(A), (B). For years, the 340B program has been beset with violations of the restrictions against duplicate discounts and diversion. *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024) (citing evidence of "unlawful diversion and duplicate discounts").

Kalderos is a technology company that has sought to help drug manufacturers and covered entities satisfy their obligations under the 340B program while addressing the manifest problems of unlawful duplicate discounts and drug diversion. For over five years, Kalderos has worked closely with covered entities and manufacturers to ensure that (i) manufacturers can identify and prevent duplicate discounts and diversion, and (ii) covered entities are offered the ceiling prices required by the 340B statute. The platform serves these goals by collecting claims data from covered entities and ensuring that covered entities receive the 340B ceiling price through transparent, timely, and direct cash rebates. Claims data collected under the Kalderos platform allow manufacturers to confirm that they are providing discounts only where appropriate under the 340B program, and cash rebates provide manufacturers and covered entities with a transparent method of

implementing the ceiling price. In this way, the Kalderos platform improves the integrity of the 340B program for all stakeholders through a cash rebate model.

Notwithstanding these benefits, Defendants have stymied efforts by Kalderos to implement its platform by adopting a policy prohibiting claims-data requirements and then blocking adoption of the Kalderos platform through a preapproval requirement found nowhere in the 340B statute. Those actions are unlawful.

I.      Defendants' prohibition of claims-data requirements is contrary to the 340B statute. Defendants first adopted this policy in 2021. But the D.C. Circuit recently invalidated that policy as inconsistent with the 340B statute. *See Novartis*, 102 F.4th at 463–64; *see also Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479 (DLF), 2021 WL 5161783, at *8 (D.D.C. Nov. 5, 2021) (agreeing that "claims data conditions" added to manufacturer's "340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B"). The same result is warranted here.

II.     Defendants' use of a preapproval requirement to block adoption of the Kalderos platform's cash rebate model is also unlawful and should be set aside. In September 2024, HRSA issued decisions prohibiting drug manufacturers from offering the 340B ceiling price through a direct cash rebate even though the 340B statute expressly authorizes rebates as a mechanism for providing the ceiling price. *See, e.g.*, Administrative Record ("AR") 292–94 ("September 18 Decision"). As to Kalderos, HRSA asserted that the 340B statute requires agency preapproval of rebate models and there had been no approval of the Kalderos platform, so implementing the platform "would be inconsistent with the statutory requirements for the 340B program." *Id.* HRSA threatened manufacturers seeking to employ rebate mechanisms with civil monetary penalties and

2

expulsion from the 340B program. These actions are both contrary to law and arbitrary and capricious.

A.    HRSA's actions are contrary to law. By its terms, the 340B statute expressly provides that ceiling prices may be offered by either a "rebate or discount," 42 U.S.C. § 256b(a)(1), and Defendants do not and cannot contend otherwise. HRSA's own long-standing guidance provides that the 340B statute authorizes both "a discount mechanism" and "a rebate option." S*ee* HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option*, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997). Nonetheless, Defendants now insist that subsection (a)(1) includes a preapproval requirement. But an agency possesses "*only* those authorities conferred upon it by Congress," *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004), and Congress conferred no preapproval authority in the 340B statute.

Defendants' contrary reading of the 340B statute would require a judicial rewrite of the statutory language and should be rejected. The statutory language on which Defendants rely for their purported preapproval authority expressly addresses "any rebate *or discount*." 42 U.S.C. § 256b(a)(1) (emphasis added). Thus, any preapproval authority Defendants possess must cover discounts as well as rebates. But Defendants do not assert—and they have never suggested—that the agency must preapprove the use of "discounts" for offering the 340B price. And no manufacturers offering the 340B price via discount have ever obtained Defendants' preapproval. Thus, Defendants' interpretation would either read the words "or discount" "out of the statute entirely," *Patel v. Garland*, 596 U.S. 328, 344 (2022), or it would mean that manufacturers have been violating the 340B statute by offering unapproved discounts since the 340B program's inception. Either way, Defendants' interpretation fails.

    B.      HRSA's decision should also be set aside as arbitrary and capricious because it was neither "reasonable [nor] reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Even if Congress had authorized Defendants to require preapproval—it did not—Defendants have never explained why the Kalderos platform requires preapproval yet other mechanisms for offering 340B pricing do not. For example, the agency has never before required preapproval under the 340B statute, including for the currently used "replenishment model," which is itself a rebate model. *See Vonage Holdings Corp. v. FCC,* 489 F.3d 1232, 1243–44 (D.C. Cir. 2007) (setting aside agency's selective imposition of a preapproval requirement). This sort of "unexplained inconsistency is the hallmark of arbitrary and capricious decisionmaking." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 109 (D.D.C. 2018).

    Nor did HRSA offer any reasoned explanation for refusing to approve the Kalderos platform. Kalderos has engaged with HRSA since 2019 regarding its platform. AR 499. Yet in blocking manufacturers' use of the platform, the agency simply stated that it "has not" approved it. AR 292 (September 18 Decision at 1). This circular and "ipse dixit conclusion . . . epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecom. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997) (per curiam). An agency is required to "explain its result." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404–05 (D.C. Cir. 1995). Simply stating the result is *not* a reasoned explanation.

    Finally, HRSA "entirely failed to consider" that the Kalderos platform is needed to prevent rampant violations of the 340B statute's prohibitions against duplicate discounts and diversion and to enable manufacturers to comply with new obligations under the Inflation Reduction Act. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Only a rebate model can ensure compliance with these complicated pricing requirements. HRSA ignored these concerns—and shut its eyes to the "obvious ramifications" of its decision, which will make it

vastly more difficult for manufacturers to comply with their obligations under the 340B statute and the Inflation Reduction Act. *See Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 209–10 (D.C. Cir. 1988) (per curiam). HRSA's decision is unreasonable and should be set aside.

<u>**STATUTORY AND REGULATORY BACKGROUND**</u>

Years before the enactment of the 340B program, manufacturers had voluntarily offered discounts to rural hospitals and other entities serving low-income populations. But in 1990, Congress enacted the Medicaid Drug Rebate Program ("MDRP"), which requires manufacturers to offer rebates to State Medicaid purchasers matching the "best" price that they offer in the marketplace. *See Astra*, 563 U.S. at 114–15 (citing 42 U.S.C. § 1396r-8(a)). Enactment of the MDRP had the unintended effect of deterring manufacturers from continuing to offer *voluntary* discounts to entities serving low-income populations, because doing so would dramatically increase the rebates that they would be required to provide to States for all of their Medicaid drug utilization.

In 1992, Congress enacted the Veterans Health Care Act of 1992, which added Section 340B to the Public Health Service Act. Pub. L. No. 78-410, 58 Stat. 682 (1944). Section 340B created a program that "requires drug manufacturers to sell certain drugs to covered entities at bargain prices." *Novartis*, 102 F.4th at 455; *see* Pub. L. No. 102-585 § 602(a), 106 Stat. 4943, 4967 (1992). Congress enacted the 340B statute to ensure that entities serving low-income populations could continue receiving the discounts manufacturers had previously offered to them before Congress enacted the MDRP. Congress accomplished this goal by exempting these discounted prices for certain "covered" entities from the Medicaid "best" price calculation under the MDRP. *See* 42 U.S.C. §§ 256b, 1396r-8(c)(1)(C)(i); H.R. Rep. No. 102-384, pt. 2, at 11–12 (1992). Congress then required manufacturers to offer the types of discounts previously offered to these entities as a condition of having the manufacturers' drugs covered by Medicaid. 42 U.S.C. § 1396r-8(a)(1), (5).

To implement this program, Section 340B directs the Secretary of HHS to enter into agreements with manufacturers under which covered entities can purchase certain drugs at amounts at or below a statutory "ceiling price." *See* 42 U.S.C. § 256b(a)(1)–(2). These agreements, referred to as Pharmaceutical Pricing Agreements (PPAs), "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them." *Astra*, 563 U.S. at 117–18. The 340B statute "requires only that manufacturers 'shall . . . offer each covered entity covered drugs'" at the 340B price "if such drug is made available to any other purchaser at any price." *Novartis*, 2021 WL 5161783, at *7 (quoting 42 U.S.C. § 256b(a)(1)). This "shall . . . offer" provision means that manufacturers must make a "bona fide offer" to sell covered entities drugs at or below the ceiling price. *Novartis*, 102 F.4th at 462.

The 340B statute expressly authorizes manufacturers to "offer" covered entities the ceiling price through either "rebates[s] or discount[s]." 42 U.S.C. § 256b(a)(1). The statute specifies that, under the PPAs, "the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs . . . purchased by a covered entity" must "not exceed an amount equal to the" ceiling price. *Id*. The 340B statute authorizes agency enforcement actions and civil monetary penalties for manufacturers' knowing violations of their "shall . . . offer" obligation. *Id.* § 256b(d)(1)(B)(vi); 42 C.F.R. § 10.11(a) (authorizing civil penalties for "knowingly" violating the 340B statute).

As this Court has observed, for covered entities, "[t]he benefits of the 340B Program do not come without strings attached." *Novartis*, 2021 WL 5161783, at *1. The program imposes, in particular, two prohibitions designed to prevent abuse. First, covered entities cannot request payment under the 340B program for a drug that is "subject to the payment of a rebate to the State under [the MDRP]" (the "duplicate discount" prohibition). 42 U.S.C. § 256b(a)(5)(A)(i).

Violations of the duplicate discount prohibition can occur when a manufacturer is required to pay a rebate to a State under the MDRP *and* to provide the 340B ceiling price to a covered entity on the same drug. Allowing duplicate discounts on the same drug prescription can subject manufacturers to crushing financial losses because the 340B price reduction and the Medicaid rebate can *each* be over 50 percent of a drug's cost. *See Novartis*, 102 F.4th at 456 (explaining that the ceiling price "can be as low as a penny per unit").

Second, covered entities cannot resell or transfer a 340B drug to a person who is not a patient of the covered entity (the "diversion" prohibition). 42 U.S.C. § 256b(a)(5)(B). Drug diversion can occur when 340B drugs are given to individuals who are not receiving healthcare services from the covered entity or are receiving services that are not consistent with the type of services for which the covered entity qualified for 340B status. HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility*, 61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996). Like duplicate discounts, drug diversion harms manufacturers by requiring them to provide price reductions on transactions that are outside of the 340B program.

As the D.C. Circuit has explained, HHS lacks general rulemaking authority to implement these requirements or the 340B program more generally. *See Novartis*, 102 F.4th at 456. But the agency has nonetheless "issued guidance documents interpreting and implementing the scheme." *Id.* Additionally, HRSA and manufacturers can audit covered entities for compliance with the prohibitions on duplicate discounts and diversion. *See* 42 U.S.C. § 256b(a)(5)(C). And the 340B statute provides for an Administrative Dispute Resolution ("ADR") process to adjudicate manufacturers' claims that covered entities are violating these prohibitions. *Id.* § 256b(d)(1)(B)(v), (d)(3); 42 C.F.R. § 10.21(a).

Audits and ADR, however, have proven inadequate to prevent rampant duplicate discounts and drug diversion in the 340B program. The Government Accountability Office ("GAO") has issued multiple reports detailing serious shortcomings in HRSA's efforts to prevent duplicate discounts and diversion.[1] In these reports, GAO has found that "HRSA's audits do not provide the agency with reasonable assurance that covered entities are taking the necessary steps to prevent duplicate discounts," and "manufacturers are at risk of being required to erroneously provide duplicate discounts for Medicaid drugs." January 2020 GAO Report at 25. These risks have increased with the "substantial growth in the 340B Program" and the 2010 expansion of the MDRP to include drugs provided under Medicaid managed care in addition to drugs provided under Medicaid fee-for-service. *Id*. at 2–3. Indeed, "HRSA audits do not assess for the potential for duplicate discounts in Medicaid managed care," *id.*, even though "the majority of Medicaid enrollees, prescriptions, and spending for drugs are in managed care, and the drug manufacturers [GAO] contacted believe that duplicate discounts are more prevalent in Medicaid managed care than [fee-for-service]." *Id.* at 26.[2]

According to GAO, manufacturer audits offer no solution to this problem because "manufacturers lack complete information on the extent to which covered entities use 340B drugs for Medicaid beneficiaries" and HRSA does not collect "information on whether covered entities are

---

[1] *See* GAO, GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* (June 2018) ("2018 GAO Report"); GAO, GAO-20-212, *340B Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 2020) ("January 2020 GAO Report"); GAO, GAO-21-107, *Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* (Dec. 2020) ("December 2020 GAO Report").

[2] *See also* January 2020 GAO Report at 6 & n.14 (noting that in fiscal year 2018, "71 percent of Medicaid drug prescriptions were in managed care"); 2018 GAO Report at 40 ("Until HRSA develops guidance and includes an assessment of the potential for duplicate discounts in Medicaid managed care as part of its audits, the agency does not have assurance that covered entities' efforts are effectively preventing noncompliance.").

using 340B drugs for Medicaid managed care beneficiaries." January 2020 GAO Report at 32. Although "drug manufacturers can request approval from HRSA to audit a covered entity to investigate suspicions of duplicate discounts," the manufacturers must first "document reasonable cause." *Id.* at 34. And because "HRSA requires the drug manufacturer to use an independent auditor who follows government auditing standards," the "cost of audits may outweigh the benefits received in the form of repayments." *Id.* Manufacturers that have pursued audits have found the process to be burdensome and ineffective, with HRSA failing to intervene and require covered entities to return improper discounts. Indeed, in the managed care context, "HRSA does not require covered entities to repay manufacturers for duplicate discounts." *Id.*

Although HRSA's program audits have failed to prevent widespread violations of the duplicate discount prohibition, they have highlighted the extent of the problem. HRSA's program audits for fiscal years 2012–2019 found more than 400 duplicate discount violations. *See* December 2020 GAO Report at 14. And HRSA's more recent audits have shown such violations continuing unabated, including 170 audits finding potential duplicate discount violations. *See* HRSA, *Program Integrity: FY21 Audit Results* (Oct. 2024), https://www.hrsa.gov/opa/program-integrity/fy-21-audit-results; HRSA, *Program Integrity: FY22 Audit Results* (Oct. 2024) https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results; HRSA, *Program Integrity: FY23 Audit Results* (Dec. 2024), https://www.hrsa.gov/opa/program-integrity/fy-23-audit-results; HRSA, *Program Integrity: FY24 Audit Results* (Dec. 2024), https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results.[3]

---

[3] Kalderos's own analysis confirms the extensive nature of the problem. Kalderos confirmed duplicate discounts exceeding $23 million in 2019, up from the $17.4 million it documented in 2018. AR 450. Based on its extrapolation of these findings, Kalderos estimates that in 2019 manufacturers, as a whole, paid a total of more than $1.2 *billion* in duplicate discounts. AR 450, 485.

Diversion, too, is a significant problem. HRSA's audits indicate that the problem is extensive. HRSA's 1,240 audits for fiscal years 2012–2019 documented more than 450 instances of diversion, plus an additional 83 findings related to inadequacies in covered entities' efforts to prevent diversion. *See* December 2020 GAO Report at 14.[4] Audits conducted in subsequent years by HRSA continue to uncover unlawful diversion in violation of the 340B statute, including 83 audits finding instances of potential unlawful diversion. *See* HRSA, *Program Integrity: FY21 Audit Results*; HRSA, *Program Integrity: FY22 Audit Results*; HRSA, *Program Integrity: FY23 Audit Results* (identifying findings of diversion necessitating corrective action plans); HRSA, *Program Integrity: FY24 Audit Results*.

The 2022 enactment of the Inflation Reduction Act ("IRA") has compounded these problems by creating two new drug discount programs that intersect with the 340B program. First, the IRA requires manufacturers to provide a "maximum fair price" ("MFP") for certain drugs subject to the IRA's Drug Price Negotiation Program. 42 U.S.C. § 1320f-2(a). If a drug is subject to both the MFP and a 340B discount, then a manufacturer must offer the lower—but not both—of the two prices. *See id.* § 1320f-2(d). Second, the IRA requires manufacturers to pay rebates on certain drugs covered under Medicare Parts B and D if their prices rise faster than the rate of inflation. *See id.* § 1395w-3a(i). The IRA, however, excludes drugs under the 340B program from the calculation of Medicare Part B and Part D inflation rebates. *See id.* § 1395w-3a(i)(3)(B)(ii)(I)

---

[4] As with duplicate discounts, the diversion issue has been exacerbated by the rise in the use of contract pharmacies to dispense 340B drugs on covered entities' behalf. *See* 2018 GAO Report at 44 (reporting that 66 percent of the diversion findings in HRSA's audits "involved drugs distributed at contract pharmacies"); GAO, GAO-15-455T, *Drug Discount Program: Status of GAO Recommendations to Improve 340B Drug Pricing Program Oversight* at 9 (Mar. 2015) (explaining that "increased use of the 340B Program by contract pharmacies and hospitals may have resulted in a greater risk of drug diversion to ineligible patients, in part because these facilities were more likely to serve patients that did not meet the definition of a patient of the program").

(Medicare Part B); *id.* § 1395w-114b(b)(1)(B) (Medicare Part D). These new programs under the IRA amplify the risk of manufacturers paying multiple additional discounts on the same drug.

## STATEMENT OF FACTS

Kalderos first approached HHS in 2019 about the ability of its platform to implement the 340B program and address problems of duplicate discounts and diversion through a rebate model. AR 465. Kalderos explained that its platform could bring transparency to 340B transactions and address the manifest statutory violations plaguing the 340B program. AR 446–60, 503–05. Despite the uncontroverted benefits of the Kalderos platform, HRSA has repeatedly taken steps to block its implementation.

### A.     The Kalderos Platform Provides a Remedy to Fix the 340B Program.

In 2016, Kalderos concluded that a principal problem causing the breakdown in the 340B Program, from both a covered entity and a manufacturer perspective, was a failure to communicate essential information among covered entities, state Medicaid agencies, and manufacturers. AR 503–05, 266, 487.

Kalderos designed solutions to address this information gap and to facilitate efficient and compliant drug transactions effectuating the 340B ceiling price. The Kalderos platform works as follows. A manufacturer involved with the 340B program contracts with Kalderos to facilitate 340B transactions. AR 272, 453, 459. The manufacturer then informs covered entities that they will need to use the Kalderos platform to obtain 340B prices from that manufacturer. AR 272–73.

The Kalderos platform requires that covered entities provide certain minimal claims information when submitting a request for 340B prices. AR 272–73, 280. That claims information includes the Rx number, prescriber identification number, national drug code, number of units, date of service, and 340B covered entity identification number. AR 280. Kalderos uses the information provided by the covered entity to perform checks ensuring that a rebate is approved. For example,

the data allow Kalderos to determine whether a Medicaid rebate already has been provided for the drug being dispensed. AR 286, 453. If no duplicate discount is present at the time the covered entity submits the 340B price request, Kalderos informs the manufacturer, which then reviews Kalderos's recommendation and agrees to provide 340B pricing. AR 453. If a duplicate discount is present, the Kalderos platform would address that consistent with the manufacturer's policy.

Kalderos then notifies the covered entity that the transaction qualifies for 340B pricing and provides instructions to the manufacturer's bank to remit payment through a direct cash rebate to the covered entity within days of the covered entity's request. AR 453. This is all done electronically, and the covered entity has real-time, around-the-clock visibility into the transaction's status. AR 278–82. If a Medicaid rebate, a price or a rebate under the IRA, or other 340B discount is subsequently requested on that same utilization, the manufacturer can dispute that discount or rebate request without involving the covered entity, relieving covered entities of the burden and cost of becoming involved in such disputes. AR 286.

The claims data Kalderos requests are not burdensome for covered entities to provide. They are readily available and match what covered entities and their third-party administrators typically include when they attempt to identify a 340B-eligible claim. AR 273. They also are the very same information customarily provided in the pharmacy or healthcare claim submitted by the 340B covered entity to secure reimbursement for the drugs from a third-party payor, like the Medicaid or Medicare programs. *Cf. Novartis*, 102 F.4th at 463 (noting that "the burden of providing the claims data is 'minimal'"); AR 273. Information like this is routinely required by manufacturers that offer

12

price concessions to non-340B customers, including States participating in the Medicaid program.[5]
AR 281.

The Kalderos platform also benefits covered entities. AR 287. In developing its solution,
Kalderos worked closely with covered entities to identify the transaction points in the traditional
system that created the greatest risk of a noncompliant transaction and to ensure that feedback
provided by covered entities was integrated. AR 286–87, 454–57. The result is a solution that
reduces burdens on covered entities through direct payments and a simple, intuitive, and easy-to-
use platform. AR 286–87, 278–79.

Covered entities currently receive 340B pricing via the so-called "replenishment model, "
which involves an initial purchase of drugs at the market price followed by a "replenishment"
purchase of drugs at the 340B ceiling price. *See* Declaration of Krista M. Pedley, *Sanofi-Aventis
US, LLC v. U.S. Dep't of Health & Hum. Servs.*, No. 3:21-cv-00634-FLW-LHG, (D.N.J. June 16,
2021), Doc. 93-2 ("Pedley Decl."). Under this model, "most [pharmacies] fill prescriptions from
inventories that intermingle discounted and non-discounted drugs." *Novartis Pharms.*, 102 F.4th
at 457; *see also* Pedley Decl. ¶¶ 5, 11. "Only after dispensing the drugs do these pharmacies

---

[5] *See e.g.*, MDRP *Electronic State Invoice Form CMS-R-144, Data Definitions* (effective July 1,
2021),    https://www.medicaid.gov/medicaid/prescription-drugs/downloads/cms-r-144-state-in-
voice-data-definitions-jul-2021.pdf (addressing the regular practice of state Medicaid programs to
request rebates by providing record ID, labeler code, units reimbursed, package size, number of
prescriptions, and other data in their pricing invoices to manufacturers); HHS Off. for Civil Rights,
*HIPAA FAQ 455* (Dec. 18, 2024), https://www.hhs.gov/guidance/document/faq-455-does-pri-
vacy-rule-permit-health-plans-disclose-protected-health-information (addressing "health plans
disclos[ing] protected health information, such as prescription numbers, to a pharmaceutical man-
ufacturer" for purposes of "adjudicating claims submitted under a drug rebate contract"); Mark
Campbell, RxBenefits, *What Employers Need to Know about Drug Rebates* (June 21, 2022),
https://www.rxbenefits.com/blogs/understanding-the-role-of-drug-rebates/ (drug price conces-
sions "are paid on a per claim basis"); *see also* 63 Fed. Reg. 35,239, 35,241 (June 29, 1998) (HRSA
itself encouraging state AIDS Drug Assistance Programs to make "detailed and accurate" "claim
data" available to manufacturers).

attempt to discern . . . whether individual prescriptions were eligible for the discount." *Novartis Pharms.*, 102 F.4th at 45; *see also* Pedley Decl. ¶¶ 6–9. "Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount." *Novartis Pharms.*, 102 F.4th at 457; *see also* Pedley Decl. ¶ 4. After "the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases." *Novartis Pharms.*, 102 F.4th at 457. The "trigger" for this replenishment purchase "will not usually be a single dispense." Pedley Decl. ¶ 8. Instead, the pharmacy or administrator purchasing on the covered entity's behalf "will 'accumulate' 340B-eligible dispenses . . . towards a pre-set package size." *Id.*

The replenishment model has several obvious defects. For one thing, it creates perverse incentives. Namely, because "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate," they all have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis Pharms.*, 102 F.4th at 457. For another, the replenishment model delays covered entities' receipt of the ceiling price because they must wait for a "package" of eligible dispenses to accumulate.

Under the Kalderos platform, by contrast, covered entities will be able to request 340B pricing immediately after dispensing a drug to a patient and will be paid weekly, often before payment is required by a wholesaler for the drug and without needing to dispense a certain quantity of eligible prescriptions. AR 287–89, 297. Covered entities will typically realize the 340B price under the Kalderos platform faster than they do today. AR 287. Further, because the Kalderos platform works directly with 340B covered entities and Medicaid rebates are requested on a time-lagged basis, Kalderos's solution will allow 340B entities to routinely assert, receive, and validate

their price concessions before a duplicate discount can arise. AR 280, 453, 505. Manufacturer disputes that arise thereafter will then, in the normal course, be focused on the Medicaid program, not the 340B covered entities. AR 286.

The Kalderos platform also provides an essential mechanism for complying with manufacturer's obligations under the IRA. AR 286, 274–75. As explained above, the discounts and rebates required by the IRA overlap with the 340B ceiling price. Without the Kalderos platform, manufacturers would have no way to avoid paying those rebates and discounts in addition to honoring the 340B ceiling price on a single prescription—and no way to comply with the statutory prohibition against duplicate discounts.

## B.    HRSA's Prohibition of Manufacturer Conditions on 340B Transactions.

Beginning in mid-2020, a number of drug manufacturers began imposing conditions on their offers to sell 340B drugs to covered entities at the statutory ceiling price. *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700–01 (3d Cir. 2023). Several manufacturers required covered entities dispensing 340B drugs through contract pharmacies to provide claims data as a condition of receiving the ceiling price. *Id.* at 701; *see also Novartis*, 102 F.4th at 458, 463.

On May 17, 2021, HRSA sent letters to various drug manufacturers declaring all conditions placed by manufacturers on their offers of 340B pricing unlawful. *Novartis,* 102 F.4th at 458–59; *Sanofi*, 58 F.4th at 701. Although the letters were styled as statements to individual manufacturers, they reflected a policy that prohibited any conditions of any kind, without regard to any individual fact or circumstance. The manufacturers who received the May 17 letters each challenged the agency's determination. *See Sanofi*, 58 F.4th at 702; *Novartis*, 102 F.4th at 459. United Therapeutics and Sanofi challenged, in particular, the agency's determination that manufacturers may not

15

condition 340B prices on covered entities' production of claims data. *See United Therapeutics Corp. v. Espinosa*, No. 1:21-cv-01686-DLF (D.D.C. June 23, 2021); *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-00634-FLW (D.N.J. Jan. 12, 2021).

Kalderos initially filed this lawsuit on October 6, 2021 to challenge HRSA's policy prohibiting reasonable conditions on 340B transactions. *See* Docket Entry ("DE") No. 1. More than 2 years later, the D.C. Circuit ruled that Defendants could not "categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities." *Novartis*, 102 F.4th at 464. The court further held that the disputed manufacturer conditions—including claims-data requirements—"do not violate section 340B on their face." *Id.* Likewise, the Third Circuit ruled that manufacturer conditions were lawful and did not violate 340B. *Sanofi*, 58 F.4th at 704.

### C.    Defendant HRSA's Rejection of the Kalderos Platform.

In 2024, Kalderos entered into an agreement with Eli Lilly and Company ("Lilly") through which Lilly would use the Kalderos platform to satisfy its obligations under the 340B statute. AR 262–63, 272. On August 9, 2024, Kalderos communicated with HRSA concerning its platform, explaining that it requires covered entities to provide limited claims data and effectuates the 340B price through a direct cash rebate to covered entities. AR 272–77. Kalderos explained that its platform was to be launched with a manufacturer in the coming months, and detailed the platform's capacity to ensure accurate and timely discount payments and prevent nearly 100% of non-compliant discounts. AR 504–05.

Kalderos also explained that the IRA and the 340B ADR process "necessitate a transition to a 340B rebate model." AR 503–05. Kalderos highlighted that CMS has recognized in IRA guidance that a rebate model is appropriate to implement the MFP while complying with the statute's duplicate discount prohibitions. AR 503–04. Kalderos similarly pointed out that the new ADR regulations require manufacturers to obtain relevant information to support or defend an ADR

16

claim, and that Kalderos' platform allows manufacturers to identify the necessary information efficiently, minimizing requests made of covered entities or others. AR 503–04.

On September 4, 2024, Kalderos and Lilly jointly presented the Kalderos platform to HRSA. AR 260. They explained that the platform was needed to comply with the 340B and IRA duplicate discount prohibitions and to initiate or defend against ADR proceedings. AR 286. Kalderos and Lilly underscored that the platform was better for all stakeholders. AR 287.

Under the platform, Lilly would issue rebates weekly, so covered entities would receive the ceiling price within days of dispensing the 340B products, rather than waiting for a "package" of dispenses to accumulate. AR 286. The Kalderos platform also would provide the manufacturer and covered entity with equal access to the same claims data thereby making it easier to identify violations of the 340B statute. AR 266–68, 286–87. Kalderos and Lilly explained that they would begin implementing the platform on November 1, 2024. AR 289.

After the September 4, 2024 meeting, HRSA emailed Kalderos to say that it would no longer communicate with Kalderos regarding its platform. AR 502. From then on, HRSA would engage only with the manufacturer, Lilly, "as it is a party to the PPA and responsible for compliance under the 340B Program." AR 502. In response, Kalderos noted that HRSA's decision was a break from the agency's past practice considering that Kalderos had engaged in discussions with the agency since 2019. AR 502. HRSA provided no further response to Kalderos.

On September 9, 2024, Lilly sent a follow-up letter to HRSA explaining its intention to implement the Kalderos platform. AR 272. Lilly expressed its hope that HRSA would "issue a statement endorsing Lilly's efforts to advance the cause of 340B—and broader government healthcare—program integrity." AR 272. Lilly highlighted that the "340B statute clearly states that rebates are a permissible form for offering and effectuating a 340B ceiling price," and that "as a

matter of law, the statutory requirement to offer covered entities covered outpatient drugs at the ceiling price can be effectuated *either* with an upfront discount *or* a post-purchase rebate." AR 274. Lilly reiterated that the Kalderos platform was superior to the current *product* replenishment model. AR 273. That process, Lilly explained, is "slow, indirect, and opaque," whereas the Kalderos platform would be "fast, direct, and transparent." AR 273.

On September 18, 2024, HRSA sent Lilly a letter stating that implementing the Kalderos platform would violate the 340B statute. AR 292. HRSA stated that the 340B statute "require[s] the approval of a rebate model," and that "the Secretary has not provided for such rebate as proposed by Lilly." AR 292. Without that approval, HRSA asserted, "implementing such a proposal at this time would be inconsistent with the statutory requirements for the 340B Program." AR 292.[6]

On September 23, 2024, Lilly conveyed its disappointment that HRSA had rejected "Lilly's cash replenishment model" and had "determin[ed] that implementing a rebate model without affirmative approval would violate the 340B statute." AR 295. Lilly refuted HRSA's claimed "statutory authority" to "require approval" of the Kalderos platform and explained that HRSA had "offered no explanation" for its arbitrary and capricious decision. AR 295, 301.

At the same time, HRSA rejected similar proposals from other drug manufacturers. For example, on September 17, 2024, HRSA (i) informed Johnson & Johnson, that the 340B statute requires preapproval of a rebate before it can be implemented under the 340B program, and (ii) threatened that adoption of a rebate model would subject the manufacturer to cancellation of its Pharmaceutical Pricing Agreement and civil monetary penalties. AR 202–04. HRSA stated that

---

[6] HRSA also interposed a series of questions. AR 292–94. Lilly provided responses to HRSA's questions in a September 23, 2024 Letter. AR 295–301.

if the manufacturer "implements its rebate proposal without Secretarial approval, it will violate Section 340B(a)(1)" because it "would require [certain covered entities] to purchase [340B drugs] at prices that exceed 'the maximum price[s] that covered entities may permissibly be required to pay' for those drugs." AR 203.

On September 27, 2024, HRSA stated, in another letter to Johnson & Johnson, that "the 340B statute requires Secretarial approval of *any* rebate mechanism." AR 214 (emphasis added). HRSA reiterated that, unless it "ceas[ed] implementation of its rebate proposal," the agency would take steps to terminate the manufacturer's PPA and impose civil penalties. AR 214.

In December 2024, HRSA posted on its webpage its policy that "implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1)." HRSA, *340B Drug Pricing Program*, https://www.hrsa.gov/opa (last visited Jan. 30, 2025).

## LEGAL STANDARDS

Summary judgment is warranted when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In cases under the Administrative Procedure Act ("APA"), "summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Novartis*, 2021 WL 5161783, at *5. That standard of review requires a court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (2)(C).

When reviewing agency action under the APA, courts "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). "[C]ourts need not and under the APA may not *defer* to an agency

19

interpretation." *Id.* at 413 (emphasis added). Courts "*may* . . . seek aid from the interpretations of [agencies] responsible for implementing particular statutes." *See id.* at 394 (emphasis added). But the weight given such an interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. Agency action must be set aside if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Further, a court cannot uphold a rule based on grounds not given by the agency in the rule. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

## ARTICLE III STANDING

Kalderos has standing to pursue this lawsuit. To satisfy Article III, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the challenged action, and (3) a likelihood that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Kalderos satisfies all three requirements.

HRSA's actions prevent Lilly and other manufacturers from using the Kalderos platform, which operates based on a rebate model and requires the collection of claims data. The inability of Lilly and others to use the Kalderos platform is causing—and will continue to cause—Kalderos "monetary harms" that "readily qualify as concrete injury under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The harms are also "fairly traceable" to HRSA's actions given that Lilly's and other manufacturers' inability to implement Kalderos' platform is "the predictable effect of" HRSA's threats. *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019). A

favorable decision would redress Kalderos' injury because a drug manufacturer (Lilly) has contractually committed to use the Kalderos platform but for HRSA's illegal threat to terminate manufacturers' PPAs. As the D.C. Circuit has explained, "[i]f the Government prohibits or impedes Company A from using Company B's product, . . . both Company A and Company B are 'an object of the action (or forgone action) at issue,' so 'there is ordinarily little question' that they have standing." *Energy Future Coal. v. EPA*, 793 F.3d 141, 144–45 (D.C. Cir. 2015). Just so here.

## FINAL AGENCY ACTION

To be "final" under the APA, an agency action (1) "must mark the 'consummation' of the agency's decisionmaking process" and (2) "must be [an action] by which rights or obligations have been determined, or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). HRSA's actions preventing adoption of the Kalderos platform are final actions subject to APA review.

First, HRSA's policy prohibiting manufacturer conditions, including claims-data requirements, has long been final. This Court and the D.C. Circuit have already set aside letters issued in May 2021 first announcing that policy. *E.g.*, *Novartis*, 102 F.4th at 464. Those letters were unquestionably final because they "amount[ed] to a definitive statement of [HRSA's] legal position" barring manufacturer conditions. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011). And given that "[t]he letters closed by threatening enforcement action if the companies did not comply," there was no doubt that "legal consequences" would flow from the agency's determination. *See Novartis*, 2021 WL 5161783, at *5; *see also Pharm. Rsch. & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 46–47 (D.D.C. 2015) (holding that HHS's interpretation of the 340B statute was final where "failure to comply with the" agency's interpretation of the statute would "expose manufacturers to significant penalties in future enforcement proceedings").

Second, and similarly, HRSA's September 18 Decision is final agency action under the APA. Just like the May 2021 letters, the September 18 Decision constituted "a definitive statement of [HRSA's] legal position," *see CSI Aviation Servs.*, 637 F.3d at 412, that use of Kalderos's rebate model "would be inconsistent with the statutory requirements for the 340B Program." AR 292. And as with the May 2021 letters, the September 18 Decision carries legal consequences by exposing manufacturers to "significant penalties in future enforcement proceedings." *Pharm. Rsch.*, 138 F. Supp. 3d at 46.

Moreover, although the September 18 Decision was issued to Lilly, Defendants were aware that Lilly had contracted with Kalderos to use its platform, and Kalderos had been communicating with HRSA about the platform for years. Indeed, the September 18 Decision expressly references Lilly's use of the Kalderos platform. AR 292–93. Now, following the September 18 Decision, Kalderos has "no meaningful recourse to dispute [HRSA's] reading of" the 340B statute, *see Pharm. Rsch.*, 138 F. Supp. 3d at 46, because HRSA has refused to continue dealing directly with Kalderos on these issues. AR 502.

## ARGUMENT

### I.    *NOVARTIS* FORECLOSES HRSA'S POLICY PROHIBITING CLAIMS-DATA REQUIREMENTS

HRSA's policy of prohibiting manufacturers from requiring covered entities to provide claims data is contrary to the 340B statute. Kalderos filed its original lawsuit to challenge that policy. This Court stayed the case pending the D.C. Circuit's resolution of similar challenges. The D.C. Circuit then struck down Defendants' policy prohibiting reasonable 340B delivery conditions, including claims-data requirements. *See Novartis*, 102 F.4th at 469; *see also Sanofi*, 58 F.4th at 707 (same). *Novartis* therefore disposes of the claims data issue here.

*Novartis* rejected HRSA's position that section 340B "prohibits drug manufacturers from imposing any conditions on the distribution of discounted drugs to covered entities." 102 F.4th at 459. *Novartis* further upheld the provision of claims data as a reasonable condition on the delivery of 340B drugs. In doing so, the court explained that the legitimacy of claims-data requirements was supported by agency guidance reflecting HRSA's view that manufacturers could require "standard information" from covered entities. *See id.* at 463 (quoting 59 Fed. Reg. at 25,114). Further, because claims data were the type of "standard information" that HRSA guidance already required covered entities to maintain, *Novartis* concluded that claims-data requirements would impose a "minimal" burden. *Id.* (noting that 2010 HRSA guidance provided that "covered entities must 'maintain auditable records sufficient to demonstrate continued compliance with 340B requirements'" (quoting 75 Fed. Reg. at 10,274)).

*Novartis* also recognized that manufacturers sought to impose these claims-data requirements "to facilitate [their] efforts to police diversion and duplicate discounts." *Id.* at 458. Indeed, as this Court previously acknowledged, "claims data conditions . . . will enable [manufacturers] to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B." *Novartis,* 2021 WL 5161783, at *8. That is precisely why the Kalderos platform depends on claims data; absent such data, it would be impossible to ensure covered entities' compliance with 340B's statutory prohibitions and to bring needed transparency to the 340B program.

After *Novartis*, there is no basis for sustaining HRSA's policy against the Kalderos platform's claims-data requirement. In the wake of the D.C. Circuit's decision in *Novartis* (and the Third Circuit's decision in *Sanofi*), HRSA recognized as much by entering into stipulated judgments to settle lawsuits brought by manufacturers challenging the agency's policy. *See, e.g.*, Joint Status Report [DE No. 29] at 1–2, ¶ 4 (Sept. 25, 2024) (describing final judgment entered in

litigation brought by Merck). Those judgments affirmed that, in light of *Novartis*, claims-data requirements "do not violate Section 340B on its face." *Id.* at 1.[7] The same result is warranted here. Under *Novartis*, the Kalderos platform's claims-data requirement is consistent with the 340B statute, and HRSA lacks authority to prevent its implementation.

## II.    HRSA'S REJECTION OF THE KALDEROS PLATFORM IS CONTRARY TO THE 340B STATUTE AND ARBITRARY AND CAPRICIOUS.

### A.    Defendants' Rejection of the Kalderos Platform Is Contrary to the 340B Statute and Exceeds Agency Authority.

HRSA's decision preventing implementation of the Kalderos platform because it employs a cash rebate model violates the 340B statute and exceeds the agency's authority. The 340B statute expressly authorizes manufacturers to provide 340B pricing through rebates as well as discounts, and it does not require agency preapproval before a manufacturer can do so. Defendants' imposition of a preapproval requirement is beyond the agency's authority and should be rejected.

"In addressing a question of statutory interpretation, [courts] begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). Here, by its plain text, the 340B statute authorizes manufacturers to use rebates *or* discounts to offer the 340B price. Paragraph (a)(1) of Section 340B makes this clear by specifying that the 340B ceiling price (*i.e.*, the "amount required to be paid . . . to the manufacturer") must "tak[e] into account *any* rebate or discount." *See* 42 U.S.C. § 256b(a)(1) (emphasis added). "[T]he word 'any' naturally carries 'an expansive meaning.'" *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 362 (2018). When the term "any" is "used (as here) with 'singular noun[s] in affirmative contexts,'" it "'implies every member of the class or group.'"

---

[7] *See Merck Sharp & Dohme LLC v. HHS*, No. 22-cv-01986 (DLF), 2024 WL 4295312 (D.D.C. Sept. 17, 2024); *accord Boehringer Ingelheim Pharms. v. Becerra*, No. 21-cv-02826 (DLF), 2024 WL 4295371 (D.D.C. Sept. 17, 2024); *UCB, Inc. v. Becerra*, No. 22-cv-02893 (DLF), 2024 WL 4295351 (D.D.C. Sept. 17, 2024); *Amgen Inc. v. HHS*, No. 22-cv-03763 (DLF), 2024 WL 4295310 (D.D.C. Sept. 17, 2024).

*Id.* at 363 (cleaned up). Thus, the statutory default under Section 340B is that a "rebate or discount" should be taken into account when assessing whether the amount required to be paid to a manufacturer does not exceed the ceiling price.

Statutory "structure and purpose" confirm this interpretation. *See Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020). As multiple circuits have recognized, the 340B statute's linchpin "shall offer" provision was intended to require only that manufacturers make a "bona fide offer" of covered drugs at the 340B price, leaving manufacturers otherwise free to impose reasonable delivery conditions. *See Novartis*, 102 F.4th at 463–64; *Sanofi*, 58 F.4th at 703. But an offer of 340B pricing is no less "bona fide" because it is conveyed via a direct rebate instead of a discount, or vice versa. Indeed, whereas "340B is . . . silent about delivery conditions," *Novartis*, 102 F.4th at 460, the statute expressly *authorizes* "taking into account any rebate or discount" when assessing whether the amount required to be paid to a manufacturer does not exceed the 340B ceiling price, 42 U.S.C. § 256b(a)(1). The statute's express authorization of rebates or discounts thus forecloses categorical prohibition of a rebate model.

HRSA does not and cannot contend that the 340B ceiling price may not be offered via rebate. To the contrary, the agency has long recognized that manufacturers may use rebates to offer 340B pricing. *See* 1998 Guidance, 63 Fed. Reg. 35,239, 35,242 (June 29, 1998). In doing so, HRSA has concluded that the statute does not dictate "whether the [340B price] should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)." 62 Fed. Reg. at 45,823. And HRSA has expressly stated that a rebate model may be enforced through a rebate claims-data format. *See* 63 Fed. Reg. at 35,240.

Unable to deny that the 340B statute *authorizes* rebate models, HRSA instead has taken the position that, under subsection (a)(1), any use of rebates to offer 340B pricing is unlawful unless *preapproved* by the agency. *See* AR 292. Without preapproval, HRSA contends, even cash rebates issued directly from manufacturers to covered entities cannot be "tak[en] into account" in assessing "the amount required to be paid" to manufacturers, and manufacturers using such rebates will be in violation of the 340B program. *See* AR 292. That reading should be rejected because it would impermissibly expand HRSA's authority under the 340B statute.

As a "creature of statute," HRSA possesses "*only* those authorities conferred upon it by Congress." *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398. And Congress knows perfectly well how to confer preapproval authority on an agency. For example, Congress "has long required FDA approval . . . of new drugs into the market." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315 (2008). It did so by providing expressly that "[n]o person shall introduce . . . into interstate commerce any new drug, unless an approval of an application . . . is effective." 21 U.S.C. § 355(a). Likewise, Congress granted FDA pre-market approval authority over Class III medical devices, *Riegel*, 552 U.S. at 317, by dictating that any such device must have "an approval . . . of an application for premarket approval," 21 U.S.C. § 360e(a). Similarly, Congress granted FDA pre-market approval authority over new tobacco products, *Phillip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 39 (D.D.C. 2016), by authorizing the agency to "issue an order that the new [tobacco] product may be introduced . . . into interstate commerce," 21 U.S.C. § 387j(c)(1)(A)(i); *see also Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) (analyzing statute prohibiting public utility from disposing of facilities "'without first having secured an order of the Commission authorizing it to do so'" (quoting 16 U.S.C. § 824b(a)); *cf. Isbrandtsen Co. v. United States*, 211 F.2d 51, 56–57

(D.C. Cir. 1954) (distinguishing between statute that "makes orders with respect to agreements unlawful until approved" from statute where rates are deemed lawful "merely upon filing").

Here, the 340B statute nowhere grants the agency preapproval authority. The statute instead authorizes the agency to enter into "an agreement with each manufacturer" (*i.e.*, the PPA) to ensure that covered entities receive the 340B ceiling price and specifies that the "amount required to be paid . . . to the manufacturer" under the authorized agreements must be calculated "taking into account any rebate or discount, as provided by the Secretary." *See* 42 U.S.C. § 256b(a)(1). Had Congress intended to grant HRSA preapproval authority under the 340B statute, "it easily could have drafted language to that effect." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"). Because Congress conferred no preapproval authority on HRSA, it follows that HRSA "has no jurisdiction to require preapproval under that provision." *Atl. City Elec. Co*, 295 F.3d at 13.

Instead of authorizing HRSA to preapprove whether 340B pricing occurs through a discount model or a rebate model, the statute tasks the agency with "provid[ing]" whether any specific rebate or discount should be "tak[en] into account." This makes sense. The market for prescription drugs includes multiple rebates or discounts extraneous to the requirements of the 340B program. Under Paragraph (a)(1), the agency may "provid[e]" that such extraneous discounts and rebates should *not* be "tak[en] into account" when assessing whether the "amount required to be paid" to the manufacturer exceeds the 340B ceiling price. Paragraph (a)(1) does *not* grant HRSA authority to declare any and all rebates unlawful absent prior approval by the agency.

HRSA's reading of the "as provided" language should be rejected because it would "produce absurd consequences" and would be inconsistent with prior agency practice. *See Novartis*,

27

102 F.4th at 461. On HRSA's interpretation, the agency must formally preapprove "any rebate" a manufacturer wishes to use to offer the 340B price. Given the 340B statute's reference to "any rebate *or* discount," HRSA's interpretation necessarily means that the agency must also formally preapprove the use of "any . . . discount." But that would make no sense. To offer the 340B price via direct discount is simply to offer the 340B price itself. And it would be odd for an upfront offer of the 340B price to require the agency's preapproval. HRSA's interpretation would impermissibly rewrite the 340B statute to omit the words "or discount" from subsection (a)(1). *See Patel*, 596 U.S. at 344 (rejecting interpretation that "reads [a word] out of the statute entirely"). And, absent a rewrite, HRSA's interpretation of the "any rebate or discount" language would mean that manufacturers offering the ceiling price via up-front discounts without HRSA's preapproval have been acting unlawfully since 340B's inception more than 30 years ago.

In contrast, Kalderos' reading of the 340B statute follows directly from the statute's text. Although Section 340B presumes that both rebates or discounts may be used, a manufacturer may offer some rebates (*e.g.*, payor rebates) *and* some discounts (*e.g.*, wholesaler prompt-pay discounts) on specific units of a drug that should *not* be taken into account when assessing whether the amount required to be paid to a manufacturer does not exceed the 340B ceiling price. And the agency can "provid[e]" that these rebates and discounts should not be taken into account, so long as any decision to exclude specific types of rebates or discounts is "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.[8] Because some *discounts* as well as some

---

[8] How the agency might reasonably exercise the authority granted by Congress is a separate question that need not be decided to reject HRSA's erroneous assertion of preapproval authority. But as Lilly demonstrates in its related challenge, the statute reflects that the agency must act, if at all, by amending a manufacturer's PPA. *See* 42 U.S.C. § 256b(a)(1) (granting authority to Secretary to enter into an "*agreement* with each manufacturer") (emphasis added). And to the extent resorting to legislative history is appropriate, *see Novartis*, 2021 WL 5161783, at *8 n.7 (noting that

*rebates* may reasonably be excluded in determining whether a manufacturer has offered the 340B price to covered entities, this reading makes sense of the statute's reference to "any rebate *or discount*."

Kalderos' reading is further bolstered by the 340B statute's structure. Again, the 340B statute expressly authorizes rebates as a means to implement the 340B ceiling price. And the D.C. Circuit in *Novartis* concluded that the 340B statute does not authorize HRSA to impose extra-statutory restrictions on a manufacturer's *bona fide* offers of the 340B price. *See* 102 F.4th at 469; *see also Sanofi*, 58 F.4th at 707. The upshot of *Novartis* is that Congress intended the regulated parties to have discretion and flexibility in how they offered the 340B price. Kalderos's interpretation of the "as provided" parenthetical affirms manufacturers' discretion and flexibility under the statute. By contrast, HRSA's expansive interpretation of the "as provided" parenthetical would circumvent *Novartis* and *Sanofi* by allowing the agency to use its purported preapproval authority to block manufacturers from imposing reasonable conditions—*e.g.*, the use of statutorily authorized rebates—on *bona fide* offers.

Finally, agency practice likewise forecloses HRSA's reading of subsection (a)(1). HRSA has never before required or suggested that its preapproval is required for the use of upfront discounts, even though subsection (a)(1) references both "rebate[s] or discount[s]." *Cf. Loper Bright*, 114 S. Ct. at 2262 (explaining that agency view may be "useful" when it was "issued contemporaneously with the statute at issue" and has "remained constant over time"). Nor has HRSA

---

"citation to legislative history is problematic"), that history suggests that agency determinations to exclude certain rebates or discounts must be set forth in the PPA. *See* H.R. Rep. No. 102-384, pt. 2, at 16 (discussing what agency may do "in developing these agreements"). Of course, the terms of the PPA must adhere faithfully to the terms of the 340B statute. *See Astra*, 563 U.S. at 118 (explaining that PPAs "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them" and that "[t]he statutory and contractual obligations . . . are one and the same").

required preapproval of the currently prevalent product "replenishment model," which involves an initial payment at market prices followed thereafter by a "rebate" via a replenishment drug purchased at the 340B ceiling price. AR 292–94. HRSA's novel interpretation of the 340B statute to impose a preapproval requirement is contrary to prior agency practice and is thus not a persuasive reading of the 340B statute. *Cf. Novartis*, 102 F.4th at 464 (upholding manufacturer condition that was "consistent with historic practices under the section 340B program").

### B.    HRSA's Rejection of the Kalderos Platform Is Arbitrary and Capricious.

Defendants' September 18 Decision also should be set aside because it is arbitrary and capricious. In blocking implementation of the Kalderos platform, HRSA (i) imposed an unlawful preapproval requirement and (ii) then simply asserted, without explanation, that the Kalderos platform has not been approved. AR 292. Neither component of HRSA's decision is "reasonable [or] reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

*First*, even if there were a preapproval requirement—and there is not, *see supra* II.A—HRSA must still apply that requirement consistently and reasonably explain each application. *See Vonage*, 489 F.3d at 1243–44 (agency imposition of a preapproval obligation on one category of regulated parties but not another was arbitrary and capricious where the agency "devoted but one sentence to justifying" the inconsistency). HRSA has never required preapproval where covered entities have received 340B pricing via *discounts*. Nor has the agency required preapproval for the prevailing replenishment model, which is itself a rebate model that operates through an after-the-fact sale of replenishment product at the 340B ceiling price following an initial market-price purchase. AR 273. Likewise, the Kalderos model involves a purchase of the covered drugs at market prices followed in quick succession by a rebate that effectuates the 340B ceiling price. AR 272–73. Yet HRSA has not explained why the Kalderos platform requires preapproval and the replenishment model did not.

This sort of "unexplained inconsistency is the hallmark of arbitrary and capricious decisionmaking." *Bauer*, 325 F. Supp. at 109 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C. Cir. 2017); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014); *Action for Children's Television v. FCC*, 821 F.2d 741, 745 (D.C. Cir. 1987). Insofar as HRSA intends to depart from past practice and begin requiring preapproval consistently going forward, the agency cannot "depart from a prior policy *sub silentio.*" *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 706 (D.C. Cir. 2016) (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515); *accord Verizon*, 740 F.3d at 636; *Comcast Corp. v. FCC*, 600 F.3d 642, 659 (D.C. Cir. 2010). HRSA "must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres.*, 873 F.3d at 923. HRSA has not done so here.

*Second*, even if HRSA had applied the preapproval requirement evenhandedly, its refusal to approve the Kalderos platform was arbitrary and unexplained. A bedrock requirement of reasoned decisionmaking is that the agency must "'adequately explain its result,'" *Dickson*, 68 F.3d at 1404–05 (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)), and "'take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision,'" *id.* (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). Here, HRSA has offered no justification for its refusal to approve the Kalderos platform. It simply asserted that the agency "has not" approved it—with no explanation as to *why* it was withholding approval. This circular and "ipse dixit conclusion . . . epitomizes arbitrary and capricious decisionmaking." *Ill. Pub. Telecom. Ass'n*, 117 F.3d at 564 (rejecting agency action dismissing party's position "with two words—'We disagree'—and never providing any reasons for its 'disagreement'"); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir.

2011) (rejecting agency rule based upon agency assertion that was "an ipse dixit, without any evidentiary support"); *Nat'l Tire Dealers & Retreaders Ass'n v. Brinegar*, 491 F.2d 31, 40 (D.C. Cir. 1974) (refusing to accept "agency's mere *ipse dixit*"); *Prevor v. FDA*, 895 F. Supp. 2d 90, 98 (D.D.C. 2012) (rejecting agency *ipse dixit*).

HRSA's failure to offer any justification is particularly stark in this circumstance. Kalderos has been interacting with HRSA since 2019 concerning its platform. AR 502. Kalderos has explained in great detail—including a walk-through of a live, working demonstration—how the platform works to implement the 340B program by requesting claims data and providing cash rebates to covered entities. AR 265–69, 286. Kalderos has further explained that its platform addresses duplicate discounts and diversion and delivers the ceiling price to covered entities in a timely and transparent manner. AR 265–69. Yet HRSA could offer no justification—*i.e.*, "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted)—for withholding approval beyond its circular assertion that it had not approved the Kalderos platform.

The reason the agency was unable to offer a reasoned explanation for rejecting the Kalderos platform is simple: there is no reasonable basis for denying approval of the Kalderos platform. Under the Kalderos platform, covered entities pay a market price to purchase covered outpatient drugs and provide limited claims data relating to those purchases. AR 272–74. Purchases of covered outpatient drugs that qualify for the 340B pricing trigger a rebate payment from the manufacturer directly to the covered entity and that rebate is timely, efficient, and transparent in full compliance with the parties' statutory obligations. AR 272–74. There is no coherent basis for concluding that the timely and transparent rebate is not a "bona fide offer," *see Novartis*, 102 F.4th at 462–64, or that such a rebate should not be "tak[en] into account" in assessing whether the amount

required to be paid to the manufacturer exceeds the ceiling price. 42 U.S.C. § 256b(a)(1). Put another way, it would be arbitrary and capricious for HRSA to look solely to the initial market price paid to the manufacturer for the covered outpatient drug while ignoring the direct rebate provided from the manufacturer to the covered entity, which necessarily ensures that the covered entity pays no more than the ceiling price. HRSA's refusal to acknowledge as much—and its refusal to approve the Kalderos platform—is arbitrary and capricious.

*Finally*, HRSA's refusal to approve the Kalderos platform was arbitrary and capricious because the agency "entirely failed to consider" how its decision would affect the ability of manufacturers to comply with their obligations under the 340B statute and the IRA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency cannot ignore "an important aspect of the problem"). Not only does the Kalderos platform properly implement the ceiling price under section (a)(1) of the 340B statute, but it also provides a mechanism through which illegal duplicate discounts and diversion within the 340B program and the IRA can be identified, avoided, and remedied after the fact if necessary. AR 272–74. HRSA ignored these benefits—and ignored that its rejection of the Kalderos platform would make it far more difficult (if not impossible) for manufacturers to comply with their obligations under 340B and the IRA. Agencies must "come to grips with the obvious ramifications of [their] approach and address them in a reasoned fashion." *Nat. Res. Def. Council, Inc.*, 859 F.2d at 209–10. HRSA's decision to shut its eyes against the obvious consequences of its approach is unreasonable and requires vacatur.

## **CONCLUSION**

For these reasons, Kalderos respectfully requests that the Court grant its motion for summary judgment.

February 3, 2025                                   Respectfully Submitted,

*/s/ Paul J. Zidlicky*

Paul J. Zidlicky (D.C. Bar No. 450196)
Elizabeth Hardcastle (*pro hac vice* forthcoming)
SIDLEY AUSTIN, LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8013
pzidlicky@sidley.com

Trevor L. Wear (*pro hac vice* forthcoming)
SIDLEY AUSTIN, LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7101
twear@sidley.com

*Counsel for Plaintiff Kalderos, Inc.*

34