# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, DC 20001.2113

TELEPHONE: +1.202.879.3939 • JONESDAY.COM

November 1, 2024

**CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION**
**CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION**
**SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)**

*Via Electronic Mail to cbritton@hrsa.gov*

Chantelle Britton
Director, Office of Pharmacy Affairs
Health Resources & Services Administration
5600 Fishers Lane
Rockville, Maryland 20857

   **RE: Sanofi's 340B Credit Model**

Dear Ms. Britton:

   On behalf of Sanofi-Aventis U.S., LLC ("Sanofi"), I write to notify the Health Resources & Services Administration ("HRSA") that Sanofi has adopted and will announce a new model (the "Credit Model") for the 340B Program. As explained in Attachment A, which Sanofi intends to make public on November 15, Sanofi's Credit Model has two components: (1) effectuating the 340B price through a credit for certain covered entities; and (2) ensuring that 340B pricing is provided when hospital covered entities transfer Sanofi's drugs to their patients, as defined by HRSA's guidance, but not when the drugs are transferred to others. The first component of Sanofi's Credit Model will take effect on January 1, 2025, and the second component will take effect on March 1, 2025.

   In light of HRSA's recent public statements, this letter explains why Sanofi's Credit Model is consistent with Section 340B and recent circuit court decisions interpreting that statute. Under Sanofi's Credit Model, Sanofi will continue to offer the 340B price to all eligible covered entities. Covered entities will *not* be required to pay out of pocket the higher wholesale acquisition cost ("WAC") as part of Sanofi's Credit Model. It would be wholly inappropriate—and extraordinarily harmful to patients—for HRSA to terminate Sanofi's Pharmaceutical Pricing Agreement ("PPA"), as the agency stated it would do in response to another manufacturer's similar plans, based on a misconception of the agency's legal authority.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

Absent objection by November 14, 2024, Sanofi will assume HRSA agrees that Sanofi's Credit Model is consistent with Section 340B and will note that understanding in its public announcement on November 15.

## I.    Background

### A.    Section 340B

As enacted in 1992, Section 340B directed the Secretary of Health and Human Services to enter into PPAs "under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered drugs . . . purchased by a covered entity" does not exceed a maximum price determined through a prescribed formula.[1]  In 2010, Congress amended this provision to "require that the manufacturer *offer* each covered entity covered outpatient drugs for purchase at or below" the statutory maximum price.[2]

Section 340B also includes provisions that aim to prohibit waste and abuse within the program.  For example, Section 340B provides that "with respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."[3]  A covered entity must comply with this prohibition on diversion to remain eligible for the 340B Program.[4]  Although the statute does not expressly define the term "patient," HRSA interpreted "patient" in 1996 guidance and has also addressed the meaning of "patient" in other materials.[5]

### A.    Sanofi's Credit Model

Sanofi has adopted a Credit Model with two components.  These components are described in detail in Attachment A and summarized below.  Each component will be effectuated by collecting claims data for covered entities' prescriptions, a practice that the Third Circuit and D.C.

---

[1] 42 U.S.C. § 256b(a)(1).

[2] *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102(b), 124 Stat. 119, 827 (2010) and Pub. L. No. 111-152, 124 Stat. 1029, 1082 (2010), *codified at* 42 U.S.C. § 256b(a)(1) (emphasis added).

[3] 42 U.S.C. § 256b(a)(5)(B).

[4] *Id.* § 256b(a)(4).

[5] *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55156, 55157–58 (1996); *see also* Letter from Thomas G. Morford, Deputy Administrator, HRSA, to William H. von Oehsen at 4-5 (May 26, 2001); 340B Drug Pricing Program Omnibus Guidance, 80 Fed. Reg. 52300, 52306–07 (2015).

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000349

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

Circuit have both held is permissible under Section 340B.[6]  Sanofi's Credit Model will only apply to critical access hospitals, disproportionate share hospitals, rural referral centers, sole community hospitals, and consolidated health centers.

## 1.    340B Credits

Effective January 1, 2025, Sanofi will effectuate 340B pricing through a credit rather than by the covered entity paying the 340B price directly.  Covered entities currently receive 340B pricing by directly paying a wholesaler the 340B price for drugs.  Through the replenishment model that is currently the prevalent method for covered entities to leverage 340B pricing, 340B-priced drugs generally are used to refill a pharmacy's neutral inventory of drugs purchased at WAC after those drugs have been dispensed to patients later identified by a Third-Party Administrator ("TPA") as the covered entity's patients.

Under Sanofi's Credit Model, Sanofi will continue to *always* offer and sell its drugs to covered entities at the 340B price—covered entities will *not* be required to pay the WAC price out of pocket.  To purchase Sanofi drugs at the 340B price, a covered entity will place an order with a wholesaler for Sanofi's drugs at the WAC price; the product will be dispensed to the covered entity's patient; the covered entity or its TPA will submit purchase and claims data for the prescriptions; and the covered entity will realize the 340B discount through Sanofi's payment of a standalone credit for 340B-eligible prescriptions (covering the difference between the 340B price and the WAC price) directly to the covered entity.

Importantly, Sanofi is committed to paying the credit *before* the wholesaler's bill to the covered entity becomes due.  In particular, Sanofi will offer covered entities the ability to obtain the 340B credit within 30 days of their order—and thus before the wholesaler's bill becomes due under commercially prevalent terms—when the covered entity submits claims data within 22 days of the order.  (Sanofi will pay the 340B credit no later than 7 days after the submission of claims data.)  As a result, although a covered entity will initially place an order at WAC under Sanofi's Credit Model, the covered entity should never pay out of pocket the full WAC price because it will receive a credit for the difference between WAC and the 340B price *before* it has to pay the wholesaler at the WAC price.  Thus, covered entities will always be offered—and should only ever pay—the 340B price, not the WAC price, for Sanofi's medicines.  Sanofi will of course continue to work together with covered entities in good faith, as it has always done, in the event a covered entity notifies the company that it cannot access drugs at the 340B price in a particular case.

---

[6] *See Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000350

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

### 2.    Patient Eligibility Condition

Effective March 1, 2025, Sanofi will issue a 340B credit (as discussed above) only for prescriptions that are dispensed to the covered entity's patients, and not for prescriptions dispensed to any other individuals. Sanofi will only apply this patient eligibility condition to hospital covered entities. Sanofi's patient eligibility condition adopts the patient definition in HRSA's 1996 guidance. Sanofi will use purchase and claims data elements to apply HRSA's patient definition, but covered entities will have an opportunity to rebut Sanofi's initial conclusion if they believe a credit was incorrectly denied in a particular case.

## II.    Section 340B Allows Sanofi To Effectuate the 340B Price Through Credits.

Statutory text and structure, contract principles, agency practice, program history, and legislative history all support Sanofi's decision to effectuate the 340B price through credits.

### A.    The Text of Section 340B Allows Credits.

Sanofi's use of the Credit Model to effectuate the 340B price through a credit complies with Section 340B. As the D.C. Circuit has explained, "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount."[7] Under the Credit Model, Sanofi will propose to sell covered drugs to covered entities at or below the ceiling price on specified terms. Specifically, Sanofi will offer drugs for purchase at the 340B price on terms that will provide a credit to effectuate the 340B price *after* a covered entity places an order with a wholesaler and submits the requested claims data for eligible prescriptions, but *before* the wholesaler's invoice at the WAC price becomes due. Thus, the amount of money the covered entity will be required to pay out of pocket for covered drugs should not exceed the 340B price for an eligible prescription after factoring in the credit.

The text of Section 340B shows that Congress allowed manufacturers to use credits to effectuate the 340B price. Importantly, Congress described "the amount required to be paid . . . to the manufacturer"—*i.e.*, the ceiling price—by "taking into account *any rebate or discount*, as provided by the Secretary."[8] A "discount" is a "reduction from the full amount or value of something,"[9] and Sanofi will be using a credit to reduce the full price of its drugs. Moreover, a "rebate" is inherently retroactive, as it is provided after an initial payment.[10] The statutory text

---

[7] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

[8] 42 U.S.C. § 256b(a)(1) (emphasis added).

[9] *Discount*, Black's Law Dictionary (12th ed. 2024).

[10] *See, e.g.*, *Rebate*, MERRIAM-WEBSTER DICTIONARY ("a return of a part of a payment"), https://www.merriam-webster.com/dictionary/rebate?src=search-dict-box (last visited Sept. 27, 2024)); *Rebate*,

CONFIDENTIAL-ATTORNEYS' EYES ONLY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

thus expressly contemplates that post-payment credits may be used to effectuate the 340B price paid to the manufacturer. Because the statute permits *retroactive* rebates after payment has been made, credits applied *before* payment likewise do not offend it.

Other parts of Section 340B confirm the permissibility of credits to effectuate the 340B price. For example, in 2010, Congress authorized a mechanism by which "appropriate credits and refunds are issued to covered entities" where needed to effectuate the 340B price when the ceiling price shifts "subsequent to the sale of" the drugs—which would not make sense if the statute did not already permit the use of credits.[11] Put together, these provisions confirm that it is permissible for manufacturers to effectuate the 340B price through credits that have the effect of lowering the purchase price of the drugs to the ceiling price.

Certainly nothing in Section 340B "prohibits" this practice.[12] Indeed, HRSA has conceded that "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (*i.e.*, a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (*i.e.*, a rebate option)."[13] Because the statute is silent about whether the ceiling price must be effectuated "by an initial reduction" or a "rebate,"[14] Sanofi "may act freely" to effectuate the price through either option.[15]

### B.    Background Contract Principles Support 340B Credits.

Providing a credit to effectuate the purchase price is also consistent with "background contract principles," which the D.C. Circuit held were relevant to understanding what Section 340B permits.[16] Under general contract principles, a contract price can include credits and/or

---

Black's Law Dictionary (12th ed. 2024) ("A return of part of a payment, serving as a discount or reduction."; "An amount of money that is paid back when someone has overpaid.").

[11] 42 U.S.C. § 256b(d)(1)(B)(iv)(II).

[12] *Sanofi*, 58 F.4th at 704.

[13] Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45823, 45824 (1997).

[14] *Id*.

[15] *Novartis*, 102 F.4th at 459; *see also Sanofi*, 58 F.4th at 704 ("The 'purchased by' provision imposes only a price term for drug sales to covered entities, leaving all other terms blank.").

[16] *Novartis*, 102 F.4th at 460 (citing Corbin on Contracts (2023), Restatement (Second) Contracts (Am. L. Inst. 1981), Williston on Contracts (2023), and the Uniform Commercial Code (Am. L. Inst. & Unif. L. Comm'n 2022) ("UCC")).

CONFIDENTIAL-ATTORNEYS' EYES ONLY

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

rebates to effectuate the purchase price.[17]  Sanofi will thus be acting consistent with "the law of contracts" by offering the 340B price through a credit for the difference between the WAC and 340B prices.[18]

### C.    HRSA Has Recognized the Permissibility of Rebates and Credits.

HRSA's "guidance reinforces our conclusion" that providing a credit complies with Section 340B.[19]  Repeatedly, HRSA has permitted the use of credits in order to effectuate the 340B price, which is further evidence that credits do not violate the statute.

To start, HRSA's 1994 guidance addressed the topic of retroactive discounts for the period when manufacturers were first implementing the 340B Program.[20]  HRSA opined that "eligible covered entities included on the initial eligibility list may request *retroactive discounts (discounts, rebates, or account credit)* for covered outpatient drugs purchased retroactive to December 1, 1992."[21]  In other words, manufacturers that had charged covered entities the WAC price could comply with Section 340B by paying retroactive "discounts, rebates, or account credit" to effectuate the 340B price.[22]

HRSA has also stated in a binding regulation that credits are appropriate in connection with newly launched drugs.  For such drugs, the agency has directed manufacturers to estimate the ceiling price while waiting for the ceiling price to be calculated, "which should occur no later than the 4th quarter that the drug is available for sale," and to then "offer to *refund or credit* the covered entity the difference between the estimated 340B ceiling price and the actual 340B ceiling price within 120 days of the determination by the manufacturer that an overcharge occurred."[23]

---

[17] *See* 14 Corbin on Contracts § 78.2 n.11 (2024) ("If a contract fixes the price at a specified amount with an agreed 'rebate,' the buyer is no longer bound to take the goods and pay the specified amount without the rebate, when a supervening statute makes the rebate illegal."); 1 Corbin on Contracts § 3.11 (2024) (Seller's "statement of selling price, including a rebate, was an implicit term of each order placed by the buyer."); 10 Williston on Contracts § 29:50 (4th ed. May 2024) ("Assuming the contract in this case was modified to include the rebate (a price modification) and the additional purchase (a quantity modification), the pass-through power of the original contract's satisfaction infuses the contract as modified with the characteristic of enforceability.").

[18] *Novartis*, 102 F.4th at 460.

[19] *Id.*

[20] *See* Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25110.

[21] *Id.* at 25112 (emphasis added).

[22] *Id.*

[23] 42 C.F.R. § 10.10(c) (2019) (emphasis added).

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

Similarly, HRSA has issued guidance regarding "a rebate option for State AIDS Drug Assistance Programs (ADAPs) receiving funds under Title XXVI of the PHS Act as an optional alternate means of accessing section 340B discount pricing."[24] This guidance recognized that rebates might be permissible in other contexts, too. In response to a comment stating that "[o]ur (favorable) response to the recognition of a rebate program for the ADAPs would be different if HRSA proposed a rebate program for all covered entities," and "urg[ing] that the rebate mechanism be an option only for meeting the unique needs of the State ADAP programs and that HRSA not consider any further expansion to other categories of entities," the agency stated: "*At this time*, we agree."[25]

Another regulation supports looking beyond the initial order price in assessing compliance with Section 340B. Under Section 10.11(b)(4), "[a]n instance of overcharging may occur at the time of initial purchase *or* when subsequent ceiling price recalculations due to pricing data submitted to CMS or new drug price estimations as defined in § 10.10(c) result in a covered entity paying more than the ceiling price due to failure or refusal to *refund or credit* a covered entity."[26] If Section 340B were concerned only with the price paid by the covered entity "at the time of initial purchase," then HRSA would have no need to account for the possibility of an overcharge "due to failure or refusal to refund or credit a covered entity."[27]

In sum, HRSA's longstanding recognition that credits may retroactively effectuate the 340B price, and that credits must be considered when determining whether a manufacturer has improperly charged a higher price, further confirms that the 340B statute does not *prohibit* the use of credits.

## D.    Historical Context Supports 340B Credits.

Moreover, the "historical context of section 340B" supports using credits to effectuate the 340B price.[28] Under the replenishment model, covered entities have historically paid the WAC price for their initial purchase of covered drugs before identifying "whether individual

---

[24] Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35239, 35239 (June 29, 1998).

[25] *Id.* at 35241 (emphasis added).

[26] 42 C.F.R. § 10.11(b)(4) (emphasis added).

[27] *Id.*

[28] *Novartis*, 102 F.4th at 462.

7

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000354

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

prescriptions were eligible for the discount" and then placing "an order to replenish its section 340B purchase."[29] HRSA has blessed covered entities' use of the replenishment model.[30]

Sanofi's Credit Model will function in the same manner—covered entities will continue placing orders at the WAC price before a credit is issued to effectuate the 340B price. The only change that comes with using credits concerns when and how the 340B price is effectuated—and, as explained above, covered entities can receive the credits *before* having to pay the WAC price. In all events, the purchase price remains the same 340B price from the covered entity's perspective. Thus, the Credit Model "conforms to business practices that governed section 340B sales during much of the program's history."[31]

### E.    Legislative History Supports 340B Credits.

Legislative history further supports the permissibility of credits. A House Committee Report explicitly states that Section 340B "does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, *through a manufacturer rebate*, or through some other mechanism."[32] Although the Report also suggests the Secretary may have the ability to specify the appropriate "mechanism" that manufacturers must use,[33] the Secretary has never done so.

### F.    HRSA Does Not Need to Approve Using Credits to Effectuate the 340B Price.

HRSA has recently claimed that Section 340B requires the Secretary's approval before manufacturers may alter how they effectuate the 340B price. HRSA appears to be relying on the statute's language directing that the PPA shall specify that "the amount required to be paid (taking into account any rebate or discount, *as provided by the Secretary*) to the manufacturer for covered outpatient drugs . . . does not exceed" the ceiling price.[34] As we understand it, HRSA's position is that the "as provided by the Secretary" language means that manufacturers may "tak[e] into

---

[29] *Id.* at 457.

[30] *See* 80 Fed. Reg. at 52319.

[31] *Novartis*, 102 F.4th at 463.

[32] H.R. REP. NO. 102-384, pt. 2, at 16 (1992); *see also id.* at 12 ("[M]anufacturers, as a condition of receiving Federal Medicaid matching funds on their covered outpatient drugs, would have to enter into an agreement with the Secretary of HHS to provide price reductions (whether through a discount, rebate, or other mechanism) to these "covered entities" on covered outpatient drugs.").

[33] *Id.* at 12.

[34] 42 U.S.C. § 256b(a)(1).

8

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000355

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

account any rebate or discount" only when authorized in advance by HRSA.  Respectfully, HRSA's reading of that provision is incorrect.

The phrase "as provided by the Secretary" does not resemble a pre-approval requirement. Congress "knew how to" draft a pre-approval requirement.[35]  For example, new drugs require the Secretary's "approval" before the drug is marketed.[36]  The Secretary must also "approve" state Medicaid plans.[37]  Congress could have written Section 340B to permit only "any rebate or discount, as *approved* by the Secretary," if Congress had wanted to impose a pre-approval requirement,[38] but it did not.  Because "Congress [has] added that specific language [in other provisions] but not here," "[w]e presume that it did so intentionally."[39]  The different phrase "as provided by the Secretary" thus does not suggest the Secretary must approve "any rebate or discount" in advance.

Instead, the statute's "as provided by the Secretary" phrase merely reflects that the Secretary has the authority to specify in the PPA *how* "any rebate or discount" should be taken into account when manufacturers invoice the "amount required to be paid" by covered entities.  But the Secretary has not "provided" any relevant conditions on "taking into account any rebate or discount" in calculating "the amount required to be paid" that would cast doubt on the Credit Model.  And in the absence of any legal restriction on the use of "any rebate or discount,"[40] Sanofi "may act freely" to effectuate the 340B price through the Credit Model.[41]

---

[35] *Sanofi*, 58 F.4th at 703.

[36] 21 U.S.C. § 355(a).

[37] 42 U.S.C. §§ 1396a(b), 1396b(a); *see also* 42 U.S.C. § 302(b).

[38] Indeed, Congress frequently uses exactly those words ("as approved by the Secretary") when enacting a pre-authorization requirement.  *See, e.g.*, 42 U.S.C. § 1396r-1a(b)(3)(A)(IV) (defining a "qualified entity" for certain medical assistance funding to include, in addition to an enumerated list, "any other entity the State so deems, *as approved by the Secretary*" (emphasis added)); 42 U.S.C. § 1396u(a)(6) (defining "community supported living arrangements services" for developmentally disabled individuals to include an enumerated list of services as well as "other services (*as approved by the Secretary*, except those services described in subsection (g)" (emphasis added)); 42 U.S.C. § 2297h-4(5) (addressing the U.S. Enrichment Corporation's transfer of "funds in accounts of the Corporation held by the Treasury or on deposit with any bank or other financial institution *as approved by the Secretary* of the Treasury" (emphasis added)); 42 U.S.C. § 6506a(i)(1) ("Each lease [of the National Petroleum Reserve] shall be issued for an initial period of not more than 10 years, and shall be extended for so long thereafter as oil or gas is produced from the lease in paying quantities, oil or gas is capable of being produced in paying quantities, or drilling or reworking operations, *as approved by the Secretary*, are conducted on the leased land." (emphasis added)).

[39] *Sanofi*, 58 F.4th at 703.

[40] 42 U.S.C. § 256b(a)(1).

[41] *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703.

CONFIDENTIAL-ATTORNEYS' EYES ONLY

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

Moreover, to the extent HRSA reads Section 340B to prohibit using credits to effectuate the 340B price without the Secretary's approval, HRSA's view is not entitled to any deference.[42] And even if the statute did require Sanofi to obtain HRSA's approval, it would be arbitrary and capricious for HRSA to withhold its approval because Section 340B permits Sanofi to effectuate the ceiling price through a credit, HRSA may not impose requirements that exceed the statute, and HRSA has previously allowed the use of credits.[43]

### G.    Terminating Sanofi's PPA Would Harm Patients.

Although HRSA has threatened to terminate another manufacturer's PPA for implementing a "rebate model," it would be inappropriate for HRSA to terminate Sanofi's PPA for its decision to implement the Credit Model.  Terminating Sanofi's PPA would also terminate Sanofi's ability to participate in Medicare Part B and the Medicaid Drug Rebate Program because of the statutory links among these federal programs.   Taking such drastic action would have devastating effects for Medicare and Medicaid patients, who would lose access to Sanofi's medicines due to HRSA's misconception of its legal authority under Section 340B.

As explained, terminating Sanofi's PPA for implementing the Credit Model would exceed HRSA's authority under Section 340B because the Credit Model is consistent with the statute.  But termination is also an inappropriate way to address the manner in which manufacturers should apply credits and rebates to reach the 340B price, as the statute allows.  If HRSA wishes to address that issue, it should do so through less drastic and harmful alternatives than terminating a PPA.

## III.    Sanofi May Limit 340B Pricing to a Covered Entity's Patient.

Section 340B also permits Sanofi to deny 340B pricing for a drug that a covered entity has transferred to a person who is not the covered entity's patient.  Such a transfer constitutes improper diversion under Section 340B.  And compliance with the prohibition on diversion is part of a covered entity's eligibility for the 340B price.  Nothing in Section 340B prohibits Sanofi from attempting to stop diversion before it occurs.  In taking this step, Sanofi will use the patient definition set forth in HRSA's guidance.

---

[42] *Novartis*, 102 F.4th at 459; *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

[43] *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703.

CONFIDENTIAL-ATTORNEYS' EYES ONLY

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

### A.    Section 340B Does Not Require Providing 340B Pricing on Drugs Dispensed to Persons Who Are Not Patients of a Covered Entity.

Section 340B is explicit that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."[44] Not only is diversion unlawful, but complying with the prohibition on diversion is a condition of a covered entity's *eligibility* to receive 340B pricing. Section 340B defines a "covered entity" to mean "an entity that meets the requirements described in paragraph (5)"—which includes the prohibition on diversion[45]—in addition to being one of the 15 enumerated types of providers.[46] Covered entities that engage in diversion are not eligible to receive 340B pricing for the diverted drugs.

Background contract principles again reinforce this understanding of the "offer" required by Section 340B.[47] As a condition of that offer, covered entities must comply with the statute's prohibition on diversion.[48] "As a general matter, including such terms is fully consistent with making an 'offer' at a specified 'price.'"[49] Covered entities breach that obligation—and violate the statute—when they unlawfully divert Sanofi's drugs. Because covered entities are not entitled to 340B pricing if they violate their own legal obligations, Sanofi's patient condition aligns with Congress's intent by denying 340B pricing for instances of diversion.

Indeed, it would be "absurd" to read Section 340B to require Sanofi to sell its drug at the 340B price on the front end in circumstances where Sanofi knows for a fact that it will be entitled to the WAC price on the back end because of diversion—and will need to claw back the discount from the covered entity.[50] Nothing in Section 340B prohibits Sanofi from proactively addressing

---

[44] 42 U.S.C. § 256b(a)(5)(B).

[45] *Id.* § 256b(a)(4).

[46] *See id.* § 256b(a)(4)(A)–(O).

[47] *Novartis*, 102 F.4th at 460.

[48] *See, e.g.*, 11 Williston on Contracts § 30:20 (May 2024 4th ed.) ("When the subject matter of the contract between the parties lies in an area covered by federal law, they necessarily adopt, as a portion of their agreement, the applicable provisions of the particular Act of Congress."); 11 Williston on Contracts § 30:19 ("[T]he parties to a contract . . . are presumed or deemed to have contracted with reference to existing principles of law. . . . Under this presumption of incorporation, valid applicable laws existing at the time of the making of a contract enter into and form a part of the contract as fully as if expressly incorporated in the contract."); 5 Corbin on Contracts § 24.26 (2024) ("In numerous [] instances, courts have stated that existing statutes are incorporated in contracts.").

[49] *Novartis*, 102 F.4th at 460.

[50] *Id.* at 461; *see* 42 U.S.C. § 256b(a)(5)(D) (stating that a covered entity that violates the prohibition on diversion "shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug").

11

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

the unlawful diversion of 340B-priced drugs. While the statute's ADR provisions "serve to ensure compliance with the various obligations that section 340B imposes," they "do not speak to the scope of those underlying obligations, such as what a manufacturer must do to make the requisite 'offer' at the requisite 'price.'"[51] And even if the ADR scheme is the "exclusive" means for addressing *past* violations of the statute, that only "shows that section 340B establishes the precise metes and bounds of audits and administrative adjudications."[52] It does not mean that Sanofi is prohibited from attempting to stop violations *before* they occur.[53] Otherwise, Sanofi would be forced to provide 340B discounts even in situations where a covered entity is openly engaged in rampant diversion, which cannot be the law. At a minimum, it is certainly permissible for Sanofi to take this step with drugs delivered to contract pharmacies, given that manufacturers have no obligation to deliver 340B-priced drugs to contract pharmacies.[54]

## B.    Sanofi's Patient Condition Adopts HRSA's Patient Definition.

Sanofi will enforce its patient condition by using HRSA's longstanding patient definition, as set forth in HRSA's 1996 guidance on the issue. Under that definition (and Sanofi's patient condition), an individual is a "patient" if:

> 1. the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and

> 2. the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and

> 3. the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this requirement.

An individual will not be considered a "patient" of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is

---

[51] *Novartis*, 102 F.4th at 461–62.

[52] *Id.* at 462.

[53] *See Sanofi*, 58 F.4th at 705 (explaining that "Section 340B's compliance measures do not implicitly preclude delivery limits" and rejecting the government's argument that "drug makers may not tack on measures of their own").

[54] *Novartis*, 102 F.4th at 460; *see also Sanofi*, 58 F.4th at 703.

12

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

the dispensing of a drug or drugs for subsequent self administration or administration in the home setting.[55]

To operationalize this definition, Sanofi will presumptively pay a 340B credit if HRSA's patient definition is satisfied. In particular, Sanofi will analyze claims data submitted by hospital covered entities to determine if the individual receiving a prescription (1) is currently receiving medical care from the covered entity, and (2) receives health care services from a health care professional who is employed by or similarly affiliated with the covered entity. For prescriptions that arise from a referral following a patient encounter at the covered entity, Sanofi will analyze claims data to determine if the prescription relates to the health care services provided by the covered entity to the patient. If Sanofi determines that HRSA's patient definition is not satisfied, covered entities will have an opportunity to rebut that determination in order to receive a 340B credit for the prescription.

## 1.    HRSA Requires a Patient Be the Covered Entity's Current Patient.

The text of Section 340B states that an individual must be a *current* patient in order to receive a 340B-priced drug. The statute is written in the present tense—covered entities may transfer the drug only to a person who *is* a patient of the entity.[56] To that end, HRSA's guidance similarly requires a current, active relationship between a patient and the covered entity, as the guidance defines a patient as someone who "*receives* health care services" (not "received") and that "responsibility for the care provided *remains with* the covered entity."[57] The limited caselaw on this issue holds the same.[58] After all, patients often change medical providers over time, and nobody would say that a person who last saw a physician 20 years ago is a patient of that physician today, just as nobody would say that adults are still patients of their childhood pediatricians.

The text of Section 340B, including as construed by HRSA's guidance, thus requires a current, ongoing patient relationship. A person's status as a "patient" of a covered entity requires more than a past encounter with the entity.

Sanofi will operationalize this principle by presuming that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed

---

[55] 61 Fed. Reg. 55156 (1996).

[56] *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who *is* not a patient of the entity" (emphasis added)).

[57] 61 Fed. Reg. at 55157 (emphasis added).

[58] *See Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 326 (D.S.C. Nov. 3, 2023) (stating that the 340B statute "require[s] an ongoing patient relationship between the individual and the 'covered entity'").

13

340B_REBATES_000360

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

is a patient of that entity. [59]  Under this approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity.  But Sanofi will allow a covered entity to rebut that presumption by demonstrating that the person remains a current patient (*e.g.*, because the typical interval between visits for a patient with the medical condition at issue exceeds 24 months).

### 2.    HRSA Requires a Patient Receive the Prescription in Connection with Services Provided by the Covered Entity.

HRSA's guidance also requires that the drug be connected to care provided by the covered entity to the patient—*i.e.*, the covered entity must be the one that provides the care and prescribes the drug.  Thus, as the guidance states, an individual "will not be considered a 'patient' of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting."[60]  HRSA has made this point in other contexts, too.[61]

This understanding of the word "patient" also comports with the plain text of the statute, which states:  "*With respect to any covered outpatient drug that is subject to an agreement under this subsection*, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."[62]  The prefatory clause ("with respect to any covered outpatient drug that is subject to an agreement under this subsection") limits which patients count for purposes of the statute—they must be patients of the covered entity "with respect to [the] covered outpatient drug."  A person is not a "patient of the [covered] entity" "with respect to [the] covered outpatient drug" if the drug is prescribed by some other provider.

This principle also reflects common sense.  Because patients often have multiple conditions and seek medical care for those conditions from multiple providers, we tend to speak of patients with respect to particular care and particular providers.  Suppose a person sees an oncologist for cancer treatment and a cardiologist for high blood pressure.  That person is the oncologist's patient

---

[59] *See, e.g.*, *id.* (noting that "Genesis voluntarily utilizes a two year look back period to determine whether an individual is a patient").

[60]  61 Fed. Reg. at 55158.

[61] *See, e.g.*, *Genesis*, 701 F. Supp. 3d at 329 (noting HRSA's position that that "in order for an individual to qualify as a 340B patient, [the covered entity] must have initiated the healthcare service resulting in the prescription"); Letter from Thomas G. Morford, Deputy Administrator, HRSA, to William H. von Oehsen at 4-5 (May 26, 2001) (describing a "proximate relationship" test between the prescription and the healthcare service for assessing 340B patients); 80 Fed. Reg. 52307 (requiring that the "individual receives a drug that is ordered or prescribed by the covered entity provider as a result of the service described").

[62] 42 U.S.C. § 256b(a)(5)(B) (emphasis added).

CONFIDENTIAL-ATTORNEYS' EYES ONLY

JONES DAY

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

with respect to cancer treatment and the cardiologist's patient with respect to treatment for high blood pressure. Nobody would say that the person received chemotherapy as a patient of the cardiologist. In other words, a person's status as a physician's patient is always tied to the medical condition for which the person is receiving care.

Sanofi will operationalize this element of the patient definition by checking if the prescription is written by a provider employed by or otherwise affiliated with the covered entity. If the prescription was not written by such a provider (e.g., in the case of prescriptions that arise from a referral following a patient encounter at the covered entity), then Sanofi will analyze the claims data submitted by hospital covered entities to determine if there is a connection between an individual's prescription and the healthcare services that the individual has received from the covered entity. If such a connection is present, or if the prescription was written by a provider employed by or otherwise affiliated with the covered entity, Sanofi will issue the 340B credit. If such a connection is lacking, however, Sanofi will presume that the individual is *not* the covered entity's patient for purposes of the prescription and will decline to issue a 340B credit—but, as with the temporal requirement discussed above, the covered entity could rebut this presumption by showing a connection between the prescription and the covered entity's services.

## IV.    Conclusion

Sanofi reiterates its commitment to comply with its 340B obligations. Those obligations are set forth in the 340B statute. As the courts have recently made clear, HRSA cannot enforce obligations that go beyond Section 340B. Because nothing in Section 340B prohibits the Credit Model, Sanofi intends to implement the Credit Model beginning on January 1, 2025. Unless I hear from you before November 14, 2024, we will assume that HRSA agrees that Sanofi's Credit Model is fully consistent with Section 340B, and Sanofi will announce its planned Credit Model to the public on November 15.

Very truly yours,

Brett A. Shumate
*Counsel for Sanofi-Aventis U.S., LLC*

Enclosures:
Attachment A

15

CONFIDENTIAL-ATTORNEYS' EYES ONLY

# ATTACHMENT A

340B_REBATES_000363

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

November 15, 2024

Dear Covered Entity:

Sanofi is updating its policy related to its 340B Integrity Initiative and the method through which Sanofi effectuates the 340B ceiling price for certain Covered Entities.  As described in detail below and as part of Sanofi's 340B Integrity Initiative, Sanofi will be adopting a new model for 340B ceiling price effectuation (the "Credit Model"). Sanofi will continue to offer the 340B price to all covered entities, but for the covered entities listed below, Sanofi will effectuate the 340B price through a credit paid to the covered entities. In addition, for hospital covered entities, Sanofi will effectuate the 340B price when they dispense the drugs to their patients, as defined by HRSA's guidance, but not when the drugs are dispensed to others.

The 340B Drug Pricing Program today bears little resemblance to the safety net program established by Congress over 30 years ago. The 340B Program is now the nation's second largest federal prescription drug program with more than $66 billion in annual sales at discounted prices.[1]

340B's unchecked growth has not come with any meaningful increase in patient benefit. Government reports have found that most patients receive no discount on drugs dispensed by 340B covered entities.[2] And a recent analysis showed that patients receive a portion of 340B discount in only 1.4% of 340B contract pharmacy claims.[3] 340B's financial incentives also skew prescribing decisions and increase patient out-of-pocket costs. According to multiple analyses, patients of 340B hospitals receive more drugs and more expensive drugs than patients of non-340B hospitals.[4]

Over the past few years Sanofi took multiple steps to address prohibited duplicate discounts and diversion in the 340B Program. But this waste and abuse has unfortunately persisted, in part because of the current model of 340B. Today, the various transactions and data points that establish 340B eligibility and effectuate the 340B price are disconnected from one another. That disconnect generates opacity, a primary driver of 340B waste and abuse.

---

[1]  HRSA, "2022 Covered Entity Purchases," (September 2023), https://www.hrsa.gov/opa/updates/2022-340b-covered-entity-purchases.
[2] GAO, Drug Discount Program:  Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement, GAO-18-480, at 30 (June 2018), https://www.gao.gov/products/GAO-18-480.
[3] IQVIA, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?, (September 27, 2022), https://www.iqvia.com/locations/united-states/library/white-papers/are-discounts-in-the-340b-drug-discount-program.
[4] GAO, Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals, GAO-15-422, at 2 (June , 2015), https://www.gao.gov/products/gao-15-442;  Milliman, Analysis of 2020 Commercial Outpatient Drug Spend at 340B Participating Hospitals (September, 202), https://www.milliman.com/-/media/milliman/pdfs/2022-articles/9-13-22_phrma-340b-commercial-analysis.ashx.

340B_REBATES_000364

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

Sanofi is implementing the 340B Credit Model to rein in the 340B waste and abuse we see today. Sanofi's 340B Credit Model will, for the first time, link the relevant data elements and transactions for every 340B dispense. This innovation will bring transparency to 340B. It will identify potential duplicate discounts and prevent instances of illegal diversion.

Sanofi's 340B Integrity Initiative, including the Credit Model, applies to the following covered entities:

- Hospital Covered Entities:
  - Critical Access Hospitals (CAH)
  - Disproportionate Share Hospitals (DSH)
  - Rural Referral Centers (RRC)
  - Sole Community Hospitals (SCH)
- Consolidated Health Centers (CH)

All covered entity types not listed are excluded from this initiative.

The 340B Integrity Initiative applies only to the products listed in Attachment A (the "Products").

Sanofi's Contract Pharmacy Policy is located in Attachment B.

State-specific policy information is located in Attachment C.

Sanofi's Contract Pharmacy Anti-Diversion Policy is located in Attachment D.

The requested data elements for the 340B Credit Model are located in Attachment E.

**The 340B Credit Model**

Sanofi will continue to offer the 340B price to all covered entities, but Sanofi will now effectuate the 340B price through a 340B Credit for certain covered entities.

Sanofi's Credit Model will be operationalized using the Beacon platform. Detailed instructions on covered entity registration, data submission, and other pertinent information regarding Beacon are available on the Beacon website at www.beaconchannelmanagement.com. Sanofi encourages covered entities to register an account on Beacon as soon as possible.

Under the Credit Model, the 340B ceiling price will be effectuated through a credit paid directly to the covered entity using the following 3-step process:

**Step 1**: The covered entity places an order for a Product through their wholesaler at the Product's Wholesale Acquisition Cost (WAC).

**Step 2**: The Product is dispensed to a patient of the covered entity.

340B_REBATES_000365

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**Step 3**: The covered entity submits purchase and claims data to Beacon for 340B eligible dispenses. Beacon confirms 340B eligibility and issues a credit payment to the covered entity representing the difference between the WAC and 340B price.

Covered entities will not be required to carry the cost of purchasing a Product at WAC as part of Sanofi's Credit Model. The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. As a result, a covered entity that promptly submits data should never carry the cost of the full WAC because it will receive a credit for the difference between the WAC and 340B price before it must pay the wholesaler at the WAC.

**Credit Model Effective Dates**

This update will go into effect on the dates listed below. As of the dates listed below, 340B pricing will no longer be available through wholesalers for the applicable covered entity types for the products listed on Attachment A. The 340B price will instead be available through a credit from Beacon.

- January 1, 2025 – CAH, DSH, RRC, SCH
- March 1, 2025 – CH

**Claim Submission, Validation, and 340B Credit Payment Process**

Within 30 days of the dispense of a Product, the covered entity must submit a claim for a 340B Credit from Sanofi by submitting the applicable data elements listed in Attachment E to the Beacon platform. These data elements consist of standard purchase and claims data that covered entities and their Third-Party Administrators ("TPAs") already collect, maintain, and use to establish 340B eligibility or submit to insurers for reimbursement in the ordinary course of business.

Through Beacon, Sanofi will review the data submitted and validate that a claim is eligible for a 340B Credit. Claims will be eligible for a 340B Credit if 1) the drug was ordered by a covered entity at WAC; 2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy; 3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and 4) the requested claims data was submitted within 30 days of the drug's dispense. Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

To maintain consistency with current covered entity operations, 340B Credit payments will be calculated and paid at the NDC-11 level. The 340B Credit will equal the difference between (i) WAC and (ii) the 340B ceiling price of the Product.

For Hospital Covered Entities (CAH, DSH, RRC, SCH), payment for a 340B Credit will be transmitted within 7 days after the covered entity submits data sufficient to trigger a full package accumulation, which, for Products with single-unit package sizes, will be a single validated 340B dispense.

340B_REBATES_000366

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

For CHs, Sanofi will presumptively transmit a 340B Credit upon submission and validation of only the Purchase Data Elements listed in Attachment E. Sanofi encourages CHs to submit Purchase Data Elements immediately upon placing an order at WAC with their wholesaler to receive the 340B Credit as soon as possible. CHs must still submit all remaining applicable data elements within 30 days of the drug's dispense. Sanofi will validate both the Purchase and Pharmacy or Medical Claim Data Elements, and 340B Credit payments will only be applied to valid data submissions. Credits presumptively transmitted on a claim that is not validated will be applied to subsequent claims for 340B Credits.

Sanofi encourages covered entities to submit data as quickly as possible to ensure faster payment of 340B Credits.

Payment details will be available on the Beacon platform, permitting covered entities to reconcile and verify 340B Credits claimed, validated, and paid.

Sanofi will continue to work together with covered entities in good faith, as it has always done, in the event a covered entity notifies the company that it should have received a 340B Credit in a particular case.

## 340B Patient Definition

This section is effective March 1, 2025, and shall apply to Hospital Covered Entities only. This section does not apply to CHs.

As part of the 340B claim submission for pharmacy claims, Hospital Covered Entities are required to append healthcare encounter data that establishes that the submitted claim is for a prescription dispensed to the covered entity's patient. The healthcare encounter data elements are listed in Attachment E.

Sanofi shall utilize the appended healthcare encounter data to validate that the patient to whom the drug was dispensed for the specific 340B pharmacy claim is a patient of the covered entity, as set forth in HRSA's 1996 guidance available at 61 Fed. Reg. 55156. HRSA's 1996 guidance states that:

An individual is a patient of the covered entity if:

1. The covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care;

2. The individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and

3. The individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or federally qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this requirement.

340B_REBATES_000367

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

An individual will not be considered a "patient" of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.

To operationalize HRSA's 1996 patient definition, Sanofi will use healthcare encounter data to determine if the individual receiving a dispense (1) is currently receiving medical care from the covered entity, and (2) receives the prescription in connection with health care services provided by the covered entity.

Sanofi will presume that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed is currently receiving medical care from the covered entity; under this approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity.

Sanofi will also presume that a prescription written by a health care professional who is employed by or similarly affiliated with the covered entity is being provided in connection with health care services provided by the covered entity. For prescriptions that arise from a referral following a patient encounter at the covered entity, where the prescriber is not employed by or similarly affiliated with the covered entity, Sanofi will analyze the data submitted to determine if the prescription relates to the health care services provided by the covered entity to the patient.

For prescriptions dispensed to individuals who do not satisfy HRSA's patient definition, Sanofi will decline a 340B Credit to avoid statutorily prohibited diversion of 340B drugs. In the event of such a denial, a covered entity will have an opportunity to submit additional or alternative data for the same claim in order to demonstrate that the individual was the covered entity's patient.

## FREQUENTLY ASKED QUESTIONS

**Q: What types of covered entities are NOT included in Sanofi's 340B Integrity Initiative?**

**A:** Sanofi's 340B Integrity Initiative does <u>not</u> include the following categories of covered entities.

- Children's Hospitals
- Free Standing Cancer Hospitals
- Hemophilia Treatment Centers
- Ryan White Clinics
- Tribal / Urban Indian Health Centers
- Federally Qualified Health Center Look-Alikes
- Sexually Transmitted Diseases Clinics
- Family Planning Clinics
- Tuberculosis Clinics
- Native Hawaiian Health Centers

340B_REBATES_000368

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

**sanofi**

**Q:  Will I continue to have access to 340B pricing through my wholesaler?**

**A:**  Upon the applicable Credit Model effective date, 340B pricing for Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) will no longer be available through wholesalers for in-scope products included in Attachment A.  340B covered entities will initially place an order for these products at WAC from their wholesaler and then the 340B ceiling price will be effectuated for that order through a 340B Credit payment.

**Q:  Does Sanofi's policy apply to all 340B utilization or just contract pharmacies?**

**A:**  Sanofi's policy applies to all 340B utilization for the covered entities described above, inclusive of utilization at in-house retail pharmacies and contract pharmacies, as well as utilization administered to eligible 340B patients in an outpatient setting.

**Q. Can my wholly owned contract pharmacy receive 340B Credits?**

**A**: Contract pharmacies that are wholly owned by the covered entity or have common ownership with the entity are subject to Sanofi's 340B Integrity Initiative, including Sanofi's Contract Pharmacy Policy.

**Q: How do I designate a contract pharmacy?**

**A:** The designation process is administered through 340B ESP™ which can be accessed at https://www.340besp.com/.   The 340B ESP™ platform is currently the only method for a covered entity to designate a contract pharmacy location under Sanofi's policy. Please note that a contract pharmacy must have an assigned HIN for the wholesaler to process 340B transactions for Sanofi drug products. Covered entities may change their designated contract pharmacy twelve months after a designation occurs. Contract pharmacy designations can take up to 10 business days to process.

**Q: I have already designated a contract pharmacy.  Do I need to re-designate my contract pharmacy?**

**A:** Covered entities that currently have a designation in place through 340B ESP™ do not need to re-designate.

**Q: Does Sanofi's Integrity Initiative apply to all Sanofi products?**

**A:** No, Sanofi's 340B Integrity Initiative only applies to the Sanofi products listed in Attachment A.

**Q: Is Sanofi requiring data for my designated contract pharmacy if my covered entity does not have an in-house pharmacy?**

**A:**  Data is required for a designated contract pharmacy. Please see Attachment E for the required data elements.

**Q: What are the requirements for submitting data?**

340B_REBATES_000369

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

**sanofi**

**A:** Data must be submitted within 30 days of the claim's date of dispense or administration. If a claim is submitted more than 30 days after the claim's date of dispense or administration, the applicable drug dispense or administration will not be eligible for a 340B Credit.  Sanofi will work in good faith with covered entities if they believe they were incorrectly denied a 340B Credit.

**Q: Who can submit data to Beacon on behalf of a covered entity?**

**A:** Beacon account administrators may submit data on behalf of a covered entity or may grant access to other covered entity employees or contractors to submit data via Beacon. Currently, TPAs are not able to submit data to Beacon via an API or other direct data submission method on behalf of a covered entity. Sanofi anticipates that Beacon will support direct submissions from TPAs in early 2025 and additional information will be made available to 340B covered entities as this functionality becomes available.

**Q: How frequently should a covered entity submit data to Beacon?**

**A:** There is no limitation on how frequently data may be submitted. Sanofi encourages covered entities to submit data as frequently and as early as practicable. Covered entities should endeavor to submit Purchase Data Elements immediately after placing a WAC order with their wholesaler. Covered entities should submit all other applicable data elements immediately following a 340B eligible dispense or administration of a Product.

**Q:  How will Sanofi use the data that covered entities provide through Beacon?**

**A:** Data uploaded by covered entities will be used to confirm 340B eligibility of the dispense, and to identify and resolve duplicate Medicaid and commercial rebates.  The Beacon platform will validate that:

1) the drug was ordered by a covered entity at WAC;
2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy;
3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and
4) the requested claims data was submitted within 30 days of the drug's dispense.

Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

**Q:  How are claim reversals submitted and processed in Beacon?**

**A:**  Submission of a claim to Beacon is a request for payment of a 340B Credit, and 340B covered entities should only submit final claims.  In the event that a previously submitted and validated claim must be reversed, the covered entity should submit the same claim detail with a negative unit amount. Claims associated with purchases for which no 340B Credit has been paid will be disassociated with the purchase. If the 340B credit has already been paid, a future 340B claim submission will replace the reversed claim.

340B_REBATES_000370

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**Q.  Can a covered entity dispute a claim submission that is not validated in Beacon?**

**A:**  Yes. Many aspects of the 340B eligibility and claims validation processes can be disputed by a 340B covered entity within the Beacon platform. Disputes are initiated in Beacon and may require the submission of additional documentation.  Additional information on the dispute process is available in the Beacon Support Center.

**Q.  Is the Credit Model compatible with central fill pharmacy systems?**

**A:** Yes. Sanofi recognizes that many covered entities operate a central fill pharmacy in which their drug purchases are shipped to a centralized pharmacy location but dispensed or administered through numerous locations operated by the 340B covered entity. The Credit Model supports this.  Eligible claim submissions dispensed or administered at a location registered with HRSA as a parent or child site or shipping address of a parent or child site will be associated with any purchase shipped to a location registered with HRSA as a parent or child site or shipping address of a parent or child site.

**Q: What is the amount of the 340B Credit payment?**

**A:** The 340B Credit payment will always equal the difference between the (1) WAC and (2) the 340B ceiling price of the Product at the time the product was initially purchased as indicated in the Purchase Data Elements.

**Q: Will 340B Credits be paid on an individual dispense of Products?**

**A:** 340B Credits are calculated and paid on NDC-11 packages of Products to maintain consistency with how 340B pricing is effectuated today. Once the number of eligible 340B dispenses accumulated in Beacon equals the NDC-11 package size of Product, a 340B Credit will be paid.  For Products with single-unit package sizes, a 340B Credit will be paid after a single validated 340B dispense.

**Q: When will 340B Credits be paid?**

**A:** The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. A 340B Credit payment will be transmitted within 7 days after a full package accumulation of 340B eligible dispenses for a given Product which, for Products with single-unit package sizes, will be after a single validated 340B dispense. Beacon validates claims for 340B Credits on a rolling basis. Sanofi encourages covered entities to submit data frequently and promptly to ensure timely payment of 340B Credits.

**Q: How should covered entities identify dispenses that are eligible for a 340B Credit?**

**A:** Covered entities should continue to rely on their standard business practices, consistent with the 340B Statute and HRSA guidance, to identify dispenses eligible for a 340B Credit.

**Q: Who can I contact if I need assistance?**

340B_REBATES_000371

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

**sanofi**

**A:** Beacon's Support Center, available at www.beaconchannelmanagement.com, provides a variety of resources, including webinars, recorded platform demonstrations, and FAQ documents. 340B covered entities can also register to participate in live webinars and information on how Beacon protects financial and healthcare related information is available online in the Trust Center. Technical, data submission, registration, or contract pharmacy designation questions should be direct to the Beacon support team at ███████████████████████████ or 1.████████████.  For other issues, customers can email ███████████████████████.

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

sanofi

### ATTACHMENT A

Admelog™

Amaryl™

Ambien™

Apidra™

Arava™

Avalide™

Avapro™

Doxercalciferol™

Dupixent™

Enoxaparin Sodium™

Flomax™

Insulin Glargine™

Ibesartan™

Kevzara™

Lantus™

Leflunomide™

Lovenox™

Multaq™

Plavix™

Priftin™

Primaquine™

Renagel™

Renvela™

Sevelamer™

Soliqua™

Toujeo™

Zolpidem™

340B_REBATES_000373

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**ATTACHMENT B**
**Contract Pharmacy Policy**

Sanofi's Contract Pharmacy Policy remains in effect. As of the effective dates noted below, Sanofi's Contract Pharmacy Policy will be effectuated through the Beacon platform.

For Hospital Covered Entities effective January 1, 2025, the Contract Pharmacy Policy is as follows:

- Covered entities without an in-house retail pharmacy may designate a single contract pharmacy location at which to receive access to 340B pricing.

- Covered entities designating a single contract pharmacy must submit the requested data elements listed in Attachment E to access 340B pricing at their designated contract pharmacy.

For CHs effective March 1, 2025, the Contract Pharmacy Policy is as follows:

- CH covered entities may designate up to 3 contract pharmacy locations at which to receive access to 340B pricing.

- Covered entities designating contract pharmacies must submit the requested data elements listed in Attachment E through the Beacon platform to access 340B pricing at their designated contract pharmacies.

All data must be submitted through the Beacon platform. All contract pharmacy designations must be made in the 340B ESP™ platform, at https://www.340besp.com/. If the covered entity has already designated their contract pharmacy or pharmacies on the 340B ESP™ platform, no further action is required to be take on the 340B ESP™ platform.

Sanofi considers all sites together as one covered entity for purposes of Sanofi's 340B Integrity Initiative, inclusive of the covered entity's Parent Site, Child Sites, and Associated Sites[5].

Contract pharmacies that are wholly owned by or have common ownership with the covered entity are subject to this Contract Pharmacy Policy.

State-specific policy information is located in Attachment C.

---

[5] https://www.hrsa.gov/about/faqs/what-associated-site-community-health-centers-federally-qualified-health-centers-fqhcs

340B_REBATES_000374

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**ATTACHMENT C**
**STATE POLICIES**

**Arkansas**:    Arkansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Arkansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies. Hospital Covered Entities are also subject to the Sanofi Contract Pharmacy Anti-Diversion Policy. Please see Attachment D for additional information.

**Kansas:**    Kansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Kansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Maryland**:    Maryland-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Maryland must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Mississippi**:    Mississippi-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Mississippi must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Missouri:**    Missouri-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Missouri must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**West Virginia:**    West Virginia Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits from Sanofi. No claims data or utilization data is required to be submitted for payment of the 340B Credits.

West Virginia-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in West Virginia must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

12/16

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**ATTACHMENT D**
**Sanofi Contract Pharmacy Anti-Diversion Policy**

This policy applies to contract pharmacy arrangements between hospital covered entity types (CAH, DSH, RRC and SCH) and pharmacies located in the following states:

- Arkansas: Effective 9/23/2024

As detailed in Attachment C, Sanofi has modified its 340B policies in certain states. Sanofi remains committed to 340B program integrity, including the avoidance of federally prohibited drug diversion.

To further that objective, Sanofi has adopted a Contract Pharmacy Anti-Diversion Policy. Under this policy, Sanofi will continue to offer 340B-priced drugs to covered entities consistent with Attachment C. However, Sanofi's offer includes a new term: a covered entity must provide evidence or, alternatively, attestation that it retains legal title to Sanofi 340B-priced drugs delivered to its contract pharmacies until the contract pharmacies dispense those drugs to 340B-eligible patients, consistent with federal law. "Sanofi 340B-priced drugs" shall refer to those drugs listed in Attachment A to this document. This term applies only with regard to contract pharmacies located in the state(s) listed above.

Covered entities will have 30 days from the effective date(s) noted above to log into the 340B ESP™ platform and complete the Contract Pharmacy Anti-Diversion process located on the righthand side of the 340B ESP™ Entity Profile. Covered entities must complete this process for every contract pharmacy located within the state(s) listed above at which the covered entity seeks to retain or obtain 340B pricing from Sanofi. Covered entities will lose access to 340B pricing at contract pharmacies located within the state(s) listed above for which the covered entity does not complete the Contract Pharmacy Anti-Diversion process. Covered entities may return to the Contract Pharmacy Anti-Diversion process at any time to add or remove contract pharmacies at which the covered entity seeks to have Sanofi 340B-priced drugs delivered.

For covered entities that previously completed the Contract Pharmacy Anti-Diversion process on 340B ESP™, no further action is required.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in any of the states listed above will have that contract pharmacy designation terminated 30 days from the applicable effective date.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in a state not listed above and subsequently secure access to 340B pricing at a contract pharmacy under this Contract Pharmacy Anti-Diversion Policy will have their single contract pharmacy designation canceled.

**Proof of Title Requirements**

Covered entities may secure access to Sanofi 340B-priced drugs at contract pharmacies located within the state(s) listed above only through the Contract Pharmacy Anti-Diversion process on the 340B ESP™ platform. Sanofi permits covered entities to submit one of two forms of proof of title for each contract pharmacy at which the covered entity seeks access to 340B pricing.

1. <u>Contract Pharmacy Agreement</u>

340B_REBATES_000376

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

**sanofi**

Covered entities may secure access to 340B pricing at contract pharmacies located within the state(s) listed above by submitting the applicable contract pharmacy agreement(s) demonstrating they retain title to Sanofi 340B-priced drugs until the contract pharmacy dispenses those drugs to 340B-eligible patients.

The agreement must be true, correct, and currently in effect.

The contract pharmacy shipping address must be stated in the agreement.

The agreement must state or otherwise demonstrate by its express terms that the covered entity retains legal title to Sanofi 340B-priced drugs at the contract pharmacy until those drugs are dispensed to 340B-eligible patients.

If the covered entity believes that any part of the contract pharmacy agreement is confidential, the covered entity may redact those confidential portions of the agreement.  However, the covered entity must provide the relevant provisions evidencing legal title unredacted.

Sanofi will review and approve or deny any submitted contract pharmacy agreement in a timely manner.

2. <u>Proof of Title Attestation</u>

Covered entities may also secure access to 340B pricing at contract pharmacies located within the state(s) listed above by signing the Contract Pharmacy Anti-Diversion Attestation for those contract pharmacies at which those covered entity retains legal title to Sanofi 340B-priced drugs until such drugs are dispensed to 340B-eligible patients. Please note that the Contract Pharmacy Anti-Diversion Attestation is declared under penalty of perjury, pursuant to 28 U.S.C. § 1746.

Sanofi will review and approve or deny any submitted attestations in a timely manner.

340B_REBATES_000377

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)

# sanofi

**ATTACHMENT E**
**Required Data Elements**

The tables below list the specific data elements collected as part of the purchase and 340B claim submissions process for the Credit Model.  Submission template files with details on data validations are available in the Support Center at www.beaconchannelmanagement.com.

Purchase Data Elements

| Field Name | Description |
|---|---|
| Invoice Date | Date the purchase was invoiced to the covered entity |
| Invoice Number | Wholesaler assigned invoice number for the purchase order |
| NDC-11 | National Drug Code of the product that was purchased by the covered entity |
| Package Units | Number of packages of the product ordered |
| Purchase Account Number | Wholesaler assigned account number used to place the order |
| Wholesaler Name | Name of the wholesaler that processed the invoice and shipped the purchase |
| 340B ID | HRSA assigned identifier of the 340B covered entity that made the purchase |
| Ship To Pharmacy ID (NPI) | NPI of the pharmacy that received the physical shipment of the product from the wholesaler |

Pharmacy Claim Data Elements

| Field Name | Description |
|---|---|
| Date Of Service | Date the prescription was filled at the pharmacy.  Sometimes referred to as the Fill Date. |
| Date Prescribed | Date the physician wrote the prescription.  Always comes on or before the Date of Service. |
| Rx Number | Identifier applied to the prescription by the pharmacy. |
| Fill Number | Indicates the number of times the prescription has been filled as of the current fill.  For example, a value of 2 indicates that the prescription has been filled twice and the current fill is the second one. |
| NDC-11 | National Drug Code which is a unique identifier of the drug dispensed to the patient. |
| Quantity | Number of units dispensed to the patient. |
| Prescriber ID | National provider identifier (NPI) of the physician that wrote the prescription. |
| Service Provider ID | NPI of the pharmacy that filled the prescription |

340B_REBATES_000378

CONFIDENTIAL INFORMATION, NOT FOR PUBLIC INSPECTION
CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION
SUBJECT TO FOIA EXEMPTION 4 (5 U.S.C. § 552(b)(4); 45 C.F.R. §§ 5.31(d), 5.41)



| 340B ID | HRSA assigned identifier of the 340B covered entity that designated the prescription as 340B |
| BIN Number | Bank identification number of the primary payer on the claim |
| PCN Number | Processor control number assigned by the entity processing payment |

Medical Claim Data Elements

| Field Name | Description |
| --- | --- |
| Health Plan ID | ID assigned to identify the plan. |
| Health Plan | The name of the plan. |
| Service Provider ID | ID assigned to a pharmacy or provider. |
| NDC-11 | ID of the product dispensed or service provided. |
| Quantity | Total quantity being submitted. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Physician ID | ID assigned to the prescriber. |
| Claim Number | A unique identifier for a prescription and claim processor |
| 340B ID | Code specifying the 340B covered entity |

Healthcare Encounter Data Elements

These data elements are applicable to Hospital Covered Entities only. CHs are not required to submit these data elements.

| Field Name | Description |
| --- | --- |
| Billing Service Provider ID | ID assigned to the entity billing for the healthcare services provided to the patient. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Rendering Physician ID | ID assigned to the healthcare professional providing the healthcare services to the patient. |
| HCPCS Code | HCPCS Level II code set value assigned to the healthcare service provided to the patient. |
| Diagnosis Code | ICD-10 code indicating medical conditions evaluated as part of the healthcare encounter. |
| Place of Service Code | Code identifying the place where a product or service is administered. |

340B_REBATES_000379

**HRSA**
Health Resources & Services Administration
**Office of Special Health Initiatives**
5600 Fishers Lane
Rockville, MD 20857



November 12, 2024

**BY EMAIL**
Scott Bray
Head of Pricing & Contracting Operations
Sanofi-Aventis US LLC
███████████████

Dear Scott Bray:

The Health Resources and Services Administration (HRSA) has reviewed the information submitted in your November 1, 2024, correspondence, regarding Sanofi-Aventis U.S., LLC's (Sanofi) proposal to implement a 340B "credit" model on January 1, 2025, for certain hospital covered entities and health center covered entities on March 1, 2025. The 340B statute states that "[t]he Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, *as provided by the Secretary*) to the manufacturer" shall not exceed the statutory ceiling price formula. 42 U.S.C. § 256b(a)(1) (emphasis added). To date, the Secretary has not provided for such a credit model; neither has Sanofi requested approval of the same. Therefore, implementing such a proposal at this time would be inconsistent with the statutory requirements for the 340B Program, which require the approval of Sanofi's proposed credit model.

In addition, HRSA requests responses to the following questions:

1. Shifting to a credit model would disrupt how the 340B Program has operated for over thirty years. Sanofi states that, it "is committed to paying the credit before the wholesaler's bill to the covered entity becomes due." The letter further states that Sanofi will offer covered entities the 340B credit within 30 days of the covered entity's wholesale acquisition cost (WAC) order, when the covered entity submits data within 22 days of the WAC order.
   a. Has Sanofi conducted an evaluation of the terms of wholesaler contracts with covered entities to ascertain whether they contain favorable fee terms, including prompt pay terms that require payment within shortened timeframes, which may not align with Sanofi's timeline for paying covered entities the 340B credit?
   b. Has Sanofi conducted an analysis of the extent of the additional burden and/or costs to the affected covered entities, particularly those that are the sole or primary source of health care in a rural or underserved community?
   c. Has Sanofi conducted an evaluation of the impact of this proposal on the scope and breadth of health care access for patients served by affected covered entities?

340B_REBATES_000380

2.  Sanofi states that it will require covered entities to submit credit claims to the credit platform within 30-days.
    a.  How did Sanofi arrive at the 30-day cut-off after which a dispense would no longer be eligible for the 340B price?
    b.  What other parties, if any, would Sanofi share the claims data with?
    c.  What protections and safeguards would Sanofi plan to implement to ensure such information would be used in support of the 340B Program?
    d.  What protections and safeguards would Sanofi plan to implement to ensure the privacy and security of such information?
    e.  Has Sanofi evaluated if the healthcare encounter data requested is information that covered entities routinely share with third parties and is easily exported from current systems to be able to submit to its credit platform?

3.  If Sanofi identifies a potential 340B duplicate discount, how will the credit claim be adjudicated?
    a.  What is the timeframe that Sanofi will process any such adjudication?
    b.  What reconsideration or appeals process will Sanofi implement?
    c.  Will Sanofi automatically deny covered entities' 340B credit claims if Sanofi believes a Medicaid rebate was already paid?
    d.  Will Sanofi automatically deny Medicaid rebate claims if Sanofi believes a covered entity's 340B credit claim has already been paid?

4.  Sanofi's letter suggests that it intends to assume a quasi-enforcement role of the statutory diversion prohibition and HRSA's 1996 patient definition guidance. Under the guise of preventing diversion, Sanofi has, on its own accord, added an additional element to the 1996 patient definition guidance with its 24-month limit for receiving a healthcare service. Please explain how Sanofi arrived at this 24-month cut-off for determining when an individual is not a patient of a covered entity and the legal justification for this approach?

5.  Under this proposal, what are the specific reasons that will lead Sanofi to reject claims?
    a.  Would Sanofi make these reasons publicly available in advance of adjudication of claims?
    b.  Would covered entities receive claim-by-claim information from Sanofi regarding which claims were rejected and on what basis?
    c.  What reconsideration or appeals process would Sanofi implement to ensure covered entities receive any 340B discounts that are due as required by statute?

6.  With respect to the use of pharmacies with which covered entities contract:

    a.   Would covered entities need to demonstrate that they ordered individual drugs subject to the credit claim at WAC?

    b.   Would this process require covered entities to maintain a separate stock of drugs at the contract pharmacy?

    c.   If so, how does Sanofi plan to ensure this process does not functionally deny covered entities access to the 340B price required by the statute given the additional upfront cost and administrative burden for covered entities, particularly low-margin safety net providers?

7. Sanofi's letter notes the use of replenishment models by covered entities to manage their 340B inventory. In a situation where the covered entity purchases a Sanofi drug at WAC to replenish a drug previously dispensed to a patient, and subsequently dispenses the replenishment unit thirty-plus days later, how does Sanofi anticipate providing the credit to the covered entity for the replenishment unit before the wholesaler's bill is due on that replenishment unit?

8. Under this proposal, how would Sanofi treat current unreplenished accumulations?

9. Under Sanofi's plan, will covered entities be required to submit claims data to both 340B ESP and the Beacon credit platform?

10. HRSA has received a number of reports of technical and customer service difficulties with 340B ESP. How would Sanofi ensure covered entities could submit claims without technical difficulties or delays and be able to access customer support without any significant issues with the Beacon platform.?

Please send your responses to 340BPricing@hrsa.gov.

                    Sincerely,

                    Chantelle V. Britton, M.P.A., M.S.
                    Director, Office of Pharmacy Affairs

# sanofi

*Via Electronic Mail to [340BPricing@hrsa.gov](mailto:340BPricing@hrsa.gov)*

Chantelle Britton
Director, Office of Pharmacy Affairs
Health Resources & Services Administration
5600 Fishers Lane
Rockville, Maryland 20857

Dear Ms. Britton:

I write on behalf of Sanofi-Aventis U.S. LLC ("Sanofi") in response to your November 12, 2024 letter (the "November 12 Letter") regarding Sanofi's planned 340B Credit Model.

Sanofi respectfully disagrees with your determination that Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires Sanofi to obtain HRSA's approval before implementing its planned Credit Model. Your letter grounds HRSA's determination that Sanofi's Credit Model requires prior agency approval in the statute's language directing that a pharmaceutical pricing agreement ("PPA") specify that "the amount required to be paid (taking into account any rebate or discount, *as provided by the Secretary*) to the manufacturer for covered outpatient drugs . . . does not exceed" the ceiling price.[1]  As explained in Sanofi's November 1, 2024 letter to you (the "November 1 Letter"), however, this language does not require Sanofi to obtain HRSA's approval before implementing its Credit Model.

Moreover, Sanofi notes that the questions posed in your letter are not relevant to whether the Credit Model comports with Sanofi's obligation, under Section 340B, to "'offer each covered entity covered outpatient drugs for purchase' at or below a specified ceiling 'price'" (the "must offer" requirement).[2] As the D.C. Circuit observed, Section 340B "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount."[3] Through its planned Credit Model, Sanofi proposes to do just that. Under the Credit Model, Sanofi will continue to *always* offer and sell its drugs to covered entities at the 340B price. In particular, covered entities that timely submit the purchase and claims data Sanofi requests will realize the 340B discount through Sanofi's payment of a credit *before* the covered entity must pay a wholesaler for the drugs it purchases.  And, as courts have held, Section 340B permits Sanofi to make such requests for claims data as part of the offer of 340B pricing.[4] Sanofi's Credit Model is thus fully consistent with Section 340B, as explained in its November 1 Letter. While the questions HRSA posed in response to that letter are not relevant to Sanofi's statutory obligation to offer its

---

[1] 42 U.S.C. § 256b(a)(1) (emphasis added).

[2] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (quoting 42 U.S.C. § 256b(a)(1)).

[3] *Id.*

[4] *Id.*; *Sanofi Aventis U.S. LLC v. HHS,* 58 F.4th 696, 704 (3d Cir. 2023).

# sanofi

covered outpatient drugs at the ceiling price, and thus do not bear on whether Sanofi may properly proceed with its Credit Model, Sanofi nevertheless responds to those questions below in the interests of transparency and cooperation.

Sanofi had originally planned to announce its Credit Model publicly on November 15, but Sanofi has postponed that announcement until November 22 in order to respond to your November 12 letter. Absent a response from HRSA by November 21 expressly stating that Sanofi's Credit Model is not consistent with Section 340B's "must offer" requirement, Sanofi will proceed with its planned announcement on November 22—noting that HRSA has not substantively objected to Sanofi's Credit Model and instead only incorrectly suggested that the agency must pre-approve the Credit Model's launch—so that Covered Entities can take the steps necessary to prepare for the launch of Sanofi's Credit Model on January 6, 2025.

**Responses to HRSA's Questions:**

1. **Shifting to a credit model would disrupt how the 340B Program has operated for over thirty years. Sanofi states that, it "is committed to paying the credit before the wholesaler's bill to the covered entity becomes due." The letter further states that Sanofi will offer covered entities the 340B credit within 30 days of the covered entity's wholesale acquisition cost (WAC) order, when the covered entity submits data within 22 days of the WAC order.**

   a. **Has Sanofi conducted an evaluation of the terms of the wholesaler contracts with covered entities to ascertain whether they contain favorable fee terms, including prompt pay terms that require payment within shortened timeframes, which may not align with Sanofi's timeline for paying covered entities the 340B credit?**

   Sanofi has not conducted such an evaluation because the availability of "favorable fee terms" (e.g., for prompt payment) are not relevant to whether Sanofi has met its statutory obligation by offering its drugs at the 340B ceiling price. Section 340B does not require Sanofi to offer its drugs on terms that would allow covered entities to obtain those drugs at an *even lower price* as a result of a prompt payment discount or any other similar terms. If a covered entity has negotiated a prompt pay discount or similar price concession from a wholesaler, Sanofi's Credit Model will not prohibit covered entities from taking advantage of those voluntary discounts.

   b. **Has Sanofi conducted an analysis of the extent of the additional burden and/or costs to the affected covered entities, particularly those that are the sole or primary source of health care in a rural or underserved community?**

   Sanofi's Credit Model will require certain covered entities (namely, hospitals and consolidated health centers) to submit data that those covered entities already maintain and submit to other stakeholders in the normal course of business. Any new burden associated with submitting that data through the Beacon platform would be minimal. The Credit Model data requirements "do

2



not prevent any covered entity from accepting" Sanofi's offer at the 340B price.[5] They are no "more onerous" than the similar data submission requirements courts have already approved under Section 340B.[6]

> **c.    Has Sanofi conducted an evaluation of the impact of this proposal on the scope and breadth of health care access for patients served by affected covered entities?**

Section 340B imposes no obligation on Sanofi to evaluate the scope and breadth of health care access for covered entities' patients. What matters is simply whether Sanofi is offering the 340B price to covered entities.  By effectuating the 340B price through its Credit Model, Sanofi will continue to meet that statutory obligation.

Sanofi notes, moreover, that government reports demonstrate that Section 340B's unchecked growth has not come with any meaningful increase in patient benefit. For example, government reports have found that most patients receive no discount on drugs dispensed by 340B entities.[7] A recent analysis showed that patients receive a portion of the 340B discount in only 1.4% of 340B contract pharmacy claims.[8] And multiple analyses demonstrate that financial incentives created by the 340B Program, as currently administered, skew prescribing decisions and increase patient out-of-pocket costs, resulting in more prescriptions, at higher prices, for patients of 340B hospitals than patients of other hospitals.[9]

> **2.    Sanofi states that it will require covered entities to submit credit claims to the credit platform within 30 days.**

> **a.    How did Sanofi arrive at the 30-day cut-off after which a dispense would no longer be eligible for the 340B price?**

---

[5] *Sanofi*, 58 F.4th at 703.

[6] *Novartis*, 102 F.4th at 464.

[7] GAO, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement, GAO-18-480, at 30 (June 2018), https://www.gao.gov/products/GAO-18-480.

[8] IQVIA, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?, (September 27, 2022), https://www.iqvia.com/locations/unitedstates/library/white-papers/are-discounts-in-the-340b-drug-discount-program.

[9] GAO, Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals, GAO-15-422, at 2 (June 2015), https://www.gao.gov/products/gao-15-442; Milliman, Analysis of 2020 Commercial Outpatient Drug Spend at 340B Participating Hospitals (September 2022), https://www.milliman.com/-/media/milliman/pdfs/2022-articles/9-13-22_phrma-340bcommercial-analysis.ashx.

340B_REBATES_000385

# sanofi

Sanofi requires prompt submission of claims data to identify and eliminate potential duplicate discounts. Claims data submitted more than 30 days after the dispense significantly increases the risk of duplicate discounts. In developing the Credit Model, Sanofi also took note of the 14-day prompt-payment and 340B deduplication window contained within CMS's IPAY 2027 Final Guidance.[10]

**b.    What other parties, if any, would Sanofi share the claims data with?**

Sanofi will not share the data that covered entities submit through the Beacon platform with any third party unless necessary to address a duplicate discounting issue with a third-party payor or pharmacy benefit manager or to address potential diversion with HRSA or an auditor.

**c.    What protections and safeguards would Sanofi plan to implement to ensure such information would be used in support of the 340B Program?**

BRG, which administers the Beacon platform, has taken numerous steps to ensure that information submitted to the platform is used only in support of the 340B Program. In particular, Beacon's Terms of Use, attached here as Exhibit A, set forth how Beacon, Second Sight (a wholly-owned subsidiary of BRG that manages the Beacon platform), and manufacturers like Sanofi can use information submitted to the platform.  Those terms do not permit the use of this information outside of the 340B Program.

**d.    What protections and safeguards would Sanofi plan to implement to ensure the privacy and security of such information?**

The Beacon platform incorporates multiple safeguards to ensure the privacy of information covered entities submit. First, the Beacon platform is separated from other BRG systems, and only a limited number of BRG personnel will have access to the platform. Second, Sanofi will only be able to access data related to its own products. Third, the Beacon platform has undergone an extensive Web Application Cybersecurity Assessment by a third party to ensure that the platform meets all applicable standards. The certification of those results is attached as Exhibit B.

**e.    Has Sanofi evaluated if the healthcare encounter data requested is information that covered entities routinely share with third parties and is easily exported from current systems to be able to submit to its credit platform?**

The healthcare encounter data elements that Sanofi will request are consistent with the data elements that third parties already use to identify 340B-eligible dispenses on behalf of covered entities, and these data elements are readily available to covered entities and their third-party administrators ("TPAs") for submission to Beacon.  Further, these data elements include the information that a covered entity would itself need to evaluate in order to make an independent

---

[10] *See* Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2, 2024), at § 40.4.

340B_REBATES_000386

# sanofi

determination of 340B eligibility in the event that the covered entity is not using a third party to do so.  HRSA has long taken the position that manufacturers, in their contracts with covered entities, may "include provisions that address customary business practice, request standard information, or include other appropriate contract provisions."[11] Sanofi's planned request for healthcare encounter data is just such a request for standard information, much like the contract pharmacy policy previously adopted by Sanofi and approved by the Third Circuit.[12]  The D.C. Circuit likewise approved a similar program in *Novartis*.[13]

3.      **If Sanofi identifies a potential 340B duplicate discount, how will the credit claim be adjudicated?**

Sanofi will use the data submitted through the Beacon platform to identify potential duplicate discounts. If Sanofi identifies a potential 340B duplicate discount, it will continue to pay the credit to effectuate the 340B price. Sanofi will use the data submitted through the Beacon platform to reject or recover duplicate discounts paid to Medicaid or other third parties.

a.      **What is the timeframe that Sanofi will process any such adjudication?**

As indicated in Sanofi's November 1 Letter, Sanofi, through the Beacon platform, will adjudicate and, where appropriate, pay the 340B credit no later than 7 days after a covered entity submits claims data.

b.      **What reconsideration or appeals process will Sanofi implement?**

Many aspects of the 340B eligibility and claims validation processes can be disputed by a 340B covered entity within the Beacon platform. Disputes are initiated in Beacon and may require the submission of additional documentation. Additional information on the dispute process will be available in the Beacon Support Center.  Sanofi will work in good faith with covered entities if they believe they were incorrectly denied a 340B Credit.

c.      **Will Sanofi automatically deny covered entities' 340B credit claims if Sanofi believes a Medicaid rebate was already paid?**

No. Sanofi will use the data submitted through the Beacon platform to identify potential duplicate discounts. If Sanofi identifies a potential 340B duplicate discount, it will continue to pay the credit to effectuate the 340B price. Sanofi will use the data submitted through the Beacon platform to reject or recover duplicate discounts paid to Medicaid or other third parties.

---

[11] *Novartis*, 102 F.4th at 457 (quoting Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,114 (May 13, 1994)).

[12] *Sanofi*, 58 F.4th at 704.

[13] *See Novartis* 102 F.4th at 460.

5

**sanofi**

     **d.**    **Will Sanofi automatically deny Medicaid rebate claims if Sanofi believes a covered entity's 340B credit claim has already been paid?**

If Sanofi concludes that a 340B credit was paid on a unit for which a Medicaid rebate is being requested, Sanofi will reject the Medicaid rebate consistent with the 340B statute, which prohibits duplicate discounts.

**4.**    **Sanofi's letter suggests that it intends to assume a quasi-enforcement role of the statutory diversion prohibition and HRSA's 1996 patient definition guidance. Under the guise of preventing diversion, Sanofi has, on its own accord, added an additional element to the 1996 patient definition guidance with its 24-month limit for receiving a healthcare service. Please explain how Sanofi arrived at this 24-month cut-off for determining when an individual is not a patient of a covered entity and the legal justification for this approach?**

Sanofi rejects the implication that the objectives and explanation set forth in its November 1 Letter are pretextual or otherwise improper. The text of Section 340B states that a covered entity may provide 340B-priced drugs only to the covered entity's patients. The statute is written in the present tense—covered entities may transfer the drug only to a person who *is* a patient of the entity.[14] To that end, HRSA's guidance similarly requires a current, active relationship between a patient and the covered entity, as the guidance states that a "patient" is someone who "receives health care services" (not "received") for which "responsibility for the care provided remains with the covered entity."[15] The text of Section 340B, including as construed by HRSA's guidance, thus requires a current, ongoing patient relationship.

Sanofi is operationalizing this principle by presuming that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed is a patient of that entity. Some covered entities already use this rule on their own when determining when to seek 340B pricing.[16] Sanofi is aware that many covered entities employ a stricter temporal requirement, as short as 12 months. Under Sanofi's approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity. But Sanofi will allow a covered entity to rebut that presumption by demonstrating that the person remains a current patient (*e.g.*, because the typical interval between visits for a patient with the medical condition at issue exceeds 24 months).

---

    [14] *See* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity" (emphasis added)).

    [15] Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,156, at 55,157 (Oct. 24, 1996) (emphasis added).

    [16] *See Genesis Health Care, Inc. v. Becerra,* 701 F. Supp. 3d 312, 326 (D.S.C. Nov. 3, 2023) (noting that "Genesis voluntarily utilizes a two year look back period to determine whether an individual is a patient").

6



**5.    Under this proposal, what are the specific reasons that will lead Sanofi to reject claims?**

When the Credit Model launches on January 6, as detailed in Sanofi's planned letter to covered entities enclosed as Attachment A to our November 1 Letter, Sanofi will utilize the Beacon platform to validate that (i) the order was placed at WAC; (ii) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy; and (iii) the requested claims data was submitted within 30 days of the drug's dispense.

Beginning March 1, 2025, Sanofi will also utilize the Beacon platform to validate, for Hospital Covered Entities, that the drug was dispensed to a patient of the Covered Entity using the definition of patient set forth in HRSA's 1996 guidance. To operationalize HRSA's 1996 patient definition, Sanofi will use healthcare encounter data to determine if the individual receiving a dispense (i) is currently receiving medical care from the covered entity, and (ii) receives the prescription in connection with health care services provided by the covered entity. Specifically, Sanofi will presume that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed is currently receiving medical care from the covered entity; under this approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity.  Sanofi will also presume that a prescription written by a health care professional who is employed by or similarly affiliated with the covered entity is being provided in connection with health care services provided by the covered entity. For prescriptions that arise from a referral following a patient encounter at the covered entity, where the prescriber is not employed by or similarly affiliated with the covered entity, Sanofi will analyze the data submitted to determine if the prescription relates to the health care services provided by the covered entity to the patient.  If Sanofi, through the Beacon platform, determines that HRSA's patient definition is not satisfied and rejects a claim, covered entities will have an opportunity to rebut that determination in order to receive a 340B credit for the prescription.

Finally, using the Beacon platform, Sanofi will validate claims to ensure they pass the standard data validation checks currently performed by wholesalers or payors, such as aberrant order quantity checks, and a confirmation that the prescription date predates the dispense date.

**a.    Would Sanofi make these reasons publicly available in advance of adjudication of claims?**

Yes.  Sanofi included the letter it plans to send to covered entities as Attachment A to its November 1 Letter.  In addition, Sanofi's policy will be available on the Beacon platform.  Further, Beacon will inform a covered entity who receives a rejected claim of the reason for such rejection. In such instances, the covered entity will have an opportunity to submit additional or alternative data for the same claim.

340B_REBATES_000389

**sanofi**

     **b.**      **Would covered entities receive claim-by-claim information from Sanofi regarding which claims were rejected and on what basis?**

Yes.  Beacon will inform a covered entity who receives a rejected claim of the reason for such rejection.  In such instances, the covered entity will have an opportunity to submit additional or alternative data for the same claim.

     **c.**      **What reconsideration or appeals process would Sanofi implement to ensure covered entities receive any 340B discounts that are due as required by statute?**

Many aspects of the 340B eligibility and claims validation processes can be disputed by a 340B covered entity within the Beacon platform. Disputes can be initiated in Beacon and may require the submission of additional documentation. Additional information on the dispute process will be available in the Beacon Support Center.  Sanofi will work in good faith with covered entities if they believe they were incorrectly denied a 340B credit.

**6.**     **With respect to the use of pharmacies with which covered entities contract:**

     **a.**      **Would covered entities need to demonstrate that they ordered individual drugs subject to the credit claim at WAC?**

Covered entities subject to Sanofi's Credit Model will need to submit to the Beacon platform only the Purchase Data Elements defined in Attachment A to Sanofi's November 1 Letter, which includes certain purchase information, including the invoice date, wholesaler invoice number and the wholesaler name.  Those Purchase Data Elements are sufficient to demonstrate the price at which the covered entity ordered the drugs.

     **b.**      **Would this process require covered entities to maintain a separate stock of drugs at the contract pharmacy?**

No. Covered entities will not be required to maintain a separate stock of drugs at their designated contract pharmacy.

     **c.**      **If so, how does Sanofi plan to ensure this process does not functionally deny covered entities access to the 340B price required by the statute given the additional upfront cost and administrative burden for covered entities, particularly low-margin safety net providers?**

As explained, Sanofi's Credit Model will not require covered entities to maintain a separate stock of drugs at their designated contract pharmacy.

340B_REBATES_000390

# sanofi

7.    **Sanofi's letter notes the use of replenishment models by covered entities to manage their 340B inventory. In a situation where the covered entity purchases a Sanofi drug at WAC to replenish a drug previously dispensed to a patient, and subsequently dispenses the replenishment unit thirty-plus days later, how does Sanofi anticipate providing the credit to the covered entity for the replenishment unit before the wholesaler's bill is due on that replenishment unit?**

Under the Credit Model, in the example above, payment will be transmitted upon submission of the required data related to the dispense, if the data is submitted within 30 days of the dispense. The subsequent order at WAC has no bearing on the effectuation of the 340B price for the prior dispense. The 340B price will be effectuated for the subsequent order if, again, the required data is submitted within 30 days of the dispense. Sanofi has no control over a covered entity's inventory management practices and, specifically, how long a covered entity takes to dispense a drug, but Sanofi's experience is that most (if not all) covered entities dispense Sanofi drugs shortly after the order. Sanofi will encourage covered entities to take the terms of Sanofi's offer to sell its drugs to covered entities at the 340B price into account when considering inventory management practices for Sanofi products.

8.    **Under this proposal, how would Sanofi treat current unreplenished accumulations?**

Sanofi will encourage all covered entities to place 340B replenishment orders for all accumulated utilization with dates of service that precede the effective date of the Credit Model prior to the launch of the Credit Model. Sanofi recognizes that there may be limited circumstances under which a covered entity may be unable to place a replenishment order for a dispensed unit prior to the Credit Model effective date. To mitigate this potential, Sanofi will offer covered entities the ability to receive a 340B Credit on a single unreplenished package per NDC with a date of service that pre-dates the launch of the Credit Model. Sanofi will continue to work in good faith with covered entities that demonstrate circumstances necessitating additional allowances.

9.    **Under Sanofi's plan, will covered entities be required to submit claims data to both 340B ESP and the Beacon credit platform?**

No.  Covered entities will only be required to submit claims data through the Beacon platform.  The covered entity must submit a claim for a 340B credit from Sanofi by submitting the applicable data elements listed in Attachment E of the November 1 Letter to the Beacon platform. These data elements consist of standard purchase and claims data that covered entities and their TPAs already collect, maintain, and use to establish 340B eligibility or submit to insurers for reimbursement in the ordinary course.

The contract-pharmacy designation process is administered through 340B ESP™ which can be accessed at https://www.340besp.com/. The 340B ESP™ platform is currently the only method for a covered entity to designate a contract pharmacy location under Sanofi's policy as described in Attachment B to the November 1 Letter.

340B_REBATES_000391



10.   **HRSA has received a number of reports of technical and customer service difficulties with 340B ESP. How would Sanofi ensure covered entities could submit claims without technical difficulties or delays and be able to access customer support without any significant issues with the Beacon platform?**

Beacon's Support Center, available at www.beaconchannelmanagement.com, provides a variety of resources, including webinars, recorded platform demonstrations, and FAQ documents. 340B covered entities can also register to participate in live webinars and information on how Beacon protects financial and healthcare related information is available online in the Trust Center. Technical, data submission, registration, or contract pharmacy designation questions should be direct to the Beacon support team at ███████████████████ or ████████████. For other issues, customers can email ███████████████████████.

Very truly yours,

*Scott Bray*

**Scott Bray**
*Head, Operations Excellence, US Market Access & Pricing*
███████████████████

55 Corporate Drive, Bridgewater, New Jersey  08807

10

# EXHIBIT A

340B_REBATES_000393



### CREDIT MODEL PLATFORM

## TERMS OF USE

*Last updated*: August 23rd, 2024.

Welcome to our Credit Model Platform, provided by Second Sight Solutions, LLC and its affiliates (collectively, "Company," "we," "us," "our"). These Terms of Use, as may be amended by us from time to time (the "Terms") are a legally binding contract between Company and "you", the Covered Entity (and/or its agent) using this Platform. Company and the Covered Entity (and/or its agent), together, the "parties." The Terms explain how you are permitted to use the credit model services provided by and through our online platform available at beaconchannelmanagement.com (the "Platform"). These Terms also govern your use of all the data, information, documentation, software, tools, applets, browser extensions, text, analytics, graphics, proprietary content and/or anything else (all of which we refer to collectively as "Materials") that we and/or our affiliates may make accessible or available to you, as well as any services provided through the Platform. Collectively, the Credit Model Platform, the Materials, and the related services provided by the Company are referred herein to as the "Credit Model Platform" or "Credit Model."

BY USING AND/OR REGISTERING TO USE THE CREDIT MODEL PLATFORM, CLICKING THE "ACCEPT" BUTTON, OR OTHERWISE AFFIRMING ACCEPTANCE, YOU ACKNOWLEDGE THAT YOU HAVE BOTH READ AND ACCEPT THESE TERMS. IF YOU DO NOT AGREE WITH ANY OF THESE TERMS, DO NOT ACCESS OR OTHERWISE USE THE CREDIT MODEL PLATFORM. THESE TERMS APPLY TO ALL VISITORS, USERS, CUSTOMERS, COVERED ENTITIES (AS DEFINED BELOW) AND ANY OTHER WHO ACCESS OR USES THE CREDIT MODEL PLATFORM. IF YOU DO NOT AGREE TO THESE TERMS OR DO NOT HAVE AUTHORITY TO AGREE, DO NOT USE THE CREDIT MODEL PLATFORM.

***Note: These Terms contain a dispute resolution (See Section 14), including a class action waiver that affects your rights.***

### 1. YOUR ACCEPTANCE AND CONTRACTUAL RELATIONSHIP.

By using the Credit Model Platform, you represent that you are at least 18 years of age, or that you are of age under the laws of your jurisdiction, and lawfully able to enter into contracts. If you are under 18 years of age or not legally able to enter into contracts in your place of residence, you are not allowed to use the Credit Model Platform, in which case please do not use the Credit Model Platform and do not provide us with information.

IF YOU ARE ENTERING INTO THESE TERMS ON BEHALF OF A COVERED ENTITY, YOU REPRESENT AND WARRANT THAT YOU HAVE THE LEGAL AUTHORITY AND CAPACITY TO BIND SUCH COVERED ENTITY. IF YOU ARE NOT AUTHORIZED NOR DEEMED BY LAW TO HAVE SUCH AUTHORITY, YOU ASSUME SOLE PERSONAL LIABILITY FOR THE OBLIGATIONS SET OUT IN THESE TERMS. The terms "you" and "your" refer to you, the legal entity you represent, and its affiliates.

Your access to and use of the Credit Model Platform is subject to your continued compliance with these Terms and all applicable laws. If you breach these Terms, your right to access and use the Credit Model Platform will terminate immediately, without any further action by Company, except for those obligations expressly described by the Company in these Terms.

### 2. PRIVACY.

Please review our privacy policy (the "Privacy Policy") available at beaconchannelmanagement.com/pages/privacy, which explains how we use any personal information that you submit to Company. The Privacy Policy is hereby incorporated by reference.

### 3. MODIFICATIONS AND ADDITIONAL TERMS.

(a) <u>Changes to these Terms</u>. Company can change, update, add or remove provisions of these Terms at any time by posting the updated Terms on the Platform and by providing a notice on the Credit Model Platform. We will ask for your express consent to the updated Terms when and where we are legally required to do so. If you do not agree with any of the updated Terms, you must stop using the Credit Model Platform. Continued use of the Credit Model Platform following notice of any such modifications indicates You acknowledge and agree to be bound by the modifications. Unless otherwise required by law, the updated Terms are effective as of the day of posting.

(b) <u>Changes to the Platform</u>. Company may make changes to the Credit Model Platform at any time, without notice to you. If you object to any changes to the Credit Model Platform, your sole recourse will be to cease using the Credit Model Platform. Continued use of the Credit Model Platform following posting of any such changes will indicate your acknowledgement of such changes and satisfaction with the Credit Model Platform, as modified. We also reserve the right to discontinue the Credit Model Platform, or any component of it, at any time without notice to you. We will not be liable to you or any third-party should we exercise our right to modify or discontinue the Credit Model Platform.

(c) <u>Additional Terms</u>. In addition, certain features of the Credit Model Platform may be subject to additional terms of use ("Additional Terms"), which shall be provided to you at the moment you choose to use such features or services. By using such features, or any part thereof, you agree to be bound by the Additional Terms applicable to such features. In the event that any of the Additional Terms governing such features conflict with these Terms, the Additional Terms will govern.

## 4. THE CREDIT MODEL PLATFORM AND COVERED ENTITIES.

(a) <u>Definitions</u>. Capitalized words used in these Terms but not otherwise defined have the meaning set forth below.

"340B" or "340B Program" refers to the 340B Drug Pricing Program, codified at 42 U.S.C. § 256b.

"340B Covered Entity" or "Covered Entity" means a health care organization or "covered entity" as such term is defined under the 340B Drug Pricing Program codified at 42 U.S.C. § 256b.

"340B Credits" or "Credits" refers to the 340B discounts requested from a PPM by a Covered Entity through this Credit Model Platform.

"Covered Outpatient Drug" refers to a covered outpatient drug under the 340B Drug Pricing Program, codified at 42 U.S.C. § 256b.

"MFP" refers to the 'maximum fair price' for certain pharmaceutical products, established under the Inflation Reduction Act of 2022 (IRA), as it applies to Medicare Part D drugs.

"Participating Pharmaceutical Manufacturers" or "PPM" refer to those pharmaceutical manufacturers identified within the Platform as participating in this Credit Model Platform.

"TPA" means, collectively, 340B third-party administrators.

"WAC" means the 'wholesale acquisition cost' with respect to a drug, referencing the manufacturer's list price for the drug to wholesalers or direct purchasers in the United States, not including other discounts, rebates or reductions in price.

(b) <u>The Credit Model Platform</u>. PPMs have enlisted Company to provide this Credit Model Platform as the mechanism through which PPMs will receive and validate requests made by 340B Covered Entities for 340B Credits. PPMs are requiring Covered Entities to request 340B Credits through the Credit Model Platform and provide de-identified Claims Data and other data for purposes of validating such requests. The Covered Entity is entitled to receive a Credit after submission of the requisite data, data validation, and PPM approval pursuant to the process and instructions detailed in the Platform.

(c) <u>340B Credit Model Process</u>. The Covered Entity, or TPA on behalf of the Covered Entity, shall be responsible for the identification of Covered Outpatient Drug purchases for which it is seeking 340B Credits from the PPM through the Platform. The Covered Entity (or TPA on its behalf) shall send the details of the 340B eligible prescriptions to the

Credit Model Platform in accordance with PPM instructions or policies. After validating the 340B Claims Data and other data, and calculating any Credits due, the PPM issues Credit(s) to the Covered Entity. The validation process may result in approval of a 340B Credit request or in the identification of requests that would result in ineligible 340B discounts or in duplicate discounts (including without limitation, Medicaid, Medicare, TriCare and/or commercial payer rebates) that are not eligible for reimbursement by such PPMs. While the 340B discount is calculated based on the difference between the applicable price at which a Covered Entity purchased the Covered Outpatient Drug (e.g., WAC; MFP) and the 340B Ceiling Price, as such term is defined under the 340B Program, the PPM may, at its sole discretion, voluntarily offer a discount that results in a final purchase price for the 340B Covered Entity that is lower than the established 340B Ceiling Price in certain situations, as it deems appropriate. The Credit Model Platform calculates discounts and rebates in accordance with applicable law and regulations.

**5. CLAIMS DATA AND LICENSE.**

To realize the 340B Credit, the Covered Entity agrees to submit accurate and complete claims data de-identified as set forth in 5(a) below (the "Claims Data") on a timely basis, including, but not limited to, payer information. Such submission shall be strictly in accordance with the timelines, structure, and formats specified by Company in the Platform. Any deviations or modifications from the requirements applicable to data submissions as outlined in the Platform may result in the invalidation or ineligibility of the claims submissions. Company assumes no responsibility or liability for any errors in the data received from you, to the extent arising from errors in your records or from incorrect use of the Credit Model Platform.

(a) <u>De-identification and re-identification</u>. The Platform enables the Covered Entity, (and/or its agent) on a computer under Covered Entity control to de-identify 340B Claims Data as defined under the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations, as may be modified from time to time ("HIPAA"). Company shall not attempt to re-identify or de-anonymize any of the Claims Data, including, without limitation, attempting to correlate any such data with any number, identifier, characteristic or other information that could be used, alone or in combination with other information, to identify any individual patient.

(b) <u>Data License</u>. The Credit Model Platform permits running analytics on such Claims Data, for the use by PPMs, subject to the licenses set forth below. You and the Covered Entity represent and warrant that you and the Covered Entity have any and all necessary right, title, license and authority (including any and all necessary permissions from third-party owners and rights holders) to provide the Claims Data to the Credit Model Platform. You grant Company a worldwide, sublicensable through multiple tiers, non-exclusive, royalty-free, perpetual, irrevocable license to collect, process, disclose, analyze, combine with other data, create derivative works of and otherwise use the Claims Data ("Data License") for the purposes set forth herein, and represent and warrant that you are authorized to grant such Data License on behalf of the Covered Entity. This Data License survives after termination of these Terms and shall survive as to any Claims Data that you have submitted on behalf of the Covered Entity or that a TPA has submitted on behalf of the Covered Entity after such respective dates of submission. You further represent and warrant that you are under no obligation to any third party that would prohibit or interfere with entering into these Terms, providing such Claims Data, granting the Data License or otherwise performing under these Terms, and that entering into these Terms and the arrangements set forth in these Terms (including without limitation providing such data and granting the Data License) and performance hereunder will neither conflict with, result in, nor constitute a breach under any other agreement or arrangement to which you are a party. You agree to follow all instructions provided within the Credit Model Platform to provide 340B Claims Data on behalf of the Covered Entity in the specified format to facilitate de-identification thereof and submission of Claims Data.

You agree that if the Covered Entity has authorized and consented to having one or more TPAs submit Claims Data associated with such Covered Entity to Company on its behalf, Company may reach out to such TPAs to collect such Claims Data from the TPAs.

You agree that Company may enable Claims Data to be combined with other data remitted by other Covered Entities or to PPMs by payers (including Medicaid, Medicare, TRICARE and commercial payers). You agree that Company may enable reporting of such combined data, together with any other Service Data (defined below), to PPMs, commercial payers, rebate claims processors or state Medicaid agencies. You agree that Company may disclose and sub-license the Claims Data and any other data derived from the interpretation, analysis, and combination of the

foregoing data with other data (the "Service Data") to the PPMs. Further, you agree that Company may use the Service Data for purposes of identifying 340B Credits, improving the Credit Model Platform and improving the process for identifying Credits.

Subject to the sub-licensing rights granted above, you acknowledge and agree that PPMs, commercial payers, rebate claims processors or state Medicaid agencies may link the Claims Data with other data (including identifiable rebate data) possessed by such entities. Further, you also agree that Claims Data may be utilized for the purposes of determining eligibility under the 340B Program and for any other purpose as required to use all the functionality of the Credit Model Platform, including without limitation to participating wholesalers and/or to the PPMs as necessitated to ensure the accurate processing, reconciliation, and payment of 340B Credits in accordance with the Program's regulations.

You consent to the reporting of any Claims Data to relevant federal and state agencies as necessary to ensure transparency in the administration of the 340B Program or as may be otherwise required by such agencies.

(c) <u>Monitoring.</u> You acknowledge and grant us the right to (i) monitor and track your use of the Credit Model Platform; (ii) monitor compliance with these Terms; (iii) investigate any complaint or reported violation of our policies; or (iv) report any activity that we suspect may violate any law or regulation to regulators, law enforcement officials or other persons or entities that we deem appropriate. Monitoring data is property of Company. If any such monitoring reveals that you are not using the Credit Model Platform in compliance with these Terms, then you will remedy any such non-compliance within five (5) business days of receiving notice from us.

(d) <u>Security and Confidentiality.</u> Company agrees to use appropriate administrative, physical, and technical safeguards to keep Claims Data secure and to prevent the use or disclosure of Claims Data other than as provided by these Terms.

## 6. LICENSE TO USE THE CREDIT MODEL PLATFORM AND REGISTRATIONS, GENERALLY.

For as long as you agree to these Terms and abide by them, you may use the Credit Model Platform. These Terms apply to all users of the Credit Model Platform. The Credit Model Platform is licensed, not sold, to you.

(a) <u>Covered Entity Registration.</u>  To register for the Credit Model Platform, the Covered Entity is required to submit specific documents for identity and business verification purposes, in compliance with Know Your Business (KYB) requirements. These documents shall include, but may not be limited to, the Covered Entity's Internal Revenue Service Employer Identification Number (EIN) confirmation letter (CP 575) and its duly executed Articles of Incorporation. Upon submission, the Covered Entity's documentation shall be forwarded to an Identity Verification Service, or such other similarly qualified third-party service as may be designated at the sole discretion of Company, for the purpose of verifying the authenticity and validity of the information provided. The Covered Entity consents to the sharing of its provided documents and any other necessary information for the purposes of this verification process. Covered Entity agrees that Company may not grant access to the Credit Model Platform until the verification process has been completed and the Covered Entity's identity and legal status has been confirmed. If you are employed by, represent or acting as an agent of a Covered Entity that is already registered with Company, in order to use the Credit Model Platform, you (i) must register for an account using an e-mail address associated with the Covered Entity by whom you are employed or acting as an agent and on whose behalf you will be submitting 340B Claims Data, or (ii) you must register using an invitation received from an Administrator Account (defined below) associated with the Covered Entity.

(b) <u>Grant of a Limited License to Use the Credit Model Platform.</u>  The Credit Model Platform is protected by copyright laws throughout the world. Subject to your agreement, and continuing compliance with these Terms, Company grants you a personal, non-exclusive, non-transferable, non-sublicensable, revocable limited license subject to the limitations below to use the Credit Model Platform and/or download and use copy(ies) of App(s) or downloadable software on a mobile device or computer, including any desktop version of the platform, that you own or control, and to run such copy solely for your own individual, non-commercial purposes only. You agree not to use the Credit Model Platform for any other purpose. Nothing in the license granted above or in these Terms shall restrict Company's ability to license the access and use of the Credit Model Platform or provide any other services to any third parties, regardless of any potential conflict between such third parties and you.

(c) <u>Restrictions.</u>  Unless otherwise is expressly provided herein, You will not (yourself, or through any parent, subsidiary, affiliate, agent or other third party): (i) sell, lease, distribute, license, resell, transfer, publicly display, publicly perform, transmit, stream, broadcast, reproduce or otherwise exploit the Credit Model Platform or sublicense the Credit Model Platform or any documentation, information, data or anything else accessible through the Credit Model Platform; (ii) decompile, disassemble, or reverse engineer the Credit Model Platform, in whole or in part; (iii) write or attempt to modify or develop any derivative work based upon the Credit Model Platform or any documentation, information, data, confidential information, or anything else accessible through the Credit Model Platform; (iv) use the Credit Model Platform in violation of any federal, state, or local law, regulation or rule ("Applicable Laws"); (v) use the Credit Model Platform for purposes of competitive analysis of the Credit Model Platform, the development of competing software products or services or any other purpose that is to the commercial disadvantage of Company; (vi) provide, disclose, divulge or make available to, or permit access or use of the Credit Model Platform, by any third party; (vii) retrieve, index, scrape, harvest, data mine or otherwise systematically gather or store content of the Credit Model Platform; (viii) remove any copyright, trademark or other proprietary notice or legend contained on (or printed from) the Credit Model Platform; (ix) link to, mirror or frame any portion of the Credit Model Platform except as expressly permitted by Company; (x) cause or launch any programs or scripts for the purpose of unduly burdening or hindering the operation and/or functionality of any aspect of the Credit Model Platform; or (xi) attempt to gain unauthorized access to or impair any aspect of the Credit Model Platform or its related systems or networks.  All rights not expressly granted to you in these Terms are reserved and retained by Company and/or its licensors.

## 7.  PAYMENTS OF CREDITS.

Access to the Credit Model is at no charge.  However, in order to receive payment of any Credits issued by PPMs, the Covered Entity is required to submit valid and accurate bank account information. This information will be used solely for the purpose of facilitating Credit payments to the Covered Entity.  Credits issued by PPMs will be directed by the Credit Model Platform to be paid to the Covered Entity's designated bank account in a timely and secure manner. The Covered Entity hereby authorizes the Company to handle the Covered Entity's bank account information for the purpose of facilitating Credit payments. The Covered Entity also acknowledges its responsibility to provide current and accurate bank account details, and to promptly notify the Company of any changes to such information to ensure the uninterrupted processing of payments.  The Covered Entity acknowledges that the Company acts merely as a facilitator for the receipt and disbursement of funds related to the 340B Credits on behalf of the PPM.

## 8.  OUR INTELLECTUAL PROPERTY RIGHTS AND FEEDBACK.

The Credit Model Platform and its features and functionality, including, without limitation, any Materials, and the selection and arrangement thereof, are the exclusive property of Company, our licensors or other content suppliers, and are protected by United States of America and international copyright, trademark, patent, trade secret and other intellectual property or proprietary rights laws, and may not be used or exploited in any way without our prior written consent. Company owns, solely and exclusively, all intellectual property rights embodied in or practiced by our products, services, and systems, and any improvements and derivatives therein. No right, title or interest in or to the Credit Model Platform or any Materials is transferred to you and all rights not expressly granted are reserved. Any use of the Credit Model Platform that is not expressly permitted by these Terms may be a breach of these Terms and may violate copyright, trademark and other intellectual property laws.

In addition to the intellectual property rights mentioned above, for purposes of these Terms, "Materials" also include all information such as the "look and feel" of the Credit Model Platform, data files, graphics, text, information, analytics, blogs, photographs, drawings, logos, images, sounds, music and video and audio files on the Credit Model Platform. Company exercises reasonable efforts to ensure that the Materials are accurate, however *Your use of the Credit Model Platform is at your own risk.*

Any comments, questions, suggestions, or materials regarding the Credit Model Platform from You to Us (collectively, "Feedback") through any communication whatsoever (e.g., call, email) will be treated as both non-confidential and non-proprietary.  Except as prohibited by Applicable Law, you hereby assign all right, title, and interest in, and We are free to use, without any attribution or compensation to You, any ideas, know-how, concepts, techniques, or other intellectual property and proprietary rights contained in the Feedback, whether or not patentable, for any purpose

340B_REBATES_000398

whatsoever, including but not limited to, developing, manufacturing, having manufactured, licensing, marketing, and selling, directly or indirectly, products and services using such Feedback. Where the foregoing assignment is prohibited by law, you hereby grant Us an exclusive, transferable, worldwide, royalty-free, fully paid-up license (including the right to sublicense) to use and exploit all Feedback as We may determine in our sole discretion. Notwithstanding the foregoing, you understand and agree that We are not obligated to use, display, reproduce, or distribute any such ideas, know-how, concepts, or techniques contained in the Feedback, and You have no right to compel such use, display, reproduction, or distribution.

**9. UNAUTHORIZED ACTIVITIES.**

Unauthorized use of the Credit Model Platform may result in violation of various United States and international laws. In addition to any restrictions set forth other sections, You are not authorized to use this Credit Model Platform in any of the following ways (these are examples only and the list below is not exhaustive of everything that You are not permitted to do):

- In a manner that violates any local, state, national, foreign, or international statute, regulation, rule, order, treaty, or other law;
- To stalk, harass, or harm another individual;
- To impersonate any person or entity or otherwise misrepresent Your affiliation with a person or entity;
- Remove, alter, bypass, avoid, interfere with or circumvent any copyright, trademark or other proprietary notices marked on the Materials or any digital rights management mechanism, device or other content protection measures either directly or through other means;
- Access the Credit Model Platform via any automated system, including, without limitation, by "robots," "spiders," "offline readers," etc., or take any action that imposes, or may impose (as determined in our sole discretion), an unreasonable or disproportionately large load on our infrastructure;
- Knowingly or recklessly upload invalid data or introduce viruses, worms, Trojan horses or other malware or software agents, whether harmful or not, to the Credit Model Platform, or tamper with, impair, damage, attack, exploit or penetrate the Company system or network, or otherwise attempt to interfere with or compromise the system integrity or security of Company or any connected networks, or take any action to impact the proper operation of the Credit Model Platform and any person's or entity's use or enjoyment thereof;
- Bypass the measures we may use to prevent or restrict access to or use of the Credit Model Platform, including by hacking into secured or non-public areas of the Credit Model Platform, circumventing any geo-blocking mechanisms or otherwise;
- Use the Credit Model Platform to collect any personally identifiable information, including Account names and e-mail addresses, or use the Credit Model Platform for any commercial solicitation purposes, without our prior express written permission;
- Attempt to reverse engineer any aspect of the Credit Model Platform or attempt to derive the source code (including the tools, methods, processes and infrastructure) that enables or underlies the Credit Model Platform, create any derivative works or materials of any kind using the Materials, whether or not you intend to give away the derivative materials free of charge, or otherwise build a business utilizing any aspect of the Credit Model Platform;
- Use the Credit Model Platform to upload or present any material which is false, defamatory, libelous, obscene, harassing, threatening, discriminatory, bigoted, hateful, violent, vulgar, profane, pornographic or otherwise offensive, inappropriate, damaging, unlawful, disruptive or harmful;
- Use the Credit Model Platform to violate our or any other person's legal rights (including the rights of publicity and privacy), contain any material that could give rise to any civil or criminal liability under applicable laws or regulations or otherwise promote, advocate or assist any illegal activity or unlawful act;
- Use the Credit Model Platform to infringe any patent, trademark, trade secret, copyright, contract or other intellectual property or other proprietary rights of Company or any other person;
- Use the Credit Model Platform to seek to harm or exploit children by exposing them to inappropriate content, asking for personally identifiable information or otherwise; or
- Be otherwise objectionable as determined by Company at its sole discretion.

You agree to hire attorneys to defend Us if You violate these Terms and that violation results in a problem for Us. You also agree to pay any damages that We may end up having to pay as a result of Your violation. You alone are

responsible for any violation of these Terms by You. We reserve the right to assume the exclusive defense and control of any matter otherwise subject to indemnification by You and, in such case, You agree to cooperate with Our defense of such claim.

## 10. WARRANTIES AND DISCLAIMERS.

You use the Credit Model Platform at your own risk. THE CREDIT MODEL PLATFORM IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT WARRANTIES OF ANY KIND, AND TO THE FULLEST EXTENT PERMITTED BY LAW, COMPANY (ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ASSOCIATES, PARTNERS, LICENSORS AND SUPPLIERS) DISCLAIM ALL WARRANTIES EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, SATISFACTORY QUALITY, AND THOSE ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. COMPANY DOES NOT WARRANT THAT YOU WILL BE ABLE TO ACCESS OR USE THE CREDIT MODEL PLATFORM AT THE TIMES OR LOCATIONS OF YOUR CHOOSING; THAT THE CREDIT MODEL PLATFORM WILL BE UNINTERRUPTED OR ERROR-FREE; OR THAT ALL DEFECTS WILL BE CORRECTED; OR THAT THE CREDIT MODEL PLATFORM IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

COMPANY DOES NOT WARRANT THAT THE FUNCTIONAL ASPECTS OF THE CREDIT MODEL PLATFORM OR THE MATERIALS WILL BE ERROR FREE OR THAT THE CREDIT MODEL PLATFORM, THE MATERIALS OR THE PLATFORM THAT MAKES IT AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. COMPANY AND ITS SUPPLIERS MAKE NO WARRANTIES ABOUT THE MATERIALS OR ABOUT RESULTS TO BE OBTAINED FROM USING THE CREDIT MODEL PLATFORM. COMPANY RESERVES THE RIGHT TO WITHDRAW, TEMPORARILY OR PERMANENTLY, ANY MATERIALS FROM THE CREDIT MODEL PLATFORM AT ANY TIME AND FOR ANY REASON AND SUCH REMOVAL MAY BE IMMEDIATE AND WITHOUT NOTICE. AS AN EXPRESS CONDITION TO YOUR USE OF AND ACCESS TO THE CREDIT MODEL PLATFORM, YOU ACKNOWLEDGE, AGREE AND CONFIRM THAT COMPANY IS NOT LIABLE TO YOU OR ANY THIRD PARTY FOR ANY SUCH WITHDRAWAL. WE DO NOT GUARANTEE CONTINUOUS, UNINTERRUPTED OR SECURE ACCESS TO ANY PART OF OUR CREDIT MODEL PLATFORM (INCLUDING ANY NETWORKS AND SERVERS USED TO PROVIDE ANY PART OF THE CREDIT MODEL PLATFORM).

You will take appropriate steps, both before accessing and using the Credit Model Platform and at all times thereafter, to copy and protect your own data and programs that may be lost, harmed or destroyed and to protect your equipment from any damage. You will be responsible for reconstruction, replacement, repair or recreation of lost programs, data or equipment in the event of any hardware, software, or services failure as a result of accessing or using the Credit Model Platform. Company will not, under any circumstances, be responsible for any such losses or damages.

**11. LIMITATIONS OF LIABILITY.** YOU UNDERSTAND AND AGREE THAT COMPANY SHALL NOT BE LIABLE FOR ANY DAMAGES, ECONOMIC OR OTHER LOSS OR DAMAGE, WHETHER INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE, AND EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILTY OF SUCH DAMAGES. THE LIMITATIONS OF LIABILITY SHALL NOT APPLY TO COMPANY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. COMPANY'S AGGREGATE LIABILITY FOR DIRECT DAMAGES UNDER THIS AGREEMENT WILL NOT EXCEED THE GREATER OF (i) AMOUNTS PAID HEREUNDER, OR (ii) ONE HUNDRED DOLLARS ($100).

## 12. TERM AND TERMINATION.

The Terms commence on the date when you start using the Credit Model Platform and/or upon your agreement to these Terms and remain in full force and effect while you use the Credit Model Platform, unless terminated earlier in accordance with the Terms. If you want to terminate the Credit Model Platform, you may do so by (a) notifying Company thirty (30) days in advance; and/or (b) deleting your account.

We reserve the right to terminate or suspend your account or access to the Credit Model Platform at any time and for any reason. It is within our sole discretion and determination to terminate your Account for what we deem to be a violation or breach of these Terms. In the event that we terminate or suspend your Account, you will have no further access to your Account or anything associated with it. Termination of the Credit Model Platform includes (i) automatic termination of all licenses and you must immediately destroy any downloaded or printed Materials (including

340B_REBATES_000400

software); and (ii) deletion of your password and related information, files and content associated with or inside your Account (or any part thereof), except to the extent of any surviving licenses or applicable record retention requirements. Company will not have any liability whatsoever to you for any suspension or termination. All your credit amounts in a trust account will be immediately remitted to your bank account upon termination.

Termination of the Credit Model Platform shall immediately and automatically terminate your right to access and use the Credit Model Platform. Upon termination, you will promptly cease using the Credit Model Platform and Company may immediately terminate your access to the Credit Model Platform and Company shall have no obligation to return to you any data stored on Company's systems.

All provisions of the Terms, which by their nature should survive, shall survive termination of the Credit Model Platform, including without limitation, ownership provisions, warranty disclaimers, and limitation of liability.

**13. LINKS TO THIRD-PARTY SITES.**

The Credit Model Platform may be linked to other websites that are not Company properties (collectively, "Third-Party Sites"). You acknowledge and agree that the Third-Party Sites may have different privacy policies and terms and conditions and/or user guides and business practices than Company, and you further acknowledge and agree that your use of such Third-Party Sites is governed by the respective Third-Party Site privacy policy and terms and conditions and/or user guides. Company does not verify, make any representations or take responsibility for any Third-Party Site, including, without limitation, the truthfulness, accuracy, quality or completeness of the content, services, links displayed and/or any other activities conducted on or through such Third-Party Sites.

**14. DISPUTE RESOLUTION AND ARBITRATION; CLASS ACTION WAIVER.**

*Please read this carefully. It affects your rights.*

    (a) Applicable Law. These Terms will be subject to and construed in accordance with the laws of the State of Illinois, United States of America, excluding its rules regarding conflicts of law. You agree that any claim or dispute you may have against Company must be resolved exclusively by a state or federal court located in the Northern District of Illinois, except as otherwise agreed by the parties or as described in the Arbitration subsection below. You agree to submit to the personal jurisdiction of the courts located in Illinois for the purpose of litigating all such claims or disputes.

    (b) Dispute Resolution. Before either party may seek arbitration as provided below, the party must first send to the other party a written notice of dispute ("Notice") describing the nature and basis of the claim or dispute, and the requested relief. After the Notice is received, you and Company may attempt to resolve the claim or dispute informally. If you and Company do not resolve the claim or dispute within thirty (30) days after the Notice is received, either party may begin a judicial or an arbitration proceeding.

    (c) Arbitration. You agree that Company may elect to resolve the dispute in a cost-effective manner through binding arbitration (including non-appearance-based arbitration), except that you may assert claims in small claims court if your claims qualify. In the event Company elects arbitration, you hereby agree to move any claims to the exclusive jurisdiction of an arbitration procedure, which shall be initiated through the American Arbitration Association or another established alternative dispute resolution provider (collectively, "ADR") chosen by Company. The ADR provider and the parties must comply with the following rules for non-appearance arbitration: (i) the arbitration shall be conducted by telephone, online and/or be solely based on written submissions, the specific manner shall be chosen by the party initiating the arbitration; (ii) the arbitration shall not involve any personal appearance by the parties or witnesses unless otherwise mutually agreed by the parties, in which case the location of the arbitration shall be in Illinois, and (iii) the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Arbitration expressly excludes claims for injunctive or other equitable relief. The U.S. Federal Arbitration Act and U.S. federal arbitration law apply to these Terms.

    (d) Waiver of Jury Trial. YOU HEREBY WAIVE YOUR CONSTITUTIONAL AND STATUTORY RIGHTS TO GO TO COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. In the event any litigation should arise between you and Company in any state or federal court in a suit to vacate or enforce an arbitration award or otherwise, YOU WAIVE ALL RIGHTS TO A JURY TRIAL, instead electing that the dispute be resolved by a judge.

(e) <u>Waiver of Class or Consolidated Actions</u>.  ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THESE TERMS MUST BE ARBITRATED OR LITIGATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS, AND CLAIMS OF MORE THAN ONE USER CANNOT BE ARBITRATED OR LITIGATED JOINTLY OR CONSOLIDATED WITH THOSE OF ANY OTHER USER.  EACH PARTY WAIVES THE RIGHT TO LITIGATE IN COURT OR ARBITRATE ANY CLAIM OR DISPUTE AS A CLASS ACTION, EITHER AS A MEMBER OF A CLASS OR AS A REPRESENTATIVE.

## 15. ELECTRONIC COMMUNICATIONS.

The communications between you and Company use electronic means, whether you visit the Site, send Company e-mails, or use the Credit Model Platform or whether Company posts notices on the Site or communicates with you via e-mail.  For contractual purposes, you (1) consent to receive communications from Company in an electronic form; and (2) agree that all terms and conditions, agreements, notices, disclosures, and other communications that Company provides to you electronically satisfy any legal requirement that such communications would satisfy if it were to be in writing.  Where Company requires that you provide an e-mail address; you are responsible for providing Company with your most current e-mail address.  In the event that the last e-mail address you provided to Company is not valid, or for any reason is not capable of delivering to you any notices required/ permitted by the Terms, Company's dispatch of the e-mail containing such notice will nonetheless constitute effective notice. We are not responsible for any automatic filtering you or your network or e-mail provider may apply to communications we send to an e-mail address that you provide to us.

## 16.  GENERAL.

(a) <u>Entire Agreement</u>.  These Terms together with our Privacy Policy (beaconchannelmanagement.com/privacy), and any Additional Terms that we may make available from time to time through our internet properties, constitute the entire agreement between you and Company regarding your use of our Credit Model Platform and supersede and replace any prior written or oral agreements regarding the foregoing. Our failure to exercise or enforce any right or provision in these Terms shall not operate as a waiver of such right or provision. If any provision of the Terms is found to be unlawful, void or for any reason unenforceable, then that provision shall be deemed severable from the Terms and shall not affect the validity and enforceability of any remaining provisions. Neither the rights nor obligations arising under these Terms are assignable by you. Any such attempted assignment or transfer shall be void and without effect. We may assign these Terms (and any licenses granted hereunder) without restriction. You specifically authorize our use of subcontractors and our right to delegate any of the rights or obligations hereunder. Section headings used herein are provided for convenience of reference only and shall not constitute a part of these Terms.

(b) <u>Confidentiality</u>. You may be given access to certain non-public proprietary information related to the Credit Model Platform and Company (the "Confidential Information"). You shall use this Confidential Information only as necessary in exercising the rights granted to you by these Terms. You shall not disclose any Confidential Information to any third party without our prior written consent and you agree that you will protect this Confidential Information from unauthorized use, access, or disclosure in the same manner that you would use to protect your own confidential and proprietary information of a similar nature and in any event with no less than a reasonable degree of care.

(c) <u>Force Majeure</u>. We will not be deemed to be in breach of these Terms or liable for any breach of these Terms or our Privacy Policy (beaconchannelmanagement.com/pages/privacy) due to any event or occurrence beyond our reasonable control, including without limitation, acts of God, terrorism, war, invasion, failures of any public networks, electrical shortages, earthquakes or floods, civil disorder, strikes, fire, pandemics or epidemics (whether or not already active at the time you accept these Terms), act of government (including but not limited to "shelter in place," "travel ban," "quarantine" or "shutdown" orders, whether or not already active at the time you accept these Terms) or other disaster.

(d) <u>Third Party Beneficiaries</u>. Except for Participating Pharmaceutical Manufacturers, these Terms are for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of these Terms. You expressly acknowledge and agree that the Participating Pharmaceutical Manufacturers are third party beneficiaries of these Terms and have the full rights to enforce these

Terms as if any one of them was a signatory hereto. These Terms do not create or imply any partnership, agency, or joint venture between the parties hereto.

(e) <u>United States Only.</u>  The Credit Model Platform is intended for use by individuals located in the United States of America and is not intended for use by anyone located outside of the United States. You should not use the Credit Model Platform if you are not located in the United States. Company makes no claims that the Credit Model Platform is accessible or appropriate outside of the United States.

**17. CONTACT US.**

If you have any questions about these Terms or otherwise need to contact Company for any reason, you can reach us at telephone: ███████████ (toll free) or e-mail: ██████████████████████.

© 2024 Second Sight Solutions, LLC. All rights reserved.

# EXHIBIT B

340B_REBATES_000404

 

**August 7, 2024**

To Concerned Parties and Prospective Business Partners

This document serves as a formal Letter of Attestation for BRG Second Site Solutions' comprehensive Web Application Cybersecurity Assessment focused on the 'Beacon' Web Application. The exercises were performed by ecfirst between July 25, 2024, and August 2, 2024.

These assessments aim to identify potential security issues and deviations from best practice. ecfirst's Web App Cybersecurity Assessment Methodology has been designed to follow best practice recommendations as identified by NIST, SANS, PCI, OWASP, CIS and other industry-accepted sources, coupled with direct experience, to ensure a comprehensive assessment is performed within the defined scope.

Based on the information collected and reviewed from the Web Application Cybersecurity Assessment, ecfirst analysis concluded that BRG Second Site Solutions has implemented a credible set of security controls to meet the applicable standards.

*Michael G. Turpin*

**Michael G. Turpin**
Director of Client Engagement and Compliance Services

        

AI Defense, *Beyond Cyber*

| | |
|---|---|
| **From:** | Britton, Chantelle (HRSA) |
| **To:** | Shumate, Brett A. |
| **Cc:** | Trivedi, Nimisha /US; Muttreja, Rajeev; Citera, Toni-Ann; Owen, Megan L.; HRSA HSB 340B Pricing; ██████████ |
| **Subject:** | RE: Sanofi"s 340B Credit Model |
| **Date:** | Thursday, November 21, 2024 1:36:00 PM |
| **Attachments:** | image001.png |
| | image002.gif |
| | image003.gif |
| | image004.gif |
| | image005.gif |
| | image006.gif |
| | image007.gif |

Brett –

HRSA has recently received inquiries from manufacturers related to different proposed rebate models for the 340B Program. HRSA continues to be in the process of reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program. As HRSA has previously stated, implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act.

Thank you,
Chantelle

---

**From:** Shumate, Brett A. <██████████████████>
**Sent:** Friday, November 15, 2024 3:40 PM
**To:** HRSA HSB 340B Pricing <340BPricing@hrsa.gov>; ████████████████
**Cc:** Trivedi, Nimisha /US <████████████████>; Muttreja, Rajeev <████████████████>; Citera, Toni-Ann <████████████████>; Owen, Megan L. <████████████████>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>
**Subject:** [EXTERNAL] RE: Sanofi's 340B Credit Model

Ms. Britton,

Please see the attached response from Sanofi.

Thank you,

Brett A. Shumate
Partner
**JONES DAY® - One Firm Worldwide®**
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
202.879.3835

---

**From:** HRSA HSB 340B Pricing <340BPricing@hrsa.gov>
**Sent:** Tuesday, November 12, 2024 2:14 PM
**To:** ████████████████████



**Cc:** Trivedi, Nimisha /US <███████████>; Shumate, Brett A. <███████████>; Muttreja, Rajeev <███████████>; Citera, Toni-Ann <███████████>; Owen, Megan L. <███████████>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; HRSA HSB 340B Pricing <340BPricing@hrsa.gov>
**Subject:** re: Sanofi's 340B Credit Model

Dear Scott Bray,

Please find the attached letter.

Thank you,

**Chantelle V. Britton, M.P.A., M.S. (she/her)**
Director
Office of Pharmacy Affairs
Office of Special Health Initiatives



Sign up for email updates!

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

# sanofi

November 22, 2024

Dear Covered Entity:

Sanofi is updating its policy related to its 340B Integrity Initiative and the method through which Sanofi effectuates the 340B ceiling price for certain Covered Entities.  As described in detail below and as part of Sanofi's 340B Integrity Initiative, Sanofi will be adopting a new model for 340B ceiling price effectuation (the "Credit Model"). Sanofi will continue to offer the 340B price to all covered entities, but for the covered entities listed below, Sanofi will effectuate the 340B price through a credit paid to the covered entities. In addition, for hospital covered entities, Sanofi will effectuate the 340B price when they dispense the drugs to their patients, as defined by HRSA's guidance, but not when the drugs are dispensed to others.

The 340B Drug Pricing Program today bears little resemblance to the safety net program established by Congress over 30 years ago. The 340B Program is now the nation's second largest federal prescription drug program with more than $66 billion in annual sales at discounted prices.[1]

340B's unchecked growth has not come with any meaningful increase in patient benefit. Government reports have found that most patients receive no discount on drugs dispensed by 340B covered entities.[2] And a recent analysis showed that patients receive a portion of 340B discount in only 1.4% of 340B contract pharmacy claims.[3] 340B's financial incentives also skew prescribing decisions and increase patient out-of-pocket costs. According to multiple analyses, patients of 340B hospitals receive more drugs and more expensive drugs than patients of non-340B hospitals.[4]

Over the past few years Sanofi took multiple steps to address prohibited duplicate discounts and diversion in the 340B Program. But this waste and abuse has unfortunately persisted, in part because of the current model of 340B. Today, the various transactions and data points that establish 340B eligibility and effectuate the 340B price are disconnected from one another. That disconnect generates opacity, a primary driver of 340B waste and abuse.

---

[1] HRSA, "2022 Covered Entity Purchases," (September 2023), https://www.hrsa.gov/opa/updates/2022-340b-covered-entity-purchases.
[2] GAO, Drug Discount Program:  Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement, GAO-18-480, at 30 (June 2018), https://www.gao.gov/products/GAO-18-480.
[3] IQVIA, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?, (September 27, 2022), https://www.iqvia.com/locations/united-states/library/white-papers/are-discounts-in-the-340b-drug-discount-program.
[4] GAO, Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals, GAO-15-422, at 2 (June , 2015), https://www.gao.gov/products/gao-15-442;  Milliman, Analysis of 2020 Commercial Outpatient Drug Spend at 340B Participating Hospitals (September, 2022), https://www.milliman.com/-/media/milliman/pdfs/2022-articles/9-13-22_phrma-340b-commercial-analysis.ashx.

340B_REBATES_000408

# sanofi

Sanofi is implementing the 340B Credit Model to rein in the 340B waste and abuse we see today. Sanofi's 340B Credit Model will, for the first time, link the relevant data elements and transactions for every 340B dispense. This innovation will bring transparency to 340B. It will identify potential duplicate discounts and prevent instances of illegal diversion.

Sanofi's 340B Integrity Initiative, including the Credit Model, applies to the following covered entities:

- Hospital Covered Entities:
    - Critical Access Hospitals (CAH)
    - Disproportionate Share Hospitals (DSH)
    - Rural Referral Centers (RRC)
    - Sole Community Hospitals (SCH)
- Consolidated Health Centers (CH)

All covered entity types not listed are excluded from this initiative.

The 340B Integrity Initiative applies only to the products listed in Attachment A (the "Products").

Sanofi's Contract Pharmacy Policy is located in Attachment B.

State-specific policy information is located in Attachment C.

Sanofi's Contract Pharmacy Anti-Diversion Policy is located in Attachment D.

The requested data elements for the 340B Credit Model are located in Attachment E.

**The 340B Credit Model**

Sanofi will continue to offer the 340B price to all covered entities, but Sanofi will now effectuate the 340B price through a 340B Credit for certain covered entities.

Sanofi's Credit Model will be operationalized using the Beacon platform. Detailed instructions on covered entity registration, data submission, and other pertinent information regarding Beacon are available on the Beacon website at www.beaconchannelmanagement.com. Sanofi encourages covered entities to register an account on Beacon as soon as possible.

Under the Credit Model, the 340B ceiling price will be effectuated through a credit paid directly to the covered entity using the following 3-step process:

**Step 1**: The covered entity places an order for a Product through their wholesaler at the Product's Wholesale Acquisition Cost (WAC).

**Step 2**: The Product is dispensed to a patient of the covered entity.

340B_REBATES_000409

# sanofi

**Step 3**: The covered entity submits purchase and claims data to Beacon for 340B eligible dispenses. Beacon confirms 340B eligibility and issues a credit payment to the covered entity representing the difference between the WAC and 340B price.

Covered entities will not be required to carry the cost of purchasing a Product at WAC as part of Sanofi's Credit Model. The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. As a result, a covered entity that promptly submits data should never carry the cost of the full WAC because it will receive a credit for the difference between the WAC and 340B price before it must pay the wholesaler at the WAC.

**Credit Model Effective Dates**

This update will go into effect on the dates listed below. As of the dates listed below, 340B pricing will no longer be available through wholesalers for the applicable covered entity types for the products listed on Attachment A. The 340B price will instead be available through a credit from Beacon.

- January 6, 2025 – CAH, DSH, RRC, SCH

- March 1, 2025 – CH

**Claim Submission, Validation, and 340B Credit Payment Process**

Within 30 days of the dispense of a Product, the covered entity must submit a claim for a 340B Credit from Sanofi by submitting the applicable data elements listed in Attachment E to the Beacon platform. These data elements consist of standard purchase and claims data that covered entities and their Third-Party Administrators ("TPAs") already collect, maintain, and use to establish 340B eligibility or submit to insurers for reimbursement in the ordinary course of business.

Through Beacon, Sanofi will review the data submitted and validate that a claim is eligible for a 340B Credit. Claims will be eligible for a 340B Credit if 1) the drug was ordered by a covered entity at WAC; 2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy; 3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and 4) the requested claims data was submitted within 30 days of the drug's dispense. Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

To maintain consistency with current covered entity operations, 340B Credit payments will be calculated and paid at the NDC-11 level. The 340B Credit will equal the difference between (i) WAC and (ii) the 340B ceiling price of the Product.

For Hospital Covered Entities (CAH, DSH, RRC, SCH), payment for a 340B Credit will be transmitted within 7 days after the covered entity submits data sufficient to trigger a full package accumulation, which, for Products with single-unit package sizes, will be a single validated 340B dispense.

340B_REBATES_000410

# sanofi

For CHs, Sanofi will presumptively transmit a 340B Credit upon submission and validation of only the Purchase Data Elements listed in Attachment E. Sanofi encourages CHs to submit Purchase Data Elements immediately upon placing an order at WAC with their wholesaler to receive the 340B Credit as soon as possible. CHs must still submit all remaining applicable data elements within 30 days of the drug's dispense. Sanofi will validate both the Purchase and Pharmacy or Medical Claim Data Elements, and 340B Credit payments will only be applied to valid data submissions. Credits presumptively transmitted on a claim that is not validated will be applied to subsequent claims for 340B Credits.

Sanofi encourages covered entities to submit data as quickly as possible to ensure faster payment of 340B Credits.

Payment details will be available on the Beacon platform, permitting covered entities to reconcile and verify 340B Credits claimed, validated, and paid.

Sanofi will continue to work together with covered entities in good faith, as it has always done, in the event a covered entity notifies the company that it should have received a 340B Credit in a particular case.

**340B Patient Definition**

This section is effective March 1, 2025, and shall apply to Hospital Covered Entities only. This section does not apply to CHs.

As part of the 340B claim submission for pharmacy claims, Hospital Covered Entities are required to append healthcare encounter data that establishes that the submitted claim is for a prescription dispensed to the covered entity's patient. The healthcare encounter data elements are listed in Attachment E.

Sanofi shall utilize the appended healthcare encounter data to validate that the patient to whom the drug was dispensed for the specific 340B pharmacy claim is a patient of the covered entity, as set forth in HRSA's 1996 guidance available at 61 Fed. Reg. 55156. HRSA's 1996 guidance states that:

An individual is a patient of the covered entity if:

1. The covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care;

2. The individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and

3. The individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or federally qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this requirement.

340B_REBATES_000411

# sanofi

An individual will not be considered a "patient" of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.

To operationalize HRSA's 1996 patient definition, Sanofi will use healthcare encounter data to determine if the individual receiving a dispense (1) is currently receiving medical care from the covered entity, and (2) receives the prescription in connection with health care services provided by the covered entity.

Sanofi will presume that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed is currently receiving medical care from the covered entity; under this approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity.

Sanofi will also presume that a prescription written by a health care professional who is employed by or similarly affiliated with the covered entity is being provided in connection with health care services provided by the covered entity.  For prescriptions that arise from a referral following a patient encounter at the covered entity, where the prescriber is not employed by or similarly affiliated with the covered entity, Sanofi will analyze the data submitted to determine if the prescription relates to the health care services provided by the covered entity to the patient.

For prescriptions dispensed to individuals who do not satisfy HRSA's patient definition, Sanofi will decline a 340B Credit to avoid statutorily prohibited diversion of 340B drugs. In the event of such a denial, a covered entity will have an opportunity to submit additional or alternative data for the same claim in order to demonstrate that the individual was the covered entity's patient.

## FREQUENTLY ASKED QUESTIONS

**Q: What types of covered entities are NOT included in Sanofi's 340B Integrity Initiative?**

**A:** Sanofi's 340B Integrity Initiative does <u>not</u> include the following categories of covered entities.

- Children's Hospitals
- Free Standing Cancer Hospitals
- Hemophilia Treatment Centers
- Ryan White Clinics
- Tribal / Urban Indian Health Centers
- Federally Qualified Health Center Look-Alikes
- Sexually Transmitted Diseases Clinics
- Family Planning Clinics
- Tuberculosis Clinics
- Native Hawaiian Health Centers

340B_REBATES_000412

# sanofi

**Q:  Will I continue to have access to 340B pricing through my wholesaler?**

**A:**  Upon the applicable Credit Model effective date, 340B pricing for Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) will no longer be available through wholesalers for in-scope products included in Attachment A.  340B covered entities will initially place an order for these products at WAC from their wholesaler and then the 340B ceiling price will be effectuated for that order through a 340B Credit payment.

**Q:  Does Sanofi's policy apply to all 340B utilization or just contract pharmacies?**

**A:**  Sanofi's policy applies to all 340B utilization for the covered entities described above, inclusive of utilization at in-house retail pharmacies and contract pharmacies, as well as utilization administered to eligible 340B patients in an outpatient setting.

**Q. Can my wholly owned contract pharmacy receive 340B Credits?**

**A**: Contract pharmacies that are wholly owned by the covered entity or have common ownership with the entity are subject to Sanofi's 340B Integrity Initiative, including Sanofi's Contract Pharmacy Policy.

**Q: How do I designate a contract pharmacy?**

**A:** The designation process is administered through 340B ESP™ which can be accessed at https://www.340besp.com/.   The 340B ESP™ platform is currently the only method for a covered entity to designate a contract pharmacy location under Sanofi's policy. Please note that a contract pharmacy must have an assigned HIN for the wholesaler to process 340B transactions for Sanofi drug products. Covered entities may change their designated contract pharmacy twelve months after a designation occurs. Contract pharmacy designations can take up to 10 business days to process.

**Q: I have already designated a contract pharmacy.  Do I need to re-designate my contract pharmacy?**

**A:** Covered entities that currently have a designation in place through 340B ESP™ do not need to re-designate.

**Q: Does Sanofi's Integrity Initiative apply to all Sanofi products?**

**A:** No, Sanofi's 340B Integrity Initiative only applies to the Sanofi products listed in Attachment A.

**Q: Is Sanofi requiring data for my designated contract pharmacy if my covered entity does not have an in-house pharmacy?**

**A:**  Data is required for a designated contract pharmacy. Please see Attachment E for the required data elements.

**Q: What are the requirements for submitting data?**

340B_REBATES_000413

# sanofi

**A:** Data must be submitted within 30 days of the claim's date of dispense or administration. If a claim is submitted more than 30 days after the claim's date of dispense or administration, the applicable drug dispense or administration will not be eligible for a 340B Credit. Sanofi will work in good faith with covered entities if they believe they were incorrectly denied a 340B Credit.

**Q: Who can submit data to Beacon on behalf of a covered entity?**

**A:** Beacon account administrators may submit data on behalf of a covered entity or may grant access to other covered entity employees or contractors to submit data via Beacon. Currently, TPAs are not able to submit data to Beacon via an API or other direct data submission method on behalf of a covered entity. Sanofi anticipates that Beacon will support direct submissions from TPAs in early 2025 and additional information will be made available to 340B covered entities as this functionality becomes available.

**Q: How frequently should a covered entity submit data to Beacon?**

**A:** There is no limitation on how frequently data may be submitted. Sanofi encourages covered entities to submit data as frequently and as early as practicable. Covered entities should endeavor to submit Purchase Data Elements immediately after placing a WAC order with their wholesaler. Covered entities should submit all other applicable data elements immediately following a 340B eligible dispense or administration of a Product.

**Q: How will Sanofi use the data that covered entities provide through Beacon?**

**A:** Data uploaded by covered entities will be used to confirm 340B eligibility of the dispense, and to identify and resolve duplicate Medicaid and commercial rebates. The Beacon platform will validate that:

1) the drug was ordered by a covered entity at WAC;
2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy;
3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and
4) the requested claims data was submitted within 30 days of the drug's dispense.

Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

**Q: How are claim reversals submitted and processed in Beacon?**

**A:** Submission of a claim to Beacon is a request for payment of a 340B Credit, and 340B covered entities should only submit final claims. In the event that a previously submitted and validated claim must be reversed, the covered entity should submit the same claim detail with a negative unit amount. Claims associated with purchases for which no 340B Credit has been paid will be disassociated with the purchase. If the 340B credit has already been paid, a future 340B claim submission will replace the reversed claim.

340B_REBATES_000414



**Q. Can a covered entity dispute a claim submission that is not validated in Beacon?**

**A:** Yes. Many aspects of the 340B eligibility and claims validation processes can be disputed by a 340B covered entity within the Beacon platform. Disputes are initiated in Beacon and may require the submission of additional documentation. Additional information on the dispute process is available in the Beacon Support Center.

**Q. Is the Credit Model compatible with central fill pharmacy systems?**

**A:** Yes. Sanofi recognizes that many covered entities operate a central fill pharmacy in which their drug purchases are shipped to a centralized pharmacy location but dispensed or administered through numerous locations operated by the 340B covered entity. The Credit Model supports this. Eligible claim submissions dispensed or administered at a location registered with HRSA as a parent or child site or shipping address of a parent or child site will be associated with any purchase shipped to a location registered with HRSA as a parent or child site or shipping address of a parent or child site.

**Q: What is the amount of the 340B Credit payment?**

**A:** The 340B Credit payment will always equal the difference between the (1) WAC and (2) the 340B ceiling price of the Product at the time the product was initially purchased as indicated in the Purchase Data Elements.

**Q: Will 340B Credits be paid on an individual dispense of Products?**

**A:** 340B Credits are calculated and paid on NDC-11 packages of Products to maintain consistency with how 340B pricing is effectuated today. Once the number of eligible 340B dispenses accumulated in Beacon equals the NDC-11 package size of Product, a 340B Credit will be paid. For Products with single-unit package sizes, a 340B Credit will be paid after a single validated 340B dispense.

**Q: When will 340B Credits be paid?**

**A:** The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. A 340B Credit payment will be transmitted within 7 days after a full package accumulation of 340B eligible dispenses for a given Product which, for Products with single-unit package sizes, will be after a single validated 340B dispense. Beacon validates claims for 340B Credits on a rolling basis. Sanofi encourages covered entities to submit data frequently and promptly to ensure payment of 340B Credits.

For CHs, Sanofi will presumptively transmit a 340B Credit upon submission and validation of only the Purchase Data Elements listed in Attachment E. CHs must still submit all remaining applicable data elements within 30 days of the drug's dispense.

**Q: How should covered entities identify dispenses that are eligible for a 340B Credit?**

# sanofi

**A:** Covered entities should continue to rely on their standard business practices, consistent with the 340B Statute and HRSA guidance, to identify dispenses eligible for a 340B Credit.

**Q: Who can I contact if I need assistance?**

**A:** Beacon's Support Center, available at www.beaconchannelmanagement.com, provides a variety of resources, including webinars, recorded platform demonstrations, and FAQ documents. 340B covered entities can also register to participate in live webinars and information on how Beacon protects financial and healthcare related information is available online in the Trust Center. Technical, data submission, registration, or contract pharmacy designation questions should be direct to the Beacon support team at ███████████████████████ or ████████████████. For other issues, customers can email ████████████████████████.

340B_REBATES_000416

sanofi

**ATTACHMENT A**

Admelog™

Ambien™

Apidra™

Arava™

Avalide™

Avapro™

Doxercalciferol™

Dupixent™

Enoxaparin Sodium™

Flomax™

Insulin Glargine™

Ibesartan™

Kevzara™

Lantus™

Leflunomide™

Lovenox™

Multaq™

Plavix™

Priftin™

Primaquine™

Renvela™

Sevelamer™

Soliqua™

Toujeo™

Zolpidem™



**ATTACHMENT B**
**Contract Pharmacy Policy**

Sanofi's Contract Pharmacy Policy remains in effect. As of the effective dates noted below, Sanofi's Contract Pharmacy Policy will be effectuated through the Beacon platform.

For Hospital Covered Entities effective January 6, 2025, the Contract Pharmacy Policy is as follows:

- Covered entities without an in-house retail pharmacy may designate a single contract pharmacy location at which to receive access to 340B pricing.

- Covered entities designating a single contract pharmacy must submit the requested data elements listed in Attachment E to access 340B pricing at their designated contract pharmacy.

For CHs effective March 1, 2025, the Contract Pharmacy Policy is as follows:

- CH covered entities may designate up to 3 contract pharmacy locations at which to receive access to 340B pricing.

- Covered entities designating contract pharmacies must submit the requested data elements listed in Attachment E through the Beacon platform to access 340B pricing at their designated contract pharmacies.

All data must be submitted through the Beacon platform. All contract pharmacy designations must be made in the 340B ESP™ platform, at https://www.340besp.com/. If the covered entity has already designated their contract pharmacy or pharmacies on the 340B ESP™ platform, no further action is required to be take on the 340B ESP™ platform.

Sanofi considers all sites together as one covered entity for purposes of Sanofi's 340B Integrity Initiative, inclusive of the covered entity's Parent Site, Child Sites, and Associated Sites[5].

Contract pharmacies that are wholly owned by or have common ownership with the covered entity are subject to this Contract Pharmacy Policy.

State-specific policy information is located in Attachment C.

---

[5] https://www.hrsa.gov/about/faqs/what-associated-site-community-health-centers-federally-qualified-health-centers-fqhcs

340B_REBATES_000418



**ATTACHMENT C**
**STATE POLICIES**

**Arkansas**:      Arkansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Arkansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies. Hospital Covered Entities are also subject to the Sanofi Contract Pharmacy Anti-Diversion Policy. Please see Attachment D for additional information.

**Kansas:**      Kansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Kansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Maryland**:      Maryland-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Maryland must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Mississippi**:      Mississippi-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Mississippi must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Missouri:**      Missouri-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Missouri must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**West Virginia:**   West Virginia Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits from Sanofi. No claims data or utilization data is required to be submitted for payment of the 340B Credits.

West Virginia-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in West Virginia must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.



**ATTACHMENT D**
**Sanofi Contract Pharmacy Anti-Diversion Policy**

This policy applies to contract pharmacy arrangements between hospital covered entity types (CAH, DSH, RRC and SCH) and pharmacies located in the following states:

- Arkansas: Effective 9/23/2024

As detailed in Attachment C, Sanofi has modified its 340B policies in certain states. Sanofi remains committed to 340B program integrity, including the avoidance of federally prohibited drug diversion.

To further that objective, Sanofi has adopted a Contract Pharmacy Anti-Diversion Policy. Under this policy, Sanofi will continue to offer 340B-priced drugs to covered entities consistent with Attachment C. However, Sanofi's offer includes a new term: a covered entity must provide evidence or, alternatively, attestation that it retains legal title to Sanofi 340B-priced drugs delivered to its contract pharmacies until the contract pharmacies dispense those drugs to 340B-eligible patients, consistent with federal law. "Sanofi 340B-priced drugs" shall refer to those drugs listed in Attachment A to this document. This term applies only with regard to contract pharmacies located in the state(s) listed above.

Covered entities will have 30 days from the effective date(s) noted above to log into the 340B ESP™ platform and complete the Contract Pharmacy Anti-Diversion process located on the righthand side of the 340B ESP™ Entity Profile. Covered entities must complete this process for every contract pharmacy located within the state(s) listed above at which the covered entity seeks to retain or obtain 340B pricing from Sanofi. Covered entities will lose access to 340B pricing at contract pharmacies located within the state(s) listed above for which the covered entity does not complete the Contract Pharmacy Anti-Diversion process. Covered entities may return to the Contract Pharmacy Anti-Diversion process at any time to add or remove contract pharmacies at which the covered entity seeks to have Sanofi 340B-priced drugs delivered.

For covered entities that previously completed the Contract Pharmacy Anti-Diversion process on 340B ESP™, no further action is required.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in any of the states listed above will have that contract pharmacy designation terminated 30 days from the applicable effective date.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in a state not listed above and subsequently secure access to 340B pricing at a contract pharmacy under this Contract Pharmacy Anti-Diversion Policy will have their single contract pharmacy designation canceled.

**Proof of Title Requirements**

Covered entities may secure access to Sanofi 340B-priced drugs at contract pharmacies located within the state(s) listed above only through the Contract Pharmacy Anti-Diversion process on the 340B ESP™ platform. Sanofi permits covered entities to submit one of two forms of proof of title for each contract pharmacy at which the covered entity seeks access to 340B pricing.

1. <u>Contract Pharmacy Agreement</u>

340B_REBATES_000420

# sanofi

Covered entities may secure access to 340B pricing at contract pharmacies located within the state(s) listed above by submitting the applicable contract pharmacy agreement(s) demonstrating they retain title to Sanofi 340B-priced drugs until the contract pharmacy dispenses those drugs to 340B-eligible patients.

The agreement must be true, correct, and currently in effect.

The contract pharmacy shipping address must be stated in the agreement.

The agreement must state or otherwise demonstrate by its express terms that the covered entity retains legal title to Sanofi 340B-priced drugs at the contract pharmacy until those drugs are dispensed to 340B-eligible patients.

If the covered entity believes that any part of the contract pharmacy agreement is confidential, the covered entity may redact those confidential portions of the agreement.  However, the covered entity must provide the relevant provisions evidencing legal title unredacted.

Sanofi will review and approve or deny any submitted contract pharmacy agreement in a timely manner.

2.  <u>Proof of Title Attestation</u>

Covered entities may also secure access to 340B pricing at contract pharmacies located within the state(s) listed above by signing the Contract Pharmacy Anti-Diversion Attestation for those contract pharmacies at which those covered entity retains legal title to Sanofi 340B-priced drugs until such drugs are dispensed to 340B-eligible patients. Please note that the Contract Pharmacy Anti-Diversion Attestation is declared under penalty of perjury, pursuant to 28 U.S.C. § 1746.

Sanofi will review and approve or deny any submitted attestations in a timely manner.

340B_REBATES_000421



**ATTACHMENT E**
**Required Data Elements**

The tables below list the specific data elements collected as part of the purchase and 340B claim submissions process for the Credit Model.  Submission template files with details on data validations are available in the Support Center at www.beaconchannelmanagement.com.

Purchase Data Elements

| Field Name | Description |
|---|---|
| Invoice Date | Date the purchase was invoiced to the covered entity |
| Invoice Number | Wholesaler assigned invoice number for the purchase order |
| NDC-11 | National Drug Code of the product that was purchased by the covered entity |
| Package Units | Number of packages of the product ordered |
| Purchase Account Number | Wholesaler assigned account number used to place the order |
| Wholesaler Name | Name of the wholesaler that processed the invoice and shipped the purchase |
| 340B ID | HRSA assigned identifier of the 340B covered entity that made the purchase |
| Ship To Pharmacy ID (NPI) | NPI of the pharmacy that received the physical shipment of the product from the wholesaler |

Pharmacy Claim Data Elements

| Field Name | Description |
|---|---|
| Date Of Service | Date the prescription was filled at the pharmacy.  Sometimes referred to as the Fill Date. |
| Date Prescribed | Date the physician wrote the prescription.  Always comes on or before the Date of Service. |
| Rx Number | Identifier applied to the prescription by the pharmacy. |
| Fill Number | Indicates the number of times the prescription has been filled as of the current fill.  For example, a value of 2 indicates that the prescription has been filled twice and the current fill is the second one. |
| NDC-11 | National Drug Code which is a unique identifier of the drug dispensed to the patient. |
| Quantity | Number of units dispensed to the patient. |
| Prescriber ID | National provider identifier (NPI) of the physician that wrote the prescription. |
| Service Provider ID | NPI of the pharmacy that filled the prescription |

340B_REBATES_000422



| 340B ID | HRSA assigned identifier of the 340B covered entity that designated the prescription as 340B |
|---|---|
| BIN Number | Bank identification number of the primary payer on the claim |
| PCN Number | Processor control number assigned by the entity processing payment |

Medical Claim Data Elements

| Field Name | Description |
|---|---|
| Health Plan ID | ID assigned to identify the plan. |
| Health Plan | The name of the plan. |
| Service Provider ID | ID assigned to a pharmacy or provider. |
| NDC-11 | ID of the product dispensed or service provided. |
| Quantity | Total quantity being submitted. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Physician ID | ID assigned to the prescriber. |
| Claim Number | A unique identifier for a prescription and claim processor |
| 340B ID | Code specifying the 340B covered entity |

Healthcare Encounter Data Elements

These data elements are applicable to Hospital Covered Entities only. CHs are not required to submit these data elements.

| Field Name | Description |
|---|---|
| Billing Service Provider ID | ID assigned to the entity billing for the healthcare services provided to the patient. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Rendering Physician ID | ID assigned to the healthcare professional providing the healthcare services to the patient. |
| HCPCS Code | HCPCS Level II code set value assigned to the healthcare service provided to the patient. |
| Diagnosis Code | ICD-10 code indicating medical conditions evaluated as part of the healthcare encounter. |
| Place of Service Code | Code identifying the place where a product or service is administered. |

340B_REBATES_000423



**HRSA**
Health Resources & Services Administration



5600 Fishers Lane
Rockville, MD 20857

December 13, 2024

**BY EMAIL**

Paul Hudson
Chief Executive Officer
Sanofi-Aventis U.S. LLC
█████████████████

Dear Paul Hudson:

The Health Resources and Services Administration (HRSA) understands that Sanofi-Aventis U.S. LLC (Sanofi) has publicly announced plans to implement a credit model for sales of certain covered outpatient drugs to particular covered entities starting January 6, 2025. By way of this correspondence, HRSA provides warning that this unapproved credit proposal violates Sanofi's obligations under the 340B statute, and HRSA expects Sanofi to cease implementation of it.

Specifically, in a notice dated November 22, 2024, to 340B covered entities regarding purchases of select Sanofi Products, Sanofi stated that it would be effectuating 340B discounts via the new credit model as of January 6, 2025, for disproportionate share hospitals, critical access hospitals, rural referral centers, and sole community hospitals and as of March 1, 2025, for consolidated health centers. These covered entity types would be required to place an order for a Product through their wholesaler at the Product's Wholesaler Acquisition Cost (WAC) and then submit purchase and claims data to Sanofi's third-party tool, which would then determine whether to issue a credit payment to the covered entity representing the difference between the WAC and the 340B price.

Additionally, Sanofi's November 22, 2024, notice states that effective March 1, 2025, hospital covered entities would be required to submit healthcare encounter data so Sanofi can make its own determination regarding whether the claim complies with HRSA's 1996 patient guidelines. In particular, the notice stated that Sanofi would use the criteria that "the individual receiving a dispense (1) is currently receiving medical care from the covered entity, and (2) receives a prescription in connection with health care services provided by the covered entity."

As HRSA noted in its November 12, 2024, letter to Sanofi, the 340B statute states that "[t]he Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, *as provided by the Secretary*) to the manufacturer" shall not exceed the statutory ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). The statute also provides that the ceiling price "represents the maximum price that covered entities may permissibly be required to pay for the drug," and that said agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." *Id.*

340B_REBATES_000424

Paul Hudson
Page 2

The Secretary has not "provided" that the credits described in Sanofi's notice should be "tak[en] into account" in the "amount required to be paid" for select Sanofi Products by certain covered entity types. If Sanofi implements its credit proposal without Secretarial approval, it will violate Section 340B(a)(1) of the Public Health Service Act (PHSA).

According to its Notice, Sanofi intends to unilaterally (i.e., without Secretarial approval) charge certain covered entities WAC for covered outpatient drugs, starting January 6, 2025. In other words, Sanofi's credit proposal would require certain covered entity types to purchase certain Sanofi products at prices that exceed "the maximum price[s] that covered entities may permissibly be required to pay" for those drugs. This, too, violates Section 340B(a)(1) of the PHSA. [1]

Because Sanofi's credit proposal, if implemented, violates Sanofi's obligations under the 340B statute, it subjects Sanofi to potential consequences, such as termination of Sanofi's Pharmaceutical Pricing Agreement (PPA). *See Astra USA v. Santa Clara Cnty.*, 563 U.S. 110 (2011). As stated in the PPA, even apart from "a violation of the Agreement," the Secretary may "terminate the Agreement" for "other good cause." In addition, the 340B statute provides for "[t]he imposition of sanctions in the form of civil monetary penalties" on "any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1)." 42 U.S.C. § 256b(d)(1)(B)(vi).

HRSA expects Sanofi to cease implementation of its credit proposal immediately and to inform HRSA no later than December 20, 2024, in order to provide adequate notice to covered entities. Please provide your response to Chantelle Britton, Director of HRSA's Office of Pharmacy Affairs at cbritton@hrsa.gov.

Sincerely,

Carole Johnson
Administrator

cc:
Scott Bray, Head, Operations Excellence, US Market Access & Pricing, Sanofi
███████████████████████████

Brett Shumate, Partner, Jones Day
███████████████████████

---

[1] Sanofi's notice states that the credit payment is subject to Sanofi's unilaterally imposed requirements for the timely submission of "purchase and claims data" by a covered entity, as well as Sanofi's "validation" of said data. In short, the notice makes clear that issuance of the "340B Credit" is conditioned on Sanofi's prior approval at Sanofi's sole discretion.

340B_REBATES_000425

| From: | Caprisecca, Odalys |
|---|---|
| To: | Johnson, Carole (HRSA) |
| Cc: | Pedley, Krista (HRSA); Britton, Chantelle (HRSA) |
| Subject: | [EXTERNAL] Novartis Policy |
| Date: | Tuesday, December 17, 2024 4:03:33 PM |
| Attachments: | image001.png |
| | Novartis letter to HRSA 121724.pdf |

Good Afternoon Administrator Johnson:

I am writing on behalf of Novartis Pharmaceuticals Corporation ("Novartis") (labeler codes 00078, 71894, 69488) to inform the Health Resources and Services Administration ("HRSA") of Novartis's intent to implement a 340B cash rebate model on June 1, 2025. As detailed in the attached communication, Novartis's contemplated rebate model would enhance the integrity of the 340B program by upholding critical statutory protections against 340B duplication while maintaining timely access to 340B pricing.

We respectfully request that HRSA acknowledge in writing by January 7, 2025 Novartis's right to implement the contemplated 340B rebate model. Absent such acknowledgement, we will understand HRSA to have purported to disapprove the model, consistent with its publicly stated position on the 340B rebate model more generally.

Thank you for your consideration.

Thank you,
Odalys

**Odalys Caprisecca**
Vice President, Managed Markets Finance
**MANAGED MARKETS FINANCE / US PHARMA**
Novartis Pharmaceuticals Corporation
One Health Plaza
East Hanover, NJ 07936-1080



CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

# ∪ NOVARTIS

**Novartis Pharmaceuticals Corporation**
One Health Plaza
East Hanover, NJ 07936
USA

December 17, 2024

**FOIA-Exempt Confidential Commercial Information**

**By Electronic Mail**

Carole Johnson
Administrator
Health Resources and Services Administration
5600 Fishers Lane
Rockville, MD  20857
carole.johnson@hrsa.hhs.gov

**Re: 340B Rebate Model**

Dear Administrator Johnson:

I am writing on behalf of Novartis Pharmaceuticals Corporation ("Novartis") (labeler codes 00078, 71894, 69488) to inform the Health Resources and Services Administration ("HRSA") of Novartis's intent to implement a 340B cash rebate model on June 1, 2025.  As explained below, Novartis's contemplated rebate model would enhance the integrity of the 340B program by upholding critical statutory protections against 340B duplication while maintaining timely access to 340B pricing.  The model would be fully consistent with applicable standards under the 340B statute and the Pharmaceutical Pricing Agreement ("PPA").  Indeed, the 340B statute makes clear that a manufacturer is permitted to offer 340B pricing via a discount or rebate, and HRSA has historically permitted comparable 340B rebate models, such as the AIDS Drug Assistance Program ("ADAP") rebate model and the product replenishment model.  The contemplated rebate model is also the only mechanism available to Novartis for effectuating 340B non-duplication as to what the Inflation Reduction Act of 2022 ("IRA") deems the Maximum Fair Price ("MFP") under the Drug Price Negotiation Program ("DPNP"), and therefore is supported by the interlocking provisions of the DPNP and 340B program as well.

We respectfully request that HRSA acknowledge in writing by January 7, 2025 Novartis's right to implement the contemplated 340B rebate model.  Absent such acknowledgement, we will understand HRSA to have purported to disapprove the model, consistent with its publicly stated position on the 340B rebate model more generally.

    I.      **The 340B Program**

The 340B statute expressly provides for the effectuation of the 340B price through a discount or rebate while also prohibiting covered entity noncompliance in the form of diversion of 340B-priced product to individuals who do not qualify as the entity's "patient" as well as 340B discount duplication with respect to Medicaid Drug Rebate Program ("MDRP") rebates.  Such 340B-MDRP duplication, in particular, is a well-documented part of ongoing programmatic abuses by covered entities.  Indeed, the 340B program effectively permits such duplication as to Medicaid managed care utilization, through the absence of any process to prevent or police such statutory violations.  Novartis's contemplated 340B rebate model would serve as a necessary mechanism for ensuring that Novartis is protected from that and other covered entity noncompliance.

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

Importantly, the model would be entirely consistent with the legal standards contained in the 340B statute and the PPA. In accordance with these standards, as well as prior agency practice, Novartis does not need agency approval in order to proceed with implementation of its model.

A.    The 340B pricing obligation

At its core, the 340B program requires a participating manufacturer to offer its covered outpatient drugs to covered entities at no more than the 340B ceiling price. There is no requirement that the manufacturer use a discount model to fulfill this obligation. To the contrary, both the text and history of the 340B statute expressly contemplate that 340B pricing may be effectuated via either a discount or rebate, without preference.[1] HRSA itself has long acknowledged this to be the case, stating that "[s]ection 340B has no explicit language as to whether the required reduction in price should be obtained by . . . a discount mechanism [or] a rebate option."[2] Moreover, neither the PPA nor any regulation mandates the use of a discount model over a rebate model.[3] Accordingly, a manufacturer may offer 340B pricing to covered entities via either a discount or a rebate, at the manufacturer's discretion.

To help explain why a rebate model is both reasonable as well as necessary, we note that the 340B statute does not require the 340B price to be offered on every unit that is sold to a covered entity. As noted, the 340B statute prohibits covered entities from diverting 340B-priced product to an individual who does not qualify as the covered entity's "patient" as well as seeking Medicaid reimbursement for a 340B-price unit and thereby generating a duplicate MDRP rebate on the unit. Manufacturers are not required to offer 340B pricing to a covered entity that is noncompliant with either prohibition.[4] Additionally, manufacturers are not required to offer 340B pricing multiple times on the same unit,[5] nor on bundled or inpatient units.[6] Novartis's contemplated 340B rebate model would function as a vital tool in upholding these statutory safeguards.

B.    HRSA has historically permitted 340B rebate models, without requiring pre-approval

For many years, HRSA's practice has been to both formally and informally permit use of 340B rebate models, without pre-approval, such that the rebate model is now the dominant method of 340B pricing effectuation.

---

[1] See Public Health Service Act ("PHSA") § 340B(a)(1), (2), (5)(A) (explicitly contemplating a "rebate" or "rebates"); H.R. Rep. No 102-384, 102d Cong., 2d Sess., pt. 2 at 16 (1992) ("The [340B] bill does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism.").

[2] 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (quoting the legislative history for the proposition that "section 340B does not specify whether entities should receive the section 340B pricing 'through a point of purchase discount, through a manufacturer rebate, or through some other mechanism'") (quoting H.R. Rep. No 102-384, 102d Cong., 2d Sess., pt. 2 at 16 (1992)).

[3] A regulation could not mandate the use of a rebate model, as the agency's limited rulemaking authority does not extend to mandating the form in which the 340B discount must be offered. See Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs., 43 F. Supp. 3d 28, 41 (D.D.C. 2014) (noting HRSA's limited rulemaking authority).

[4] PHSA § 340B(a)(1) (requiring a manufacturer to offer 340B pricing only to a "covered entity"), (4) (defining a "covered entity" as an entity in compliance with the prohibitions on MDRP-340B duplication and 340B diversion), (5)(A) (prohibiting MDRP-340B duplication), (B) (prohibiting 340B diversion).

[5] Id. at § 340B(a)(1) (requiring a manufacturer to charge no more than the 340B ceiling price on a given unit).

[6] Id. at § 340B(a)(1) (requiring a manufacturer to offer 340B pricing only on a "covered outpatient drug"), (b)(1) (defining a "covered outpatient drug" by cross-reference to section 1927(k) of the Social Security Act ("SSA")); SSA § 1927(k)(3) (excluding bundled units from the definition of a "covered outpatient drug"); HRSA, FAQs, available at https://www.hrsa.gov/opa/faqs (providing that a "covered outpatient drug" excludes inpatient units).

2

CONFIDENTIAL-ATTORNEYS' EYES ONLY

First, HRSA formally permitted a 340B cash rebate model over 25 years ago, and it did so without imposing a pre-approval requirement on the manufacturers already operating under that approach.  In 1997, HRSA initiated a notice-and-comment process to formally "recognize" a 340B cash rebate model already in place between certain manufacturers and ADAPs.  HRSA proposed to permit the model so long as the rebate amount equaled or exceeded the 340B discount amount.[7]  Following public comment, HRSA published a final notice "recogniz[ing] rebates obtained by the State ADAPs or their components that equal or exceed the 340B discount provided by the statutory ceiling price as a method of participating in the 340B program."[8]  Notably, HRSA's approval of the ADAP rebate model came only *after* the model had already been implemented by manufacturers, and the approval served to expressly grandfather in certain *pre-existing* models.[9]  HRSA never asserted there that preapproval of a cash rebate model was required.  Moreover, HRSA expressly acknowledged that the model requires covered entities to submit claims data, consistent with ordinary business practices.[10]

Second, HRSA has long permitted the use of a *product* rebate model, with much wider-ranging impact.[11]  This so-called "product replenishment model" is now the default approach by which all covered entity types access the 340B price.  It has never been the subject of any formal pre- or post-approval process.  And HRSA continues to permit use of the product replenishment model despite significant and pervasive compliance concerns.

<em>i.    Use of the product replenishment model</em>

When the 340B program was first established, covered entities primarily utilized the *physical* inventory model.  Under this model, units purchased under the 340B program were physically segregated from units purchased at the commercial price, and covered entities determined whether a prescription was 340B-eligible *before* a unit was dispensed.[12]  If the prescription was deemed 340B-eligible, the covered entity dispensed a unit purchased under the 340B program; if not, the covered entity dispensed a unit purchased at the commercial price.[13]  As a result, the model provided reasonable confidence that a 340B-purchased unit would be dispensed *only* where the prescription was 340B-eligible.

Over time, covered entities shifted to using a *virtual* inventory model (i.e., the product replenishment model) under which they no longer maintain distinct physical inventories of 340B-purchased and commercially purchased units.  Instead, units purchased under the 340B program and units purchased the commercial price are commingled in a single inventory.

The product replenishment model works as follows:[14]

   a. A covered entity purchases a unit at the *commercial* price, places it in a single, commingled inventory, and dispenses it without regard to whether the prescription is 340B-eligible;

---

[7] 62 Fed. Reg. 45,823-24 (Aug. 29, 1997).
[8] 63 Fed. Reg. at 35,239.
[9] *See id.* at 35,240 (rebate agreements that predated the notice were not required to be renegotiated if they met the requirements of the notice).
[10] *See id.* at 35,239-42.
[11] *See, e.g.*, HRSA, 340B Peer-to-Peer Program: 340B Compliance Improvement Guide at 36-37 (Oct. 1, 2015), *available at* https://www.hrsa.gov/sites/default/files/hrsa/opa/compliance-improvement-guide.pdf.
[12] *See* 340B Health, *Key Terms*, *available at* https://www.340bhealth.org/members/340b-program/key-terms/; HHS OIG, *Contract Pharmacy Arrangements in the 340B Program,* OEI-05-13-00431 at 5 (Feb. 4, 2014), *available at* https://oig.hhs.gov/documents/evaluation/2914/OEI-05-13-00431-Complete Report.pdf.
[13] *See id.*
[14] *See id.*

3

b. *After* the dispense (often, weeks or months later), the covered entity (or, more typically, a for-profit middleman acting for the covered entity) determines whether or not the prescription was purportedly 340B-eligible;[15]

c. If the covered entity or middleman claims that the prescription was 340B-eligible, the covered entity purchases a replacement unit at the 340B price (effectively an in-kind rebate); and

d. The replenishment unit is then placed in the commingled inventory and dispensed, again without regard to whether the prescription is 340B-eligible.[16]

Clearly, the product replenishment model is functionally a rebate model, but with the rebate taking the form of product rather than cash. And, just as HRSA did not require preapproval of the ADAP cash rebate model, it has never required preapproval of the now near-ubiquitous product replenishment model.

ii.     *Significant and pervasive compliance concerns with the product replenishment model*

Critically, the product replenishment model eliminates any assurance that a 340B-purchased unit will be dispensed in a way that does not violate the 340B statute's MDRP-340B duplication or 340B diversion prohibition.[17] A defining characteristic of the product replenishment model is that covered entities no longer determine whether a prescription is 340B-eligible before a unit is dispensed. Instead, covered entities determine 340B eligibility after the dispense based on information that is never made available to the manufacturer. The result is that neither manufacturers nor covered entities can be certain that a 340B-purchased unit will be dispensed only where a prescription is 340B-eligible, and manufacturers have no access to the data needed to confirm eligibility for the 340B price for either the original or replenishment unit. **When effectuated through a discount approach, the product replenishment model thereby forces manufacturers to offer 340B pricing where, by law, none is owed.**

We note that the post-sale audit and administrative dispute resolution ("ADR") processes do not alleviate this concern. In order to address the compliance concerns that are endemic to the product replenishment model, a manufacturer would need to bear the cost and burden of conducting retrospective audits on every sale, of every covered outpatient drug, by every covered entity, on a never-ending basis. And this presumes that, as an initial matter, the manufacturer could even make the required showing of reasonable cause to initiate an audit in every case, as that showing requires the very data the covered entities refuse to provide.[18] Further, where an audit identified MDRP-340B duplication or 340B diversion, the manufacturer would have to seek relief through a burdensome ADR proceeding. This would be a patently unreasonable expectation of any manufacturer.

---

[15] These are unreliable and often involve false determinations that dispenses are 340B-eligible, leading to program abuse.

[16] Because the replacement unit was in fact purchased at the 340B price, its dispense violates the 340B statute where the prescription is not 340B-eligible.

[17] *See id.*

[18] *See* PHSA § 340B(d)(3)(A) (requiring a manufacturer to audit a covered entity before it is permitted to initiate an ADR proceeding); 61 Fed. Reg. 65,405, 65,409 (Dec. 12, 1996) (prohibiting a manufacturer from auditing a covered entity unless it has documented reasonable cause). Even where HRSA authorizes a manufacturer audit, covered entities sue to prevent such audits despite such authorization. *See, e.g., Univ. of Wash. Med. Ctr. v. Becerra*, No. 1:24-cv-02998 (D.D.C. 2024) (the fifth lawsuit brought by a covered entity to halt a HRSA-authorized audit).

4

C.  The 340B program suffers from rampant covered entity noncompliance

A 340B rebate model is necessary in light of the programmatic noncompliance that is rampant among covered entities, as documented time and again by multiple federal agencies, including HRSA itself.

HRSA's own audits have consistently found widespread violations by covered entities, including with respect to the prohibition on MDRP-340B duplication.[19]  Between 2012 and 2019, HRSA audits of covered entities found 1,536 instances of program noncompliance.[20]

The GAO likewise has found widespread violation of the MDRP-340B duplicate discount prohibition, and HRSA has openly acknowledged its failure to ensure this statutory protection is enforced.  When evaluating MDRP-340B duplication, a GAO report published in January 2020 found that "[the Department of Health and Human Services ("HHS")] does not have reasonable assurance that states and covered entities are complying with the prohibition on [MDRP-340B] duplicate discounts."[21]  The GAO concluded that "[l]imitations in federal oversight impede [HHS's] ability to ensure compliance with the prohibition on [MDRP-340B] duplicate discounts" and that HHS's "[f]ailure to [ensure that covered entities are complying with 340B program requirements] not only puts drug manufacturers at risk of providing [MDRP-340B] duplicate discounts, but also compromises the integrity of the 340B Program."[22]  GAO also observed that "the potential for [MDRP-340B] duplicate discounts has increased due to substantial growth in the 340B Program and the expansion of [MDRP],"[23] an expansion fueled by covered entity shifts away from the physical inventory model to the product replenishment/rebate model.  Moreover, GAO highlighted the fact that HHS itself had identified "challenges covered entities and states face in identifying 340B drugs provided to Medicaid beneficiaries, and thus in preventing duplicate discounts,"[24] and GAO had previously "identified weaknesses in HRSA's oversight that impede its ability to ensure compliance with 340B Program requirements, including the prohibition on duplicate discounts."[25]

---

[19] *See, e.g.*, HRSA, Audit Results of Covered Entities, *available at* https://www.hrsa.gov/opa/program-integrity; Gov't Accountability Off. ("GAO"), HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements, GAO-21-107 at 14 (Dec. 2020) ("2020 GAO Report"), *available at* https://www.gao.gov/assets/gao-21-107.pdf; *see also* Ashwin Mundra, The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark, Drug Channels (Mar. 18, 2022), *available at* https://www.drugchannels.net/2022/03/the-340b-noncompliance-data-gap-leaves.html (a conservative estimate is that three to five percent of MDRP rebates duplicate 340B price discounts, resulting in billions of dollars in program abuse).

[20] 2020 GAO Report at 14 (Of these instances of program noncompliance, 429 concerned Medicaid-340B duplication, 546 concerned 340B diversion, and 561 concerned other covered entity eligibility requirements).

[21] GAO, 340B Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement, GAO-20-212, (Jan. 2020), *available at* https://www.gao.gov/assets/gao-20-212.pdf.

[22] *Id.* at 27.

[23] *Id.* at 2.

[24] *Id.* at 3 (citing HHS Off. of Inspector Gen. ("OIG"), State Efforts to Exclude 340B Drugs from Medicaid Managed Care Rebates, OEI-05-14-00430 (June 2016), *available at* https://oig.hhs.gov/documents/evaluation/2918/OEI-05-14-00430-Complete%20Report.pdf; Nat'l Ass'n of Medicaid Dirs., Medicaid and the 340B Program: Alignment and Modernization Opportunities (May 2015), *available at* https://medicaiddirectors.org/wp-content/uploads/2022/02/NAMD-White-Paper-on-Medicaid-and-340B-Alignment_pdf.pdf; Medicaid & CHIP Payment & Access Comm'n, The 340B Drug Pricing Program and Medicaid Drug Rebate Program: How They Interact (May 2018), *available at* https://www.macpac.gov/wp-content/uploads/2018/05/340B-Drug-Pricing-Program-and-Medicaid-Drug-Rebate-Program-How-They-Interact.pdf).

[25] *Id.* (citing GAO, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480 (June 2018), *available at* https://www.gao.gov/assets/d18480.pdf) ("2018 GAO Report").

\\4149-1448-2773_v6

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000432


Among other things, GAO "identified several areas of weakness in HRSA's oversight processes that impede its ability to ensure that duplicate discounts are prevented or remedied."[26]  For example, GAO concluded

- o   "HRSA audits do not assess for the potential for duplicate discounts in Medicaid managed care . . . ."[27]  In addition, "the agency does not require covered entities to take the same actions to address duplicate discounts for managed care claims that HRSA learns about through its audits or other means."[28]  "This is particularly problematic as the majority of Medicaid enrollees, prescriptions, and spending for drugs are in managed care, and the drug manufacturers we contacted believe that duplicate discounts are more prevalent in Medicaid managed care than [Medicaid fee for service]."[29]

- o   "HRSA does not assess whether covered entities are actually following state policies and procedures regarding the use and identification of 340B drugs for Medicaid beneficiaries . . . ."[30]  "Without fully assessing compliance with state policy, HRSA's audits do not provide the agency with reasonable assurance that covered entities are taking the necessary steps to prevent duplicate discounts.  As a result, drug manufacturers are at risk of being required to erroneously provide duplicate discounts for Medicaid drugs."[31]

In short, *HRSA does not require compliance with the MDRP-340B duplicate discount prohibition as to Medicaid managed care utilization, and therefore does not police such compliance either.  HRSA has thus abdicated responsibility for this central statutory mandate which impacts more than 70% of Medicaid claims and rendered the protection an effective nullity*.[32]  These findings are merely illustrative of the breadth of similar governmental findings over time.[33]  In the face of such programmatic noncompliance, an alternative approach is critical to ensure that Congress's intent is honored and the 340B program's statutory mandate is fulfilled.  A 340B rebate model provides the only effective means for doing so.

## II.    The IRA's Drug Price Negotiation Program and Inflation Rebates

As part of the IRA, Congress established the DPNP, which requires the Centers for Medicare & Medicaid Services ("CMS") to set an MFP that must be honored on certain Medicare units of certain drugs.  Importantly, the manufacturer of a drug subject to an MFP is not required to offer both the MFP and the 340B price on the same unit, and instead must offer only the lower of the two prices.[34]  The statute's prohibition against MFP-340B nonduplication creates an inextricable linkage between the two programs.  In doing so, the prohibition implicitly amends the 340B statute by limiting the scope of a manufacturer's 340B pricing obligation, making it an essential part of the 340B scheme.

The DPNP statute does not specify whether the MFP must be offered by the manufacturer through an up-

---

[26] *Id.* at 23.

[27] *Id.* at 25.

[28] *Id.* at 26.

[29] *Id.*

[30] *Id.* at 24.

[31] *Id.* at 24-25.

[32] *See* Kaiser Family Foundation, 10 Things to Know About Medicaid Managed Care, at 1 (May 1 ,2024), *available at* https://www.kff.org/medicaid/issue-brief/10-things-to-know-about-medicaid-managed-care/#:~:text=Managed%20care%20is%20the%20dominant,managed%20care%20organizations%20(MCOs).

[33] *See, e.g.*, House Energy & Commerce Comm., Review of the 340B Drug Pricing Program at 36-38 (Jan. 10, 2018), *available at* https://energycommerce.house.gov/wp-content/uploads/2018/01/20180110Review_of_the_340B_Drug_Pricing_Program.pdf.

[34] SSA § 1193(d).

6

front discount or a post-sale rebate.  However, in recognition of the considerable risk of MFP diversion that would be posed by an up-front discount model, CMS has made clear that a manufacturer may choose to utilize a rebate model to effectuate the MFP.[35]  Under this model, CMS requires that the MFP rebate be paid within 14 days of the manufacturer receiving certain claims data from CMS's designated contractor.[36]  Such data are intended to be used by the manufacturer to help verify MFP eligibility.  A manufacturer that fails to timely pay the MFP rebate risks a substantial civil monetary penalty ("CMP").[37]

The statute's guarantee against MFP-340B nonduplication can be achieved only if a unit is identified as 340B-eligible in a timely manner.  Nevertheless, CMS has declined to provide any meaningful mechanism for such identification.[38]  CMS has declined to require the use of a 340B claims modifier by covered entities, and has clarified that a provider's status as a covered entity alone is insufficient to identify a unit as 340B-eligible.[39]  CMS has also made clear that, without documentation identifying a unit as 340B-eligible, a manufacturer may not deny an MFP rebate on account of MFP-340B duplication.[40]

In other words, CMS has tasked manufacturers with establishing a process of their own to identify 340B-eligible units and thereby effectuate the statutory prohibition against MFP-340B nonduplication.[41]

Carrying out this task is not feasible using the product replenishment model, which identifies a unit as 340B-eligible only after dispensing, often well beyond the 14-day MFP payment window mandated by CMS, and without the provision of any supporting data to the manufacturer to tie the replenishment unit to the original unit dispensed.  Because the product replenishment model is the primary model used by covered entities, it makes timely identification of 340B-eligible units by CMS's deadline effectively impossible.  Novartis's contemplated 340B rebate model would redress this concern by enabling timely identification of 340B-eligible units.  This approach is the only feasible mechanism by which Novartis can effectuate the MFP-340B nonduplication guarantee, as directed by CMS through the DPNP Final Guidance.

The IRA also establishes inflation rebates under Medicare Part B and Part D, which are likewise subject to a 340B nonduplication requirement:  340B units must be excluded from the calculation of total units on which inflation rebates are due.[42]  The product replenishment model's opacity prevents manufacturers from accurately identifying the 340B units that, by statute, must be excluded from the inflation rebate calculation,

---

[35] *See* CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 at § 40.4 (Oct. 2, 2024), *available at* https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 231 ("CMS will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP."); *see also id.* at 54 ("Neither CMS nor [its contractor] will verify that a claim was or was not billed as a 340B-eligible drug.").

[39] *Id.* at 54 ("CMS is not mandating that dispensing entities add a 340B claim indicator to claims at this time."); *id.* at 230 ("CMS also notes that [a National Provider Identifier ("NPI")] alone (whether a prescriber NPI or a hospital/provider NPI) generally will not constitute sufficient evidence that a claim was 340B-eligible as not all individuals served by covered entities are necessarily eligible to receive a drug purchased at the 340B ceiling price.").

[40] *Id.* ("In this scenario, the Primary Manufacturer would be required to provide documentation demonstrating the claim was 340B-eligible and the 340B ceiling price was lower than the MFP upon request from CMS.").

[41] *Id.* at 232 ("CMS strongly encourages manufacturers to work with dispensing entities, covered entities and their 340B TPAs, and other prescription drug supply chain stakeholders (e.g., wholesalers) to facilitate access to the lower of the MFP and the 340B ceiling price, wherever applicable.").

[42] SSA §§ 1847A(i)(3)(B)(ii)(I), 1860D-14B(b)(1)(B).

\\4149-1448-2773_v6
CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000434

thereby preventing manufacturers from meaningfully assessing the preliminary rebate report in which CMS provides manufacturers a count of the units on which inflation rebates are proposed to be invoiced. Novartis's contemplated 340B rebate model would enable the company to identify the units that must be excluded on nonduplication grounds, and dispute any inaccurate calculation of the inflation rebates.

### III.    Novartis's Contemplated 340B Rebate Model

Novartis plans to launch its contemplated 340B rebate model on June 1, 2025 using the Berkeley Research Group ("BRG") Beacon platform.  The model would apply to all of Novartis's products that are eligible for 340B pricing and as an initial matter would be limited to purchases made by Disproportionate Share Hospital ("DSH") covered entities.  Novartis currently intends to limit the model to DSH covered entities as this is where we have observed the most significant abuse of the program.[43]  The implementation timeline would provide Novartis sufficient experience with the model prior to finalizing its MFP effectuation plan, which, under the DPNP, must be submitted by September 1, 2025.

Consistent with Novartis's standard business practices, DSH covered entities would have the option to purchase covered outpatient drugs at commercial prices and subsequently submit data through the Beacon platform, within 30 days of the drug's dispense, to validate whether a given purchase is eligible for 340B pricing.  These data would include standard information about the product dispense or administration that covered entities collect, report, and maintain in the normal course of business.  Rebate payments would be issued once the number of validated dispenses equals the number of units in the purchased package size.  For products with single-unit package size, this payment would occur after a single validated 340B dispense.  In general, rebate payments would be issued within seven to ten days.

Novartis would utilize the submitted data to identify 340B units for which state Medicaid programs have submitted rebate claims under the MDRP.  With respect to such units, Novartis would honor the 340B rebate claim by the DSH covered entity over the MDRP rebate claim by the state Medicaid program.  Moreover, where multiple DSH covered entities submit 340B rebate claims on the same unit, Novartis would work with the covered entities to determine the appropriate recipient of the 340B rebate.

In sum, Novartis's contemplated 340B rebate model would enhance operational efficiency, support compliance with 340B program requirements and MFP-340B nonduplication, and facilitate timely access to 340B pricing.

### IV.    Novartis's 340B Rebate Model Is Permissible Under the 340B Statute, and Any Prohibition Against Implementation Is Unlawful

#### A.    Novartis's 340B model accords with the statute and PPA

Novartis's contemplated model is consistent with the legal standards under the 340B statute and the PPA. Yet HRSA has publicly asserted that a manufacturer is prohibited from implementing a 340B rebate model, on pain of termination of its PPA—and, by extension, the loss of federal payment for its covered outpatient drugs under Medicaid and Medicare Part B.[44]  This position has no basis in law.

---

[43] DSH covered entities constitute the vast majority of 340B program utilization, accounting for $51,886,954,092 of the total $66,292,782,635 in 340B purchases made in 2023.  HRSA, *2023 340B Covered Entity Purchases* (Oct. 2024), *available at* https://www.hrsa.gov/opa/updates/2023-340b-covered-entity-purchases.  DSH covered entities also have the highest average number of contract pharmacies (25, compared to 4 for critical access hospitals).  *See* 2018 GAO Report at 23.

[44] Letter from HRSA to Johnson & Johnson ("J&J") (Sep. 17, 2024) *available at* https://www.hrsa.gov/sites/default/files/hrsa/opa/sept-17-2024-hrsa-letter-johnson-johnson.pdf ("[I]f J&J proceeds with implementing its rebate proposal without Secretarial approval, it will violate section

8

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000435



As noted above, the text and legislative history of the 340B statute expressly contemplate that 340B pricing may be effectuated through either a discount or a rebate, with no statutory preference for one over the other.[45] HRSA itself has long acknowledged this flexibility, and neither the PPA nor any regulation requires the use of a discount model.[46] Therefore, under the plain terms of the 340B statute, manufacturers are free to effectuate 340B pricing via either a discount or a rebate, without agency approval.

### B. Disapproval of Novartis's 340B rebate model would be arbitrary and capricious

Even if agency approval were required, however, disapproval of Novartis's contemplated 340B rebate model would be arbitrary and capricious, for several reasons.

> i. HRSA may not require Novartis to offer 340B pricing where there is no obligation to do so under the statute

First, requiring a manufacturer to use a discount model forces it to offer 340B pricing where, by the plain terms of the 340B statute, such pricing is not required. Indeed, HRSA's audits and those conducted by its oversight counterparts at GAO and HHS OIG have repeatedly found this to be the case. HRSA cannot lawfully impose an obligation on a manufacturer that lacks any statutory basis and that forces manufacturers to offer discounts that clearly are not mandated by the statute. Mandatory use of a discount model does precisely those things and is therefore patently arbitrary and capricious.

> ii. HRSA may not treat Novartis's contemplated 340B rebate model differently than the ADAP rebate model

Because there is no material difference between Novartis's contemplated 340B rebate model and the ADAP rebate model, HRSA must afford the same treatment to both models.

In its guidance purporting to authorize the use of a 340B rebate model solely for ADAPs, HRSA sought to justify such distinctions by citing to the "unique" needs of ADAPs.[47] However, the agency's characterization of these needs – both in its original guidance and more recently – demonstrates that, while such needs may have been unique to ADAPs when the guidance was issued in 1998, the same reasons now apply with equal force to all covered entity types, thereby eliminating the rationale for limiting the rebate model's availability to ADAPs. Most recently, HRSA stated in its ADAP manual that "ADAPs submit claims to drug

---

340B(a)(1) of the Public Health Service Act. If J&J has not notified HRSA that it is ceasing implementation of its rebate proposal by September 30, 2024, HRSA will begin the process outlined in J&J's Pharmaceutical Pricing Agreement related to terminating the agreement. In addition, if J&J moves forward with implementation of its rebate proposal, HRSA will initiate a referral to the HHS Office of Inspector General pursuant to 42 U.S.C. § 256b(d)(1)(B)(vi)."); *see also* Letter from HRSA to Sanofi-Aventis (Dec. 13, 2024) *available at* https://www.hrsa.gov/sites/default/files/hrsa/opa/dec-13-2024-hrsa-letter-sanofi.pdf; SSA § 1927(a)(1), (5)(A) (conditioning federal payment for a manufacturer's covered outpatient drugs under Medicaid and Medicare Part B on a PPA).

[45] *See* PHSA § 340B(a)(1), (2), (5)(A) (expressly contemplating a "rebate" or "rebates"); H.R. Rep. No 102-384, 102d Cong., 2d Sess., pt. 2 (1992) (same).

[46] 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (noting that "[s]ection 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)," and quoting the legislative history for the proposition that "section 340B does not specify whether entities should receive the section 340B pricing 'through a point of purchase discount, through a manufacturer rebate, or through some other mechanism'") (quoting H.R. Rep. No 102-384, 102d Cong., 2d Sess., pt. 2 at 16 (1992)).

[47] 63 Fed. Reg. at 35,241.

9

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**



manufacturers for rebates on medications that were purchased through a retail pharmacy network at a price higher than the 340B price."[48]  In other words, HRSA recognized the need for a rebate model for ADAPs when they purchase covered outpatient drugs at a commercial price and there is a subsequent need to reconcile the commercial price with the 340B ceiling price.  While this need may have been unique to ADAPs in 1998, that is no longer the case today.  A rebate model is equally applicable to any covered entity using the product replenishment model, under which covered outpatient drugs are purchased at the commercial price and there is a subsequent need to reconcile that prices with the 340B ceiling price.  In short, there is no justifiable basis to limit the 340B rebate model to ADAPs, even under the agency's own stated rationale.[49]

HRSA has also acknowledged that "standard business practices," including those regarding data reporting, should be followed when implementing the ADAP rebate model.[50]  Indeed, HRSA expressly encourages ADAPs "to consider that the more detailed and accurate the initial claim data, the less likelihood a claim will be questioned or disputed."[51]  This aligns with HRSA's longstanding position that manufacturers may apply standard business practices, including data reporting, to 340B transactions.[52]  It also reflects court rulings confirming that reasonable conditions, including those regarding data reporting, may attach to an offer of 340B pricing.[53]  Novartis's contemplated 340B rebate model, including its data reporting component, fully aligns with its standard business practices.

> iii.    *HRSA may not treat Novartis's contemplated 340B rebate model differently than the product replenishment model*

HRSA also may not deny Novartis's intended 340B rebate model the same treatment that it affords to the product replenishment model, which is, in fact, just another form of a rebate model, under which 340B eligibility is determined, and 340B pricing is effectuated, retrospectively.  The fact that 340B pricing is effectuated through after-the-fact product replenishment, rather than an after-the-fact cash rebate, is of no consequence.  Therefore, there is no basis for any objection to Novartis's contemplated rebate model on the grounds that covered entities would not receive up-front 340B pricing on a 340B-eligible unit; the prevailing product replenishment model operates in the same manner.

HRSA has publicly stated that, without formal pre-approval, a 340B rebate model is subject to the strictest enforcement measure.[54]  However, the product replenishment model was never formally pre-approved, yet HRSA acknowledges its existence and permits its use.[55]  And, while the product replenishment model significantly weakens 340B program integrity by perpetuating 340B-ineligible dispenses, Novartis's contemplated 340B rebate model would significantly enhance it.  Yet HRSA countenances the former and prohibits the latter.

> iv.    *A 340B rebate model is the only mechanism by which a manufacturer can carry out the task of effectuating MFP-340B nonduplication*

---

[48] HRSA, AIDS Drug Assistance Program (ADAP) Manual at 42 (June 2023), *available at* https://ryanwhite.hrsa.gov/sites/default/files/ryanwhite/resources/adap-manual.pdf.

[49] Furthermore, the ADAP rebate model also is not specified in PPA, and also was not *pre*-approved.  *See* 63 Fed. Reg. at 35240 ("ADAPs may *continue* to provide utilization data according to terms of *existing* agreements if so desired.") (emphasis added).

[50] *Id.* at 35,239, 35,240, 35,241.

[51] *Id.* at 35,241.

[52] *See* 59 Fed. Reg. 25,110, 25,114 (May 13, 1994) (permitting "provisions that address customary business practice, request standard information, or include other appropriate contract provisions").

[53] *See, e.g., Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024).

[54] *See* Letter from HRSA to J&J (Sep. 17, 2024).

[55] *See, e.g.*, HRSA, 340B Peer-to-Peer Program: 340B Compliance Improvement Guide at 36-37 (Oct. 1, 2015).

\\4149-1448-2773_v6
**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000437

NOVARTIS

HRSA's consideration of the 340B rebate model must be performed against the backdrop of the interconnected statutory provisions that form the foundation of the overall 340B scheme. As noted above, the DPNP statute guarantees that manufacturers may not be subjected to MFP-340B duplication. As to the effectuation of MFP-340B nonduplication, the Secretary of HHS, through CMS, has declined to provide any mechanism for identifying 340B-eligible units, instead tasking manufacturers with creating such a mechanism on their own. Yet the Secretary, through HRSA, has prohibited the only mechanism available to manufacturers: use of a 340B rebate model. Placing manufacturers in this untenable bind is arbitrary and capricious.

Moreover, this irrational administration of the overall 340B scheme violates the constitutional guarantee of substantive due process. Because CMS, acting on behalf of the Secretary, has tasked manufacturers with establishing a mechanism to identify 340B-eligible units and thereby effectuate MFP-340B nonduplication, it is unlawful for HRSA, acting on behalf of the Secretary, to disapprove the 340B rebate model when it is the only mechanism available to manufacturers to effectuate MFP-340B nonduplication.

\* \* \*

We respectfully request HRSA's acknowledgment in writing of our right to implement our contemplated 340B rebate model by January 7, 2025. Absent such acknowledgement, it will be our understanding that HRSA has purported to disapprove our model, consistent with its publicly stated position on the 340B rebate model more generally. Thank you for your consideration.

\* \* \*

Novartis's contemplated 340B rebate model is confidential commercial information protected from public disclosure under the Freedom of Information Act ("FOIA"). Accordingly, HRSA may not publicly disclose Novartis's intentions without Novartis's consent. We request that HRSA maintain the confidentiality of this letter and of all Novartis-related information herein to the greatest extent permitted by law. We specifically request that, in accordance with FOIA, HHS's FOIA regulations, and Executive Order 12600, HRSA protect the information in this letter from public disclosure. This information constitutes confidential commercial information not subject to disclosure under FOIA. Novartis hereby designates the information in this letter as exempt from disclosure under Exemption 4 of FOIA. We request that, when any of this designated information is requested under FOIA or otherwise, HRSA notify Novartis of the request and afford Novartis the opportunity to submit objections to disclosure.

Sincerely,

DocuSigned by:

*Odalys Caprisecca*

6B46EFA5994D430...

Odalys Caprisecca
VP, Managed Markets Finance

cc:     Rear Admiral Krista Pedley, PharmD, MS
        Director
        Office of Special Initiatives
        krista.pedley@hrsa.hhs.gov

        Chantelle Britton
        Director
        Office of Pharmacy Affairs
        chantelle.britton@hrsa.hhs.gov

11

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

## External Scheduling Request Memo for Deputy Secretary Hargan

**Filled out by:**

Elizabeth Hardcastle, Associate, Sidley Austin

**Topics:**

Kalderos' Drug Discount Management Platform Launch

**Objective:**

Kalderos has developed a solution to resolve the 340B Drug Discount Program's widespread problem of duplicate discounts. Kalderos' solution, called the Drug Discount Management Platform, identifies duplicate discounts before they occur by effectuating 340B discounts through a rebate mechanism. Specifically, covered entities request a 340B discount through the online Kalderos Platform, Kalderos performs validations on the request, such as ensuring the requestor is an authorized covered entity, and Kalderos sends an invoice to the manufacturer who authorizes the payment of 340B discounts to covered entities.

Kalderos has tested the solution and has incorporated feedback from both manufacturers and covered entities. Kalderos is preparing to launch September 8th. We believe Kalderos' solution solves the most critical, intractable problem with the 340B Program, duplicate discounts, and does so in a way that improves compliance and program integrity for all stakeholders.

We have been engaging with the government, both HRSA and CMS, for over 18 months to ensure open and transparent communications regarding Kalderos' solution. We have sought a communication confirming that the rebate mechanism is an appropriate way to offer the 340B price. We are confident that the 340B statute permits a rebate mechanism and that we are not prohibited from launching our solution, but we believe that it is important that the government speak to the issue.

**Why do you want to meet with the Deputy Secretary:**

We are hoping to discuss Kalderos' solution with the Deputy Secretary and understand the government's position with respect to effectuating 340B discounts through a rebate mechanism, including why the government has not yet released a communication on the issue.

**Point of Contact (Name, Cell and email):**

Elizabeth Hardcastle, ehardcastle@sidley.com, 419-618-8957

**Who will provide Briefing/read ahead materials (please pan on sending 48 hours in advance)?**

Elizabeth Hardcastle, Associate, Sidley Austin

**Are all external attendees US Citizens or Legal Permanent Residents? Y/N, if No, please list those attendees below.**

Yes

**External Attendees (include bio's and pictures):**

Jeremy Docken, Founder & CEO, Kalderos: https://www.linkedin.com/public-profile/in/jeremydocken?challengeId=AQEt5MdUd1km0AAAAXQiT6DDgc-2CwhqIhyCAES-ltqmHI2OB6t6KMz7uJ0BjRcsVexUVmZajtD4H1I9vVLxeDku9ILDTRCZFA&submissionId=ce0dac7a-8b50-2e16-70ea-19693e57ac06

William Sarraille, Partner, Sidley Austin: https://www.sidley.com/en/people/s/sarraille-william-a

Trevor Wear, Partner, Sidley Austin: https://www.sidley.com/en/people/w/wear-trevor-l

Elizabeth Hardcastle, Associate, Sidley Austin: https://www.sidley.com/en/people/h/hardcastle-elizabeth

*If your meeting request is accepted please plan on sending briefing/read ahead material at least 48 hours in advance**

340B_REBATES_000444

**kalderos**

jdocken@kalderos.com
kalderos.com

# Redefining how the business of healthcare performs™

**Jeremy Docken**
Founder & CEO



© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, ©&A Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

kalderos

2

# HHS Meeting: Kalderos 340B Rebate Solution

8/26/2020

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

**Agenda**

8/26/2020

1  Duplicate Discounts Remain an Intractable Problem

2  Recap of Kalderos Solution for 340B Rebates: "340B Pay"

3  Feedback from Covered Entities after 8 Months of Testing

4  Plan for General Availability

5  Data Sharing & HRSA Notices

6  Request for Feedback

3

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

4

# Duplicate Discounts Remain an Intractable Problem

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

kalderos

5



2020

OIG's Top Unimplemented Recommendations:
**Solutions To Reduce Fraud, Waste, and Abuse in HHS Programs**

U.S. Department of Health and Human Services
Office of Inspector General

**Duplicate Discounts Remain an Intractable Problem**

# Per HHS OIG, the Intersection of 340B & Medicaid Remains an Unaddressed Problem

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, CFIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**





**Duplicate Discounts Remain an Intractable Problem**

# Duplicate Discounts Kalderos Has Confirmed to Date

We estimate the total size of the duplicate discount problem in 2019 totaled $1.2B

*YTD in 2020, duplicates discounts Kalderos has confirmed are $11,278,253, which is largely consistent with 2019.

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

© 2020 Kalderos, Inc..
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

kalderos

7

# Recap of Kalderos Solution for 340B Rebates – "340B Pay"

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

8

**Recap of Kalderos Rebate Solution**

# Kalderos
# Manage
# platform

## API & Integration

Business Intelligence Data Lake

GP, ERP, Contract Management, Pharmacy Switch

### Delivery & Applications

**API & Integration**

**Ledger**
- Claims Data
- Distribution Data
- Payment

**Coordination & Monitoring**
- Validations
- Messaging
- Automation

**Payment**
- Direct payment
- Two-way

### Enterprise Administration

**Share & Exchange**

State Medicaid, PBM, Part D Plan, Pharmacy

## API & Integration

EDI
Spreadsheet
Flat File
NCPDP
External AP

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

Recap of Kalderos Rebate Solution

# Manage's 340B discount model



**340B Discount Payment**



① Covered entity & TPA qualify transaction as 340B eligible and submit claim to Kalderos

② Kalderos checks if MDRP discount already paid, and resolves issues before duplicate discount occurs

③ Manufacturer reviews Kalderos recommendation to pay and agrees to pay 340B rebate

④ Kalderos notifies covered entity that rebate will be paid & provides payment remittance advice (RAD)

⑤ Kalderos payments partner enables electronic payment of rebate from manufacturer to covered entity

⑥ Dispensing-level transaction data allows manufacturer to identify and prevent 340B duplicate discounts




● Product
● Payment
● Data
● Agreement

9

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000453

kalderos

10

# Feedback from Covered Entities after 8 Months of Testing

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

11

# 2 Manufacturers

>$2B in annual 340B discounts

# 4 Covered Entities

Feedback from Covered Entities

## Beta Testing Participants

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000455

kalderos

12

Feedback from Covered Entities

Beta Testing
# Key Learnings

**Key Learnings & Outcomes**

**1** **Little Effort Required for CEs** – Easy for even small covered entities to submit rebate requests.

**2** **Hardened API** – Based on direct feedback from a CE's IT partner we were able to simplify the API structure enabling a shorter and more effective implementation

**2** **Enhanced Integration Guide Content** – New content was developed for this guide, which will be available publicly to all CEs and their partners, so that they have all the information they need to implement Kalderos' APIs

**3** **Speedy Implementation** – Confirmed that should CE partners, such as TPAs, choose to do so, they can implement connecting to our API using existing systems cheaply and quickly

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

13

Feedback from Covered Entities

# Overall feedback has been positive

"

The Kalderos program will **allow covered entities to work with manufacturers** to better control their 340B program and **prevent encroachment** and excessive fees from contract pharmacies and **middlemen**".

**Brian Donahu**
CFO, Dickinson County Healthcare System

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

kalderos

14

# Plan for General Availability

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

15

**Plan for General Availability**

# General Availability Date: September 2020

- Kalderos has one committed manufacturer and three manufacturers in final contracting stages to use the 340B Pay rebate solution once available

- This number is expected to grow quickly based on increasing interest from manufacturers and positive feedback from covered entities

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

16

**Plan for General Availability**

# An Open Platform Solution

Kalderos has intentionally designed our platform to allow for other technology companies to build their own custom integrations allowing easy connection with current and future software and services used by manufacturers, covered entities, and government agencies

## What it means

**Few restrictions placed on outside developers**

We encourage other companies to build their own applications that will work on our platform

**Community innovation**

Covered entities and their contract pharmacies have already designed unique implementation methods that work for their businesses

**API open to Medicaid agencies**

Medicaid agencies will receive unique credentials that allow them to query data to avoid causing duplicate discounts with FFS or MCO claims

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

# Data Sharing & HRSA Notices

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

kalderos

18

# Data Sharing

Data Sharing & HRSA Notices

- We understand that HRSA receives data reports from Apexus as required by the Prime Vendor agreement
- We would be happy to provide similar data reports to HRSA

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

19

Data Sharing & HRSA Notices

# HRSA Notices

- Kalderos has provided HRSA with a letter to be posted on HRSA's website outlining the 340B rebate solution.

- We will encourage manufacturers to post in advance of transitioning to our platform (e.g., provide 30-day notice)

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000463

kalderos

20

# Request for Feedback

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

Request for Feedback

# Long History of Government Communication

| Date | Communication | Nature of Communication |
|------|---------------|-------------------------|
| 2/26/19 | HHS Meeting | Description of 340B rebate solution and legal and policy basis. |
| 4/8/19 | OIG Comment Letter | Description of 340B rebate solution and its legal basis. |
| 5/2/19 | HRSA Meeting | Description of 340B rebate solution and how it will address 340B duplicate discounts. |
| 5/8/19 | CMS Meeting | Description of 340B rebate solution and how it will address 340B duplicate discounts. |
| 8/22/19 | HRSA Meeting | Description of 340B rebate solution, timetable for implementation, and request for HRSA's legal position. |
| 8/29/19 | HHS Communication | Further discussion of 340B rebate solution and legal basis. |
| 9/19/19 | HRSA Communication | Proposed FAQ summarizing legal basis for 340B rebate solution. |
| 9/20/19 | HHS Letter | Description of 340B rebate solution, policy need for the platform, and legal basis for the platform. |
| 11/21/19 | HRSA Meeting | Description of 340B rebate solution, timetable for implementation, and request for HRSA's legal position. |
| 3/4/20 | CMS Meeting | Further description of 340B rebate solution and timetable for implementation. |
| 5/13/20 | HRSA Communication | Update of pilot and HHS communications. |
| 5/14/20 | Questions from HRSA | |
| 5/18/20 | Kalderos Response to HRSA | Providing additional information on CMS engagement and pilot and timing for implementation (again noting June or July go live). |
| 7/13/20 | Final HRSA Meeting | Final report on pilot completion and reiterated discussion of basis for 340B rebate solution. |

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos./FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Request for Feedback

# Status of Government Engagement

- Over more than two years of engagement with the government, Kalderos is at the point of full implementation.

- During the course of Kalderos' extensive engagement, HRSA has not stated that the 340B rebate solution violates the 340B statute or that a manufacturer using our solution would be in violation of the statute.

- We reiterate our repeated, prior requests for HRSA's legal position on whether, in its view, chargebacks are required by the statute, or whether, as Kalderos believes, and has explained in detail, the statute does not dictate the mechanisms by which 340B discounts may be made available.

- We asked that HRSA provide us a clear written statement of its statutory position by August 13, 2020.

- Consistent with this, we have provided a letter that HRSA can post describing the 340B rebate solution for all 340B entities to be able to review.

- Delay in receiving feedback from HRSA is putting us at a competitive disadvantage.
  ○ Kalderos was transparent with HRSA; others appear to have been less so.

22

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos; FOIA Exempt

kalderos

jdocken@kalderos.com
kalderos.com

# Say Hello.

**Jeremy Docken**
Founder & CEO



© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, CFAA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000467

# kalderos

24

## Audit

**For Providers, Payers, & Patients**

### Review

Respond to manufacturer questions regarding accuracy & validity of previously paid discounts

**For manufacturers**

Live

### Verify

Validate post drug discount requests. Initiate and resolve discount disputes as permitted by law or contract.

## Manage

**For Providers, Payers, & Patients**

### Request

Request drug discounts, respond real-time to manufacturer questions regarding discount-eligible transaction, and obtain cash payment vs. on-invoice discount.

**For manufacturers**

In Beta

### Pay

Review, coordinate and pay drug discounts at the point of sale, adjust prior adjudicated discounts for error or price adjustments.

Recap of Kalderos Manage Platform

# Our Manage platform ensures the right discount is applied to the right transaction.®

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos; FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

kalderos

25

Feedback from Covered Entities

# Beta Testing
# Lessons Learned

**Objective:**

To validate that CEs can submit discount request data successfully via API

## Summary of Success

A CE, with their IT partner, successfully submitted discount requests to the Manage platform via API.

## Key Activities

**Successful discount request submission setup**

The CE and their partner leveraged Kalderos' publicly available APIs and the associated documentation to set up a direct feed from their existing systems to the Manage platform

**Gathered continuous feedback**

The CE shared several rounds of feedback with the Kalderos team to optimize the structure of the APIs and enhance the documentation

**Validated against acceptance criteria**

CE was able to consistently send discount requests with all the required data, including reversal information

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

Update and Feedback on Beta Testing

kalderos

# Our phased approach to launch

| Beta Phase | Scope | # Mfrs | # NDCs | # CEs | Dates |
|---|---|---|---|---|---|
| Phase 1 (CE only) | • Validated that CEs can submit discount request data successfully via API | 0 | 2 | 1 | Jan – Mar 2020 |
| Phase 2 | • CEs sent 340B discount requests for mock NDCs<br>• Manufacturers reviewed + approved requests<br>• Payments sent via sandbox environment<br>• CE still purchased products at 340B price | max 3 | 2 (mock) | 4 | Mar – May 2020 |
| Phase 3 | • Full functionality - discount effectuation and payment processing to CEs via Kalderos for real NDCs<br>• Products are purchased at WAC or GPO price (if permitted) | max 5 | ~2 per | 4 | May – Jul 2020 |
| General Availability | • Manage platform rolled out to all CEs who purchase the in-scope NDCs | 1 or more | TBD | All | September 2020 |

© 2020 Kalderos, Inc.<br>This document contains proprietary trade secrets of Kalderos, FOIA Exempt

26

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000470

kalderos

**Feedback from Covered Entities**

# Beta Testing – Key Lessons Learned

**Objective:**

To validate that CEs can submit discount request data successfully via API

**1** **Hardened API** – Based on direct feedback from a CE's IT partner we were able to simplify the API structure enabling a shorter and more effective implementation

**2** **Enhanced Integration Guide Content** – New content was developed for this guide, which will be available publicly to all CEs and their partners, so that they have all the information they need to implement Kalderos' APIs

**3** **Speedy Implementation** – Confirmed that should CE partners, such as TPAs, choose to do so, they can implement connecting to our API using existing systems cheaply and quickly

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000471

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Update and Feedback on Beta Testing

# Beta Phase 2 Overview

**Objectives:**

- For CEs to send 340B discount requests for mock NDCs
- For manufacturers to review + approve requests
- To send payments via sandbox environment

## Summary of Success

CEs and manufacturers simulated the full effectuation process using real dispensations and mock identifiers.

## Key Activities

**Successful submission of real discount requests**

CEs (inclusive of health centers, hospitals, and STD clinics) pulled real, 340B dispensations from their pharmacies to submit discount requests to a manufacturer via the Manage platform.

**Delivery of discount requests & completion of discount review**

Manufacturers reviewed those requests and the results of Kalderos validations to make a decision on which to pay.

**Validated payment process & exchange**

The CEs received a mock payment (sandbox) and associated remittance advice.

A manufacturer confirmed delivery of mock payment and reviewed past invoices.

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

kalderos

29

Update and Feedback on Beta Testing

# Beta Phase 2
# Key Learnings

**Objectives:**

- For CEs to send 340B discount requests for mock NDCs
- For manufacturers to review + approve requests
- To send payments via sandbox environment

## Key Learnings & Outcomes

**1** **Little Effort Required for CEs**

**2** **TPA Reports could be Leveraged** – Standard TPA reports were used to create basic dispensation reports that matched the format required to upload to the Manage Platform.

**3** **Simplified CE Requirements** – We learned that several CEs still did not know how to obtain 340B price information, so the platform was optimized to apply manufacturer-provided 340B prices to CE-provided claims data.

**4** **Aligned Terminology** – Fields and language throughout the application was adjusted to better match terminology used in existing CE and manufacturer systems.

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

kalderos

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos; FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Update and Feedback on Beta Testing

# Overall feedback has been positive

- Feedback from CEs in BP2 was positive, with most commenting that the process was surprisingly simple and intuitive

- CEs have been able to successfully submit discounts in all 3 ways that are available to do so (in the UI, via a file upload, and via the API)

- CEs, without Kalderos assistance, worked with their contract pharmacies to adjust to the new model

- CEs provided recommendations for enhancements that have been incorporated into our development backlog to be completed before launch

- The CEs who completed BP2 were eager to move into Phase 3

30

340B_REBATES_000474

kalderos

31

# Beta Phase 3 Details

Kalderos 340B
Rebate Solution

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

kalderos

32

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Beta Phase 3 Details

# Beta phase 3 is driven by two primary objectives:



**Systems Level Testing**

Actual dispensations and live payment processing



**Remaining Component Level Testing**

Validate that remaining requirements (those not tested in BP1 or BP2) are satisfied prior to launch



kalderos

33

## Beta Phase 3 Details
# Testing areas

### Manufacturers

- Bank setup, funding, and actual transfer of funds
- Systems integration (EDI 844, 845, 849)
- Workflow implementation
- Master data management
- Price restatements and corrections
- Roles & permissions
- Reporting requirements

### Covered Entities

- Bank setup & receipt of funds
- Removal of NDCs from current 340B inventory/purchase processes
- Changes to contact pharmacy replenishment model
- Day 1 cutover challenges
- Reporting and audit requirements

© 2020 Kalderos, Inc.
This document contains proprietary trade secrets of Kalderos, FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000477

| | |
|---|---|
| **From:** | Jeremy Docken |
| **To:** | Garrison, Elizabeth (HRSA) |
| **Cc:** | Pedley, Krista (HRSA); Herzog, Michelle (HRSA); Faria, Aisha (HRSA); Britton, Chantelle (HRSA); Wear, Trevor L.; Hardcastle, Elizabeth Kolbe; Sarraille, William |
| **Subject:** | Re: Kalderos |
| **Date:** | Wednesday, May 5, 2021 5:37:30 PM |
| **Attachments:** | image001.png |
| | image006.png |
| | image007.png |
| | image008.png |
| | image009.png |
| | image010.png |
| | image011.png |
| | image012.png |
| | image013.png |
| | Kalderos_HRSA_20210506.pdf |

Hi Betty,

Please find attached the slides Kalderos plans to use during our discussion tomorrow. We look forward to speaking with Admiral Pedley and the team.

Many thanks,

Jeremy

On Mon, Apr 19, 2021 at 11:45 AM Garrison, Elizabeth (HRSA) <EGarrison1@hrsa.gov> wrote:

> Thanks so much, Lisa.
>
> I will set this up and send an invitation shortly.
>
> If there is any background information, agenda, etc., please forward as soon as possible. Also, if there are any additional attendees, please let us know as well.
>
> Thanks again, and have a great afternoon!
>
> 
>
> Management Analyst
>
> Office of Pharmacy Affairs
>
> Health Resources and Services Administration
>
> 5600 Fishers Lane, Room 8W05A
>
> Rockville, MD 20857
>
> Tel: 301-443-2217
>
> Email: Egarrison1@hrsa.gov
>
> 

---

**From:** Breighner, Lisa M. <lbreighner@sidley.com>
**Sent:** Monday, April 19, 2021 11:30 AM
**To:** Garrison, Elizabeth (HRSA) <EGarrison1@hrsa.gov>; Pedley, Krista (HRSA) <KPedley@hrsa.gov>
**Cc:** Jeremy Docken <jdocken@kalderos.com>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Wear, Trevor L. <twear@sidley.com>; Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>; Sarraille, William <wsarraille@sidley.com>; Faria, Aisha (HRSA) <AFaria@hrsa.gov>
**Subject:** RE: Kalderos

Hello,

Bill Sarraille is available on May 6, 11:00-11:30 a.m.

Thank you.

340B_REBATES_000478

**LISA M. BREIGHNER**
Legal Secretary

**SIDLEY AUSTIN LLP**
+1 202 736 8036
lbreighner@sidley.com

**From:** Garrison, Elizabeth (HRSA) <EGarrison1@hrsa.gov>
**Sent:** Monday, April 19, 2021 7:45 AM
**To:** Sarraille, William <wsarraille@sidley.com>; Pedley, Krista (HRSA) <KPedley@hrsa.gov>;
**Cc:** Jeremy Docken <jdocken@kalderos.com>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>; Britton, Chantelle (HRSA)
<CBritton@hrsa.gov>; Wear, Trevor L. <twear@sidley.com>; Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>; Faria, Aisha (HRSA)
<AFaria@hrsa.gov>
**Subject:** RE: Kalderos

Good morning, Mr. Sarraille,

During the first week of May, Admiral Pedley has the following times available:

Monday, May 3 – 2:00 – 2:30 pm 2:30 – 3:00 pm

Tuesday, May 4 – 2:00 – 2:30 pm 2:30 – 3:00 pm

Thursday, May 6 – 11:00 – 11:30 am 11:30 am – 12:00 pm

Friday, May 7 – 11:00 – 11:30 am 11:30 am – 12:00 pm

Please let us know if any of these times would work.

Thanks so much and have a great day!!



Management Analyst

Office of Pharmacy Affairs

Health Resources and Services Administration

5600 Fishers Lane, Room 8W05A

Rockville, MD 20857

Tel: 301-443-2217

Email: Egarrison1@hrsa.gov




**From:** Sarraille, William <wsarraille@sidley.com>
**Sent:** Sunday, April 18, 2021 6:40 PM
**To:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>
**Cc:** Jeremy Docken <jdocken@kalderos.com>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>; Britton, Chantelle (HRSA)
<CBritton@hrsa.gov>; Wear, Trevor L. <twear@sidley.com>; Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>; Faria, Aisha (HRSA)
<AFaria@hrsa.gov>; Garrison, Elizabeth (HRSA) <EGarrison1@hrsa.gov>
**Subject:** RE: Kalderos

Thank you so much, Admiral.

We look forward to speaking with you. Are there times in the first week of May?

Thank you.

Best regards,

Bill

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>

**Date:** Wednesday, Apr 07, 2021, 3:13 PM

**To:** Sarraille, William <wsarraille@sidley.com>

**Cc:** Jeremy Docken <jdocken@kalderos.com>, Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>, Britton, Chantelle (HRSA) <CBritton@hrsa.gov>, Wear, Trevor L. <twear@sidley.com>, Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>, Faria, Aisha (HRSA) <AFaria.hrsa@hrsa.gov>, Garrison, Elizabeth (HRSA) <EGarrison1@hrsa.gov>

**Subject:** RE: Kalderos

Hello and thank you for reaching out.

We are able to meet in a listen only mode so we can hear the updates you have made to your model. Please work with Betty Garrison to provide some possible dates/times in the next few weeks and we can then coordinate on our end.

Krista M. Pedley, PharmD, MS

RADM, USPHS

Assistant Surgeon General

Director, Office of Pharmacy Affairs

301-443-5294



Sign up for email updates!

---

**From:** Sarraille, William <wsarraille@sidley.com>

**Sent:** Tuesday, March 30, 2021 4:00 PM

**To:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>

**Cc:** Jeremy Docken <jdocken@kalderos.com>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Wear, Trevor L. <twear@sidley.com>; Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>

**Subject:** RE: Kalderos

Dear Rear Admiral Pedley:

Thank you for your response. Understanding that you cannot speak to the congressional letter that addresses a rebate option, we would nonetheless like the opportunity to have a call with you. In particular, we would like to use the call to provide an update on recent 340B developments related to Kalderos. We are also hoping to discuss any questions you may have.

Please let us know if there is a time in the next week or two that may work for you.

Many thanks,

Bill

**WILLIAM A. SARRAILLE**
Partner

**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
+1 202 736 8195
wsarraille@sidley.com
www.sidley.com



**From:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>
**Sent:** Wednesday, March 17, 2021 8:00 AM
**To:** Sarraille, William <wsarraille@sidley.com>
**Cc:** Jeremy Docken <jdocken@kalderos.com>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>
**Subject:** RE: Kalderos

Hello Bill

HRSA is unable to speak to the referenced letter from Congress. However, if you have updated information to share with HRSA regarding your model, please send those to us as we continue our review. Thank you.

Krista M. Pedley, PharmD, MS

RADM, USPHS

Assistant Surgeon General

Director, Office of Pharmacy Affairs

301-443-5294



Sign up for email updates!

---

**From:** Sarraille, William <wsarraille@sidley.com>
**Sent:** Thursday, March 04, 2021 10:40 AM
**To:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>
**Cc:** Jeremy Docken <jdocken@kalderos.com>
**Subject:** Kalderos

Hello, Admiral Pedley, I hope this finds you well. We understand that the Office of the Secretary was sent a piece of correspondence by some House members. We would like to speak with you about the letter, which we believe contains errors regarding Kalderos.

When might be a good time for a call to discuss?

Thank you.

Best regards,

Bill

Sent with BlackBerry Work
(www.blackberry.com)

*********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

*********************************************************************************************

*The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential and/or trade secret material. If you are not the intended recipient of this message, be aware that any use, review, re-transmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

kalderos.com

# Redefining how the business of healthcare performs®

05 06 2021

**Jeremy Docken**
Founder & CEO
jdocken@kalderos.com

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000482

2

# Agenda

1. Duplicate discounts remain an intractable problem

2. We changed 340B Pay due to covered entity feedback

3. Responding to covered entities' remaining concerns

4. Data sharing & HRSA notices

5. Request for feedback

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000483

3

# Duplicate discounts remain an intractable problem

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Duplicate discounts remain an intractable problem

# Five years of good-faith inquiries lead us to estimate total duplicate discounts exceed $1B in 2019



Our good-faith inquiry results suggest that 3–5% of 340B discounts and Medicaid rebates are duplicates. As the 340B program has grown, the financial impact of duplicate discounts has grown, too. As of 2019, that 3–5% adds up to at least $933 million in duplicate discounts, potentially as high as $1.6 billion.

Source: Kalderos' Annual Report

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos, ©2016 Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

5

# We changed 340B Pay as a result of covered entity feedback

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

6

We changed 340B Pay as a result of covered entity feedback

# 340B Pay model now allows covered entities to choose rebates or discounts for their own pharmacies

- When we announced 340B Pay to the 340B community in September 2020, some FQHCs asked about what they understood might be a working capital impact.

- Covered entities and certain congressional members shared this feedback with HHS via a November 2020 letter.

- By December 2020, we had already made changes to the 340B Pay platform to empower covered entities to choose to continue to receive 340B upfront discounts for their own pharmacies, or switch to 340B rebates.

- We continue to strive to have our platform be a fair, impartial solution that considers needs of stakeholders, just as we have since our company's launch in 2016.

kalderos    © 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Responding to covered entities' remaining concerns

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

**Responding to covered entities' remaining concerns**

# February 2021 Letter to Acting Secretary Cochran

We appreciate the dialog, but want to share that this statement is incorrect, for reasons that we set out in the slides that follow.

**Congress of the United States**
**House of Representatives**
Washington, DC 20515

February 26, 2021

Acting Secretary Cochran
Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20201

Dear Acting Secretary Cochran,

We write today as leading congressional proponents of the 340B drug discount program to ask you to take immediate action to ensure that manufacturers are prohibited from imposing unilateral changes to the program in direct conflict with congressional intent and decades of written guidance.

We were pleased to see 28 attorneys general urge former HHS Secretary Azar to protect the 340B program. We believe that letter and the Department's Office of General Counsel's advisory opinion, released on December 30 and described below, represent some of the most compelling legal arguments for the actions we ask you to take.

As you know, Congress enacted the 340B Drug Pricing Program in 1992 following the creation of the Medicaid Drug Rebate Program. In order for their drugs to be covered by Medicaid, manufacturers are required to offer discounts to certain public and nonprofit health care organizations known as covered entities, including Federally Qualified Health Centers, Ryan White HIV/AIDS Clinics, Medicare/Medicaid Disproportionate Share hospitals, rural hospitals, and children's hospitals. According to the legislative history, Congress's intent in creating the discount program was to "stretch scarce federal resources to reach more eligible patients and provide more comprehensive services."

The 340B statute requires drug manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."[1] There are no provisions in the statute that allow manufacturers to set conditions or otherwise impede a covered entity's ability to access 340B discounts. The Health Resources and Services Administration (HRSA), which oversees the program, has indicated on multiple occasions, dating back to the early years of the program, that the 340B statute requires manufacturers to provide 340B discounts to covered entities when covered entities purchase drugs to be dispensed through contract pharmacies on a covered entity's behalf.[2]

Beginning in the summer of 2020, several drug manufacturers began to announce a range of actions to avoid honoring 340B discounts for certain drugs, many with the highest prices, delivered to covered

[1] https://www.hrsa.gov/opa/index.html
Manufacturers' Actions Violating 340B Drug Pricing Program Requirements]
[2] 42 U.S.C. § 256b(a)(1).
[3] Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549 (Aug. 23, 1996); Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10272, 10278 (March 5, 2010).

> " Furthermore, an information technology company has allied with manufacturers to change the 340B program from one of upfront discounts to post-sale rebates, **a change that would greatly increase costs for covered entities and give manufacturers tremendous leverage over covered entities.**"

**kalderos**

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Responding to covered entities' remaining concerns

# 340B Pay provides covered entities better financial outcomes vs. discounts for contract pharmacies

Based on our research, we have identified at least three areas where covered entities benefit from 340B rebates vs. discounts for contract pharmacies:

**1** Covered entities are paid more quickly and more often

**2** Covered entities receive larger payments

**3** Covered entities have greater power to stop contract pharmacies from siphoning 340B savings for their own benefit.

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

9

10

Responding to covered entities' remaining concerns

# We commissioned 3 Axis Advisors – experts in pharmacy economics – to perform a study



3△XIS Advisors

*340B REBATE MODEL CASH FLOW ANALYSIS*

Prepared for Kalderos
March 2021

3 Axis Advisors LLC
info@3axisadvisors.com

Page 1 of 33

"Overall, we find the 340B rebate model proposed by Kalderos to be cash flow positive from the perspective of a covered entity within the assumptions of our report. Projected positive cash flow is likely resulting from two sources: (1) the increased speed by which the covered entity is able to recognize dollars generated from relationships with contract pharmacy (15 days in the rebate model versus 30 days in the existing model) and (2) the higher payment that results from a 340B rebate based on the Wholesale Acquisition Cost (WAC) instead of a commercial Average Wholesale Price (AWP)-based reimbursement rate. The sensitivity analysis conducted resulted in positive cash flow for all scenarios tested for the covered entity, adding a reasonable degree of confidence to this conclusion."

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**



**Responding to covered entities' remaining concerns**

# How 340B rebates generate more cash for the covered entity vs. 340B upfront discounts

**Assumptions**
AWP=$100; WAC=$84, 340B Price=$50

**340B Upfront Discount Net Cash**
(Excluding TPA and CP Fees)

AWP-17% reimbursement    + $83
AWP-24% reimbursement    + $76
340B Price               – $50
**Range of net cash generated (range)    = $33 to $26**

**340B Rebate Net Cash**
(Excluding TPA and CP Fees)

WAC (starting point for calculating 340B rebate)    + $84
340B Price    – $50
**Net cash generated    = $34**

11

kalderos    © 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

340B_REBATES_000492

12

Responding to covered entities' remaining concerns

# Paying 340B rebates directly to the covered entity provides entities with greater negotiating power

- Under a 340B upfront discount model, contract pharmacies generate cash flows by dispensing drugs to patients and collecting proceeds of the sale. Under 340B rebate model, covered entities generate cash from rebates for each 340B eligible dispense.

- Per conversations with covered entities, contract pharmacies use the fact they generate the cash flows as leverage to demand higher fees.

- 340B rebates paid to covered entities, not contract pharmacies, will provide covered entities with greater power to negotiate lower fees, since covered entities, not contract pharmacies, will be paid by the manufacturer.

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

13

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Responding to covered entities' remaining concerns

# Improving our processes for assisting covered entities and manufacturers should 340B rebate requests be denied

- While we disagree with the notion that rebates will give manufacturers "leverage" over covered entities, we assume some entities are afraid valid rebate requests will go unpaid.

- As a platform company whose software connects manufacturers and covered entities, assisting all parties when a dispute arises is one of our core responsibilities.

- Our Customer Success and Application Support teams are redesigning our processes to ensure we engage with manufacturers and covered entities when rebate requests "fail", in order to avoid disputes from escalating and reducing friction between stakeholders.

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

14

# Data sharing & HRSA notices

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

# Data sharing

**1**

We understand that HRSA receives data reports from Apexus as required by the Prime Vendor agreement

**2**

We would be happy to provide similar data reports to HRSA; please let us know what might be **helpful to you**

**3**

This is part of our commitment to transparency, which will enable HRSA to verify that our system is ensuring that manufacturers pay what they should and invalid claims (and only invalid claims) fail

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

15

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Data sharing & HRSA notices

# HRSA notices



**1**

We anticipate our first manufacturer(s) will be ready to move forward with 340B Pay in June.

**2**

We will encourage manufacturers to post in advance of transitioning to our platform

(e.g., provide 30-day notice)

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

340B_REBATES_000497

17

# Request for feedback

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

kalderos

CONFIDENTIAL-ATTORNEYS' EYES ONLY

18

Request for feedback

# Long history of government communication

| Date | Communication | Nature of communication |
|------|---------------|-------------------------|
| 2/26/19 | HHS Meeting | Description of 340B Pay platform and legal and policy basis, |
| 4/8/19 | OIG Comment Letter | Description of 340B Pay platform and its legal basis. |
| 5/2/19 | HRSA Meeting | Description of 340B Pay platform and how it will address 340B duplicate discounts, |
| 5/8/19 | CMS Meeting | Description of 340B Pay platform and how it will address 340B duplicate discounts, |
| 8/22/19 | HRSA Meeting | Description of 340B Pay platform, timetable for Implementation, and request for HRSA's legal position, |
| 8/29/19 | HHS Communication | Further discussion of 340B Pay platform and legal basis, |
| 9/19/19 | HRSA Communication | Proposed FAQ summarizing legal basis for 340B Pay platform. |
| 9/20/19 | HHS Letter | Description of 340B Pay platform, policy need for the platform, and legal basis for the platform, |
| 11/21/19 | HRSA Meeting | Description of 340B Pay platform, timetable for implementation, and request for HRSA's legal position, |
| 3/4/20 | CMS Meeting | Further description of 340B Pay platform and timetable for implementation, |
| 5/13/20 | HRSA Communication | Update of pilot and HHS communications. |
| 5/14/20 | Questions from HRSA | |
| 5/18/20 | Kalderos Response to HRSA | Providing additional Information on CMS engagement and pilot and timing for implementation (again noting June or July go live), |
| 7/13/20 | Final HRSA Meeting | Final report on pilot completion and reiterated discussion of basis for 340B Pay platform. |

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Request for Feedback

# Status of government engagement

- Over more than two years of engagement with the government, Kalderos is at the point of full implementation.

- During the course of Kalderos' extensive engagement, HRSA has not stated that the 340B Pay violates the 340B statute or that a manufacturer using 340B Pay would be in violation of the statute.

- We reiterate our repeated, prior requests for HRSA's legal position on whether, in its view, chargebacks are required by the statute, or whether, as Kalderos believes, and has explained in detail, the statute does not dictate the mechanisms by which 340B prices may be made available.

- We look forward to continuing to work with HRSA in implementing 340B Pay.

- We anticipate our first manufacturer customers will be ready to move their products to the platform in June 2021.

kalderos

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

**CONFIDENTIAL-ATTORNEYS' EYES ONLY**

19



**Jeremy Docken**
Founder & CEO
jdocken@kalderos.com

# Say
# Hello

kalderos

kalderos.com

© 2021 Kalderos, Inc. This document contains proprietary trade secrets of Kalderos. FOIA Exempt

CONFIDENTIAL-ATTORNEYS' EYES ONLY

| | |
|---|---|
| **From:** | Angie Franks |
| **To:** | Britton, Chantelle (HRSA) |
| **Cc:** | Rusty Hensley; Trevor L. Wear; Hardcastle, Elizabeth Kolbe; Pedley, Krista (HRSA); Herzog, Michelle (HRSA) |
| **Subject:** | Re: [EXTERNAL] Re: Kalderos Direct Discount Platform Update |
| **Date:** | Thursday, September 5, 2024 3:33:30 PM |

Dear Chantelle and HRSA team,

Thank you for your email and for meeting with Kalderos and Lilly yesterday to discuss Kalderos' Direct Discount Platform.  That discussion and the email below are just the most recent of many communications between Kalderos and the HRSA team, dating back to 2019, about Kalderos' Platform.  The Kalderos Platform continues to be a means for ensuring the proper operation of the 340B Program for covered entities and manufactures alike.

Once again, we are very excited about the benefits the Direct Discount Platform will bring to covered entities and manufacturers and appreciate the opportunity to share it with you.

Best regards,

Angie

**From:** Britton, Chantelle (HRSA) <CBritton@hrsa.gov>
**Date:** Wednesday, September 4, 2024 at 12:01 PM
**To:** Angie Franks <angie.franks@kalderos.com>
**Cc:** Rusty Hensley <rusty.hensley@kalderos.com>, Trevor L. Wear <twear@sidley.com>, Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>, Pedley, Krista (HRSA) <KPedley@hrsa.gov>, Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>
**Subject:** RE: [EXTERNAL] Re: Kalderos Direct Discount Platform Update

Hello Angie – thanks for today's discussion. We had an opportunity to review your email regarding Kalderos' Direct Discount Platform – which would effectuate the 340B price directly to a covered entity as a rebate. Under the 340B Program, the Pharmaceutical Pricing Agreement (PPA) is between the Secretary of HHS and the manufacturer. To the extent a manufacturer would like to discuss its model for 340B pricing with HRSA, HRSA would engage with the manufacturer directly as it is  a party to the PPA and responsible for compliance under the 340B Program.

Please let us know if you have any questions.

Thank you,
Chantelle

**From:** Angie Franks <angie.franks@kalderos.com>
**Sent:** Wednesday, August 28, 2024 6:35 AM

**To:** Pedley, Krista (HRSA) <KPedley@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>
**Cc:** Rusty Hensley <rusty.hensley@kalderos.com>; Trevor L. Wear <twear@sidley.com>; Hardcastle, Elizabeth Kolbe <ehardcastle@sidley.com>
**Subject:** [EXTERNAL] Re: Kalderos Direct Discount Platform Update

Dear HRSA team,

We, of course, have seen J&J's announcement about a rebate model and have seen trade press reports on HRSA's response to the announcement.  In light of these reports, we wanted to follow up on prior email to ask if there is  anything else Kalderos should be considering or anything else HRSA would like to see or learn about our model before going live.

We would be happy to meet with you to answer any questions. We are also happy to provide a demonstration of our platform and model.

Thank you,

Angie

On Fri, Aug 9, 2024 at 4:19 PM Angie Franks <angie.franks@kalderos.com> wrote:

> Dear Rear Admiral Pedley, Director Britton, and Deputy Director Herzog,
>
> We are writing to provide an update regarding Kalderos's Direct Discount Platform, our model for effectuating the 340B price directly to covered entities as a rebate. We appreciate your prior engagement as we developed this model a few years ago and soft launched it with a pilot program and a manufacturer with a limited distribution network.
>
> At the time of our prior engagement, we believed the 340B Program needed a technology solution like the Direct Discount Platform. That could not be more true today. Both covered entities and manufacturers are concerned about actions taken by each other, and about the regulatory challenges that currently exist. We believe that more needs to be done to help increase transparency and improve compliance to improve program sustainability through reduction of duplicate discounts, diversion, and other compliance challenges. The Direct Discount Platform is that solution.
>
> Since our prior engagement, we have continued to work to improve our platform to promote ease of use for all stakeholders and are preparing for launch with a manufacturer in the coming months. We expect multiple manufacturers and covered entities to be using the Direct Discount Platform by year's end.
>
> **The Direct Discount Platform is Needed Now**
>
> Recent developments related to the IRA and ADR process necessitate a transition to a 340B rebate model. Recent IRA guidance from CMS indicate that CMS and the Medicare Transaction Facilitator (MTF) will be challenged to prevent the duplicate discounts that will inevitably occur as a result of the effectuation of the Maximum Fair

Price (MFP), Part B and D inflation rebates, and wastage refunds. CMS has recognized in IRA guidance that a rebate model is necessary and appropriate for the effectuation of the MFP while complying with the duplicate discount prohibitions built into the statute. The use of modifiers will not be the answer to prevent non-compliance, as they are voluntary in some settings and there is no means to enforce their use or ensure they are not lost in the process. Further, none of these new discount programs provide manufacturers a sufficient opportunity to audit, dispute, or recoup duplicative discounts, payments, or rebates.

Our Direct Discount Platform is built to ensure compliance with the various government drug discount programs. Our model is ready to launch and will seamlessly address both 340B and Medicare compliance, including with drugs subject to an MFP. We believe it is crucial that the Direct Discount Platform enter the market now to transition the system to rebates in advance of MFPs going live, Part B and D inflation rebates being invoiced, and wastage refunds being collected.

Additionally, the new ADR regulations place the burden on manufacturers to obtain relevant information (directly or through third parties) to support or defend a dispute. However, the regulations do not provide a process for manufacturers to comply with this requirement. The existing stakeholders in the process, including wholesalers and third-party administrators, are not agents of manufacturers and are not obligated to provide this information. A rebate model is a means through which a third party, that maintains relationships with both manufacturers and covered entities, is able to gain access to the necessary information in an efficient manner that minimizes the requests made of covered entities and others.

Accordingly, changes in the marketplace, as a result of the implementation of the IRA and revised ADR regulations, require comprehensive and easy to use technology solutions, such as the Direct Discount Platform, to ensure compliance.

**Launch of the Direct Discount Platform**

*Technology-driven approach.* Our focus has been, and continues to be, on service as a technology partner to help improve the integrity of the 340B Program for all stakeholders through data transparency and easy-to-use IT platforms.

*Details of Direct Discount Platform.* The Direct Discount Platform will be used for all 340B discount requests. Wholesalers will no longer have to submit chargebacks for a manufacturer's covered outpatient drugs on the Platform.

Under this approach, claims-level data is exchanged between all parties, ensuring accurate and timely payment of discounts and **preventing nearly 100% of non-compliant discounts**. Our model builds in compliance checks that ensure that a covered entity is approved for 340B pricing and duplicate discounts across all discount programs can be avoided.

*Benefits to all 340B stakeholders.* Our model was designed to benefit both covered entities and manufacturers. A few of the benefits include:

- Direct Discount funds are accessible faster to covered entities than in a replenishment system, since there is no wait for accumulations.

340B_REBATES_000504

- Since funds flow directly to covered entities, they experience greater control over program funds.
- All stakeholders can access a central ledger of claim and rebate information, ensuring complete transparency to all parties.
  - Transparency of, and access to, the claims and discount information by covered entities and manufacturers can prevent disputes in the first instance and then ease their resolution, if disputes do arise.
- Our model is simple for covered entities' staff or their agents to operate, as the Direct Discount Platform will work with covered entities' existing claims management processes.
- Resource needs and uncertainty in efforts to ensure compliance are reduced for all stakeholders.
- Our model can prevent nearly 100% of duplicate discounts across all discount programs.
- This transparent approach fosters trust and creates positive working relationships between key stakeholders.
- Covered entities of any size can access the platform on the same terms and conditions as any other covered entity.
- Our model and platform can be used with other discount or payment programs.

**Direct Discount Platform Communications and Next Steps**

As we prepare for launch with a new manufacturer, we will implement a communication plan to provide information and training to stakeholders. Below are the key steps we will take in collaboration with our manufacturer partner:

- The manufacturer will update their 340B policy notice to include the Direct Discount Platform, with information for covered entities to register on the platform. Kalderos will also post this notice on our website.

- The manufacturer will notify channel partners of the change and the timing for the change in policy.

- Kalderos will provide technical assistance to help onboard covered entities, including having an online tutorial for how to sign-up and use the Direct Discount Platform and an active customer service team that can assist covered entities with any issues. Additionally, we will have a help center accessible through the Direct Discount Platform website.

*     *     *

We are very excited about the benefits the Direct Discount Platform will bring to covered entities and manufacturers alike.

Best regards,

Angie Franks

--

**Angie Franks**
CEO

**M:** 651.271.2994
angie.franks@kalderos.com
kalderos.com

*The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential and/or trade secret material. If you are not the intended recipient of this message, be aware that any use, review, re-transmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

*The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential and/or trade secret material. If you are not the intended recipient of this message, be aware that any use, review, re-transmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

| | |
|---|---|
| **From:** | Britton, Chantelle (HRSA) |
| **To:** | Rogers, Kim (HRSA); Zadecky, Julie (HRSA) |
| **Subject:** | Fwd: House letter to HHS on J&J Rebate Model |
| **Date:** | Friday, September 27, 2024 5:58:01 PM |
| **Attachments:** | image001.png |
| | Letter to HHS on J&J 340B Rebate Model_Final.pdf |

Begin forwarded message:

> **From:** "Algire-Fedarcyk, Kathleen (HRSA)" <KAlgireFedarcyk@hrsa.gov>
> **Date:** September 27, 2024 at 5:25:00 PM EDT
> **To:** "Johnson, Carole (HRSA)" <Carole.Johnson@hrsa.gov>, "Grossman, Jordan (HRSA)" <JGrossman@hrsa.gov>, "Devenney, Garrett (HRSA)" <GDevenney@hrsa.gov>, "Pedley, Krista  (HRSA)" <KPedley@hrsa.gov>, "Britton, Chantelle (HRSA)" <CBritton@hrsa.gov>, "Herzog, Michelle  (HRSA)" <MHerzog@hrsa.gov>
> **Cc:** "McBride, Maren (HRSA)" <MMcBride@hrsa.gov>, "Robleto, Melissa (HRSA)" <MRobleto@hrsa.gov>, "Dobias, Michael (HRSA)" <MDobias@hrsa.gov>
> **Subject: House letter to HHS on J&J Rebate Model**

Good afternoon,

This afternoon, OL received a letter (attached) from Reps. Abigail Spanberger (D-VA), Dusty Johnson (R-SD), Doris Matsui (D-CA), Tracey Mann (R-KS), Debbie Dingell (D-MI), Robert Wittman (R-VA), and 183 additional Members of Congress, to HHS on the proposed J&J rebate model.

Thank you,
Kathleen

**Kathleen Algire** (she/her)
Legislative Analyst
Office of Legislation

*For constituent casework, please visit our* **website** *and fill out a* **casework form**

# Congress of the United States

## Washington, DC 20515

September 27, 2024

Secretary Xavier Becerra
Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 2021

Dear Secretary Becerra,

We write to express our concern over the Johnson & Johnson (J&J) plan to upend more than 30 years of federal law by delaying access to 340B Drug Pricing Program (340B) discounts on pharmaceuticals for certain safety-net hospitals. J&J aims to impose new extra-statutory rules for hospitals to follow as a condition of accessing those discounts. This unapproved and unlawful change would have severe consequences for our nation's safety net providers and the patients they serve. We understand that J&J is moving forward with this proposal despite being told by the Health Resources & Services Administration (HRSA) that the company's proposal is inconsistent with the 340B statute. We thank you for your continued efforts to preserve the integrity of 340B and swift response to this announcement thus far, and urge you to use every enforcement tool at your disposal to protect the communities safety-net hospitals serve from this devastating change to 340B.

On August 23, 2024, J&J announced its intent to cease providing upfront 340B discounts, instead instituting a back-end rebate model for disproportionate share (DSH) hospitals that participate in 340B, the largest category of 340B covered entities.[1] Despite the lack of legal authority and existing infrastructure that would be necessary to impose this policy, J&J intends to implement this change on October 15, 2024.

Congress intended 340B to enable the nation's safety-net hospitals that serve a disproportionate share of patients with low incomes as well as those living in rural areas (and other covered entities) to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services. A rebate model would severely undermine that purpose. As HRSA has stated, it is not in compliance with the law. Therefore, the Department of Health and Human Services (HHS) should act quickly to prevent the financial impact and burden this change would create for safety-net hospitals across the country.

J&J, or any other manufacturer, does not have the statutory authority to unilaterally restructure the 340B program by determining when, how, and to what subset of drugs or covered entities the upfront 340B discount is provided. The 340B statute requires manufacturers to offer a discounted price on the "purchase" of drugs.[2] Providers must comply with rules governing to whom the drugs are dispensed and other requirements that HRSA oversees. J&J's proposed rebate model violates the statute by requiring providers to purchase drugs at a high sticker price and submit data to the manufacturer for "validation." J&J's rebate model hijacks HRSA's oversight role and delays the benefit of the 340B price until some undetermined date. This approach is to the manufacturer's financial benefit because the company retains those sums for a longer time and creates hurdles for covered entities to claim the discount.

Under the rebate model, impacted safety-net hospitals would be required to purchase drugs at the high sticker price, instead of at the substantially lower 340B discount, and wait for an undetermined period to receive the 340B discount as a rebate. This model would reduce resources available for providing comprehensive services to patients and communities, undermining the core purpose of 340B. 340B DSH hospitals provide high levels of care to patients with low incomes and

---

[1] Johnson & Johnson Notice to 340B End Customers Regarding Purchases of STELARA and XARELTO, https://www.340bhealth.org/files/Johnson-Johnson-Innovative-Medicine-340B-Rebate-Model-Policy-Update-08-23-2024_FINAL.pdf.
[2] 42 U.S. Code § 256b(a)(1) ("The Secretary shall … require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price …).

Page 2

are responsible for 75% of all hospital care to Medicaid patients and 60% of uncompensated care.[3] 340B savings enables hospitals to expand access to necessary services that improve patient care, subsidize many essential services that operate at a loss, and support community health initiatives.

A rebate model would create significant financial challenges for safety-net hospitals, which already are operating under much lower operating margins than non-340B hospitals.[4] J&J's announcement states that rebate payment would be received within 10 days after the claim is "validated." Without any description of what it means to validate a claim, hospitals could be carrying that high cost for months to the sole benefit of J&J. Many hospitals would be forced to hire new full-time employees to develop new purchasing arrangements as well as to monitor, validate, and reconcile the rebates. Moreover, there is no existing infrastructure for accumulating and sharing the data that J&J would require for hospital rebate claims.

Medicaid programs throughout the country would also be impacted by this proposal. More than 35 state Medicaid fee-for-service (FFS) programs require covered entities to bill 340B drugs at actual acquisition cost (AAC), which is based on the invoice price paid for that category of drugs.[5] Under J&J's rebate model, the invoice price would be the high sticker price, depriving states of upfront savings and requiring an entirely new infrastructure or process for reconciling payments if a J&J rebate is received.

The rebate approach not only runs contrary to statute, but also defies longstanding HRSA program guidance that distinguishes rebates and retroactive discounts from upfront 340B discounts.[6] In the more than 30-year history of 340B, HRSA has permitted rebates in only one limited circumstance to accommodate state AIDS drug assistance programs (ADAPs). Many ADAPs reimbursed pharmacies for drugs rather than purchasing them directly and therefore were unable to access a 340B discount at the point of purchase.[7]

The 340B program was created to serve our most vulnerable neighbors. J&J actions threaten both the integrity and effectiveness of the program. With these concerns in mind, we respectfully request the following information.

1. What enforcement tools will HHS leverage to ensure that J&J, and any other companies that attempt to use an unapproved rebate model, remain compliant with 340B statutory requirements?
   a. For example, will HRSA consider imposing civil monetary penalties against J&J for overcharging disproportionate share hospitals by denying direct discounts on the purchase of 340B drugs and instead offering unapproved rebates?
2. What tools would HRSA have for oversight and monitoring of J&J's rebate model should it take effect, including ensuring that covered drugs are not denied and that discounts are paid to covered entities in a timely manner without facing unnecessary administrative or financial burden?
3. Have any other manufacturers ever sought guidance from HHS regarding the use of a rebate model for covered entities? How has HHS approached these inquiries?

We appreciate HHS's continued efforts to support 340B, and we look forward to partnering with you to ensure 340B continues to enable hospitals to meet their communities' needs. Thank you for your prompt consideration of these important matters.

---

[3] L&M Policy Research, Analysis of Disproportionate Share Hospital Services to Low-income Patients (2018) https://www.340bhealth.org/files/340B_Report_03132018_FY2015_final.pdf; Dobson DaVanzo, The Role of 340B DSH Hospitals in Serving Medicaid and Low-income Medicare Patients (2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.10.2020_FINAL_.pdf.
[4] Ibid.
[5] 340B Prime Vendor Program, 340B Medicaid Profiles by State/Territory, https://www.340bpvp.com/resource-center/medicaid.
[6] Final Notice on Entity Guidelines, 59 Fed. Reg. 25112; Notice on Initial Guidance, 58 Fed. Reg. 27291, 27292.
[7] Final Notice on Rebate Option, 63 Fed. Reg. 35, 241-242.

Sincerely,

Abigail Davis Spanberger
Member of Congress

Dusty Johnson
Member of Congress

Doris Matsui
Member of Congress

Tracey Mann
Member of Congress

Debbie Dingell
Member of Congress

Robert J. Wittman
Member of Congress

Barbara Lee
Member of Congress

Sharice L. Davids
Member of Congress

Joseph D. Morelle
Member of Congress

Greg Landsman
Member of Congress

John Rose
Member of Congress

Valerie P. Foushee
Member of Congress

Glenn "GT" Thompson
Member of Congress

Dan Goldman
Member of Congress

Jason Crow
Member of Congress

Josh Harder
Member of Congress

Austin Scott
Member of Congress

Yvette D. Clarke
Member of Congress

Patrick K. Ryan
Member of Congress

Joaquin Castro
Member of Congress

Katie Porter
Member of Congress

Sanford D. Bishop, Jr.
Member of Congress

Lloyd Doggett
Member of Congress

Rashida Tlaib
Member of Congress

Timothy M. Kennedy
Member of Congress

Jasmine Crockett
Member of Congress

Jake Ellzey
Member of Congress

Sam Graves
Member of Congress

Lois Frankel
Member of Congress

Jerrold Nadler
Member of Congress

Brandon Williams
Member of Congress

Sheila Cherfilus-McCormick
Member of Congress

Ritchie Torres
Member of Congress

Jack Bergman
Member of Congress

Mike Flood
Member of Congress

Adam Smith
Member of Congress

David G. Valadao
Member of Congress

Michael V. Lawler
Member of Congress

Mary Sattler Peltola
Member of Congress

Maxine Waters
Member of Congress

Grace Meng
Member of Congress

Michael Guest
Member of Congress

Brittany Pettersen
Member of Congress

Derrick Van Orden
Member of Congress

Lori Trahan
Member of Congress

Ro Khanna
Member of Congress

Marcy Kaptur
Member of Congress

Ami Bera, M.D.
Member of Congress

Hillary J. Scholten
Member of Congress

Alex X. Mooney
Member of Congress

Nikki Budzinski
Member of Congress

Dwight Evans
Member of Congress

Shri Thanedar
Member of Congress

Gerald E. Connolly
Member of Congress

Elise M. Stefanik
Member of Congress

Eleanor Holmes Norton
Member of Congress

Stephen F. Lynch
Member of Congress

John Garamendi
Member of Congress

Mark DeSaulnier
Member of Congress

Jimmy Panetta
Member of Congress

Haley M. Stevens
Member of Congress

Gregory W. Meeks
Member of Congress

Michael R. Turner
Member of Congress

Jim Costa
Member of Congress

Jahana Hayes
Member of Congress

Adam B. Schiff
Member of Congress

Sydney Kamlager-Dove
Member of Congress

Joyce Beatty
Member of Congress

Anna G. Eshoo
Member of Congress

Glenn Grothman
Member of Congress

William R. Keating
Member of Congress

Mark Pocan
Member of Congress

Zoe Lofgren
Member of Congress

Betty McCollum
Member of Congress

Kim Schrier, M.D.
Member of Congress

Chellie Pingree
Member of Congress

Tim Burchett
Member of Congress

Ilhan Omar
Member of Congress

Eric Sorensen
Member of Congress

Lucy McBath
Member of Congress

Ayanna Pressley
Member of Congress

Raúl M. Grijalva
Member of Congress

Mike Quigley
Member of Congress

Veronica Escobar
Member of Congress

Paul Tonko
Member of Congress

Shontel M. Brown
Member of Congress

Danny K. Davis
Member of Congress

Rick Larsen
Member of Congress

Colin Z. Allred
Member of Congress

Bill Huizenga
Member of Congress

Chris Deluzio
Member of Congress

Earl Blumenauer
Member of Congress

Steve Cohen
Member of Congress

Pete Stauber
Member of Congress

Mike Thompson
Member of Congress

Blaine Luetkemeyer
Member of Congress

Becca Balint
Member of Congress

Mary Gay Scanlon
Member of Congress

Suzanne Bonamici
Member of Congress

James P. McGovern
Member of Congress

Andrea Salinas
Member of Congress

Kelly Armstrong
Member of Congress

Chris Pappas
Member of Congress

Don Bacon
Member of Congress

Lizzie Fletcher
Member of Congress

Jonathan L. Jackson
Member of Congress

Vince Fong
Member of Congress

Julia Brownley
Member of Congress

Brad Finstad
Member of Congress

Harold Rogers
Member of Congress

Adriano Espaillat
Member of Congress

Nydia M. Velázquez
Member of Congress

Jared Golden
Member of Congress

Judy Chu
Member of Congress

Juan Vargas
Member of Congress

Suzan K. DelBene
Member of Congress

Marie Gluesenkamp Perez
Member of Congress

Gwen S. Moore
Member of Congress

Salud Carbajal
Member of Congress

Marc A. Veasey
Member of Congress

Emanuel Cleaver, II
Member of Congress

Seth Moulton
Member of Congress

André Carson
Member of Congress

Dean Phillips
Member of Congress

Greg Casar
Member of Congress

Daniel T. Kildee
Member of Congress

Angie Craig
Member of Congress

Kathy Castor
Member of Congress

Jefferson Van Drew
Member of Congress

Henry C. "Hank" Johnson, Jr.
Member of Congress

Robert Garcia
Member of Congress

Raja Krishnamoorthi
Member of Congress

Elissa Slotkin
Member of Congress

Tony Cárdenas
Member of Congress

Bradley Scott Schneider
Member of Congress

Debbie Wasserman Schultz
Member of Congress

Thomas R. Suozzi
Member of Congress

Sean Casten
Member of Congress

Mike Garcia
Member of Congress

Ted W. Lieu
Member of Congress

Susan Wild
Member of Congress

Russ Fulcher
Member of Congress

Bennie G. Thompson
Member of Congress

Nikema Williams
Member of Congress

Kathy E. Manning
Member of Congress

Frederica S. Wilson
Member of Congress

Robin L. Kelly
Member of Congress

Lance Gooden
Member of Congress

Bill Foster
Member of Congress

Delia C. Ramirez
Member of Congress

Jan Schakowsky
Member of Congress

Jimmy Gomez
Member of Congress

Andrew R. Garbarino
Member of Congress

Dina Titus
Member of Congress

Randy K. Weber, Sr.
Member of Congress

Michael K. Simpson
Member of Congress

Troy Carter
Member of Congress

John P. Sarbanes
Member of Congress

Ann McLane Kuster
Member of Congress

C. A. Dutch Ruppersberger
Member of Congress

Kay Granger
Member of Congress

Jill Tokuda
Member of Congress

Matt Cartwright
Member of Congress

Emilia Strong Sykes
Member of Congress

Darren Soto
Member of Congress

Christopher H. Smith
Member of Congress

John B. Larson
Member of Congress

Val Hoyle
Member of Congress

340B_REBATES_000547

Donald S. Beyer Jr.
Member of Congress

Nanette Diaz Barragán
Member of Congress

Steven Horsford
Member of Congress

Greg Stanton
Member of Congress

Jesús G. "Chuy" García
Member of Congress

Sylvia R. Garcia
Member of Congress

Chrissy Houlahan
Member of Congress

Mark Takano
Member of Congress

Diana DeGette
Member of Congress

Mike Bost
Member of Congress

Jake LaTurner
Member of Congress

Cori Bush
Member of Congress

Grace F. Napolitano
Member of Congress

Alma S. Adams, Ph.D.
Member of Congress

Brendan F. Boyle
Member of Congress

Ryan K. Zinke
Member of Congress

Thomas P. Tiffany
Member of Congress

Madeleine Dean
Member of Congress

Lauren Underwood
Member of Congress

Rosa L. DeLauro
Member of Congress

Susie Lee
Member of Congress

CC: HRSA Administrator Carole Johnson

CC: HRSA Office of Pharmacy Affairs Director Chantelle Britton

340B_REBATES_000549

| | |
|---|---|
| **From:** | Skirmont, Sarah |
| **To:** | Algire-Fedarcyk, Kathleen (HRSA) |
| **Subject:** | [EXTERNAL] RE: 340B/J&J Issue |
| **Date:** | Friday, September 27, 2024 11:55:05 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Apologies – I gave you an outdated extension – please use this one: 62094

**From:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Sent:** Friday, September 27, 2024 11:52 AM
**To:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>; Robleto, Melissa (HRSA) <MRobleto@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** RE: 340B/J&J Issue

Thank you!

**From:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>
**Sent:** Friday, September 27, 2024 11:49 AM
**To:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>; Robleto, Melissa (HRSA) <MRobleto@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** [EXTERNAL] RE: 340B/J&J Issue

Great! The number below is good.

(202) 225-6676 x 60652

**Sarah Skirmont (she/her)**
Senior Legislative Assistant
Congresswoman Linda T. Sánchez (CA-38)
2428 Rayburn House Office Building, Washington, DC 20515
Ph: (202) 225-6676



[Click HERE to get updates from Rep. Sánchez](#)

**From:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Sent:** Friday, September 27, 2024 11:25 AM
**To:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>; Robleto, Melissa (HRSA)
<MRobleto@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** RE: 340B/J&J Issue

Sounds good, what number can I call you on?

Thank you,
Kathleen

---

**From:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>
**Sent:** Friday, September 27, 2024 9:46 AM
**To:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>; Robleto, Melissa (HRSA)
<MRobleto@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** [EXTERNAL] RE: 340B/J&J Issue

Hi Kathleen,

Thanks so much for the quick response on short notice – I am free at noon if that works?

---

**From:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Sent:** Friday, September 27, 2024 8:30 AM
**To:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>; Robleto, Melissa (HRSA)
<MRobleto@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** RE: 340B/J&J Issue

Hi Sarah,

I can connect on the phone today if you'd like. Please let me know if you have time between 11AM-
1PM and the best number to call you.

Thank you,
Kathleen

**Kathleen Algire** (she/her)
Legislative Analyst
Office of Legislation

HRSA Logo


*For constituent casework, please visit our* **website** *and fill out a* **casework form**

---

**From:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>
**Sent:** Thursday, September 26, 2024 2:51 PM
**To:** Robleto, Melissa (HRSA) <MRobleto@hrsa.gov>; Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** [EXTERNAL] RE: 340B/J&J Issue

Yes I have it! Thanks so much, and thank you for connecting me with Kathleen.

Kathleen, let me know if you have a moment to chat briefly over the phone today or tomorrow.

Sarah

---

**From:** Robleto, Melissa (HRSA) <MRobleto@hrsa.gov>
**Sent:** Thursday, September 26, 2024 2:49 PM
**To:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>; Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Cc:** McBride, Maren (HRSA) <MMcBride@hrsa.gov>
**Subject:** RE: 340B/J&J Issue

Hi, Sarah—

Thanks for reaching out. Looping in my colleague, Kathleen, who handles 340B for our office and can get back to you. Also just making sure you have the letter that we sent to Johnson & Johnson last Tuesday, which explains HRSA's position.

Thank you,
Melissa
**HRSA Office of Legislation**
**Legislation@hrsa.gov**
*For constituent casework inquiries, please visit our* **website** *and fill out a* **casework form**.

---

**From:** Skirmont, Sarah <Sarah.Skirmont@mail.house.gov>
**Sent:** Thursday, September 26, 2024 2:36 PM
**To:** Robleto, Melissa (HRSA) <MRobleto@hrsa.gov>
**Subject:** [EXTERNAL] 340B/J&J Issue

Hey Melissa,

Hope you are doing well! I handle health for Congresswoman Sánchez. I was wondering if you had a second to chat today or tomorrow about this ongoing issue between the Admin and J&J

over their planned 340B rebate model? Our office has been hearing from J&J quite a bit about the ongoing dialogue (or per J&J, a lack thereof) between HRSA and J&J over this new model, and my boss asked that I reach out to HRSA directly.

Thanks so much,

Sarah

**Sarah Skirmont (she/her)**
Senior Legislative Assistant
Congresswoman Linda T. Sánchez (CA-38)
2428 Rayburn House Office Building, Washington, DC 20515
Ph: (202) 225-6676

Click HERE to get updates from Rep. Sánchez

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

| | |
|---|---|
| **From:** | Algire-Fedarcyk, Kathleen (HRSA) |
| **To:** | Weinrich, Jackie |
| **Subject:** | RE: Lilly/Sanofi & 340B question |
| **Date:** | Friday, December 13, 2024 4:50:00 PM |
| **Attachments:** | image001.png |

Thank you, you too!

**From:** Weinrich, Jackie <Jackie.Weinrich@mail.house.gov>
**Sent:** Friday, December 13, 2024 3:42 PM
**To:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Subject:** [EXTERNAL] RE: Lilly/Sanofi & 340B question

Thank you so much for flagging, Kathleen. This is great news and I know the entities will be very relieved to see this. Please keep me posted on any further developments.

Thank you again & have a great weekend!



**Jackie Weinrich** (she/her)
**Health Policy Advisor**
U.S. Representative Doris Matsui (CA-07)
**NEW OFFICE**: **2206** Rayburn House Office Building
Washington, DC 20515

**From:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Sent:** Friday, December 13, 2024 3:04 PM
**To:** Weinrich, Jackie <Jackie.Weinrich@mail.house.gov>
**Subject:** RE: Lilly/Sanofi & 340B question

Hi Jackie,

We just posted our letter to Sanofi on our website,
https://www.hrsa.gov/sites/default/files/hrsa/opa/dec-13-2024-hrsa-letter-sanofi.pdf.

Thank you,
Kathleen

**From:** Algire-Fedarcyk, Kathleen (HRSA)
**Sent:** Tuesday, December 10, 2024 4:17 PM
**To:** Weinrich, Jackie <Jackie.Weinrich@mail.house.gov>
**Subject:** RE: Lilly/Sanofi & 340B question

Hi Jackie,

I don't have any updates yet but will make sure to let you know. We updated the main 340B webpage to include the following notice:

***340B Rebate Models***

*HRSA has recently received inquiries from manufacturers related to different proposed rebate models for the 340B Program. HRSA continues to be in the process of reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program. As HRSA has previously stated, implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act.*

Let me know if you have any questions,

Thanks!
Kathleen

**From:** Weinrich, Jackie <Jackie.Weinrich@mail.house.gov>
**Sent:** Tuesday, December 10, 2024 4:00 PM
**To:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Subject:** [EXTERNAL] RE: Lilly/Sanofi & 340B question

Hey Kathleen – thanks again for chatting last week! Checking in to see if you had any updates, and also if you could direct me to the webpage that has HRSA's thinking on the rebate models without Secretarial approval being unlawful. You mentioned you all had recently added that language to one of the webpages.

Thanks!



**Jackie Weinrich** (she/her)
**Health Policy Advisor**
U.S. Representative Doris Matsui (CA-07)
**NEW OFFICE: 2206** Rayburn House Office Building
Washington, DC 20515

**From:** Weinrich, Jackie
**Sent:** Friday, December 6, 2024 2:49 PM
**To:** Algire-Fedarcyk, Kathleen (HRSA) <KAlgireFedarcyk@hrsa.gov>
**Subject:** Lilly/Sanofi & 340B question

Hi Kathleen – hope you're well.

I just tried giving you a call, wanted to see if you had a few minutes to chat about the Lilly & Sanofi rebate models & anything you can share about what we might expect from HRSA. Let

me know if you have time this afternoon or maybe Monday am – thanks!

Best,

 **Jackie Weinrich** (<u>she/her</u>)
**Health Policy Advisor**
U.S. Representative Doris Matsui (CA-07)
**NEW OFFICE**: **2206** Rayburn House Office Building
Washington, DC 20515

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

| | |
|---|---|
| **From:** | Krishnamurthy, Bharath |
| **To:** | Britton, Chantelle (HRSA); Herzog, Michelle (HRSA) |
| **Cc:** | Kuhlman, Aimee; Golder, Chad; Smith, Molly |
| **Subject:** | [EXTERNAL] J&J Notices Re: 340B Rebates |
| **Date:** | Monday, August 19, 2024 11:31:18 AM |
| **Importance:** | High |

Hi Chantelle & Michelle,

Hope this email finds you both well. We were recently made aware that J&J may be issuing notices to 340B covered entities that they will no longer be providing upfront access to 340B pricing for some drugs and will instead operationalize a rebate model. As you can imagine, this is very concerning for our members and wanted to touch base with the HRSA team on this issue as soon as possible. Please let me know if you and your team have any availability to meet, virtually or in-person, in the next couple of weeks.

Thank you and appreciate your continued partnership.

Thanks,

Bharath Krishnamurthy
Director, Health Analytics & Policy
American Hospital Association
800 10th Street, NW
Two CityCenter, Suite 400
Washington, DC 20001-4956
202-626-2689
bkrishnamurthy@aha.org

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.



William B. Schultz
PARTNER
Zuckerman Spaeder LLP
wschultz@zuckerman.com
(202) 778-1820

ZUCKERMAN
SPAEDER

August 22, 2024

*Via Email*

Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
Parklawn Building
Room 13N188
Rockville, MD 20857

Dear Administrator Johnson,

We write on behalf of 340B Health and its more than 1,500 public and nonprofit 340B member hospitals to request that the Health Resources and Services Administration (HRSA) announce immediately that the 340B statute does not permit pharmaceutical manufacturers to use rebates to achieve compliance with the statute but instead that manufacturers must continue to provide up front discounts, which is how the program has functioned from the start. We also urge HRSA to take appropriate steps to ensure compliance.

Below we explain why the 340B statute, as consistently interpreted by HRSA, does not permit compliance through rebates and why immediate action is necessary to avoid significant burdens on safety net hospitals.

I.     **Manufacturers Cannot Unilaterally Achieve Compliance with the 340B Statute Through a Rebate Program.**

      A.     **The Statute Does Not Permit Compliance Through Rebates.**

340B Health understands that at least one major drug company plans to make 340B prices available only after the covered entity has submitted claims data and a third party has evaluated that data to ensure program compliance, instead of providing the 340B price at the time the covered entity purchases a drug, which drug companies have done since the beginning of the program. The rebate approach denies 340B pricing at the time the drug is purchased and creates the opportunity to deny post-sale 340B rebates based on the manufacturer's, and not HRSA's, determination regarding compliance. Such an approach violates the 340B statute which requires the manufacturer's pharmaceutical pricing agreement "to require that the manufacturer offer each covered entity covered outpatient drugs *for purchase at or below the applicable ceiling price* if such drug is made available to any other purchaser at any price" and to HRSA's longstanding interpretation of the

340B_REBATES_000565

statute which prohibits conditioning 340B discounts on concerns about non-compliance.[1] The 340B statute further requires that under each manufacturer's pharmaceutical pricing agreement with the Secretary, "the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer" for a covered outpatient drug by a covered entity shall not exceed the 340B ceiling price for that drug.[2]

Guidance published in 1993 and 1994 made clear that under HRSA's interpretation of the statute a "*discount* must be made available" to covered entities through wholesalers.[3] The guidance specifically distinguished discounts from "rebates" and "retroactive discounts," permitting rebates only in the narrow case of making covered entities whole for purchases made prior to initial implementation of the 340B program.[4] The "must offer" language added in 2010 is consistent with HRSA's approach.

For over 30 years, 340B has been administered by HRSA exclusively as a discount program, with only one very narrow exception to accommodate one type of covered entity, which was implemented only after publishing an advance notice in the Federal Register and providing the opportunity for public comment.[5] HRSA provided for a rebate model only for State AIDS Drug Assistance Programs (ADAPs), some of which reimburse pharmacies for drugs and do not purchase drugs directly, thus preventing them from accessing the 340B discount at the point of purchase. Because the ADAP drug purchasing mechanism prevented most ADAPs from accessing 340B, HRSA intended for the ADAP rebate option to serve as "an optional alternate means of accessing

---

[1]  42 U.S.C. § 256b(a)(1) (emphasis added); 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1210, 1223 (Jan. 5, 2017). *See also* Health Resources and Services Administration, Release No. 2011 − 1.1, Clarification of Non-Discrimination Policy (2012) (stating that "[a] manufacturer may not condition the offer of 340B discounts upon a covered entity's assurance of compliance with section 340B provisions.").

[2]  42 U.S.C. § 256b(a)(1) (emphasis added).

[3]  Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25110, 25113 (May 13, 1994) (Final Notice on Entity Guidelines) (emphasis added); *see also* Guidance Regarding Section 602 of the Veterans Health Care Act of 1992; Limitation on Prices of Drugs Purchased by Covered Entities, 58 Fed. Reg. 27289, 27291 (May 7, 1993) (Notice on Initial Guidance) ("discounts" must be passed through wholesalers to covered entities).

[4]  Final Notice on Entity Guidelines, 59 Fed. Reg. 25112; Notice on Initial Guidance, 58 Fed. Reg. 27291, 27292. The 1993 initial program guidance stated that covered entities added to updated eligibility lists would be eligible for "drug discounts" only for purchases on or after their inclusion on the eligibility list and that HHS was "notifying each covered entity of its eligibility to purchase drugs at the discounted prices."

[5]  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823 (Aug. 29, 1997); Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992— Rebate Option, 63 Fed. Reg. 35,239 (June 29, 1998) (Final Notice on Rebate Option).

section 340B discount pricing."[67] HRSA made clear that it was not authorizing a rebate option beyond ADAPs.[8]

### B. The D.C. Circuit Opinion on Contract Pharmacies Does Not Support The Rebate Option

As HRSA knows, in 2020 multiple drug companies began to adopt policies refusing to provide 340B discounts for drugs if dispensed to 340B patients at contract pharmacies.[9] When HRSA took steps to stop the practice, multiple companies sued.[10] At the same time, a separate drug manufacturer vendor, Kalderos, filed a lawsuit challenging HRSA's interpretation of the statute that manufacturers may not impose conditions, including rebates, on 340B pricing.[11] That lawsuit has been stayed pending final appeals following a decision in the D.C. Circuit regarding the drug company challenges to HRSA's position.[12] The D.C. Circuit ruled against HRSA finding that the statute does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs and that the conditions imposed by two drug companies to restrict access to some contract pharmacies do not violate the 340B statute on its face, noting that both companies continued to honor at least one contract pharmacy relationship for covered entities that did not have their own retail pharmacies.[13] The court commented, however, that more onerous restrictions could violate the law, noting that some conditions could be onerous enough to nudge the price above the statutory ceiling.[14] Indeed, the parties' most recent joint status report to the district court says that while the D.C. Circuit issued a decision that 340B does not categorically prohibit conditions, the panel clarified that its decision does "not foreclose the possibility that other, more onerous conditions might violate the statute" or "the possibility that the[] conditions" before it "may violate section 340B as applied in particular circumstances."[15] Thus, nothing about the D.C. Circuit's opinion, blessed the rebate model.

---

[6]    Final Notice on Rebate Option, 63 Fed. Reg. 35,239.

[7]    62 Fed. Reg. at 45,824.

[8]    Final Notice on Rebate Option, 63 Fed. Reg. 35,241-242.

[9]    *See* Maya Goldman, *Hospital Groups Worry As More Drugmakers Limit 340B Discounts*, Modern Healthcare (Mar. 25, 2022).

[10]   *Eli Lilly & Co. v. Becerra,* No. 1-21-cv-00081 (S.D. Ind.); *Astra Zeneca Pharms, LP v. Becerra*, No. 1-21-cv-00027 (D. Del); *Sanofi-Aventis v. HHS*, No. 3-21-cv-00634 (D.N.J.); *NovoNordisk v. HHS*, No. 3-21-cv-000806 (D.N.J.); *Novartis Pharmaceutical Corp. v. Espinosa*, No. 1-21-cv-01479; *United Therapeutics v. Espinosa,* No. 1-21-cv-01686 (D.D.C).

[11]   *Kalderos, Inc. v. United States, et al*, Case *No*. 1:21-cv-02608 (D.D.C. complaint filed Oct. 6, 2021).

[12]   Jan. 28, *2022* Stay Order, Docket No. 26, *Kalderos, Inc. v. United States, et al*, Case No. 1:21-cv-02608.

[13]   *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

[14]   *Id.* at *464*.

[15]   June 4, 2024 Joint Status Report, Docket No. 27, *Kalderos, Inc. v. United States, et al*, Case No. 1:21-cv-02608.

## II. Immediate Action by HRSA Is Necessary Because a Rebate Model Would Impose Additional Burdens and Financial Strain on Safety-Net Hospitals

The rebate model imposes administrative burdens and financial harm on covered entities. 340B hospitals will be required to purchase drugs at prices that exceed 340B in order to eventually receive the 340B price for purchases of the specified drugs. Rather than saving on covered outpatient drug costs at the time of purchase, 340B hospitals will be forced to incur higher carrying costs for these drugs, essentially floating revenue to drug manufacturers, until the manufacturer approves and remits rebate payments. Purchasing at these higher amounts essentially increases the price of the drugs above the 340B purchase price and reduces the hospitals' resources available for other patient care. For 340B hospitals subject to the statutory limitation on use of group purchasing organizations or arrangements, these upfront costs will be at wholesale acquisition cost pricing, which substantially exceeds 340B pricing.[16] Many smaller covered entities that already are operating on razor thin margins would be unable to handle these upfront costs. And those who can, will also have to devote additional administrative resources to develop purchasing arrangements for covered outpatient drugs at non-340B prices, make appropriate rebate requests, and track and reconcile rebate payments with the 340B price for each purchased drug.

The resources and finances of these safety-net providers are already severely strained. 340B hospitals have a documented record of providing high levels of care to people with low incomes. 340B disproportionate share (DSH) hospitals provide 60% of uncompensated care.[17] And, although 340B DSH hospitals represent 43% of hospitals, they provide 75% of all hospital care to Medicaid patients, who tend to be sicker and more costly to treat.[18] 340B DSH hospitals also play a significant role in their communities' health care safety net for Medicare beneficiaries with chronic conditions. Among beneficiaries with 27 common chronic conditions, patients whose primary ambulatory care settings are 340B DSH hospitals are more likely to be low-income, Black, and disabled compared with beneficiaries who receive the majority of their outpatient care from

---

[16]  42 U.S.C. §§ 256b(a)(4)(L), (M).

[17]  L&M Policy Research, Analysis of Disproportionate Share Hospital Services to Low-income Patients (2018) https://www.340bhealth.org/files/340B_Report_03132018_FY2015_final.pdf.

[18]  Dobson DaVanzo, The Role of 340B DSH Hospitals in Serving Medicaid and Low-income Medicare Patients                          (2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.1 0.2020_FINAL_.pdf; Medicaid and CHIP Payment and Access Commission (MACPAC) and Medicare Payment Advisory Commission (MedPAC), Data Book: Beneficiaries Dually Eligible for Medicare and Medicaid. 2018, https://www.macpac.gov/wpcontent/uploads/2020/07/Data-Book-Beneficiaries-Dually-Eligible-for-Medicare-andMedicaid-January-2018.pdf; American Hospital Association, Underpayment by Medicare and Medicaid Factsheets, 2016-2020, https://www.aha.org/fact-sheets/2020-01-07-fact-sheet-underpayment-medicare-and-medicaid.

non-340B providers.[19] The crucial role of 340B DSH hospitals in the safety net is accompanied by substantially lower—negative on average—operating margins than those of non-340B hospitals.[20]

HRSA must take steps to stop manufacturers from using the rebate model that threatens to reduce the benefit of 340B discounts for 340B hospitals and other covered entities that are the backbone of the nation's health care safety net.

We appreciate HHS' efforts to support the 340B program and to enforce the statutory obligation of manufacturers to provide 340B discounts to covered entities for covered outpatient drugs without onerous conditions.

Sincerely,

William B. Schultz
Margaret M. Dotzel

cc:    Maureen Testoni, President and Chief Executive Officer, 340B Health
       Chantelle Britton, Director of the Office of Pharmacy Affairs

---

[19]    KNG Health Consulting, Comparison of Medicare Beneficiaries Treated in 340B Hospitals, Non-340B Hospitals, and Independent Physician Offices (2021), https://www.340bhealth.org/files/KNG_Health_340B_DSH_Hospitals_Final_Report.pdf?_zs=cIhWb1&_zl =7HEh7.

[20]    Dobson DaVanzo, The Role of 340B DSH Hospitals in Serving Medicaid and Low-income Medicare Patients (2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.1 0.2020_FINAL_.pdf.

| | |
|---|---|
| **From:** | Britton, Chantelle (HRSA) |
| **To:** | Burgess, William (HHS/OGC); Hargrove, Sherine (HHS/OGC) |
| **Cc:** | Herzog, Michelle (HRSA); Rogers, Kim (HRSA); Zadecky, Julie (HRSA) |
| **Subject:** | FW: AEH Letter about J&J 340B rebate proposal |
| **Date:** | Wednesday, August 28, 2024 3:59:20 PM |
| **Attachments:** | AEH-letter-to-HRSA-re-JJ-rebates-20240828.pdf |

Here's another one…

---

**From:** Robert Nelb <RNelb@essentialhospitals.org>
**Sent:** Wednesday, August 28, 2024 3:55 PM
**To:** Johnson, Carole (HRSA) <Carole.Johnson@hrsa.gov>; Espinosa, Diana (HRSA) <DEspinosa@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Pedley, Krista (HRSA) <KPedley@hrsa.gov>
**Cc:** Beth Feldpush <bfeldpush@essentialhospitals.org>; Carl Graziano <cgraziano@essentialhospitals.org>; Evan Schweikert <ESchweikert@essentialhospitals.org>; Jason Pray <jpray@essentialhospitals.org>; Bruce Siegel <bsiegel@essentialhospitals.org>
**Subject:** [EXTERNAL] AEH Letter about J&J 340B rebate proposal

Good afternoon,

My name is Rob Nelb and I am the new Director of Policy at America's Essential Hospitals. Attached is a letter from our Executive Director, Dr. Bruce Siegel, outlining our serious concerns about Johnson & Johnson's proposed use of rebates to avoid compliance with 340B program requirements.

We appreciate your expeditious consideration of these comments on this issue, which is of utmost importance to our members. Don't hesitate to reach out if you have any questions.

~ Rob


**Robert Nelb, MPH** | Director of Policy

**America's Essential Hospitals**

401 Ninth St. NW, Suite 900

Washington, DC 20004

202.585.0127 telephone | 202.585.0101 fax

rnelb@essentialhospitals.org | www.essentialhospitals.org

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you

recognize the sender and are confident the content is safe.

340B_REBATES_000571



August 28, 2024

Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services Parklawn Building
Room 13N188
Rockville, MD 20857

**Ref: Illegal Use of Rebates to Avoid Compliance with 340B Program Requirements**

Dear Administrator Johnson:

On behalf of our more than 300 member hospitals, most of which rely on the 340B Drug Pricing Program, America's Essential Hospitals is deeply concerned about pharmaceutical manufacturer Johnson & Johnson's (J&J) August 23, 2024, notice to 340B covered entities about its planned implementation of unauthorized rebates.[1] We urge the Health Resources and Services Administration (HRSA) to stop this and other calculated moves by drug companies to put roadblocks between hospitals and the statutorily required 340B discounts that support lifesaving care.

America's Essential Hospitals is the leading association and champion for hospitals dedicated to equitable, high-quality care for all, including those who face social and financial barriers to care. Since 1981, America's Essential Hospitals has advanced policies and programs that promote health, health care access, and equity. We support our members with advocacy, policy development, research, education, and leadership development.

Our members provide a disproportionate share of the nation's uncompensated care (UC), and three-quarters of their patients are uninsured or covered by Medicare or Medicaid. Essential hospitals provide state-of-the-art, patient-centered care while operating with an average loss of −8.6 percent, compared with −1.4 percent at other U.S. hospitals.[2]

## Essential Hospitals and Their Patients Rely on the 340B Program

The 340B program is a key component of the patchwork federal support essential hospitals rely on to meet their safety net mission. Congress established the 340B program to enable essential hospitals and other covered entities "to stretch scarce Federal resources as far as possible,

---

[1] Notice to 340B End Customers Regarding Purchases of STELARA and XARELTO. Published by STAT. https://www.documentcloud.org/documents/25060917-johnson-johnson-innovative-medicine-340b-rebate-model-policy-update-08-23-2024_final. Accessed August 27, 2024.
[2] Taylor, J, Ramiah, K, et al., *Essential Data: Our Hospitals, Our Patients—Results of America's Essential Hospitals 2023 Annual Member Characteristics Survey*. America's Essential Hospitals. October 2023. https://essentialdata.info. Accessed August 27, 2024.

essentialhospitals.org

AMERICA'S ESSENTIAL HOSPITALS
401 Ninth St NW Ste 900
Washington DC 20004

t: 202 585 0100
f: 202 585 0101
e: contact@essentialhospitals.org

340B_REBATES_000572

reaching more eligible patients and providing more comprehensive services."[3] With their 340B savings, essential hospitals can target resources to services and programs that meet their community's unique challenges at nearly no cost to taxpayers.

## Using Rebates to Deny 340B Pricing Harms Patients and Essential Hospitals

**J&J's proposed rebate model is nothing less than an attempt to line drug company pockets at the expense of patient care.**

Under the proposal, 340B-eligible hospitals would be required to purchase drugs at higher list prices and then wait for the manufacturer to distribute a rebate to receive the statutorily required 340B price. Such a delay imposes a meaningful economic hardship on essential hospitals, many of which have limited cash on hand.

We are concerned J&J's proposed rebate approach also creates the opportunity to deny post-sale 340B rebates based on the manufacturer's, and not HRSA's, determination regarding compliance. Reducing 340B discounts that essential hospitals are eligible for will only further add to the financial pressures they face as safety net providers in their communities and challenge their ability to meet their mission of care for low-income and other disadvantaged patients and communities.

The net result of J&J's proposed policy is that essential hospitals would have to devote additional administrative resources to develop purchasing arrangements for covered outpatient drugs at non-340B prices, make appropriate rebate requests, and track and reconcile rebate payments with the 340B price for each purchased drug. These additional administrative costs do nothing to improve patient care and are designed to place an undue burden on providers that can't afford it. **It appears J&J designed this policy with the hope some hospitals won't be able to navigate the new red tape it has put in the way of discounts it owes to hospitals. This is nothing more than an attempt by J&J to charge more than it should and add to the drug company's more than $13 billion in annual profits.**[4]

## J&J Is Reneging on its Responsibilities under the 340B Program

J&J is proposing to implement the new rebates on Xarelto and Stelara, two lifesaving drugs that were included in recent Medicare prescription drug negotiations. After negotiation, the Centers for Medicare & Medicaid Services (CMS) established a new maximum fair price for Xarelto and Stelara that was 62 and 66 percent lower than the list price, respectively.[5] We question whether the timing of the Medicare negotiations for these specific drugs and the proposal of the rebate model is coincidental.

**The fact that the Medicare program has lowered payments for these drugs is no excuse for J&J to start overcharging 340B covered hospitals through an illegal rebate program.** The Inflation Reduction Act established the Medicare drug negotiation program to build upon the 340B program, not replace it. Under the 340B program, manufacturers, such as J&J, agree to offer discounts to safety net providers according to

---

[3] H.R. REP. 102-384(II), p. 12.
[4] Johnson & Johnson. Johnson & Johnson Reports Q4 and Full-Year 2023 Results. https://www.investor.jnj.com/news/news-details/2024/Johnson--Johnson-Reports-Q4-and-Full-Year-2023-Results/default.aspx. Accessed August 27, 2024.
[5] Medicare Drug Price Negotiation. Centers for Medicare & Medicaid Services. https://www.cms.gov/inflation-reduction-act-and-medicare/medicare-drug-price-negotiation, Accessed August 27, 2024.

340B_REBATES_000573

statutorily prescribed methods in exchange for the benefit of having their drugs covered by Medicaid and Medicare. Manufacturers must meet these statutorily required responsibilities; they cannot pick and choose which rules to follow.

## HRSA Should Take Immediate Action to Protect Patients and Essential Hospitals

We appreciate HRSA's quick response on August 23, 2024, to clarify in a statement to stakeholders that J&J's unauthorized rebate model is contrary to federal statute.[6] Now, HRSA should use all available tools in the statute to prevent J&J and other manufacturers from harming patients by withholding upfront discounts from safety net providers.

Ultimately, HRSA must assert its statutory authority to hold drug companies accountable. It is not in the purview of pharmaceutical manufacturers to validate compliance for the purpose of providing rebates, as J&J proposes.

A broad coalition of members of Congress on both sides of the aisle continues to stand by HRSA to reaffirm its authority to administer this program in the best interests of patients. For example, in 2020, when a private company, Kalderos, proposed a rebate model similar to J&J's recent proposal, 217 members of Congress signed a bipartisan letter urging HRSA to take action to enforce the statute.[7]

******

We appreciate your expeditious consideration of these comments on this issue, which is of utmost importance to our members. If you have questions, please contact Director of Policy Robert Nelb, at 202-585-0127 or rnelb@essentialhospitals.org.

Sincerely,

Bruce Siegel, MD, MPH
President and CEO

---

[6] Newton W. HRSA Says Johnson & Johnson's New 340B Rebate Model Did Not Receive Agency Approval, Is 'Inconsistent' with 340B Statute. 340B Report. August 23, 2024. https://340breport.com/hrsa-says-johnson-johnsons-new-340b-rebate-model-did-not-receive-agency-approval-is-inconsistent-with-340b-statute/. Accessed August 28, 2024.

[7] Spanberger A., et al. Letter to Secretary Alex Azar. November 13, 2020. https://hws-media-libraries.s3.us-east-2.amazonaws.com/spanberger.house.indigov.us/uploads/legacy/uploadedfiles/201113_final_340b_hhs_letter.pdf. Accessed August 27, 2024.

3



American Hospital Association™

Advancing Health in America

**Washington, D.C. Office**
800 10th Street, N.W.
Two CityCenter, Suite 400
Washington, DC 20001-4956
(202) 638-1100

August 28, 2024

The Honorable Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD 20852

Dear Administrator Johnson:

On behalf of our more than 2,000 member hospitals and health systems participating in the 340B Drug Pricing Program, the American Hospital Association (AHA) appreciates the Health Resources and Services Administration's (HRSA) response to Johnson & Johnson's (J&J) most recent attempt to undermine the 340B Drug Pricing Program by unilaterally imposing a "rebate" model, rather than the longstanding "upfront discount" model that the Secretary of Health and Human Services (HHS) has allowed since the outset of the program. **As HRSA correctly recognized, J&J's actions violate federal law. We urge you to take immediate enforcement action if J&J moves forward with these illegal measures, including by assessing civil monetary penalties for intentionally overcharging 340B hospitals.**

On August 23, J&J announced that it would be dramatically transforming its approach to 340B pricing for two of its most popular products, Stelara and Xarelto. Historically, J&J offered upfront discounts to 340B hospitals when they purchase these drugs. Starting on October 15, however, J&J will require all disproportionate share hospitals participating in the 340B Drug Pricing Program to purchase these drugs at full price and apply for a rebate from J&J. Under the new program, these hospitals will be required to submit certain data to J&J when they purchase the drugs at full price. After J&J verifies the drug's 340B status, it will send disproportionate share hospitals a rebate for the difference between the amount paid and the discounted 340B price.

This new J&J policy is a fundamental change in how the 340B program has operated for over 30 years. Regrettably, however, it is not a change in how J&J and other drug companies operate. **J&J's adoption of this rebate model is yet another example of a drug company seeking to squeeze every possible penny from the hospitals and health systems that care for America's underserved patients.** While it may not seem like much on paper, the change from an upfront discount model to a rebate model



The Honorable Carole Johnson
August 28, 2024
Page 2 of 5

inflicts significant financial and administrative costs on hospitals. Under this new rebate model, 340B hospitals will be forced to spend their limited resources acquiring these drugs at exorbitantly high prices while they wait months for J&J to honor its 340B obligations. This flies in the face of Congress' intent in establishing the 340B program and could jeopardize patients' access to these drugs. In addition, disproportionate share hospitals, which already operate on the thinnest of margins, will be forced to develop pricey administrative mechanisms to make and track rebate requests. And J&J will essentially transform itself into the ultimate arbiter of whether a rebate should be approved and paid, with the likely consequence of J&J denying rebates to hospitals that they appropriately owe.

**Perhaps worst of all, J&J is yet again engaging in 340B vigilantism.** While J&J may contend that this new policy is needed to improve program transparency, Congress did not permit drug companies to take the law into their own hands. *See* A*stra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 114 (2011) ("Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions."); Health Resources and Services Administration, Release No. 2011 – 1.1, Clarification of Non-Discrimination Policy (2012) ("A manufacturer may not condition the offer of 340B discounts upon a covered entity's assurance of compliance with section 340B provisions."). Much like its interference with contract pharmacy arrangements during the height of the COVID-19 pandemic, the motives behind J&J's new policy are not as pure as it suggests. This new rebate policy — like the drug companies' contract pharmacy policies that preceded it — is a money-making scheme dressed up as a program integrity measure.

It also is not lost on hospitals and health systems that Stelara and Xarelto are two of the ten drugs whose prices were recently negotiated by the Centers for Medicare & Medicaid Services under the Inflation Reduction Act (IRA). J&J's new policy is nothing more than a tit-for-tat response intended to make up for lost revenues that it could incur due to the lower prices it is required to charge Medicare patients under the IRA. Strikingly, all of this comes from a company that had more than *$85 billion* in revenues in 2023.

Thankfully, HRSA has recognized the unlawfulness of J&J's actions. When the AHA first got wind that J&J was considering this rebate model, we reached out to your office to register our concerns. Soon after J&J officially announced this policy, HRSA notified the AHA that it determined J&J's rebate model "is inconsistent with the 340B statute, which requires Secretarial approval of any such proposal. The Secretary has not approved J&J's rebate model." We agree with this analysis and commend HRSA for taking such a clear, forceful stand against J&J's mercenary behavior.

The 340B statute provides: "The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid *(taking into account any rebate or discount, as provided by the Secretary)* to the manufacturer for covered outpatient drugs … does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the

The Honorable Carole Johnson
August 28, 2024
Page 3 of 5

preceding calendar quarter, reduced by the rebate percentage described in paragraph (2)." 42 U.S.C. § 256b(a)(1) (emphasis added). **The italicized portion of this text is critical, as it expressly delegates to the HHS Secretary the authority to approve any "rebate" sought by a manufacturer**.

The legislative history of the 340B statute further supports this understanding. The House Report accompanying the relevant bill made clear in *three different places* that the Secretary would have discretion to determine when the price reduction would apply:

- "*The Secretary would have the discretion to determine the mechanism (rebate, point-of-purchase discount, or otherwise) for assuring this price reduction*, which would apply only to drugs for which payment is not made separately to the clinic or other protected purchaser by a State Medicaid program."
- "[M]anufacturers, as a condition of receiving Federal Medicaid matching funds on their covered outpatient drugs, would have to enter into an agreement with the Secretary of HHS to provide price reductions (whether through a discount, rebate, or other mechanism) to these "covered entities" on covered outpatient drugs. These price reductions would be at least as great as those which Medicaid receives under the rebate program. *They would be implemented, at the discretion of the Secretary, either by a point-of-purchase discount, a rebate, or other mechanism*."
- "The Committee bill does not specify whether "covered entities" would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism. A mechanism that is appropriate to one type of "covered entity," such as community health centers, may not be appropriate to another type, such as State AIDS drug purchasing programs. *The Committee expects that the Secretary of HHS, in developing these agreements, will use the mechanism that is the most effective and most efficient from the standpoint of each type of "covered entity*."

H.R. Rep. No 102-384, 102d Cong., 2d Sess., pt. 2, at 8, 12, 16 (1992) (emphases added).[1]

HHS has interpreted the 340B statute this way consistently from the program's inception. As HRSA has explained, "Initially, HRSA guidance for the section 340B program described only a discount process." Notice Regarding Section 602 of the

---

[1] Courts have routinely relied on this House Report when interpreting the 340B statute. *See, e.g.*, *American Hospital Association v. Azar*, 967 F.3d 818, 822 (D.C. Cir. 2020); *AbbVie v. Fitch*, Civil No. 1:24-cv-184-HSO-BWR, 2024 WL 3503965, at *3 (D. Miss. July 22, 2024); *Genesis Health Care, Inc. v. Becerra*, No. 4:19-CV-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023); *PhRMA v. McClain*, 645 F.Supp.3d 890, 896 (E.D. Ark. 2022); *Eli Lilly & Co. v. Cochran*, 526 F.Supp.3d 393, 398 (S.D. Ind. 2021).

The Honorable Carole Johnson
August 28, 2024
Page 4 of 5

Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997). In fact, HRSA issued guidance in 1993 and 1994 stating that upfront discounts — not rebates — must be made available to 340B covered entities. *See* Limitation on Prices of Drugs Purchased by Covered Entities, 58 Fed. Reg. 27289, 27291 (May 7, 1993); Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25110, 25113 (May 13, 1994).

HRSA has made only one exception to this practice, allowing the use of a rebate model in a limited circumstance. *See* Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 — Rebate Option, 63 Fed. Reg. 35239 (June 29, 1998). But when it did so, the HHS Secretary issued guidance only after soliciting stakeholder feedback through the notice-and-comment process. Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997). (Needless to say, J&J did not afford HRSA the opportunity to engage in a comment process here.) And the agency's notice explicitly noted that Congress gave the HHS Secretary discretion to determine the most effective mechanism for providing 340B pricing. *See id.*

Given this text, legislative history, and consistent agency practice, the AHA is confident that courts will uphold HRSA's longstanding reading of the 340B statute. Most important, HRSA's interpretation of the relevant statutory phrase — "taking into account any rebate or discount, as provided by the Secretary" — is textually sound. The Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. ——, 144 S.Ct. 2244, only reinforces that conclusion. HRSA's reading deserves "due respect" under *Loper Bright* for two reasons. *First*, the 340B statute authorizes the Secretary to "exercise a degree of discretion" regarding the mechanism for implementing a 340B price reduction. *Id.* at 2263. Both the statutory text ("as provided by the Secretary") and the House Report make pellucidly clear that Congress "empower[ed the Secretary] to prescribe rules to 'fill up the details' of a statutory scheme." *Id.* (quoting *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed. 253 (1825)). *Second*, due respect is "especially warranted" here because HRSA's interpretation was "issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2258. HRSA endorsed the discount model and recognized its own discretion in the mid-1990s, not long after the 340B statute was passed. Critically, it has maintained that interpretation until the present day — including as recently as last week when HRSA explained that the Secretary had not approved J&J's rebate model. This "longstanding practice of the government" matters. *Id.* (quotation marks omitted).

All in all, it is clear that J&J has crossed a line. Even (and perhaps especially) if it is merely testing HRSA's resolve by only applying this new rebate policy to two drugs, HRSA must act swiftly to prevent J&J and others from pursuing the same unlawful activity. The statute affords HRSA a variety of tools to deter this kind of transgressive behavior. **HRSA should immediately impose civil monetary penalties on J&J to send a clear message that drug companies cannot take unilateral action at the expense of 340B hospitals and the vulnerable patients they serve.**

The Honorable Carole Johnson
August 28, 2024
Page 5 of 5

We appreciate your ongoing support of the 340B Drug Pricing Program and stand ready to work with you to prevent J&J and other drug companies from implementing these seismic policy shifts without Secretarial approval. Please contact me if you have questions.

Sincerely,

/s/

Chad Golder
General Counsel

340B_REBATES_000579

| | |
|---|---|
| **From:** | Miller, David |
| **To:** | xavier.becerra@hhs.gov |
| **Cc:** | Britton, Chantelle (HRSA); Pedley, Krista (HRSA); Herzog, Michelle (HRSA); Zadecky, Julie (HRSA); Rogers, Kim (HRSA); Burgess, William (HHS/OGC); Hargrove, Sherine (HHS/OGC) |
| **Subject:** | [EXTERNAL] Letter regarding 340B / UM-Health |
| **Date:** | Tuesday, September 10, 2024 12:41:59 PM |
| **Attachments:** | 340B 9.9.2024 (002).pdf |

Dear Secretary Becerra,

Please see the letter attached to this email regarding 340B and UM-Health.

Thank you,

David Miller, MD, MPH
President, University of Michigan Health
University of Michigan Medical School
Office: 734-936-3568


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Electronic Mail is not secure, may not be read every day, and should not be used for urgent or sensitive issues

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.



**David C. Miller, MD, MPH**
**President, U-M Health**

7300 Medical Science Building I
1301 Catherine Street
Ann Arbor, MI 48109-5624

734 936-3568

September 9, 2024

Dear Secretary Becerra,

First, I want to express my gratitude for your continued support for University of Michigan Health and the communities we serve across the state of Michigan. Your leadership in health care during this time is incredibly impactful, and we are grateful for all you do.  Our teams would welcome and greatly appreciate your support with the recent announcement from Johnson & Johnson that they intend to withhold 340B discounts from covered entities until a bureaucratic rebate process is established. Fundamentally modifying 340B would be financially devastating for us and threatens our ability to stretch scarce federal resources and meet the needs of our patients, regardless of their ability to pay. We've advocated for decades for government oversight of drug pricing, and our caregivers work tirelessly every day to ensure medication access and affordability. J&J's action is one of many in recent months across the pharmaceutical industry that would ultimately withhold financial resources that are necessary to serve our communities and provide accessible, affordable, life-changing medications.

Pharmaceutical manufacturers continue to make inflammatory statements about abuse and fraud in the 340B program, but as we've recently shared with the leadership team at HRSA, we are deeply committed to operating a high-integrity, highly compliant program. Our use of these savings is consistent with the intent of the 340B statute: to stretch scarce federal resources in service to our communities and take care of every patient who needs us regardless of their ability to pay.

Here is just one example: this past month, after a large national pharmacy chain closed several locations across Michigan, the University of Michigan Health Pharmacy team worked tirelessly to contact impacted patients and ensure they had continuity of pharmacy care and access to the medications they need. Just this week, a patient with epilepsy contacted one of our community pharmacies for help. After going back & forth with the national chain by phone, sadly she'd not been able to ger her medication refilled and had a seizure while there in our pharmacy. Our team reacted immediately and took care of her urgent medical needs, and then made sure she had her prescription refills as she recovered and returned home. Due to a gap in medications caused by the pharmacy chain closure, she will now have 6 months of restrictions on her daily activities, including driving.



While I'm so proud of our team for their timely response and compassionate care, my heart breaks at the consequence of decisions potentially harming patients every day across the pharmaceutical industry. U-M Health needs 340B savings to appropriately treat and care for our patients and communities. This is just one of many examples of how our 340B savings are directed to serve our most vulnerable patients and families.

Our team couldn't have been there to help her without your leadership, so on behalf of U-M Health, thank you again.  Please let us know if there is anything we can do to support or partner with you as the policy landscape continues to evolve.

Sincerely,

David C. Miller, MD, MPH
President, University of Michigan Health


CC:
Britton, Chantelle
Pedley, Krista
Herzog, Michelle
Zadecky, Julie
Rogers, Kim
Burgess, William
Hargrove, Sherine



September 19, 2024

The Honorable Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD 20852

**Re: Johnston & Johnson's Unlawful 340B Rebate Model**

Dear Administrator Johnson:

On behalf of the 101 Iowa hospitals participating in the 340B Drug Pricing Program, the Iowa Hospital Association (IHA) expresses its appreciation for the Health Resources and Services Administration's (HRSA) attention to Johnson & Johnson's (J&J) attempts to undermine the 340B Program by unilaterally imposing a "rebate" model in place of the longstanding "upfront discount" model, which the Secretary of Health and Human Services (HHS) has supported since the program's inception. HRSA has rightfully recognized that J&J's actions violate federal law, and we appreciate your agency's swift response.

Iowa's 340B covered entity hospitals serve both urban and rural underserved communities, and are a lifeline for accessible, affordable care across the state. These hospitals ensure that:

- Important service lines, such as labor and delivery or inpatient psychiatric services, continue to be available for patients
- Patients have access to robust financial assistance programs allowing for low or no cost care in their communities
- Cancer patients can receive lifesaving treatment without fear of cost implications

The action proposed by J&J presented a drastic change in process and would have fundamentally altered how the 340B Program has operated for over 30 years. Unfortunately, it is consistent with a disturbing trend among drug manufacturers like J&J, which increasingly seek to maximize profits at the expense of hospitals and health systems that serve our nation's most vulnerable patients. Although the transition from an upfront discount to a rebate model might appear minor on paper, it would impose significant financial and administrative burdens on hospitals. Under the rebate model, 340B hospitals would have to divert already limited resources to cover inflated drug prices while awaiting months for J&J to fulfill its 340B pricing obligations. Furthermore, disproportionate share hospitals —many of which are already

340B_REBATES_000583

Page 2
September 19, 2024

operating on the thinnest margins—would have to develop costly administrative systems to track and manage rebate requests. Most concerning is that J&J would serve as the sole authority on whether rebates are approved, likely leading to inappropriate rebate denials.

We are encouraged that HRSA has identified J&J's actions as unlawful and told the company to reverse course. When concerns first arose regarding J&J's potential shift to a rebate model, the American Hospital Association (AHA) reached out to your office. Shortly after J&J's formal announcement, HRSA determined that J&J's rebate model is "inconsistent with the 340B statute, which requires Secretarial approval of any such proposal. The Secretary has not approved J&J's rebate model." Iowa hospitals wholeheartedly agree with HRSA's conclusion and commend the agency for taking a strong stance against J&J's predatory practices.

In sum, J&J's actions crossed a legal and ethical boundary. Even if this rebate model was applied to only two drugs, we commend HRSA for holding firm and acting decisively to prevent J&J and other manufacturers from engaging in similar unlawful behavior. HRSA has a range of enforcement tools at its disposal, and we strongly support you using these tools if J&J persists.

We greatly appreciate your ongoing commitment to the 340B Drug Pricing Program and look forward to continuing to work with you to protect it from harmful and unauthorized policy changes.


Sincerely,

Chris Mitchell
President/CEO
Iowa Hospital Association



California
Hospital
Association

September 19, 2024

The Honorable Xavier Becerra
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

The Honorable Carole Johnson
Administrator
Health Resources and Services Administration
5600 Fishers Lane
Rockville, MD 20852

Dear Secretary Becerra and Administrator Johnson:

On behalf of nearly 200 California hospitals participating in the 340B Drug Pricing Program, the California Hospital Association is grateful for your rapid action to address concerns with a troubling rebate model for two 340B drugs when purchased by disproportionate share hospitals.

This proposal would have abandoned the longstanding direct discount method — a clear violation of federal law — and threatened to undermine the goals of the 340B program by imposing significant burdens on safety net hospitals that would have led to negative impacts on patients.

Of even greater concern is that the approach could have proliferated and decimated the widely recognized benefits of 340B for vulnerable patients. The Health Resources and Services Administration's Sept. 17, 2024, letter directing Johnson & Johnson to cease implementation due to violations of federal law made clear that the ability of 340B hospitals to continue to provide essential medications and services to those in need will remain at the forefront.

Here in California, 340B has a meaningful and positive impact for those who otherwise struggle to receive critical health care services. Here are some examples:

- Free health screenings for low-income and unhoused populations
- Co-pay assistance, financial navigation services, and free medications for uninsured patients
- Emergency financial aid, including free discharge medication vouchers, for patients and families
- Support for post-hospital care for unhoused patients
- Community health education programs

Your action on this case reinforces your commitment to 340B and to vulnerable communities. California's hospitals stand ready to support your ongoing vigilance to protect patients supported by 340B.

Sincerely,

Carmela Coyle
President & CEO

| | |
|---|---|
| **From:** | Britton, Chantelle (HRSA) |
| **To:** | Herzog, Michelle (HRSA); Rogers, Kim (HRSA); Zadecky, Julie (HRSA) |
| **Subject:** | FW: Thank you and call follow up |
| **Date:** | Thursday, October 3, 2024 11:47:14 AM |

FYI (no action needed on this)

---

**From:** Robert Nelb <RNelb@essentialhospitals.org>
**Sent:** Thursday, October 3, 2024 11:45 AM
**To:** Grossman, Jordan (HRSA) <JGrossman@hrsa.gov>; Pedley, Krista (HRSA) <KPedley@hrsa.gov>;
Devenney, Garrett (HRSA) <GDevenney@hrsa.gov>; Dempsey, Antigone (HRSA)
<ADempsey@hrsa.gov>; Britton, Chantelle (HRSA) <CBritton@hrsa.gov>
**Cc:** Beth Feldpush <bfeldpush@essentialhospitals.org>; Evan Schweikert
<ESchweikert@essentialhospitals.org>; Sarah Mutinsky <smutinsky@eymanlaw.com>
**Subject:** [EXTERNAL] Thank you and call follow up

HRSA colleagues -

Thank you so much for taking the time to meet yesterday with me and the rest of our
team at America's Essential Hospitals. We really appreciate all that you do to help
protect 340B . We look forward to continuing to work with you to help strengthen this
program that is so important to our members and the patients they serve.

You mentioned that it would be helpful if we could gather some more specific
information from our members about how changes to 340B policies would affect our
members, and so we are planning to reach out to gather some of the details that you
requested. In particular, you mentioned it would be helpful to collect information on:

- The potential added administrative costs of implementing a rebate model
- The consequences of delayed discounts under a rebate model for
  hospitals with cash flow challenges
- The extent to which manufacturer administrative barriers effectively create
  a denial of discounts that covered entities are eligible for
- The implications of increasingly onerous contract pharmacy restrictions
  (e.g. new barriers from ESP second sight solutions)
- The misalignment of restrictions between manufacturers that contributes
  to increased administrative complexity
- Implementation challenges with the interaction between 340B and the
  Inflation Reduction Act

Let us know if there's anything we missed or any other areas of information that might
help inform your policymaking. We hope that we can continue to be a resource for you to
help support your work on this vital program.

Thanks,

~ Rob

**Robert Nelb, MPH** | Director of Policy

**America's Essential Hospitals**

401 Ninth St. NW, Suite 900

Washington, DC 20004

202.585.0127 telephone | 202.585.0101 fax

rnelb@essentialhospitals.org | www.essentialhospitals.org

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

**From:** Britton, Chantelle (HRSA)
**To:** Herzog, Michelle (HRSA); Rogers, Kim (HRSA); Zadecky, Julie (HRSA)
**Subject:** FW: Manufacturer Options for 340B Effectuation of Ceiling Price
**Date:** Friday, October 11, 2024 6:47:34 AM
**Attachments:** BIO letter to HRSA on 340B rebate model_10_10_2024_FINAL.pdf
**Importance:** High

---

**From:** Jack Geisser <jgeisser@bio.org>
**Sent:** Thursday, October 10, 2024 4:44 PM
**To:** Johnson, Carole (HRSA) <Carole.Johnson@hrsa.gov>
**Cc:** Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Phyllis Arthur <parthur@bio.org>; Crystal Kuntz <ckuntz@bio.org>; John Delacourt <jdelacourt@bio.org>
**Subject:** [EXTERNAL] Manufacturer Options for 340B Effectuation of Ceiling Price
**Importance:** High

Dear Administrator Johnson,

BIO respectfully submits the attached letter regarding our support for biopharmaceutical manufacturers having the choice to effectuate the 340B Ceiling Price in a manner they deem most appropriate, i.e., through the current model or through the use of a 340B rebate, to ensure efficiency and program integrity.

Please do not hesitate to contact me if you have any questions. Thank you for your consideration.

Regards,
Jack Geisser

**Jack Geisser**
*Vice President, Health Policy*
(He/Him)
—
**Biotechnology Innovation Organization (BIO)**
1201 New York Ave., NW
Suite 1300
Washington, DC 20005
—
202-962-9509 direct |202-515-1527 mobile
—
bio.org/

**Join Us in San Francisco.** Learn More!





CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

340B_REBATES_000589



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

October 10, 2024

Carole Johnson
Administrator
Health Resources and Services Administration
5600 Fishers Lane
Rockville, MD 20857

**RE: 340B Rebate Model**

Dear Administrator Johnson:

I am writing on behalf of the Biotechnology Innovation Organization (BIO) in strong support of a 340B rebate as an option for manufacturers to make 340B pricing available to covered entities. The 340B statute provides flexibility for a participating manufacturer to give access to the 340B ceiling price in more than one way, including through a rebate. We think the Health Resources and Services Administration (HRSA) has a unique opportunity to leverage that flexibility to protect 340B program integrity, preserve administrative resources, and help validate that the 340B benefit is accessed appropriately while enhancing the integrity of the program.

BIO is the world's largest trade association representing biotechnology companies and related organizations, with members across the United States and in more than thirty other nations. BIO's members develop medical products and technologies to treat patients afflicted with serious diseases, delay the onset of such diseases, or prevent them in the first place. Our members' novel therapeutics, vaccines, and diagnostics not only have improved health outcomes, but have reduced health care expenditures due to fewer physician office visits, hospitalizations, and surgical interventions.

Our comments can be summarized as follows:

- Manufacturers should have the choice to effectuate the 340B Ceiling Price in a manner they deem appropriate, i.e., the current model or use of a 340B rebate, to ensure efficiency and program integrity;
- Use of 340B Rebates would significantly help to mitigate the duplication and diversion risk inherent in the current model;
- Given current approaches under the Medicare Drug Price Negotiation Program, use of 340B rebates would help effectuate the interrelated statutory provisions of the Drug Price Negotiation Program and the Medicare inflation rebate programs.

340B_REBATES_000590



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

## I.    BACKGROUND

As you know, under the 340B program, participating manufacturers must offer 340B pricing on their covered outpatient drugs by covered entities, as a condition of having those drugs federally payable under Medicare Part B and Medicaid.[1] Critically, Congress established that several conditions of compliance must be satisfied for a provider to access 340B pricing. Among other things, if a participating provider is out of compliance with either the statutory prohibition on Medicaid rebate-340B discounting duplication (hereinafter, "Medicaid-340B duplication") or the statutory prohibition on diversion, it is no longer a "covered entity" eligible for 340B pricing.[2] There is also no obligation to offer 340B pricing multiple times on the same unit.[3]

Such fundamental guardrails on the 340B pricing obligation reflect Congress' considered judgment of the limitations necessary to help ensure the appropriate use and sustainability of the 340B program to support vulnerable patient populations. Of particular relevance here, they necessitate a meaningful mechanism to validate the eligibility of each unit for 340B pricing in a way that helps to ensure the integrity of the program, consistent with Congress' intent.

As HRSA's audits and other federal agency reports confirm, the 340B program has long operated in transgression of its statutory bounds, with regular findings of systemic covered entity noncompliance with the Medicaid-340B duplication and diversion prohibitions.[4] And such program integrity concerns are only compounded by the explosive growth of the 340B program over the past fifteen years: In 2022, 340B purchases ballooned to $53.7 billion, equaling $106 billion in sales at list prices. In 2023, sales at list prices grew to more than $124 billion,[5] making the 340B program the second largest governmental pharmaceutical program in the nation behind only Medicare Part D.[6]

---

[1] *See* 42 U.S.C. § 256b(a)(1).
[2] *See 42 U.S.C.* § 256b(a)(1) (requiring a manufacturer to offer 340B pricing only to a "covered entity"), (4) (defining a "covered entity" as an entity in compliance with the Medicaid-340B duplication and diversion prohibitions), (5) (prohibiting Medicaid-340B duplication and diversion).
[3] *See id.* § 256b(a)(1) (requiring a manufacturer to offer no more than the 340B ceiling price on a unit).
[4] *See, e.g.*, HRSA, Program Integrity FY 23 Audit Results (last reviewed September 2024), https://www.hrsa.gov/opa/program-integrity/fy-23-audit-results; U.S. Gov't Accountability Off., *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, GAO-21-107 at 1 (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf (finding that, from 2012 to 2019, HRSA audits of covered entities uncovered 1,536 instances of noncompliance, 429 of which concerned Medicaid-340B duplication, 546 of which concerned diversion, and 561 concerned other covered entity eligibility requirements); *see also* Ashwin Mundra, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark, Drug Channels*, Mar. 18, 2022, https://www.drugchannels.net/2022/03/the-340b-noncompliance-data-gap-leaves.html (a conservative estimate is that three to five percent of Medicaid rebates duplicate 340B pricing, amounting to billions of dollars in abuse).
[5] Martin, Rory, Ph.D., and Karne, Harish, "The 340B Drug Discount Program Grew to $124B in 2023," IQVIA, April 2023. https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2024/iqvia-update-on-size-of-340b-program-report-2024.pdf (Accessed: October 10, 2024)
[6] Adam Fein, *The 340B Program Reached $54 Billion in 2022—Up 22% vs. 2021, Drug Channels*, Sept. 24, 2023, https://www.drugchannels.net/2023/09/exclusive-340b-program-reached-54.html.

340B_REBATES_000591



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

Indeed, this growth appears to be a direct byproduct of such programmatic abuse, reflecting the financial motivation of some covered entities and their for-profit contracted middlemen to grow the program, by any means, to expand their profiteering off of it. The US Government Accountability Office (GAO) found that over half of 340B profits retained by contract pharmacies are concentrated in just three pharmacy chains (Walgreens, Walmart, CVS Health) plus a payer-owned specialty pharmacy (Cigna's Accredo specialty pharmacy).[7] Another recent analysis found that those 4 entities and UnitedHealth Group (via its pharmaceutical benefit manager, OptumRx) account for *three-quarters of all* 340B contract pharmacy relationships with covered entities.[8]

The historical record could not be clearer: To date, the program has lacked a meaningful mechanism to adequately police eligibility for 340B pricing beyond HRSA's own attempts to keep up with the increasing size of the program and the number of new interrelated programs. To help ensure the integrity of the program, we believe alternative approaches are needed.[9]

Compounding such need, newly enacted statutory provisions that have altered the overall 340B scheme further necessitate the accurate and timely identification of 340B units to avoid duplication of discounted pricing. The Inflation Reduction Act of 2022 (IRA) established both the Drug Price Negotiation Program and the Medicare inflation rebate programs. Under both programs, the statute guarantees nonduplication with respect to the 340B price. Under the Drug Price Negotiation Program, the statute requires a manufacturer to offer only the lower of the maximum fair price (MFP) under such program or the 340B price—not both.[10] And, under the Medicare inflation rebate programs, the statute precludes an inflation rebate on a 340B unit.[11] As discussed below, such evolution of the 340B landscape only reinforces the need for alternative approaches.

---

[7] "Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement," GAO Report, June 2018.
[8] Fein, Adam, "Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still-Booming 340B Contract Pharmacy Market," July 12, 2022. Accessed: October 10, 2024. https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html
[9] The post-transaction 340B administrative dispute resolution process and its associated audit requirement offer no meaningful solution. To fully assure itself of the propriety of each 340B transaction, a manufacturer (even assuming it could satisfy the requirement to show reasonable cause) would have to undertake the expense and hassle of an audit of each transaction with each covered entity for each of its covered outpatient drugs, in perpetuity—a patently unrealistic proposition.
[10] 42 U.S.C. § 1320f–2(d).
[11] 42 U.S.C. §§ 1395w–3a(i)(3)(B)(ii)(I), 1395w–114b(b)(1)(B).

3

340B_REBATES_000592



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

## II.    340B THROUGH A REBATE

We strongly support the manufacturer's ability to use a 340B rebate as an appropriate option to make 340B pricing available to covered entities.[12] By surfacing the data necessary to validate the eligibility of a unit for 340B pricing, the use of 340B rebates could help provide more of the transparency needed to protect the integrity of the program. Further, data visibility can lower government costs through lower auditing costs, fewer costs for administrative dispute resolution, and fewer Medicaid disputes. Such mechanisms would also help enable accurate and timely identification of 340B units to effectuate the nonduplication of discounted pricing under interrelated statutory provisions. We elaborate on these key considerations below.

First, a manufacturer's use of a 340B rebate could materially enhance the integrity of the 340B program. Under the current model — and considering the historical shift by covered entities away from the physical inventory model that prevailed at the outset of the program where covered entities determined 340B eligibility before dispensing a 340B-purchased product — there can be no assurance, at the time of sale, whether a unit will later be subject to Medicaid-340B duplication or diversion. The current model thereby heightens the risk of programmatic abuse. Use of 340B Options to use a rebate would significantly help to mitigate this risk inherent in the current model.[13]

HRSA has created guidance related to fee-for-Service Medicaid by creating a "Medicaid Exclusion File," but to date – and despite having 14 years to establish policy – neither HRSA nor the Centers for Medicare & Medicaid Services (CMS) has taken any effective steps to curtail duplicate discounts generated by Medicaid Managed Care. Given the difficulty in ensuring compliance with the Medicaid duplicate discount prohibition, BIO advocates strongly for HRSA and CMS to work together with manufacturers to develop flexible alternatives that ensure non-duplication under the Drug Price Negotiation Program, inflation rebate programs, and Medicaid.

Second, given current approaches under the Medicare Drug Price Negotiation Program, options to use 340B rebates are needed to help effectuate the interrelated statutory provisions of the Drug Price Negotiation Program and the Medicare inflation rebate programs. Accurate and timely identification of 340B units is essential to effectuating MFP-340B nonduplication under the Drug Price Negotiation Program.

---

[12] HRSA has already approved of a rebate model with respect to the AIDS Drug Assistance Programs (ADAPs), whereby ADAPs reimburse a third-party pharmacy for covered outpatient drugs dispensed to ADAP enrollees by the third-party pharmacy.

[13] Notably, the 340B replenishment model countenanced by the agency is itself a retrospective 340B pricing effectuation model, not a true discount model. Such model is deeply flawed in many respects—most fundamentally, because it necessarily engenders diversion, in contravention of the 340B statute. Regardless, the 340B rebate model would bring to all program stakeholders' efficiencies that the 340B replenishment model lacks.

4



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

Yet, the Drug Price Negotiation Program provides no meaningful mechanism to identify such units. CMS has stated that it "is not charged with verifying or otherwise reviewing whether a particular drug claim is a 340B-eligible claim and will not, at this time, assume responsibility for deduplicating discounts between the 340B ceiling price and MFP."[14] CMS instead has charged manufacturers with the responsibility for ensuring that they properly pay the lower of the MFP or the 340B price.[15] Indeed, use of 340B rebates not only would enable manufacturers to fulfill CMS's charge, but is one of few, if not the only, mechanisms through which the agency has indicated they can do so.[16]

Finally, 340B rebates are necessary to effectuate inflation rebate-340B nonduplication, as the inflation rebate programs do not provide for a meaningful alternative. As to Part D inflation rebates in particular, CMS seeks to rely on a deeply flawed methodology for identifying the 340B units to be excluded from the rebate calculation.[17] By the agency's own admission, the proposal would rely on incomplete data to only loosely estimate such units.[18] With respect to all Medicare inflation rebates, use of 340B rebates would help ensure that 340B units are appropriately identified and properly excluded from rebate invoicing.

The inherent advantages of using the 340B rebate are reflected in the adoption of such a model across federal programs:

- The Medicaid Drug Rebate Program;[19]
- The Medicare Part D Coverage Gap Discount Program;[20]
- The Manufacturer Discount Program;[21]
- Voluntary manufacturer rebates in Medicare Part D;[22]
- The Drug Price Negotiation Program;[23]
- The Medicare inflation rebate programs;[24]

---

[14] CMS, Drug Price Negotiation Program IPAY 2027 Revised Guidance 55 (Oct. 2, 2024), https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.
[15] *Id.*
[16] Compounding the need for the 340B rebate model to accurately and timely identify 340B units, manufacturers must pay MFP rebates where they are due by the end of a fourteen-day prompt payment window or be subjected to significant civil monetary penalties. *Id.* at 196, 294.
[17] 89 Fed. Reg. 61,596, 61,969-70 (July 31, 2024).
[18] *See id.*
[19] 42 U.S.C. § 1396r-8(b)(1)(A).
[20] 42 U.S.C. § 1395w-114a; 42 C.F.R. § 423.2315 (provides for manufacturer payment of Medicare CGDP obligations within 38 calendar days of receipt of invoices).
[21] 42 U.S.C. § 1395w-114c; CMS, Medicare Part D Manufacturer Discount Program Final Guidance (Nov. 17, 2023), § 80.2.
[22] 42 U.S.C. § 1395w-102(d)(1)(B)
[23] *See* Drug Price Negotiation Program IPAY 2027 Revised Guidance at 57.
[24] 42 U.S.C. § 1395w-3a(i)(1)(B); *Id.* § 1395w-114b(a)(2).

340B_REBATES_000594



**Biotechnology Innovation Organization**
1201 New York Avenue NW
Suite 1300
Washington, DC, 20005
202-962-9200

- Medicare Part B discarded drug refunds;[25]
- TRICARE Retail Refund Program;[26] and, indeed,
- The 340B program itself, as to AIDS Drug Assistance Programs[27] (and the current replenishment model to the extent it is a retrospective 340B pricing effectuation model).

Here, use of 340B rebates would, among other things, enhance the transparency and integrity of the 340B program and facilitate the effectuation of the interrelated nonduplication provisions of the IRA. For these reasons, BIO strongly supports the use of 340B rebates as an option for manufacturers to effectuate 340B pricing.

*     *     *     *

Thank you for consideration. We strongly support the use of 340B rebates as an option for manufacturers to make 340B pricing available to covered entities. If you have questions, please contact us at 202-962-9200 or at parthur@bio.org or jgeisser@bio.org.

Sincerely,

/s/                                                             /s/

Phyllis A. Arthur                                       Jack Geisser
Executive Vice President                           Vice President
Health and Policy Programs                       Health Policy

cc: Chantelle Britton, Director, HRSA Office of Pharmacy Affairs

---

[25] *Id.* § 1395w-3a(h)(2).
[26] 10 U.S.C. § 1074g(f); 32 C.F.R. § 199.21(q).
[27] *See* 63 Fed. Reg. 35,239 (June 29, 1998).

340B_REBATES_000595

| | |
|---|---|
| **From:** | Britton, Chantelle (HRSA) |
| **To:** | Burgess, William (HHS/OGC); Hargrove, Sherine (HHS/OGC) |
| **Cc:** | Pedley, Krista (HRSA); Herzog, Michelle (HRSA); Rogers, Kim (HRSA); Zadecky, Julie (HRSA) |
| **Subject:** | FW: Letter from PhRMA to HRSA |
| **Date:** | Friday, October 11, 2024 6:46:59 AM |
| **Attachments:** | PhRMA Letter to HRSA re 340B - 10.11.24.pdf |

**From:** Stansel, Jim <JStansel@phrma.org>
**Sent:** Friday, October 11, 2024 5:59 AM
**To:** Johnson, Carole (HRSA) <Carole.Johnson@hrsa.gov>
**Cc:** Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Carpenter, Elizabeth <ECarpenter@phrma.org>
**Subject:** [EXTERNAL] Letter from PhRMA to HRSA

Administrator Johnson,

Attached please find a letter from PhRMA.

Best,

Jim

**James C. Stansel**
**EVP, Law and Regulatory**
**General Counsel**
**Pharmaceutical Research and Manufacturers of America**
670 Maine Avenue, S.W. Suite 1000
Washington, D.C. 20024
T +1 202 835 3459
M +1 703 981 2219
jstansel@phrma.org
PhRMA.org | MAT.org | VotersForCures.org

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

October 11, 2024

*Via Email*

Carole Johnson
Administrator
Health Resources and Services Administration (HRSA)
U.S. Department of Health and Human Services (HHS)
Parklawn Building
Room 13N188
Rockville, MD 20857

Dear Administrator Johnson,

The Pharmaceutical Research and Manufacturers of America (PhRMA) is writing to express serious concerns regarding HRSA's recent public statements about use of a rebate option to offer statutory 340B ceiling prices to covered entities.

PhRMA represents the country's leading innovative biopharmaceutical research companies, developing innovative medicines that transform lives and create a healthier world. Over the last decade, PhRMA member companies have invested more than $800 billion in the search for new treatments and cures, and they support nearly five million jobs in the United States.

HRSA's decision responding to a recent manufacturer announcement proposing to use a rebate model overlooks well-documented and pervasive 340B/Medicaid duplicate discount violations that HHS has not addressed. The agency's decision also ignores the 340B statute itself and improperly interferes with manufacturers' rights under the statute to implement reasonable business practices to improve transparency and compliance, as articulated by two federal appellate courts.[1] PhRMA urges HRSA to support, or not impede, manufacturer implementation of alternative approaches to address duplicate discounting and other program abuse, such as employing a rebate to ensure covered entities receive 340B ceiling prices. The agency's decision to instead threaten termination of a manufacturer's Pharmaceutical Pricing Agreement—and the ability of Medicare and Medicaid beneficiaries to access the company's medicines—simply because a manufacturer proposed a rebate mechanism raises questions about HRSA's impartial administration of the 340B program.

The remainder of this letter outlines PhRMA's specific concerns with HRSA's decision and addresses the following key points:

- Unrestrained 340B growth— due in part to a lack of program integrity measures—is raising costs for patients, the government, and payers.

- HHS has ignored recommendations from government watchdogs and has not taken necessary steps to prevent statutorily prohibited 340B/Medicaid duplicate discounts.

---

[1] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3rd Cir. 2023).

340B_REBATES_000597



670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

- The current 340B audit and administrative dispute resolution (ADR) processes do not provide meaningful mechanisms to detect and address illegal behavior.

- Manufacturers face additional duplicate discount risks due to new obligations under the Inflation Reduction Act (IRA), and HRSA is standing in the way of reasonable practices to address those risks.

- Current levels of opacity and covered entity non-compliance in the 340B program are unsustainable, and alternative methods are needed to improve transparency and covered entity compliance.

- Rebates are commonly used in other federal health care programs, and their broader use in 340B would be a commonsense approach to achieving needed program integrity improvements.

- The statute contemplates manufacturers using discounts or rebates to offer 340B prices on covered outpatient drugs.

*    *    *

**The 340B Program's Unrestrained Growth Jeopardizes Its Integrity and Long-Term Sustainability**

Congress created the 340B drug pricing program in 1992 as a result of the Medicaid drug rebate statute's unanticipated impact on voluntary manufacturer discounts. These voluntary discounts previously offered to safety-net clinics and hospitals caring for large shares of vulnerable patients could have triggered a new best price under the Medicaid drug rebate statute.[2]

The significant price reductions biopharmaceutical manufacturers provide to covered entities under the 340B program should be used to help low-income, uninsured, and other vulnerable patients obtain outpatient medicines from true safety-net providers participating in the program. However, the unrestrained and unaccountable expansion of 340B is not benefiting patients. Instead, the program is being abused for the financial benefit of large, financially successful not-for-profit health systems and their contracted for-profit consultants, chain pharmacies, and pharmacy benefit managers, while jeopardizing the fundamental, core purpose of the program: to provide affordable access to medicines for vulnerable patients.

340B is now the nation's second largest federal prescription drug program with more than $54 billion in annual sales at discounted prices.[3] Nearly 60 percent of all hospitals participate in the program.[4] The 340B program grew at a compound annual growth rate of 24 percent from 2015 to 2022.[5] Over the same period, net drug sales (excluding COVID-19 vaccines) grew at an average annual growth rate of only 4 percent.[6] Manufacturers currently do not have access to the information they need to safeguard the integrity of this outsized program and ensure that statutory requirements are met.

---

[2] H.R. Rep. No. 102-384(II), at 12 (1992) (stating that the 340B statute is intended to apply "to specified Federally-funded clinics and public hospitals that provide direct clinical care to large numbers of uninsured Americans").
[3] HRSA, 2022 Covered Entity Purchases (Sept. 2023), https://www.hrsa.gov/opa/updates/2022-340b-covered-entity-purchases; Berkeley Research Group, Measuring the Relative Size of the 340B Program: 2020 Update (Jun. 2022), https://www.thinkbrg.com/insights/publications/measuring-relative-size-340b-program-2020-update/.
[4] MedPAC, Report to Congress: Medicare and the Health Care Delivery System (Jun. 2022), https://www.medpac.gov/document/june-2022-report-to-the-congress-medicare-and-the-health-care-delivery-system/.
[5] Drug Channels, The 340B Program Reached $54 Billion in 2022 – Up 22% vs. 2021 (Sept. 24, 2023), https://www.drugchannels.net/2023/09/exclusive-340b-program-reached-54.html.
[6] Id.

340B_REBATES_000598

As described in greater detail below, growth in the 340B program and broader changes in the health care system have contributed to—and indeed worsened—program integrity challenges, and HRSA's oversight has not kept pace. For example, HRSA has, to date, failed to ensure that manufacturers have access to basic claims-level data for medicines on which 340B pricing is requested. This complete lack of transparency has undermined the program's integrity and makes it difficult for manufacturers to verify even basic information about program sales. Without access to claims-level data, manufacturers are not able to verify that medicines on which 340B pricing is requested were actually dispensed by a 340B entity. The fact that covered entities are aggressively resisting even this basic measure of transparency and accountability is striking.

The unrestrained and unaccountable growth in 340B threatens program integrity and raises costs for the health care system. The 340B program causes hospital price markups and consolidation that increase costs to patients, the government, and payers, and could ultimately reduce pharmaceutical innovation.[7] In some cases, for-profit chain pharmacies and PBMs are profiting from 340B at the expense of states and the federal government in foregone Medicaid rebate dollars.[8]

**HHS Has Not Taken Necessary Actions to Prevent Statutory 340B/Medicaid Duplicate Discount Violations**

The statutory prohibition on duplicate discounts bars covered entities from purchasing a covered outpatient drug at the 340B price if that drug also generates a Medicaid rebate.[9] This is an absolute prohibition under the law and is intended to result in zero instances of duplicate discounts—across both Medicaid fee-for-service and Medicaid managed care utilization.[10] Since the inception of the 340B program, avoiding duplicate discounts has been an ongoing challenge—but duplicate discount risks have increased sharply with the expansion of Medicaid rebates to Medicaid managed care and the proliferation of 340B contract pharmacy arrangements.[11] Growing enrollment in Medicaid managed care organizations (MCOs) has further heightened the risk of statutorily prohibited duplicate discounts. Today, about half of Medicaid beneficiaries receive their pharmacy benefit managed through an MCO.[12]

*HRSA has ignored government watchdog recommendations to address duplicate discounts*

The Government Accountability Office (GAO) and the HHS Office of Inspector General (OIG) have both found that neither HRSA nor the Centers for Medicare & Medicaid Services (CMS) has taken effective steps to prevent these statutory violations, particularly with respect to Medicaid MCOs. HRSA has been aware of many of these problems since 2011. The attached appendix provides a snapshot of the many

---

[7] Robinson, J.C. et al., Hospital Prices for Physician-Administered Drugs for Patients with Private Insurance, N. Engl. J. Med. (Jan. 25, 2024), https://pubmed.ncbi.nlm.nih.gov/38265645/; Robinson, J.C., Hospitals' Drug Price Markups Incentivize Consolidation and Reduce Funding for Pharmaceutical Innovation, Health Affairs Forefront (Mar. 6, 2024), https://www.healthaffairs.org/content/forefront/hospitals-drug-price-markups-incentivize-consolidation-and-reduce-funding; Nikpay S. et al., Association of 340B Contract Pharmacy Growth with County-Level Characteristics, Am. J. Manag. Care (Mar. 2022), https://pubmed.ncbi.nlm.nih.gov/35404549/.
[8] N. Masia and F. M Kuwonza, "Measuring the 340B Drug Purchasing Program's Impact on Charitable Care and Operating Profits for Covered Entities," Health Capital Group, Available at: https://nclnet.org/340b_briefing/.
[9] 42 U.S.C. § 256b(a)(5)(A).
[10] *See also id.* §§ 1396r-8(j)(1), 1396b(m)(2)(A)(xiii)(III).
[11] *See, e.g.*, OIG, State Efforts to Exclude 340B Drugs from Medicaid Managed Care Rebates (Jun 2016), https://oig.hhs.gov/oei/reports/oei-05-14-00430.pdf; GAO, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement (Jul. 2018), https://www.gao.gov/products/gao-18-480.
[12] Analysis of Gifford K, et al, State Approaches to Managing the Medicaid Pharmacy Benefit, HMA (Aug. 2024); Kaiser Family Foundation analysis of the Centers for Medicare and Medicaid Services' Medicaid Managed Care Enrollment Reports, 2023.

340B_REBATES_000599



watchdog agency reports highlighting the longstanding, pervasive, and unaddressed issue of statutory duplicate discount violations, among numerous other program integrity deficiencies.

In 2019, GAO sent a letter to HHS containing "Priority Open Recommendations" that warranted the Secretary's "continued personal attention" given the potential to "significantly improve government operation…by realizing large dollar savings; eliminating mismanagement, fraud, and abuse; or making progress toward addressing a High Risk or duplication issue."[13] In this letter, GAO recommended HRSA "issue guidance to covered entities on the prevention of duplicate discounts under Medicaid managed care" and assess "covered entities' compliance with the prohibition on duplicate discounts" as part of its audit process.[14] GAO previously made these recommendations to HRSA in June 2018.

GAO further stated that, "[w]ithout addressing [these] recommendations…, HHS does not have assurance that covered entities are complying with program requirements, which puts manufacturers at risk of being required to erroneously provide duplicate discounts for Medicaid prescriptions."[15] These recommendations—and the stated risk of erroneous duplicate discount payments by manufacturers—have been included in GAO's Priority Open Recommendations to the HHS Secretary in 2020,[16] 2021,[17] 2022,[18] 2023,[19] and 2024.[20] HHS has yet to implement these recommendations.

***HRSA's covered entity audits are not a meaningful mechanism to ensure program compliance***

HRSA's own audits also suggest a concerning trend of non-compliance. In an analysis of HRSA's FY 2021 covered entity final audit results, 62 percent of audited covered entities had at least one adverse finding, and nearly 30 percent had two or more adverse findings.[21] HRSA's audits are intended to assess a covered entities' compliance with requirements related to 340B/Medicaid duplicate discounts,[22] diversion,[23] and data submission and reporting errors and inaccuracies. However, it is unclear what audit standards HRSA and its contractors are currently using. Following a legal challenge in 2019, HRSA "concluded that in the absence of binding and enforceable regulations, the agency would no longer issue findings based solely on noncompliance with guidance."[24] Additionally, only a very small share of covered entities is audited each year. As of July 2024, there were 199 completed covered entity audits for

---

[13] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-19-364SP (Mar. 28, 2019), https://www.gao.gov/products/gao-19-364sp.

[14] Id.

[15] Id.

[16] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-20-552PR (Apr. 23, 2020), https://www.gao.gov/products/gao-20-552pr.

[17] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-21-527PR (May 19, 2021), https://www.gao.gov/products/gao-21-527pr.

[18] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-22-105646 (May 26, 2022), https://www.gao.gov/products/gao-22-105646.

[19] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-23-106467 (May 10, 2023), https://www.gao.gov/products/gao-23-106467.

[20] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-24-107257 (May 28, 2024), https://www.gao.gov/products/gao-24-107257.

[21] ADVI, Analysis of FY 2021 HRSA 340B Covered Entity Audits (Feb. 2023), https://www.advi.com/insight/analysis-of-fy-2021-hrsa-340b-covered-entity-audits/#HRSA-footer-ten.

[22] 42 U.S.C. § 256b(a)(5)(A).

[23] Id. § 256b(a)(5)(B).

[24] GAO, Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf.

340B_REBATES_000600



670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

the 2022 fiscal year and 159 completed for the 2023 fiscal year.[25] These figures represent less than one percent of covered entities being audited each year.

When audits do find program violations, they typically do not result in sanctions that meaningfully deter and penalize covered entities. For example, one relatively common audit finding is that covered entities have not met requirements designed to prevent fee-for-service Medicaid duplicate discounts. When this is discovered in an audit, typically the covered entity must only make a repayment to manufacturers.[26] They do not face a monetary penalty, and manufacturers report that HRSA often does not enforce repayment of price concessions covered entities should never have received, even when there is no dispute that the covered entity owes a repayment.[27] While covered entities may also have to implement a corrective action plan, this only requires they make changes that should always have been in place. Thus, the corrective actions do not create a meaningful incentive for covered entities to meet current program requirements. In the meantime, according to GAO, manufacturers continue to receive requests "to erroneously provide duplicate discounts for Medicaid prescriptions"[28] contrary to clear prohibitions in the 340B and Medicaid statutes.[29] This is to say nothing of covered entities' non-compliance with other 340B statutory requirements, including the diversion prohibition, which bars the transfer of a 340B drug to any person who is not a 340B patient of a covered entity.[30]

***The manufacturer audit guidelines and the ADR process drastically limit manufacturers' ability to seek resolution of statutory violations, in particular duplicate discounts***

While manufacturer audits of covered entities theoretically could help manufacturers detect violations of the 340B statute's diversion and duplicate discount prohibitions, HRSA's manufacturer audit guidelines,[31] issued in 1996, impose onerous and unnecessary barriers on manufacturer audits that extend beyond the statute and often effectively foreclose manufacturer audits.[32] These barriers include a requirement to use a third-party auditor and to seek prior approval from HRSA.

Because the 340B statute requires manufacturers to conduct an audit of a covered entity prior to initiating the ADR process, HRSA's onerous manufacturer audit requirements make it difficult or nearly impossible for the audit and ADR process to work as Congress intended.[33] These outdated audit guidelines also overlook the significant changes to the 340B program and were developed long before Congress enacted the ADR process with an audit prerequisite. Today, manufacturers are effectively foreclosed from relief under ADR because they cannot bring a claim without first conducting an audit of a covered entity. It also bears emphasizing that, when a manufacturer has managed to obtain HRSA's approval to audit a covered

---

[25] HRSA, Program Integrity: FY22 Audit Results (updated Jul. 24, 2024), https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results; HRSA, Program Integrity: FY23 Audit Results (updated Sept. 20, 2024), https://www.hrsa.gov/opa/program-integrity/fy-23-audit-results.

[26] *See id.*

[27] *See also* GAO, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement, GAO-20-212 (Jan. 21, 2020), https://www.gao.gov/products/gao-20-212 ("HRSA officials told us they would not require a covered entity to develop a corrective action plan or make offers of repayment to a manufacturer if a drug manufacturer's audit of that covered entity identified a duplicate discount in managed care.").

[28] GAO, Priority Open Recommendations: Department of Health and Human Services, GAO-24-107257 (May 28, 2024), https://www.gao.gov/products/gao-24-107257.

[29] 42 U.S.C. §§ 256b(a)(5)(A), 1396r-8(j)(1), 1396b(m)(2)(A)(xiii)(III).

[30] *Id.* § 256b(a)(5)(B). *See* Appendix.

[31] 61 Fed. Reg. 65406 (Dec. 12, 1996).

[32] HRSA has acknowledged the infrequency of manufacturer audits, stating "over the history of the 340B program, manufacturers have rarely utilized the process in the [HRSA] guidelines to conduct an audit." 75 Fed Reg. 57233, 57235 (Sept. 20, 2010). In April 2024, HRSA disclosed that "[i]n the last 5 years, six [manufacturers] have followed the guidelines to request audits of covered entities." 89 Fed. Reg. 28643, 28646 (Apr. 19, 2024).

[33] 42 U.S.C. § 256b(d)(3)(A), (d)(3)(B)(iv).

340B_REBATES_000601



670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

entity, it has become increasingly common for covered entities to try to thwart the audit by refusing to cooperate with manufacturers and even suing HRSA to challenge its audit approval decision.[34] Covered entities' resistance to audits to remedy instances of statutory non-compliance on the back end while simultaneously resisting claims data conditions designed to promote transparency and accountability on the front end reflects a view of 340B program compliance that simply cannot continue.

**Manufacturers Face Extra Duplicate Discount Risks Due to New Obligations Under the IRA**

The IRA enacted new requirements for manufacturers to provide entities access to the MFP of a drug, as well as new manufacturer inflation rebate obligations for both Part D and B drugs. Congress recognized that manufacturers must not be required to pay discounts twice on the same unit of drug. Specifically, the IRA's 340B/MFP "nonduplication" provision provides that a manufacturer of a selected drug is not required to provide access to the MFP for a selected drug that is subject to 340B pricing where the 340B ceiling price is lower than the MFP for the drug (or the differential between the 340B price and MFP if MFP is lower).[35] The IRA also prohibits CMS from including 340B units in the calculations of manufacturers' Medicare Part B and Part D inflation rebate amounts.[36] As PhRMA has repeatedly raised with HHS, we have significant concerns that HHS has not pursued a holistic and integrated approach across CMS and HRSA to ensure statutorily prohibited duplicate discounts do not further proliferate under the IRA. As a result, manufacturers face substantial new risks of additional types of 340B duplicate discounts. In fact, HRSA's recent decision fails to appreciate that a 340B rebate could be the only way to implement the "maximum fair price" (MFP) nonduplication requirement, a critical aspect of the IRA.

With respect to 340B/MFP deduplication, CMS has maintained that it "will not, at this time, assume responsibility for nonduplication of discounts between the 340B ceiling price and MFP," nor will it require pharmacies to indicate to manufacturers which selected drug claims are for 340B-eligible units.[37] With respect to excluding 340B units from the Part D inflation rebate calculation, instead of requiring covered entities and their contract pharmacies to identify these 340B units so CMS can simply exclude them from the rebate calculation, as the statute requires, CMS instead proposes to adopt an estimation methodology[38] that, if finalized, is so significantly flawed that it would fail to meet the Secretary's obligation under the statute.

**Rebates are Commonly Used in Other Federal Health Care Programs**

Far from being a "dramatically transforming" approach[39] to drug pricing as alleged by the American Hospital Association, rebates are a common form of discount used in many federal health care programs to provide access to statutory and negotiated prices. Rebates help improve integrity and transparency because they typically require documentation of a purchaser's compliance with applicable conditions or programmatic requirements before a manufacturer pays an amount that reduces the purchase price of a drug. Manufacturers make (or will make) retrospective payments using rebates and refunds across numerous other federal health care programs, such as those listed below:

---

[34] See, e.g., Children's Nat'l Med. Ctr. v. Johnson, No. 1:24-cv-02563 (D.D.C. Sept. 6, 2024); Univ. of Rochester v. Johnson, No. 1:24-cv-02268 (D.D.C. Aug. 1, 2024); MaineGeneral Med. Ctr. v. Johnson, No. 1:24-cv-02187 (D.D.C. Jul. 24, 2024); Oregon Health & Sci. Univ. v. Johnson, No. 1:24-cv-02184 (D.D.C. Jul. 24, 2024).
[35] 42 U.S.C. § 1320f-2(d).
[36] Id. §§ 1395w-3a(i)(3)(B)(ii)(I), 1395w-114b(b)(1)(B).
[37] CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2, 2024).
[38] 89 Fed. Reg. 61596, 61969 (Jul. 31, 2024).
[39] AHA Letter to HRSA (Aug. 28, 2024).

340B_REBATES_000602



- Coverage Gap Discount Program (Medicare Part D)[40]
- Manufacturer Discount Program (Medicare Part D)[41]
- Voluntary manufacturer rebates in Medicare Part D[42]
- Medicare Drug Price Negotiation Program[43]
- Medicare Part B and Part D inflation rebates[44]
- Medicare Part B discarded drug refunds[45]
- Medicaid Drug Rebate Program[46]
- TRICARE Retail Refund Program[47]

Retrospective rebates or refunds are used to effectuate a drug's price in all of these federal programs, yet HRSA's recent decision appears to ignore their widespread and effective use. In fact, in final guidance for manufacturer effectuation of the MFP in 2026 and 2027, issued just last week, CMS said a manufacturer "may provide access to the MFP prospectively *or retrospectively*," which—under the latter approach—the manufacturer "retrospectively provid[es] reimbursement for the difference between the dispensing entity's acquisition cost and the MFP."[48] Similarly, rebates can be an effective mechanism to offer the 340B ceiling price. HRSA's decision is even more puzzling, given that it has countenanced widespread use of the replenishment model, which—like a rebate—retrospectively provides covered entities access to 340B pricing, but replenishment does so in the least transparent way possible.

A rebate approach would help alleviate some of the challenges presented by 340B audits by providing manufacturers with claims level data to *prevent* statutory violations instead of having to resort to audits and potentially ADR to attempt to remedy violations that have already occurred. The 340B statute grants audit rights to manufacturers; however, in practice, HRSA has significantly curtailed those rights, as described in part above. Moreover, audits are not a complete solution to addressing covered entity non-compliance, in part because they are limited in scope, require significant resources, and depend on cooperation from covered entities. And, as stated above, there have been notable recent examples of covered entities refusing to cooperate with HRSA-approved manufacturer audits. Thus, the 340B program lacks basic transparency and program integrity safeguards that exist in other federal programs.

When the 340B program was first created in 1992, the health care system looked very different than it does today. The 340B program itself looks very different as well. As one recent *JAMA Health Forum*

---

[40] 42 U.S.C. § 1395w-114a; 42 C.F.R. § 423.2315 (generally providing for manufacturer payment of Medicare Coverage Gap Discount Program obligations within 38 calendar days of receipt of invoices).

[41] 42 U.S.C. § 1395w-114c; CMS, Medicare Part D Manufacturer Discount Program Final Guidance (Nov. 17, 2023), § 80.2 (describing manufacturer invoicing and reimbursement process under the Part D Manufacturer Discount Program as "similar to the process used for the Coverage Gap Discount Program").

[42] 42 U.S.C. § 1395w-102(d)(1)(B) (voluntary manufacturer rebates on covered Part D drugs may help reduce negotiated prices).

[43] *Id.* § 1320f-2(a)(3); CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2, 2024).

[44] 42 U.S.C. §§ 1395w-3a(i)(1)(B), 1395w-114b(a)(2).

[45] *Id.* § 1395w-3a(h)(2).

[46] *Id.* § 1396r-8. A 340B rebate mechanism is consistent with congressional intent to provide covered entities with the same or lower net price as Medicaid, which also is a rebate program. *See* 138 Cong. Rec. 34293 (1992) (summarizing the conference agreement and stating that the statute "require[s] a manufacturer to enter into an agreement with the Secretary of HHS under which the manufacturer must agree to extend to a covered entity a discount for a covered outpatient drug or biological *equal to or greater than the discount provided for that drug or biological under the Medicaid outpatient drug rebate program*" (emphasis added)).

[47] 10 U.S.C. § 1074g(f); 32 C.F.R. § 199.21(q).

[48] CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2, 2024) (emphasis added).

340B_REBATES_000603

article noted, there were approximately 1,000 covered entities in 1992 (including child sites); by 2021, there were more than 50,000.[49] In addition to growth in 340B sales and the number of 340B entities, covered entities have also been developing new means of expanding their use of the program. This includes alternative distribution models that "involve the 340B replenishment drug being initially delivered directly to a covered entity pharmacy, then subsequently transferred to the contract pharmacy for dispensing."[50]

HRSA's oversight simply has not kept pace with the changing health care landscape and growth in the 340B program. Changes to other parts of health care have made the 340B program more complicated to administer over time, and evidence suggests the 340B program is out of step with the realities of the current health care system. The 340B program needs to modernize in a way that reflects how the program has evolved and accounts for expanded manufacturer obligations under the IRA. To do so, it is essential that HRSA not interfere with manufacturers' rights to impose reasonable conditions on the sale of their drugs at 340B prices to ensure that, while covered entities are able to access covered outpatient drugs at the 340B price, duplicate discounting and other abuses are not allowed to persist. Alternative approaches—a rebate as one possible method—are needed to enable the program to operate efficiently and effectively in today's marketplace.

### The 340B Statute Contemplates Manufacturers Using Discounts or Rebates to Offer 340B Ceiling Prices on Covered Outpatient Drugs

Among the different mechanisms manufacturers could use to offer the 340B ceiling price, rebates are explicitly enumerated in the 340B statute. The 340B statute directs the Secretary of Health and Human Services to "enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account *any rebate or discount*, as provided by the Secretary) to the manufacturer for covered outpatient drugs…does not exceed" the ceiling price.[51]

Additionally, the section of the 340B statute prohibiting 340B pricing on drugs that generate Medicaid rebates is titled "[p]rohibiting duplicate discounts *or rebates*."[52]

Thus, it is clear from the 340B statute's text that a rebate option is permissible and that Congress contemplated both rebates and discounts as options for manufacturers to offer 340B ceiling prices. In addition, the legislative history makes clear that the 340B statute "*does not specify* whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, *through a manufacturer rebate*, or through some other mechanism."[53] HRSA has agreed in guidance that "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)."[54]

---

[49] R.P. Knox, "Outcomes of the 340B Drug Pricing Program," *JAMA Health Forum*. 2023 Nov; 4(11): e233716.
[50] Quarles, Amidst Ongoing Manufacturer Restrictions, 340B Covered Entities and Contract Pharmacies Get Creative, (Sept. 2023), https://www.quarles.com/newsroom/publications/amidst-ongoing-manufacturer-restrictions-340b-covered-entities-and-contract-pharmacies-get-creative.
[51] 42 U.S.C. § 256b(a)(1) (emphasis added).
[52] *Id.* § 256b(a)(5)(A) (emphasis added).
[53] H.R. Rep. No. 102-384(II), at 16 (1992) (emphasis added).
[54] 62 Fed. Reg. 45823, 45824 (Aug. 29, 1997).

340B_REBATES_000604

670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

HRSA asserts that a rebate does not comply with the requirement to offer covered entities the 340B ceiling price.[55] **But the 340B statute clearly contemplates use of a "rebate" as an option to offer 340B ceiling prices**. Moreover, rebates are already a permitted mechanism through which manufacturers can offer the 340B ceiling price to AIDS Drug Assistance Programs.[56] As noted above, rebates are a common approach to offering price reductions in numerous other federal health care programs, and they can be an effective mechanism to provide the 340B ceiling price to other covered entity types while reducing the risk of legal violations and improving transparency and accountability. Given the pervasive and well-documented statutory violations and risks catalogued in our letter and Appendix, it would be wrong of HRSA to reject a rebate mechanism out of hand for other covered entity types without considering the program integrity improvements such a mechanism could offer.

Lessons from appellate courts also bear emphasis here. Just this year, the D.C. Circuit Court of Appeals held that the 340B statute preserved manufacturers' ability to place reasonable conditions on their 340B offers, including requiring submission of standard information, such as claims data regarding prescriptions on which 340B pricing is sought.[57] The D.C. Circuit examined the text and structure of the 340B statute and concluded that Congress "preserve[d]…the ability of [manufacturers] to impose at least some" reasonable conditions on their statutorily required offer.[58] An appropriately-designed rebate mechanism fits squarely within the holdings of the court's decision; such an approach is eminently reasonable, as rebates are explicitly mentioned in the statute, and a rebate option would uphold the legal rights and responsibilities of both manufacturers and covered entities, enabling manufacturers to verify claims prior to payment so as to promote compliance with statutory prohibitions and enabling covered entities to receive a net price at or below the 340B ceiling price.

\*          \*          \*

We are concerned HRSA's decision in response to recent rebate announcements fails to consider manufacturers' need to mitigate the well-documented and pervasive statutory 340B/Medicaid duplicate discount violations that HHS has not adequately addressed and the increased risk that other statutorily prohibited duplicate discounts will proliferate under the IRA. HRSA's statements also have failed to take into account appellate court decisions recognizing manufacturers' rights under the 340B statute to adopt conditions reasonably designed to improve transparency and compliance. PhRMA urges HRSA to support, or not impede, alternative approaches for manufacturers to address program integrity violations such as by offering 340B ceiling prices as a rebate and seeking reasonable claims level data from covered entities.

/s/                                                          /s/

_____          _____
Elizabeth Carpenter                                James C. Stansel
Executive Vice President, Policy & Research        Executive Vice President and General Counsel

cc:    Chantelle Britton, Director, HRSA Office of Pharmacy Affairs

---

[55] HRSA Letter to J&J (Sept. 17, 2024).
[56] 63 Fed. Reg. 35239 (Jun. 29, 1998).
[57] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460, 463-64 (D.C. Cir. 2024).
[58] *Id.* at 460.

340B_REBATES_000605

670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

**Appendix: Selected Government Reports Addressing the 340B Program**

- **GAO, 340B Drug Discount Program: Information about Hospitals that Received an Eligibility Exception as a Result of COVID-19**, GAO-23-106095 (May 11, 2023), https://www.gao.gov/products/gao-23-106095.
  - "According to HRSA, as of July 2022, the agency had audited 25 of the 53 excepted hospitals. Our review of HRSA documentation found that the agency issued a total of 19 findings related to noncompliance for 14 of these hospitals as a result of these audits. Five of the hospitals had more than one finding of noncompliance. The most common finding among the excepted hospitals that were audited related to the potential for duplicate discounts…."

- **GAO, Drug Pricing Program: HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements**, GAO-21-107 (Dec. 14, 2020), https://www.gao.gov/products/gao-21-107.
  - "HRSA reported that the agency issued a total of 1,536 findings to address covered entity noncompliance found in the 1,242 finalized audits conducted from fiscal years 2012 through 2019 as of September 2020. These findings, which address violations of statutory requirements and a failure to follow guidance that HRSA developed to clarify these requirements, were in the areas of eligibility (561), diversion (546), and duplicate discounts (429)…."
  - "HRSA officials also said that there were instances among fiscal year 2019 audits in which the agency also did not issue duplicate discount findings for a failure to follow a state's Medicaid requirements, including billing the state Medicaid office for a 340B drug without using a claim identifier to indicate a drug purchased at the 340B discounted price."

- **GAO, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement**, GAO-20-212 (Jan. 21, 2020), https://www.gao.gov/products/gao-20-212.
  - "GAO found that limitations in the Department of Health and Human Services'[] (HHS) oversight of the 340B and Medicaid Drug Rebate Programs may increase the risk that duplicate discounts occur."
  - "HHS's Centers for Medicare & Medicaid Services (CMS) conducts limited oversight of state Medicaid programs' efforts to prevent duplicate discounts. CMS does not track or review states' policies or procedures for preventing duplicate discounts, and GAO found that the procedures states used to exclude 340B drugs are not always documented or effective at identifying these drugs. As a result, CMS does not have the information needed to effectively ensure that states exclude 340B drugs from Medicaid rebate requests. CMS also does not have a reasonable assurance that states are seeking rebates for all eligible drugs, potentially increasing costs to state and federal governments due to forgone rebates."
  - "HHS's Health Resources and Services Administration's (HRSA) audits of covered entities do not include reviews of states' policies and procedures for the use and identification of 340B drugs. As a result, the audits are unable to determine whether covered entities are following state requirements, and taking the necessary steps to comply with the prohibition on subjecting manufacturers to duplicate discounts."
  - "GAO reported in 2018 that HRSA had not issued guidance on, and did not audit for, duplicate discounts in Medicaid managed care and recommended the agency do so as the majority of Medicaid enrollees, prescriptions, and spending for drugs are in managed care…. In this report, GAO found that, unlike Medicaid fee-for-service, when duplicate discounts in Medicaid

10



670 Maine Avenue, SW • Suite 1000, Washington, DC 20024 • PHRMA.ORG

managed care claims are identified, HRSA does not require covered entities to address them or work with manufacturers to repay them. As a result, manufacturers may be subject to duplicate discounts for drugs provided under managed care."

o   "Given these limitations in federal oversight, HHS does not have reasonable assurance that states and covered entities are complying with the prohibition on duplicate discounts."

- **GAO, 340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements**, GAO-20-108 (Dec. 11, 2019), https://www.gao.gov/products/gao-20-108.

  o   After analyzing contract documentation for more than 250 private, nonprofit hospitals participating in the 340B program, GAO concluded that "[g]iven the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible." For example, GAO observed that 13 of the hospitals reviewed that currently participate in the 340B program had contracts with no requirement to provide care to low-income, vulnerable patients.

  o   "HRSA's current processes and procedures do not provide reasonable assurance that nongovernmental hospitals seeking to participate and benefit from the 340B Program meet the program's eligibility requirements…continued growth in the number of participating hospitals and 340B purchased drugs highlights the need for HRSA to improve its oversight processes. This is critical to safeguarding the integrity of the 340B Program."

- **GAO, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement**, GAO-18-480 (Jun. 21, 2018), https://www.gao.gov/products/gao-18-480.

  o   "GAO found weaknesses in HRSA's oversight that impede its ability to ensure compliance with 340B Program requirements at contract pharmacies, such as: HRSA audits do not fully assess compliance with the 340B Program prohibition on duplicate discounts for drugs prescribed to Medicaid beneficiaries. Specifically, manufacturers cannot be required to provide both the 340B discount and a rebate through the Medicaid Drug Rebate Program. However, HRSA only assesses the potential for duplicate discounts in Medicaid fee-for-service and not Medicaid managed care. As a result, it cannot ensure compliance with this requirement for the majority of Medicaid prescriptions, which occur under managed care."

- **OIG, State Efforts to Exclude 340B Drugs from Medicaid Managed Care Rebates,** OEI-05-14-00430 (Jun. 6, 2016), https://oig.hhs.gov/reports/all/2016/state-efforts-to-exclude-340b-drugs-from-medicaid-managed-care-rebates/.

  o   "We found that, to identify 340B drug claims and correctly collect rebates for MCO drugs, most States use methods that identify providers using 340B purchased drugs. However, we found that these provider-level methods may not accurately identify all individual 340B drug claims, creating a risk of duplicate discounts and forgone rebates. By contrast, we found that methods that operate at the claim level can improve accuracy in identifying 340B drug claims, and thereby, help States correctly collect rebates."

  o   "We recommend that the Centers for Medicare & Medicaid Services (CMS) require States to use claim level method to identify 340B claims. CMS did not concur with our recommendation, noting that while it agrees with the importance of claim level methods, the statute does not contemplate such a requirement for States. We continue to recommend that CMS require the use

340B_REBATES_000607



of claim level methods to improve accuracy in identifying 340B claims and thereby reduce the risk of duplicate discounts and forgone rebates."

- o "We also recommend that the Health Resources and Services Administration (HRSA) clarify its guidance on preventing duplicate discounts for MCO drugs to align with this new requirement. HRSA concurred with our recommendation."

- **OIG, Contract Pharmacy Arrangements in the 340B Program**, OEI-05-13-00431 (Feb. 4, 2014), https://oig.hhs.gov/reports/all/2014/contract-pharmacy-arrangements-in-the-340b-program/.

  - o "We found that contract pharmacy arrangements create complications in preventing diversion, and that covered entities are addressing these complications in different ways. The covered entities that we reviewed in our study reported different methods of identifying 340B eligible prescriptions to prevent diversion in their contract pharmacy arrangements. In some cases, these different methods lead to differing determinations of 340B eligibility from one covered entity to another for similar types of prescriptions. As a result, there is inconsistency within the 340B Program as to which prescriptions filled at contract pharmacies are treated as 340B eligible."

  - o "We also found that contract pharmacy arrangements create complications in preventing duplicate discounts. Most covered entities in our study prevent duplicate discounts by not dispensing 340B purchased drugs to Medicaid beneficiaries through their contract pharmacies. However, some covered entities that do dispense 340B purchased drugs to Medicaid beneficiaries through their contract pharmacies did not report a method to avoid duplicate discounts."

  - o "Additionally, we found that some covered entities in our study do not offer the discounted 340B price to uninsured patients in their contract pharmacy arrangements."

  - o "Finally, we found that most covered entities in our study do not conduct all of the oversight activities recommended by HRSA. Although almost all covered entities reported monitoring their contract pharmacy arrangements, the extent of such monitoring varies. Few covered entities reported retaining independent auditors for their contract pharmacy arrangements as recommended in HRSA guidance."

- **GAO, Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement**, GAO-11-836 (Sept. 23, 2011), https://www.gao.gov/products/gao-11-836.

  - o "Increased use of the 340B program by contract pharmacies and hospitals may result in a greater risk of drug diversion, further heightening concerns about HRSA's reliance on participants' self-policing to oversee the program. Operating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies."

  - o "We found that HRSA has not always provided covered entities and drug manufacturers with guidance that includes the necessary specificity on how to comply with program requirements. There also is evidence to suggest that participants may be interpreting guidance in ways that are inconsistent with the agency's intent. Finally, participants have little incentive to comply with program requirements, because few have faced sanctions for non-compliance."

| From: | Robert Nelb |
|---|---|
| To: | Johnson, Carole (HRSA); Espinosa, Diana (HRSA); Britton, Chantelle (HRSA); Pedley, Krista (HRSA); Devenney, Garrett (HRSA); Dempsey, Antigone (HRSA); Grossman, Jordan (HRSA) |
| Cc: | Beth Feldpush; Bruce Siegel; Evan Schweikert; Carl Graziano |
| Subject: | [EXTERNAL] AEH letter about Sanofi 340B rebate proposal |
| Date: | Monday, December 2, 2024 9:43:09 PM |
| Attachments: | AEH-Sanofi-Rebate-Response-20241202.pdf |

Good evening,

Attached is a letter from our executive director Dr. Bruce Siegel outlining our serious concerns about Sanofi's proposed use of rebates to avoid compliance with 340B program requirements.

We appreciate HRSA's previous response to the J & J rebate proposal, and we encourage HRSA to continue to use all available tools to protect patients from other manufacturer attempts to withhold upfront 340B discounts from safety net providers.

Don't hesitate to reach out if you have any questions.

~ Rob

**Robert Nelb, MPH** | Director of Policy
**America's Essential Hospitals**
401 Ninth St. NW, Suite 900
Washington, DC 20004
202.585.0127 telephone | 202.585.0101 fax
rnelb@essentialhospitals.org | www.essentialhospitals.org

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.



Dec. 2, 2024

Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services Parklawn Building
Room 13N188
Rockville, MD 20857

**Ref: Sanofi's Illegal Use of Rebates to Avoid Compliance with 340B Program Requirements**

Dear Administrator Johnson:

On behalf of our more than 300 member hospitals, most of which rely on the 340B Drug Pricing Program, America's Essential Hospitals is deeply concerned about pharmaceutical manufacturer Sanofi's Nov. 22 notice to 340B covered entities about its planned implementation of unauthorized rebates.[1] We urge the Health Resources and Services Administration (HRSA) to take immediate action to stop this and other calculated moves by drug companies to put roadblocks between hospitals and the statutorily required 340B discounts that support lifesaving care.

America's Essential Hospitals is the leading association and champion for hospitals dedicated to equitable, high-quality care for all, including those who face social and financial barriers to care. Since 1981, America's Essential Hospitals has advanced policies and programs that promote health, health care access, and equity. We support our members with advocacy, policy development, research, education, and leadership development.

Our members provide a disproportionate share of the nation's uncompensated care (UC), and three-quarters of their patients are uninsured or covered by Medicare or Medicaid. Essential hospitals provide state-of-the-art, patient-centered care while operating with an average loss of −8.6 percent, compared with −1.4 percent at other U.S. hospitals.[2]

## Essential Hospitals and Their Patients Rely on the 340B Program

The 340B program is a key component of the patchwork federal support essential hospitals rely on to meet their safety net mission. Congress established the 340B program to enable essential

---

[1] Sanofi policy update related to 340B integrity initiative. Published by STAT. https://www.statnews.com/wp-content/uploads/2024/11/Sanofi_Credit_Model_Policy_Letter_11.22.2024_.pdf. Accessed Nov. 27, 2024.
[2] Taylor, J, Ramiah, K, et al., *Essential Data: Our Hospitals, Our Patients—Results of America's Essential Hospitals 2023 Annual Member Characteristics Survey.* America's Essential Hospitals. October 2023. https://essentialdata.info. Accessed Dec. 2, 2024.

essentialhospitals.org        AMERICA'S ESSENTIAL HOSPITALS        t: 202 585 0100
401 Ninth St NW Ste 900        f: 202 585 0101
Washington DC 20004        e: contact@essentialhospitals.org

340B_REBATES_000610

hospitals and other covered entities "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[3] With their 340B savings, essential hospitals can target resources to services and programs that meet their community's unique challenges at nearly no cost to taxpayers.

## Sanofi is the Latest Manufacturer Reneging on Responsibilities under the 340B Program

Under the 340B program, manufacturers, such as Sanofi, agree to offer discounts to safety net providers according to statutorily prescribed methods in exchange for the benefit of having their drugs covered by Medicaid and Medicare. Manufacturers must meet all statutorily required responsibilities; they cannot pick and choose which rules to follow.

Sanofi's proposed rebate model is the latest attempt by manufacturers to subvert HRSA's authority and the rules of the 340B program. In August, Johnson and Johnson (J&J) proposed a similar rebate model, and we appreciate that HRSA took strong action to remind J&J of its statutory responsibilities. Also, a bipartisan coalition of 189 members of Congress signed a letter supporting HRSA's actions and condemning J&J's efforts to "upend more than 30 years of federal law."[4]

Sanofi's proposed rebate model flouts the law even more than J&J's proposal because Sanofi did not request approval, as statute requires. Moreover, Sanofi's proposal attempts to modify existing federal requirements for defining 340B patients and undermines the administrative dispute resolution process manufacturers must follow if they have concerns about whether purchases by covered entities are eligible for 340B discounts.

## Using Rebates to Deny 340B Pricing Harms Patients and Essential Hospitals

**Sanofi's proposed rebate model is yet another attempt to line drug company pockets at the expense of patient care.** Compared with J&J's proposal, Sanofi is proposing to limit access to 340B benefits for more drugs and more types of covered entities. In addition to harming the patients of essential hospitals, Sanofi's proposal also applies to patients at Critical Access Hospitals, Disproportionate Share Hospitals, Rural Referral Centers, Sole Community Hospitals, and Consolidated Health Centers.

Under the proposal, 340B-eligible hospitals would be required to purchase drugs at higher list prices and then wait for the manufacturer to distribute a rebate to receive the statutorily required 340B price. Such a delay imposes a meaningful economic hardship on essential hospitals, many of which have limited cash on hand.

We are concerned Sanofi's proposed rebate approach also creates the opportunity to deny post-sale 340B rebates based on the manufacturer's, and not HRSA's, determination regarding compliance. Reducing 340B discounts for which essential hospitals are eligible will only add to the already heavy financial pressures they face as safety net providers and challenge their ability to meet their mission of care for low-income and other disadvantaged patients and communities.

---

[3] H.R. REP. 102-384(II), p. 12.
[4] Office of Rep. Abigail Spanberger (D-Va.). Spanberger Leads 189-Member Bipartisan Effort Urging Administration to Protect Healthcare Providers from Johnson & Johnson's Attempt to Hike Prescription Drug Prices. 2024. https://spanberger.house.gov/posts/spanberger-leads-188-member-bipartisan-effort-urging-administration-to-protect-healthcare-providers-from-johnson-johnsons-attempt-to-hike-prescription-drug-prices. Accessed Nov. 27, 2024.

340B_REBATES_000611

The net result of Sanofi's proposed policy is that essential hospitals would have to devote additional administrative resources to develop purchasing arrangements for covered outpatient drugs at non-340B prices, make appropriate rebate requests, and track and reconcile rebate payments with the 340B price for each purchased drug. These additional administrative costs do nothing to improve patient care and are designed to place an undue burden on providers that can't afford it. **It appears Sanofi designed this policy with the hope some hospitals won't be able to overcome the red tape it has put in the way of discounts it owes to hospitals. This is nothing more than a ploy by Sanofi to charge more than it should and pad its bottom line.**

## HRSA Should Take Immediate Action to Protect Patients and Essential Hospitals

We appreciate HRSA's previous actions to protect the 340B program from illegal rebate schemes. HRSA should continue using all available tools in the statute to protect patients from manufacturer attempts to withhold upfront 340B discounts from safety net providers.

******

We appreciate your expeditious consideration of these comments on this issue, which is of utmost importance to our members. If you have questions, please contact Director of Policy Robert Nelb, at 202-585-0127 or rnelb@essentialhospitals.org.

Sincerely,

Bruce Siegel, MD, MPH
President and CEO

3

340B_REBATES_000612

| | |
|---|---|
| **From:** | Olivia Little |
| **To:** | HRSA HSB 340B Pricing |
| **Subject:** | [EXTERNAL] Sanofi Rebate Notice-CAH |
| **Date:** | Monday, December 2, 2024 11:54:17 AM |

HRSA, I am not sure if this is the correct email to send this too, but I couldn't find another one regarding 340B.

In regard to the Sanofi Rebate Notice sent to CEs, is HRSA going to put a notice out to them like they did Johnson & Johnson or take a position on their notice? From my understanding, Sanofi did not submit a rebate model/request to HRSA. But they have put out a notice to Covered Entities saying we have to submit data to Beacon and follow their rebate model in order to get 340B pricing. They are also saying we have to have WAC accounts and we are a Critical Access Hospital and not subject to GPO prohibition so we do not have WAC accounts. Also, the data they are requesting is extreme and with the limited staff and resources of CAHs I don't know how we and others will have enough time and resources to submit the requested data for this one manufacturer, let alone if several manufacturers follow their lead. The manufacturers keep creating their own rules and now we are managing not only our TPAs, but 340B ESP and now Beacon. Again, what is HRSA's stance on the Sanofi Rebate notice and is HRSA going to put out a notice in regard to this?

Thank you,

**Olivia Little, MHA, MLS (ASCP)$^{CM}$, CPhT, 340B ACE**
**340B Director**
Johnson County Hospital
202 High St
Tecumseh, NE 68450
402-335-6391



CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

| From: | Erin Saenz |
|---|---|
| To: | HRSA HSB 340B Pricing |
| Cc: | Britton, Chantelle (HRSA); Herzog, Michelle (HRSA) |
| Subject: | RE: [External] FW: 340B credit model: impact on 340B sub-ceiling prices and Apexus contracts available on WAC account |
| Date: | Wednesday, December 4, 2024 11:47:28 AM |
| Attachments: | image002.png |
|  | image003.png |
|  | image004.png |
|  | Sanofi_Credit_Model_Policy_Letter_11.22.2024_.pdf |

The Sanofi credit (rebate) model is supposed to take effect 1/6 for certain covered entities. Has HRSA approved the Sanofi method?  I attended the a webinar hosted by Beacon yesterday and they did not say this this model is pending approval.  Beacon is providing data upload templates and instructions as if it is approved.

Please advise.

Thank you,

Erin

---

**From:** HRSA HSB 340B Pricing <340BPricing@hrsa.gov>
**Sent:** Wednesday, December 4, 2024 9:44 AM
**To:** Erin Saenz <ESaenz@onvidahealth.org>
**Cc:** Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>
**Subject:** [External] FW: 340B credit model: impact on 340B sub-ceiling prices and Apexus contracts available on WAC account

> **\*\* WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. \*\*

Thank you for your email. HRSA has recently received inquiries from manufacturers related to different proposed rebate models for the 340B Program. HRSA continues to be in the process of reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program. As HRSA has previously stated, implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act.

HRSA does not have further information at this time.

### The Office of Pharmacy Affairs
Health Resources and Services Administration
Email: 340bPricing@hrsa.gov



**From:** Erin Saenz <ESaenz@onvidahealth.org>
**Sent:** Tuesday, December 3, 2024 4:38 PM
**To:** Britton, Chantelle (HRSA) <CBritton@hrsa.gov>; Herzog, Michelle (HRSA) <MHerzog@hrsa.gov>
**Subject:** [EXTERNAL] 340B credit model: impact on 340B sub-ceiling prices and Apexus contracts available on WAC account

Hi Chantelle and Michelle,
An Apexus Answers chat today pointed me in your direction.  Many 340B covered entities are able to reduce costs even more with the benefit of 340B sub-ceiling prices and Apexus contracts for WAC purchases.  How will the 340B Credit Model that several manufacturers are now exploring impact this benefit to covered entities?  It seems like the current benefits would be lost under the credit model but maybe I haven't thought things through enough.
Thank you for your advice on this matter,
Erin


**Erin P. Saenz**

340B Program Manager

C  (956) 453-0004

esaenz@onvidahealth.org

**Onvida Health**

2400 S. Avenue A
Yuma, AZ 85364

**onvidahealth.org**



(Onvida Health is a new tradename of Yuma Regional Medical Center)

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.

# sanofi

November 22, 2024

Dear Covered Entity:

Sanofi is updating its policy related to its 340B Integrity Initiative and the method through which Sanofi effectuates the 340B ceiling price for certain Covered Entities.  As described in detail below and as part of Sanofi's 340B Integrity Initiative, Sanofi will be adopting a new model for 340B ceiling price effectuation (the "Credit Model"). Sanofi will continue to offer the 340B price to all covered entities, but for the covered entities listed below, Sanofi will effectuate the 340B price through a credit paid to the covered entities. In addition, for hospital covered entities, Sanofi will effectuate the 340B price when they dispense the drugs to their patients, as defined by HRSA's guidance, but not when the drugs are dispensed to others.

The 340B Drug Pricing Program today bears little resemblance to the safety net program established by Congress over 30 years ago. The 340B Program is now the nation's second largest federal prescription drug program with more than $66 billion in annual sales at discounted prices.[1]

340B's unchecked growth has not come with any meaningful increase in patient benefit. Government reports have found that most patients receive no discount on drugs dispensed by 340B covered entities.[2] And a recent analysis showed that patients receive a portion of 340B discount in only 1.4% of 340B contract pharmacy claims.[3] 340B's financial incentives also skew prescribing decisions and increase patient out-of-pocket costs. According to multiple analyses, patients of 340B hospitals receive more drugs and more expensive drugs than patients of non-340B hospitals.[4]

Over the past few years Sanofi took multiple steps to address prohibited duplicate discounts and diversion in the 340B Program. But this waste and abuse has unfortunately persisted, in part because of the current model of 340B. Today, the various transactions and data points that establish 340B eligibility and effectuate the 340B price are disconnected from one another. That disconnect generates opacity, a primary driver of 340B waste and abuse.

---

[1]  HRSA, "2022 Covered Entity Purchases," (September 2023), https://www.hrsa.gov/opa/updates/2022-340b-covered-entity-purchases.
[2] GAO, Drug Discount Program:  Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement, GAO-18-480, at 30 (June 2018), https://www.gao.gov/products/GAO-18-480.
[3] IQVIA, Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?, (September 27, 2022), https://www.iqvia.com/locations/united-states/library/white-papers/are-discounts-in-the-340b-drug-discount-program.
[4] GAO, Medicare Part B Drugs: Action Needed to Reduce Financial Incentives to Prescribe 340B Drugs at Participating Hospitals, GAO-15-422, at 2 (June , 2015), https://www.gao.gov/products/gao-15-442;  Milliman, Analysis of 2020 Commercial Outpatient Drug Spend at 340B Participating Hospitals (September, 2022), https://www.milliman.com/-/media/milliman/pdfs/2022-articles/9-13-22_phrma-340b-commercial-analysis.ashx.

340B_REBATES_000616

# sanofi

Sanofi is implementing the 340B Credit Model to rein in the 340B waste and abuse we see today. Sanofi's 340B Credit Model will, for the first time, link the relevant data elements and transactions for every 340B dispense. This innovation will bring transparency to 340B. It will identify potential duplicate discounts and prevent instances of illegal diversion.

Sanofi's 340B Integrity Initiative, including the Credit Model, applies to the following covered entities:

- Hospital Covered Entities:
  - Critical Access Hospitals (CAH)
  - Disproportionate Share Hospitals (DSH)
  - Rural Referral Centers (RRC)
  - Sole Community Hospitals (SCH)
- Consolidated Health Centers (CH)

All covered entity types not listed are excluded from this initiative.

The 340B Integrity Initiative applies only to the products listed in Attachment A (the "Products").

Sanofi's Contract Pharmacy Policy is located in Attachment B.

State-specific policy information is located in Attachment C.

Sanofi's Contract Pharmacy Anti-Diversion Policy is located in Attachment D.

The requested data elements for the 340B Credit Model are located in Attachment E.

**The 340B Credit Model**

Sanofi will continue to offer the 340B price to all covered entities, but Sanofi will now effectuate the 340B price through a 340B Credit for certain covered entities.

Sanofi's Credit Model will be operationalized using the Beacon platform. Detailed instructions on covered entity registration, data submission, and other pertinent information regarding Beacon are available on the Beacon website at www.beaconchannelmanagement.com. Sanofi encourages covered entities to register an account on Beacon as soon as possible.

Under the Credit Model, the 340B ceiling price will be effectuated through a credit paid directly to the covered entity using the following 3-step process:

**Step 1**: The covered entity places an order for a Product through their wholesaler at the Product's Wholesale Acquisition Cost (WAC).

**Step 2**: The Product is dispensed to a patient of the covered entity.

340B_REBATES_000617

# sanofi

**Step 3**: The covered entity submits purchase and claims data to Beacon for 340B eligible dispenses. Beacon confirms 340B eligibility and issues a credit payment to the covered entity representing the difference between the WAC and 340B price.

Covered entities will not be required to carry the cost of purchasing a Product at WAC as part of Sanofi's Credit Model. The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. As a result, a covered entity that promptly submits data should never carry the cost of the full WAC because it will receive a credit for the difference between the WAC and 340B price before it must pay the wholesaler at the WAC.

**Credit Model Effective Dates**

This update will go into effect on the dates listed below. As of the dates listed below, 340B pricing will no longer be available through wholesalers for the applicable covered entity types for the products listed on Attachment A. The 340B price will instead be available through a credit from Beacon.

- January 6, 2025 – CAH, DSH, RRC, SCH

- March 1, 2025 – CH

**Claim Submission, Validation, and 340B Credit Payment Process**

Within 30 days of the dispense of a Product, the covered entity must submit a claim for a 340B Credit from Sanofi by submitting the applicable data elements listed in Attachment E to the Beacon platform. These data elements consist of standard purchase and claims data that covered entities and their Third-Party Administrators ("TPAs") already collect, maintain, and use to establish 340B eligibility or submit to insurers for reimbursement in the ordinary course of business.

Through Beacon, Sanofi will review the data submitted and validate that a claim is eligible for a 340B Credit. Claims will be eligible for a 340B Credit if 1) the drug was ordered by a covered entity at WAC; 2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy; 3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and 4) the requested claims data was submitted within 30 days of the drug's dispense. Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

To maintain consistency with current covered entity operations, 340B Credit payments will be calculated and paid at the NDC-11 level. The 340B Credit will equal the difference between (i) WAC and (ii) the 340B ceiling price of the Product.

For Hospital Covered Entities (CAH, DSH, RRC, SCH), payment for a 340B Credit will be transmitted within 7 days after the covered entity submits data sufficient to trigger a full package accumulation, which, for Products with single-unit package sizes, will be a single validated 340B dispense.

340B_REBATES_000618

# sanofi

For CHs, Sanofi will presumptively transmit a 340B Credit upon submission and validation of only the Purchase Data Elements listed in Attachment E. Sanofi encourages CHs to submit Purchase Data Elements immediately upon placing an order at WAC with their wholesaler to receive the 340B Credit as soon as possible. CHs must still submit all remaining applicable data elements within 30 days of the drug's dispense. Sanofi will validate both the Purchase and Pharmacy or Medical Claim Data Elements, and 340B Credit payments will only be applied to valid data submissions. Credits presumptively transmitted on a claim that is not validated will be applied to subsequent claims for 340B Credits.

Sanofi encourages covered entities to submit data as quickly as possible to ensure faster payment of 340B Credits.

Payment details will be available on the Beacon platform, permitting covered entities to reconcile and verify 340B Credits claimed, validated, and paid.

Sanofi will continue to work together with covered entities in good faith, as it has always done, in the event a covered entity notifies the company that it should have received a 340B Credit in a particular case.

**340B Patient Definition**

This section is effective March 1, 2025, and shall apply to Hospital Covered Entities only. This section does not apply to CHs.

As part of the 340B claim submission for pharmacy claims, Hospital Covered Entities are required to append healthcare encounter data that establishes that the submitted claim is for a prescription dispensed to the covered entity's patient. The healthcare encounter data elements are listed in Attachment E.

Sanofi shall utilize the appended healthcare encounter data to validate that the patient to whom the drug was dispensed for the specific 340B pharmacy claim is a patient of the covered entity, as set forth in HRSA's 1996 guidance available at 61 Fed. Reg. 55156. HRSA's 1996 guidance states that:

An individual is a patient of the covered entity if:

1. The covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care;

2. The individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (e.g. referral for consultation) such that responsibility for the care provided remains with the covered entity; and

3. The individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or federally qualified health center look-alike status has been provided to the entity. Disproportionate share hospitals are exempt from this requirement.

340B_REBATES_000619

# sanofi

An individual will not be considered a "patient" of the entity for purposes of 340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.

To operationalize HRSA's 1996 patient definition, Sanofi will use healthcare encounter data to determine if the individual receiving a dispense (1) is currently receiving medical care from the covered entity, and (2) receives the prescription in connection with health care services provided by the covered entity.

Sanofi will presume that a person who has received healthcare services from the covered entity within 24 months of the prescription being dispensed is currently receiving medical care from the covered entity; under this approach, a person who has not received healthcare services from the covered entity within that period of time is presumptively not a patient of that entity.

Sanofi will also presume that a prescription written by a health care professional who is employed by or similarly affiliated with the covered entity is being provided in connection with health care services provided by the covered entity. For prescriptions that arise from a referral following a patient encounter at the covered entity, where the prescriber is not employed by or similarly affiliated with the covered entity, Sanofi will analyze the data submitted to determine if the prescription relates to the health care services provided by the covered entity to the patient.

For prescriptions dispensed to individuals who do not satisfy HRSA's patient definition, Sanofi will decline a 340B Credit to avoid statutorily prohibited diversion of 340B drugs. In the event of such a denial, a covered entity will have an opportunity to submit additional or alternative data for the same claim in order to demonstrate that the individual was the covered entity's patient.

## FREQUENTLY ASKED QUESTIONS

**Q: What types of covered entities are NOT included in Sanofi's 340B Integrity Initiative?**

**A:** Sanofi's 340B Integrity Initiative does <u>not</u> include the following categories of covered entities.

- Children's Hospitals
- Free Standing Cancer Hospitals
- Hemophilia Treatment Centers
- Ryan White Clinics
- Tribal / Urban Indian Health Centers
- Federally Qualified Health Center Look-Alikes
- Sexually Transmitted Diseases Clinics
- Family Planning Clinics
- Tuberculosis Clinics
- Native Hawaiian Health Centers

340B_REBATES_000620

# sanofi

**Q:  Will I continue to have access to 340B pricing through my wholesaler?**

**A:**  Upon the applicable Credit Model effective date, 340B pricing for Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) will no longer be available through wholesalers for in-scope products included in Attachment A.  340B covered entities will initially place an order for these products at WAC from their wholesaler and then the 340B ceiling price will be effectuated for that order through a 340B Credit payment.

**Q:  Does Sanofi's policy apply to all 340B utilization or just contract pharmacies?**

**A:**  Sanofi's policy applies to all 340B utilization for the covered entities described above, inclusive of utilization at in-house retail pharmacies and contract pharmacies, as well as utilization administered to eligible 340B patients in an outpatient setting.

**Q. Can my wholly owned contract pharmacy receive 340B Credits?**

**A**: Contract pharmacies that are wholly owned by the covered entity or have common ownership with the entity are subject to Sanofi's 340B Integrity Initiative, including Sanofi's Contract Pharmacy Policy.

**Q: How do I designate a contract pharmacy?**

**A:** The designation process is administered through 340B ESP™ which can be accessed at https://www.340besp.com/.   The 340B ESP™ platform is currently the only method for a covered entity to designate a contract pharmacy location under Sanofi's policy. Please note that a contract pharmacy must have an assigned HIN for the wholesaler to process 340B transactions for Sanofi drug products. Covered entities may change their designated contract pharmacy twelve months after a designation occurs. Contract pharmacy designations can take up to 10 business days to process.

**Q: I have already designated a contract pharmacy.  Do I need to re-designate my contract pharmacy?**

**A:** Covered entities that currently have a designation in place through 340B ESP™ do not need to re-designate.

**Q: Does Sanofi's Integrity Initiative apply to all Sanofi products?**

**A:** No, Sanofi's 340B Integrity Initiative only applies to the Sanofi products listed in Attachment A.

**Q: Is Sanofi requiring data for my designated contract pharmacy if my covered entity does not have an in-house pharmacy?**

**A:**  Data is required for a designated contract pharmacy. Please see Attachment E for the required data elements.

**Q: What are the requirements for submitting data?**

340B_REBATES_000621

sanofi

A: Data must be submitted within 30 days of the claim's date of dispense or administration. If a claim is submitted more than 30 days after the claim's date of dispense or administration, the applicable drug dispense or administration will not be eligible for a 340B Credit.  Sanofi will work in good faith with covered entities if they believe they were incorrectly denied a 340B Credit.

**Q: Who can submit data to Beacon on behalf of a covered entity?**

A: Beacon account administrators may submit data on behalf of a covered entity or may grant access to other covered entity employees or contractors to submit data via Beacon. Currently, TPAs are not able to submit data to Beacon via an API or other direct data submission method on behalf of a covered entity. Sanofi anticipates that Beacon will support direct submissions from TPAs in early 2025 and additional information will be made available to 340B covered entities as this functionality becomes available.

**Q: How frequently should a covered entity submit data to Beacon?**

A: There is no limitation on how frequently data may be submitted. Sanofi encourages covered entities to submit data as frequently and as early as practicable. Covered entities should endeavor to submit Purchase Data Elements immediately after placing a WAC order with their wholesaler. Covered entities should submit all other applicable data elements immediately following a 340B eligible dispense or administration of a Product.

**Q:  How will Sanofi use the data that covered entities provide through Beacon?**

A: Data uploaded by covered entities will be used to confirm 340B eligibility of the dispense, and to identify and resolve duplicate Medicaid and commercial rebates.  The Beacon platform will validate that:

1) the drug was ordered by a covered entity at WAC;
2) the drug was dispensed or administered at a covered entity location, in-house pharmacy, or contract pharmacy consistent with Sanofi's Contract Pharmacy Policy;
3) for Hospital Covered Entities, the drug was dispensed to a patient of the Covered Entity; and
4) the requested claims data was submitted within 30 days of the drug's dispense.

Through the Beacon platform, Sanofi will validate claims on a rolling basis, as they are submitted.

**Q:  How are claim reversals submitted and processed in Beacon?**

A:  Submission of a claim to Beacon is a request for payment of a 340B Credit, and 340B covered entities should only submit final claims.  In the event that a previously submitted and validated claim must be reversed, the covered entity should submit the same claim detail with a negative unit amount. Claims associated with purchases for which no 340B Credit has been paid will be disassociated with the purchase. If the 340B credit has already been paid, a future 340B claim submission will replace the reversed claim.

340B_REBATES_000622

# sanofi

**Q.  Can a covered entity dispute a claim submission that is not validated in Beacon?**

**A:**  Yes. Many aspects of the 340B eligibility and claims validation processes can be disputed by a 340B covered entity within the Beacon platform. Disputes are initiated in Beacon and may require the submission of additional documentation.  Additional information on the dispute process is available in the Beacon Support Center.

**Q.  Is the Credit Model compatible with central fill pharmacy systems?**

**A:** Yes. Sanofi recognizes that many covered entities operate a central fill pharmacy in which their drug purchases are shipped to a centralized pharmacy location but dispensed or administered through numerous locations operated by the 340B covered entity. The Credit Model supports this.  Eligible claim submissions dispensed or administered at a location registered with HRSA as a parent or child site or shipping address of a parent or child site will be associated with any purchase shipped to a location registered with HRSA as a parent or child site or shipping address of a parent or child site.

**Q: What is the amount of the 340B Credit payment?**

**A:** The 340B Credit payment will always equal the difference between the (1) WAC and (2) the 340B ceiling price of the Product at the time the product was initially purchased as indicated in the Purchase Data Elements.

**Q: Will 340B Credits be paid on an individual dispense of Products?**

**A:** 340B Credits are calculated and paid on NDC-11 packages of Products to maintain consistency with how 340B pricing is effectuated today. Once the number of eligible 340B dispenses accumulated in Beacon equals the NDC-11 package size of Product, a 340B Credit will be paid.  For Products with single-unit package sizes, a 340B Credit will be paid after a single validated 340B dispense.

**Q: When will 340B Credits be paid?**

**A:** The Credit Model is designed to ensure that Sanofi will pay the 340B Credit within 30 days of a covered entity's WAC order — and thus before the wholesaler's bill becomes due under commercially prevalent terms — when the covered entity submits data within 22 days of the WAC order. A 340B Credit payment will be transmitted within 7 days after a full package accumulation of 340B eligible dispenses for a given Product which, for Products with single-unit package sizes, will be after a single validated 340B dispense. Beacon validates claims for 340B Credits on a rolling basis. Sanofi encourages covered entities to submit data frequently and promptly to ensure timely payment of 340B Credits.

For CHs, Sanofi will presumptively transmit a 340B Credit upon submission and validation of only the Purchase Data Elements listed in Attachment E. CHs must still submit all remaining applicable data elements within 30 days of the drug's dispense.

**Q: How should covered entities identify dispenses that are eligible for a 340B Credit?**

340B_REBATES_000623

# sanofi

**A:** Covered entities should continue to rely on their standard business practices, consistent with the 340B Statute and HRSA guidance, to identify dispenses eligible for a 340B Credit.

**Q: Who can I contact if I need assistance?**

**A:** Beacon's Support Center, available at www.beaconchannelmanagement.com, provides a variety of resources, including webinars, recorded platform demonstrations, and FAQ documents. 340B covered entities can also register to participate in live webinars and information on how Beacon protects financial and healthcare related information is available online in the Trust Center. Technical, data submission, registration, or contract pharmacy designation questions should be direct to the Beacon support team at support@beaconchannelmanagement.com or 1.878.788.8907.  For other issues, customers can email Sanofi340BOperations@Sanofi.com.

340B_REBATES_000624

# sanofi

**ATTACHMENT A**

Admelog™

Ambien™

Apidra™

Arava™

Avalide™

Avapro™

Doxercalciferol™

Dupixent™

Enoxaparin Sodium™

Flomax™

Insulin Glargine™

Ibesartan™

Kevzara™

Lantus™

Leflunomide™

Lovenox™

Multaq™

Plavix™

Priftin™

Primaquine™

Renvela™

Sevelamer™

Soliqua™

Toujeo™

Zolpidem™

340B_REBATES_000625



**ATTACHMENT B**
**Contract Pharmacy Policy**

Sanofi's Contract Pharmacy Policy remains in effect. As of the effective dates noted below, Sanofi's Contract Pharmacy Policy will be effectuated through the Beacon platform.

For Hospital Covered Entities effective January 6, 2025, the Contract Pharmacy Policy is as follows:

- Covered entities without an in-house retail pharmacy may designate a single contract pharmacy location at which to receive access to 340B pricing.

- Covered entities designating a single contract pharmacy must submit the requested data elements listed in Attachment E to access 340B pricing at their designated contract pharmacy.

For CHs effective March 1, 2025, the Contract Pharmacy Policy is as follows:

- CH covered entities may designate up to 3 contract pharmacy locations at which to receive access to 340B pricing.

- Covered entities designating contract pharmacies must submit the requested data elements listed in Attachment E through the Beacon platform to access 340B pricing at their designated contract pharmacies.

All data must be submitted through the Beacon platform. All contract pharmacy designations must be made in the 340B ESP™ platform, at https://www.340besp.com/. If the covered entity has already designated their contract pharmacy or pharmacies on the 340B ESP™ platform, no further action is required to be take on the 340B ESP™ platform.

Sanofi considers all sites together as one covered entity for purposes of Sanofi's 340B Integrity Initiative, inclusive of the covered entity's Parent Site, Child Sites, and Associated Sites[5].

Contract pharmacies that are wholly owned by or have common ownership with the covered entity are subject to this Contract Pharmacy Policy.

State-specific policy information is located in Attachment C.

---

[5] https://www.hrsa.gov/about/faqs/what-associated-site-community-health-centers-federally-qualified-health-centers-fqhcs

340B_REBATES_000626



**ATTACHMENT C**
**STATE POLICIES**

**Arkansas**: Arkansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Arkansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies. Hospital Covered Entities are also subject to the Sanofi Contract Pharmacy Anti-Diversion Policy. Please see Attachment D for additional information.

**Kansas:** Kansas-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Kansas must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Maryland**: Maryland-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Maryland must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Mississippi**: Mississippi-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Mississippi must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**Missouri:** Missouri-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in Missouri must timely submit the applicable data elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

**West Virginia:** West Virginia Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits from Sanofi. No claims data or utilization data is required to be submitted for payment of the 340B Credits.

West Virginia-based pharmacies with which the covered entity has a contract pharmacy relationship are exempt from Sanofi's Contract Pharmacy Policy. Hospital Covered Entities (CAH, DSH, RRC and SCH) and Consolidated Health Centers (CH) utilizing contract pharmacies in West Virginia must submit the Purchase Data Elements listed in Attachment E to receive 340B Credits on drugs dispensed from those contract pharmacies.

340B_REBATES_000627



**ATTACHMENT D**
**Sanofi Contract Pharmacy Anti-Diversion Policy**

This policy applies to contract pharmacy arrangements between hospital covered entity types (CAH, DSH, RRC and SCH) and pharmacies located in the following states:

- Arkansas: Effective 9/23/2024

As detailed in Attachment C, Sanofi has modified its 340B policies in certain states. Sanofi remains committed to 340B program integrity, including the avoidance of federally prohibited drug diversion.

To further that objective, Sanofi has adopted a Contract Pharmacy Anti-Diversion Policy. Under this policy, Sanofi will continue to offer 340B-priced drugs to covered entities consistent with Attachment C. However, Sanofi's offer includes a new term: a covered entity must provide evidence or, alternatively, attestation that it retains legal title to Sanofi 340B-priced drugs delivered to its contract pharmacies until the contract pharmacies dispense those drugs to 340B-eligible patients, consistent with federal law. "Sanofi 340B-priced drugs" shall refer to those drugs listed in Attachment A to this document. This term applies only with regard to contract pharmacies located in the state(s) listed above.

Covered entities will have 30 days from the effective date(s) noted above to log into the 340B ESP™ platform and complete the Contract Pharmacy Anti-Diversion process located on the righthand side of the 340B ESP™ Entity Profile. Covered entities must complete this process for every contract pharmacy located within the state(s) listed above at which the covered entity seeks to retain or obtain 340B pricing from Sanofi. Covered entities will lose access to 340B pricing at contract pharmacies located within the state(s) listed above for which the covered entity does not complete the Contract Pharmacy Anti-Diversion process. Covered entities may return to the Contract Pharmacy Anti-Diversion process at any time to add or remove contract pharmacies at which the covered entity seeks to have Sanofi 340B-priced drugs delivered.

For covered entities that previously completed the Contract Pharmacy Anti-Diversion process on 340B ESP™, no further action is required.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in any of the states listed above will have that contract pharmacy designation terminated 30 days from the applicable effective date.

Covered entities that have designated a single contract pharmacy location at which to receive access to 340B pricing in a state not listed above and subsequently secure access to 340B pricing at a contract pharmacy under this Contract Pharmacy Anti-Diversion Policy will have their single contract pharmacy designation canceled.

**Proof of Title Requirements**

Covered entities may secure access to Sanofi 340B-priced drugs at contract pharmacies located within the state(s) listed above only through the Contract Pharmacy Anti-Diversion process on the 340B ESP™ platform. Sanofi permits covered entities to submit one of two forms of proof of title for each contract pharmacy at which the covered entity seeks access to 340B pricing.

1. <u>Contract Pharmacy Agreement</u>

340B_REBATES_000628

# sanofi

Covered entities may secure access to 340B pricing at contract pharmacies located within the state(s) listed above by submitting the applicable contract pharmacy agreement(s) demonstrating they retain title to Sanofi 340B-priced drugs until the contract pharmacy dispenses those drugs to 340B-eligible patients.

The agreement must be true, correct, and currently in effect.

The contract pharmacy shipping address must be stated in the agreement.

The agreement must state or otherwise demonstrate by its express terms that the covered entity retains legal title to Sanofi 340B-priced drugs at the contract pharmacy until those drugs are dispensed to 340B-eligible patients.

If the covered entity believes that any part of the contract pharmacy agreement is confidential, the covered entity may redact those confidential portions of the agreement.  However, the covered entity must provide the relevant provisions evidencing legal title unredacted.

Sanofi will review and approve or deny any submitted contract pharmacy agreement in a timely manner.

2. Proof of Title Attestation

Covered entities may also secure access to 340B pricing at contract pharmacies located within the state(s) listed above by signing the Contract Pharmacy Anti-Diversion Attestation for those contract pharmacies at which the covered entity retains legal title to Sanofi 340B-priced drugs until such drugs are dispensed to 340B-eligible patients. Please note that the Contract Pharmacy Anti-Diversion Attestation is declared under penalty of perjury, pursuant to 28 U.S.C. § 1746.

Sanofi will review and approve or deny any submitted attestations in a timely manner.

340B_REBATES_000629



**ATTACHMENT E**
**Required Data Elements**

The tables below list the specific data elements collected as part of the purchase and 340B claim submissions process for the Credit Model. Submission template files with details on data validations are available in the Support Center at www.beaconchannelmanagement.com.

Purchase Data Elements

| Field Name | Description |
|---|---|
| Invoice Date | Date the purchase was invoiced to the covered entity |
| Invoice Number | Wholesaler assigned invoice number for the purchase order |
| NDC-11 | National Drug Code of the product that was purchased by the covered entity |
| Package Units | Number of packages of the product ordered |
| Purchase Account Number | Wholesaler assigned account number used to place the order |
| Wholesaler Name | Name of the wholesaler that processed the invoice and shipped the purchase |
| 340B ID | HRSA assigned identifier of the 340B covered entity that made the purchase |
| Ship To Pharmacy ID (NPI) | NPI of the pharmacy that received the physical shipment of the product from the wholesaler |

Pharmacy Claim Data Elements

| Field Name | Description |
|---|---|
| Date Of Service | Date the prescription was filled at the pharmacy. Sometimes referred to as the Fill Date. |
| Date Prescribed | Date the physician wrote the prescription. Always comes on or before the Date of Service. |
| Rx Number | Identifier applied to the prescription by the pharmacy. |
| Fill Number | Indicates the number of times the prescription has been filled as of the current fill. For example, a value of 2 indicates that the prescription has been filled twice and the current fill is the second one. |
| NDC-11 | National Drug Code which is a unique identifier of the drug dispensed to the patient. |
| Quantity | Number of units dispensed to the patient. |
| Prescriber ID | National provider identifier (NPI) of the physician that wrote the prescription. |
| Service Provider ID | NPI of the pharmacy that filled the prescription |

340B_REBATES_000630



| | |
|---|---|
| 340B ID | HRSA assigned identifier of the 340B covered entity that designated the prescription as 340B |
| BIN Number | Bank identification number of the primary payer on the claim |
| PCN Number | Processor control number assigned by the entity processing payment |

Medical Claim Data Elements

| Field Name | Description |
|---|---|
| Health Plan ID | ID assigned to identify the plan. |
| Health Plan | The name of the plan. |
| Service Provider ID | ID assigned to a pharmacy or provider. |
| NDC-11 | ID of the product dispensed or service provided. |
| Quantity | Total quantity being submitted. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Physician ID | ID assigned to the prescriber. |
| Claim Number | A unique identifier for a prescription and claim processor |
| 340B ID | Code specifying the 340B covered entity |

Healthcare Encounter Data Elements

These data elements are applicable to Hospital Covered Entities only. CHs are not required to submit these data elements.

| Field Name | Description |
|---|---|
| Billing Service Provider ID | ID assigned to the entity billing for the healthcare services provided to the patient. |
| Date of Service | Identifies date the prescription was filled or professional service rendered. |
| Rendering Physician ID | ID assigned to the healthcare professional providing the healthcare services to the patient. |
| HCPCS Code | HCPCS Level II code set value assigned to the healthcare service provided to the patient. |
| Diagnosis Code | ICD-10 code indicating medical conditions evaluated as part of the healthcare encounter. |
| Place of Service Code | Code identifying the place where a product or service is administered. |

340B_REBATES_000631



December 12, 2024

<u>Sent via email:</u>

Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
Parklawn Building
Room 13N188
Rockville, MD 20857

Dear Administrator Johnson:

On behalf of over 1,500 hospital and health system members that participate in 340B, we are writing to urge the Health Resources and Services Administration (HRSA) to promptly notify pharmaceutical manufacturer Sanofi that enforcement action will be taken against the company if it does not immediately abandon its plans to offer 340B pricing to eligible hospitals through rebates. We commend HRSA for the firm stance it has taken against other manufacturers' proposals to unilaterally implement rebates, and we agree with HRSA that these plans are unlawful.[1] We urge HRSA to act immediately against Sanofi, as their deadline of January 6, 2025 is fast approaching.  This is causing enormous concern for hospitals, as they do not believe they could comply with Sanofi's policy and are concerned about the potentially significant cost of purchasing drugs at Wholesale Acquisition Cost (WAC) and never being paid the difference between WAC and the 340B price due to Sanofi's plans to implement new patient eligibility rules.

340B Health has serious concerns regarding Sanofi's rebate plan which the company says it will implement next month for all 340B hospitals except children's and cancer hospitals.[2] Like J&J and other manufacturers that have announced rebate schemes, Sanofi intends to deny eligible hospitals access to 340B prices at the time of purchase, forcing them to buy drugs at prices above the 340B ceiling price, thereby imposing significant financial harm and administrative burden on safety‑net hospitals. Even more concerning, Sanofi says it will apply its own rules for hospitals subject to the model that will exclude claims from 340B pricing using criteria that HRSA has neither published nor authorized. Sanofi informed hospitals that failure to comply with Sanofi's unilaterally imposed patient eligibility rules will result in denial of the 340B rebate. This represents a clear attempt by Sanofi to illegally narrow the number of claims that would be eligible for 340B.

---

[1] Attachment 1. Zuckerman Spaeder Letter to HRSA on Rebates, August 22, 2024.
[2] Sanofi_Credit_Model_Policy_Letter_11.22.2024__.pdf

340B_REBATES_000632

340B Health Letter to HRSA on Sanofi Rebate Plan
December 12, 2024
Page 2 of 2

We appreciate HRSA's efforts to enforce the statutory obligation of manufacturers to provide 340B discounts to covered entities and we commend HRSA for its decisive message to J&J, warning of strong enforcement actions if the company proceeded with its unlawful rebate plan.[3] It is crucial that HRSA immediately issue those same warnings to Sanofi and state publicly that the company will be subject to enforcement actions that HRSA said it was prepared to take against J&J, unless Sanofi foregoes implementation of its unlawful rebate plan.

Thank you for considering our request.

Sincerely,

Maureen Testoni
President and Chief Executive Officer
340B Health

cc: Chantelle Britton, Director of the Office of Pharmacy Affairs

---

[3] *See e.g.,* HRSA Letter to J&J, Sept. 17, 2024, https://www.hrsa.gov/sites/default/files/hrsa/opa/sept-17-2024-hrsa-letter-johnson-johnson.pdf; HRSA Letter to J&J, Sept. 27, 2024, https://www.hrsa.gov/sites/default/files/hrsa/opa/sept-27-24-hrsa-letter-johnson-johnson.pdf.

# ATTACHMENT 1

340B_REBATES_000634



William B. Schultz
PARTNER
Zuckerman Spaeder LLP
wschultz@zuckerman.com
(202) 778-1820

August 22, 2024

***Via Email***

Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
Parklawn Building
Room 13N188
Rockville, MD 20857

Dear Administrator Johnson,

We write on behalf of 340B Health and its more than 1,500 public and nonprofit 340B member hospitals to request that the Health Resources and Services Administration (HRSA) announce immediately that the 340B statute does not permit pharmaceutical manufacturers to use rebates to achieve compliance with the statute but instead that manufacturers must continue to provide up front discounts, which is how the program has functioned from the start. We also urge HRSA to take appropriate steps to ensure compliance.

Below we explain why the 340B statute, as consistently interpreted by HRSA, does not permit compliance through rebates and why immediate action is necessary to avoid significant burdens on safety net hospitals.

I.     **Manufacturers Cannot Unilaterally Achieve Compliance with the 340B Statute Through a Rebate Program.**

A.     **The Statute Does Not Permit Compliance Through Rebates.**

340B Health understands that at least one major drug company plans to make 340B prices available only after the covered entity has submitted claims data and a third party has evaluated that data to ensure program compliance, instead of providing the 340B price at the time the covered entity purchases a drug, which drug companies have done since the beginning of the program. The rebate approach denies 340B pricing at the time the drug is purchased and creates the opportunity to deny post-sale 340B rebates based on the manufacturer's, and not HRSA's, determination regarding compliance. Such an approach violates the 340B statute which requires the manufacturer's pharmaceutical pricing agreement "to require that the manufacturer offer each covered entity covered outpatient drugs *for purchase at or below the applicable ceiling price* if such drug is made available to any other purchaser at any price" and to HRSA's longstanding interpretation of the

statute which prohibits conditioning 340B discounts on concerns about non-compliance.[1] The 340B statute further requires that under each manufacturer's pharmaceutical pricing agreement with the Secretary, "the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer" for a covered outpatient drug by a covered entity shall not exceed the 340B ceiling price for that drug.[2]

Guidance published in 1993 and 1994 made clear that under HRSA's interpretation of the statute a "*discount* must be made available" to covered entities through wholesalers.[3] The guidance specifically distinguished discounts from "rebates" and "retroactive discounts," permitting rebates only in the narrow case of making covered entities whole for purchases made prior to initial implementation of the 340B program.[4] The "must offer" language added in 2010 is consistent with HRSA's approach.

For over 30 years, 340B has been administered by HRSA exclusively as a discount program, with only one very narrow exception to accommodate one type of covered entity, which was implemented only after publishing an advance notice in the Federal Register and providing the opportunity for public comment.[5] HRSA provided for a rebate model only for State AIDS Drug Assistance Programs (ADAPs), some of which reimburse pharmacies for drugs and do not purchase drugs directly, thus preventing them from accessing the 340B discount at the point of purchase. Because the ADAP drug purchasing mechanism prevented most ADAPs from accessing 340B, HRSA intended for the ADAP rebate option to serve as "an optional alternate means of accessing

---

[1]  42 U.S.C. § 256b(a)(1) (emphasis added); 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1210, 1223 (Jan. 5, 2017). *See also* Health Resources and Services Administration, Release No. 2011 – 1.1, Clarification of Non‑Discrimination Policy (2012) (stating that "[a] manufacturer may not condition the offer of 340B discounts upon a covered entity's assurance of compliance with section 340B provisions.").

[2]  42 U.S.C. § 256b(a)(1) (emphasis added).

[3]  Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25110, 25113 (May 13, 1994) (Final Notice on Entity Guidelines) (emphasis added); *see also* Guidance Regarding Section 602 of the Veterans Health Care Act of 1992; Limitation on Prices of Drugs Purchased by Covered Entities, 58 Fed. Reg. 27289, 27291 (May 7, 1993) (Notice on Initial Guidance) ("discounts" must be passed through wholesalers to covered entities).

[4]  Final Notice on Entity Guidelines, 59 Fed. Reg. 25112; Notice on Initial Guidance, 58 Fed. Reg. 27291, 27292. The 1993 initial program guidance stated that covered entities added to updated eligibility lists would be eligible for "drug discounts" only for purchases on or after their inclusion on the eligibility list and that HHS was "notifying each covered entity of its eligibility to purchase drugs at the discounted prices."

[5]  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823 (Aug. 29, 1997); Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992— Rebate Option, 63 Fed. Reg. 35,239 (June 29, 1998) (Final Notice on Rebate Option).

section 340B discount pricing."[67] HRSA made clear that it was not authorizing a rebate option beyond ADAPs.[8]

## B.    The D.C. Circuit Opinion on Contract Pharmacies Does Not Support The Rebate Option

As HRSA knows, in 2020 multiple drug companies began to adopt policies refusing to provide 340B discounts for drugs if dispensed to 340B patients at contract pharmacies.[9] When HRSA took steps to stop the practice, multiple companies sued.[10] At the same time, a separate drug manufacturer vendor, Kalderos, filed a lawsuit challenging HRSA's interpretation of the statute that manufacturers may not impose conditions, including rebates, on 340B pricing.[11] That lawsuit has been stayed pending final appeals following a decision in the D.C. Circuit regarding the drug company challenges to HRSA's position.[12] The D.C. Circuit ruled against HRSA finding that the statute does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs and that the conditions imposed by two drug companies to restrict access to some contract pharmacies do not violate the 340B statute on its face, noting that both companies continued to honor at least one contract pharmacy relationship for covered entities that did not have their own retail pharmacies.[13] The court commented, however, that more onerous restrictions could violate the law, noting that some conditions could be onerous enough to nudge the price above the statutory ceiling.[14] Indeed, the parties' most recent joint status report to the district court says that while the D.C. Circuit issued a decision that 340B does not categorically prohibit conditions, the panel clarified that its decision does "not foreclose the possibility that other, more onerous conditions might violate the statute" or "the possibility that the[] conditions" before it "may violate section 340B as applied in particular circumstances."[15] Thus, nothing about the D.C. Circuit's opinion, blessed the rebate model.

---

6    Final Notice on Rebate Option, 63 Fed. Reg. 35,239.

7    62 Fed. Reg. at 45,824.

8    Final Notice on Rebate Option, 63 Fed. Reg. 35,241-242.

9    *See* Maya Goldman, *Hospital Groups Worry As More Drugmakers Limit 340B Discounts*, Modern Healthcare (Mar. 25, 2022.

10    *Eli Lilly & Co. v. Becerra*, No. 1-21-cv-00081 (S.D. Ind.); *Astra Zeneca Pharms, LP v. Becerra*, No. 1-21-cv-00027 (D. Del); *Sanofi-Aventis v. HHS*, No. 3-21-cv-00634 (D.N.J.); *NovoNordisk v. HHS*, No. 3-21-cv-000806 (D.N.J.); *Novartis Pharmaceutical Corp. v. Espinosa*, No. 1-21-cv-01479; *United Therapeutics v. Espinosa,* No. 1-21-cv-01686 (D.D.C).

11    *Kalderos, Inc. v. United States, et al*, Case *No*. 1:21-cv-02608 (D.D.C. complaint filed Oct. 6, 2021).

12    Jan. 28, *2022* Stay Order, Docket No. 26, *Kalderos, Inc. v. United States, et al*, Case No. 1:21-cv-02608.

13    *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

14    *Id.* at *464*.

15    June 4, 2024 Joint Status Report, Docket No. 27, *Kalderos, Inc. v. United States, et al*, Case No. 1:21-cv-02608.

## II.    Immediate Action by HRSA Is Necessary Because a Rebate Model Would Impose Additional Burdens and Financial Strain on Safety-Net Hospitals

The rebate model imposes administrative burdens and financial harm on covered entities. 340B hospitals will be required to purchase drugs at prices that exceed 340B in order to eventually receive the 340B price for purchases of the specified drugs. Rather than saving on covered outpatient drug costs at the time of purchase, 340B hospitals will be forced to incur higher carrying costs for these drugs, essentially floating revenue to drug manufacturers, until the manufacturer approves and remits rebate payments. Purchasing at these higher amounts essentially increases the price of the drugs above the 340B purchase price and reduces the hospitals' resources available for other patient care. For 340B hospitals subject to the statutory limitation on use of group purchasing organizations or arrangements, these upfront costs will be at wholesale acquisition cost pricing, which substantially exceeds 340B pricing.[16] Many smaller covered entities that already are operating on razor thin margins would be unable to handle these upfront costs. And those who can, will also have to devote additional administrative resources to develop purchasing arrangements for covered outpatient drugs at non-340B prices, make appropriate rebate requests, and track and reconcile rebate payments with the 340B price for each purchased drug.

The resources and finances of these safety-net providers are already severely strained. 340B hospitals have a documented record of providing high levels of care to people with low incomes. 340B disproportionate share (DSH) hospitals provide 60% of uncompensated care.[17] And, although 340B DSH hospitals represent 43% of hospitals, they provide 75% of all hospital care to Medicaid patients, who tend to be sicker and more costly to treat.[18] 340B DSH hospitals also play a significant role in their communities' health care safety net for Medicare beneficiaries with chronic conditions. Among beneficiaries with 27 common chronic conditions, patients whose primary ambulatory care settings are 340B DSH hospitals are more likely to be low-income, Black, and disabled compared with beneficiaries who receive the majority of their outpatient care from

---

[16]    42 U.S.C. §§ 256b(a)(4)(L), (M).

[17]    L&M Policy Research, Analysis of Disproportionate Share Hospital Services to Low-income Patients (2018) https://www.340bhealth.org/files/340B_Report_03132018_FY2015_final.pdf.

[18]    Dobson DaVanzo, The Role of 340B DSH Hospitals in Serving Medicaid and Low-income Medicare Patients                                                                        (2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.1 0.2020_FINAL_.pdf; Medicaid and CHIP Payment and Access Commission (MACPAC) and Medicare Payment Advisory Commission (MedPAC), Data Book: Beneficiaries Dually Eligible for Medicare and Medicaid. 2018, https://www.macpac.gov/wpcontent/uploads/2020/07/Data-Book-Beneficiaries-Dually-Eligible-for-Medicare-andMedicaid-January-2018.pdf; American Hospital Association, Underpayment by Medicare and Medicaid Factsheets, 2016-2020, https://www.aha.org/fact-sheets/2020-01-07-fact-sheet-underpayment-medicare-and-medicaid.

non-340B providers.[19] The crucial role of 340B DSH hospitals in the safety net is accompanied by substantially lower—negative on average—operating margins than those of non-340B hospitals.[20]

HRSA must take steps to stop manufacturers from using the rebate model that threatens to reduce the benefit of 340B discounts for 340B hospitals and other covered entities that are the backbone of the nation's health care safety net.

We appreciate HHS' efforts to support the 340B program and to enforce the statutory obligation of manufacturers to provide 340B discounts to covered entities for covered outpatient drugs without onerous conditions.

Sincerely,

William B. Schultz
Margaret M. Dotzel

cc:     Maureen Testoni, President and Chief Executive Officer, 340B Health
        Chantelle Britton, Director of the Office of Pharmacy Affairs

---

[19]   KNG Health Consulting, Comparison of Medicare Beneficiaries Treated in 340B Hospitals, Non-340B Hospitals, and Independent Physician Offices (2021), https://www.340bhealth.org/files/KNG_Health_340B_DSH_Hospitals_Final_Report.pdf?_zs=cIhWb1&_zl=7HEh7.

[20]   Dobson DaVanzo, The Role of 340B DSH Hospitals in Serving Medicaid and Low-income Medicare Patients (2020), https://www.340bhealth.org/files/340B_and_Medicaid_and_Low_Income_Medicare_Patients_Report_7.10.2020_FINAL_.pdf.

| From: | Jonathan Jaffery |
|---|---|
| To: | Johnson, Carole (HRSA) |
| Cc: | Britton, Chantelle (HRSA); Pedley, Krista (HRSA); David J. Skorton |
| Subject: | [EXTERNAL] AAMC letter on 340B rebate models |
| Date: | Tuesday, December 17, 2024 7:38:58 AM |
| Attachments: | image001.gif |
| | image003.jpg |
| | FINAL AAMC Letter to HRSA on 340B rebate models 12-16-24.pdf |

Dear Administrator Johnson,

On behalf of the Association of American Medical Colleges (AAMC), I am sending the attached letter regarding recent drug manufacturer proposals to implement rebate models for 340B drugs. We thank you and HRSA for your continued opposition to these rebate models, including your most recent communication to Sanofi regarding its rebate model.

The 340B program is critical to the nation's teaching hospitals and their patients—over 90 percent of AAMC members are 340B eligible. As we outline in the attached letter, these rebate models would impose significant financial and operational challenges on 340B hospitals and would severely threaten these institutions' ability to maintain the unique services they disproportionately provide.

The AAMC stands ready as a partner in ensuring the continued viability and integrity of the 340B program.

Sincerely,

Jonathan Jaffery

---

**Jonathan Jaffery, MD, MS, MMM**
(He/Him/His)
Chief Health Care Officer

**Association of American Medical Colleges**
655 K Street, N.W., Washington, D.C. 20001-2399
**T** 202.741-0996
**E** jjaffery@aamc.org                www.aamc.org

Tomorrow's Doctors, Tomorrow's Cures®

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and are confident the content is safe.



*Submitted electronically to Carole.Johnson@hrsa.hhs.gov*

**Association of**
**American Medical Colleges**
655 K Street, N.W., Suite 100, Washington, D.C. 20001-2399
T 202 828 0400
www.aamc.org

December 16, 2024

Ms. Carole Johnson
Administrator
Health Resources and Services Administration
U.S. Department of Health and Human Services
5600 Fishers Lane
Rockville, MD 20857

*Re: 340B Drug Pricing Program – Proposed Drug Manufacturer Rebate Models*

Dear Administrator Johnson:

On behalf of its member academic health systems, the Association of American Medical Colleges (AAMC or the Association) writes to convey concerns with rebate models for the 340B Drug Pricing Program proposed by drug manufacturers. We commend the Health Resources and Services Administration (HRSA) for its commitment to preserving access to 340B discounts and for its position regarding enforcement action against drug manufacturers, including its December 13 communication to Sanofi, but we remain concerned about the growing number and expanding scope of the rebate models being proposed. We urge HRSA to continue to maintain its unequivocal stance that these rebate models contravene the 340B statute and to impose appropriate sanctions on drug manufacturers that fail to comply.

The AAMC is a nonprofit association dedicated to improving the health of people everywhere through medical education, health care, medical research, and community collaborations. Its members are all 159 U.S. medical schools accredited by the Liaison Committee on Medical Education; 13 accredited Canadian medical schools; nearly 500 academic health systems and teaching hospitals, including Department of Veterans Affairs medical centers; and more than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves America's medical schools, academic health systems and teaching hospitals, and the millions of individuals across academic medicine, including more than 201,000 full-time faculty members, 97,000 medical students, 158,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences. Following a 2022 merger, the Alliance of Academic Health Centers International broadened participation in the AAMC by 70 international academic health centers throughout five regional offices across the globe.

The 340B program is critical to academic health systems and the patients and communities they serve. 340B hospitals are a vital part of the nation's health care safety-net, ensuring access to cutting-edge technology, research, and health expertise for their patients. Over 90 percent of AAMC-member short-term non-federal hospitals are 340B eligible and provide highly specialized health care services that are often unavailable in other settings, including oncology services, transplant surgery, trauma care, pediatric specialty care, and treatment for rare and complex conditions. For example, although they account for just five percent of all short-term, non-federal hospitals nationwide, AAMC members comprise 21 percent of all hospital beds, including 100 percent of all National Cancer Institute (NCI)-designated comprehensive cancer centers, 72 percent of all burn unit beds, 61 percent of all level-one trauma centers, and 63 percent

Administrator Johnson
December 16, 2024
Page 2

of pediatric ICU beds.[1] AAMC member institutions share a common mission to care for the underserved and train the nation's future health care workforce, making life-saving health care services available to all patients, regardless of their ability to pay. This commitment to high-quality care, regardless of a patient's insurance coverage or socioeconomic status, can create significant financial challenges. Savings from the 340B program help our members to navigate these challenges, supporting their ability to maintain, improve, and expand access to care for their patients.

Since August, four drug manufacturers have announced their intention to implement a rebate model for 340B drugs.[2] These models differ in terms of the types of covered entities and the number of drugs to which they apply, but they share the common theme of requiring hospitals to submit claims data for 340B drugs and receive the 340B price as a retrospective rebate instead of an upfront discount. As we outline in further detail in the letter, not only are these rebate models in violation of the 340B statute, but they also would result in substantial financial losses for 340B hospitals and would be operationally complex, if not impossible, to implement. Moreover, these manufacturer actions ultimately seek to upend HRSA's compliance responsibilities related to the 340B program and replace them with a patchwork of manufacturer policies addressing purported program integrity issues.

To preserve the vital function of these academic health systems and 340B program intent, we urge HRSA to continue to monitor, enforce, and ensure compliance with the 340B program through clear directives to manufacturers, and, if necessary, enforcement action. Should these manufacturers fail to comply, we encourage HRSA to use the enforcement tools within its purview, such as referring manufacturers to the Office of Inspector General for charging above ceiling price.

### *Rebate Models Violate the 340B Statute and Depart from Longstanding Precedent*

The rebate models require certain covered entity types to purchase covered outpatient drugs at commercial price (e.g., wholesale acquisition cost, or WAC) and then receive a rebate equal to the difference between the purchase price and the ceiling price. In unilaterally attempting to effectuate 340B prices as retrospective rebates instead of upfront discounts, drug manufacturers are violating the 340B statute's requirement that each "manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price,"[3] a point that HRSA has emphasized in its communications to manufacturers.[4] By requiring 340B hospitals to first purchase a drug at the much-higher WAC price, manufacturers would be running afoul of the 340B statute's requirement that the purchase price not exceed the ceiling price. While manufacturers assert that the 340B statute is silent as to the method of effectuating 340B prices, the statute ultimately tasks HRSA—not manufacturers—with the authority to determine whether 340B prices can be offered through retrospective rebates.[5] To date, HRSA has only authorized such an arrangement for one covered entity type—AIDS drug assistance programs. By shifting to rebate models, manufacturers are departing from over three decades of precedent, which would be disruptive for covered entities and necessitate significant operational changes for covered entities, manufacturers, and HRSA.

---

[1] AAMC analysis of FY2022 American Hospital Association data, American College of Surgeons Level 1 Trauma Center designations, 2023, and the National Cancer Institute's Office of Cancer Centers, 2022. AAMC membership data, March 2024.
[2] The four drug manufacturers are Johnson & Johnson, Eli Lilly, Sanofi, and Bristol Myers Squibb.
[3] 340B Statute. Sec. 340B(a)(1).
[4] Letter from HRSA Administrator Carole Johnson to Johnson & Johnson CEO Joaquin Duato. September 17, 2024
[5] 340B Statute. Sec. 340B(a)(1) ("taking into account any rebate or discount, as provided by the Secretary").

Administrator Johnson
December 16, 2024
Page 3

### *Rebate Models Attempt to Usurp HRSA's Oversight Responsibilities*

In enacting the 340B statute, Congress delegated responsibility for overseeing and enforcing the 340B program solely to the Department of Health and Human Services (HHS) through HRSA, the agency that HHS has tasked with 340B oversight. For example, the 340B statute provides HHS with audit authority, as well as discretion to establish a mechanism for avoiding duplicate discounts. While manufacturers are permitted under the statute to audit covered entities, the ultimate decision to sanction a covered entity for violation of 340B program requirements is made by HRSA.[6] The statute further provides that "the *Secretary* shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion and violations of the duplicate discount provision and other requirements specified under subsection (a)(5)."[7]

However, in implementing rebate models, manufacturers are requiring covered entities to submit claims data to them through their selected vendors. Manufacturers will evaluate each claim's 340B eligibility before determining whether to provide a credit equal to the difference between WAC and the ceiling price. Sanofi is going one step further and will require covered entities to submit records establishing a relationship between a patient and the covered entity that satisfies the patient definition. Manufacturers have cited supposed compliance issues on duplicate discounts as reasons for their rebate models.[8] By attempting to police the 340B program, manufacturers are creating a compliance nightmare for HRSA and covered entities and undermining program integrity efforts. The parameters of each manufacturer's rebate model differ in many aspects, including the processes for submitting data, timelines, and terms and conditions. It would be confusing for covered entities to keep track of and comply with these numerous rebate models and would ultimately run counter to ensuring program integrity. If these rebate models go into effect, HRSA would have to keep track of the various manufacturer rebate models, and because manufacturers would ultimately be deciding which drugs receive a 340B rebate, HRSA would likely see an increase in claims from covered entities of manufacturers charging above ceiling price if manufacturers do not provide rebates on some 340B drugs. If manufacturers do have legitimate concerns about program integrity, they can use existing mechanisms authorized by the 340B statute, such as manufacturer audits or the administrative dispute resolution process to address these concerns.

### *Rebate Models Would Devastate Financially Vulnerable Hospitals and Impede Patient Access to the Services Made Possible by 340B Savings*

The proposed rebate models would devastate financially vulnerable 340B hospitals and undermine their ability to continue providing access to essential services and discounted drugs to their patients, while serving only to increase the margins of drug manufacturers. Shifting the 340B program to a rebate program would delay much needed cash flow to 340B hospitals by significantly delaying the receipt of their 340B discounts. For safety-net hospitals that often carry minimal cash on hand, the impact of the delay in realizing 340B savings would have significant negative impacts on their financial standing and downstream impacts on patient care. In addition to the delayed receipt of 340B discounts, leaving the determination of which drugs are 340B eligible to the manufacturer could result in many 340B claims being denied at the manufacturer's discretion, with no oversight or appeal mechanism available to 340B

---

[6] 340B Statute. Sec. 340B(a)(5)A.
[7] 340B Statute. Sec. 340B(d)(2) (emphasis added).
[8] See, e.g., Eli Lilly complaint in U.S. District Court for the District of Columbia. Case No. 1:24-cv-3220. November 11, 2024 ("Responding to that guidance, Lilly has been searching for a solution to these government-created compliance problems.").

Administrator Johnson
December 16, 2024
Page 4

hospitals. One AAMC member academic health system projects that the annual impact of the rebate models proposed by the four drug manufacturers would be approximately $60 million in lost (not delayed) 340B savings. This figure does not account for the impacts associated with additional compliance costs, delayed savings through a rebate model, or potential effects on the ability to use 340B discounts for Medicaid patients, as well as potential loss of sub-ceiling prices.

Reduced 340B savings would impede the ability of academic health systems to maintain the unique services they disproportionately provide, such as burn care, trauma care, and pediatric specialty care. 340B hospitals have a demonstrated commitment to serving low-income, vulnerable populations—to qualify for the program, they must meet a minimum disproportionate share hospital adjustment percentage—representing their commitment to Medicaid and low-income Medicare patients. Losses from a rebate model would compound the billions of dollars of losses hospitals have already incurred because of manufacturer restrictions on 340B drugs dispensed through contract pharmacies.[9] Destabilizing these hospitals would undermine not just 340B hospitals but would harm their low-income patients as well.

***Rebate Models Would be Administratively Burdensome, If Not Impossible, to Implement***

Beyond the direct financial losses that 340B hospitals would incur because of the rebate models, there would be significant operational challenges and administrative burden on hospital staff associated with complying with manufacturer rebate models and requests for claim data.

The rebate models require covered entities to turn over voluminous amounts of sensitive data to vendors such as Second Sight Solutions and Kalderos, including multiple data elements for each 340B drug claim. Collecting and transmitting this data to these vendors would require aggregating data from various pharmacy settings, particularly in large academic health systems that manage multiple in-house pharmacies, dispense 340B drugs in mixed-use settings, and have relationships with contract pharmacies. Manufacturers have provided no assurances about maintaining the privacy and security of these claims data. On the contrary, 340B hospitals have reported that the terms and conditions of the contracts they are compelled to sign are non-negotiable and contain terms unfavorable to hospitals.

Additionally, these rebate models would require 340B hospitals to modify their existing inventory practices to maintain a separate inventory for non-340B drugs that are purchased at WAC and cannot be purchased at a lower price through a group purchasing organization (GPO) due to the GPO prohibition on 340B hospitals. 340B hospitals would have to likely utilize third-party platforms to make and track rebate requests and ultimately to match their rebate payment amounts with the 340B prices for those drugs.

**Conclusion**

Thank you for HRSA's continued support of the 340B program and for ensuring program integrity for all 340B stakeholders. Through robust internal controls, 340B hospitals are invested in and share HRSA's goal of ensuring program integrity. To summarize, we urge HRSA to continue to enforce the 340B statute by prohibiting the adoption of rebate models by drug manufacturers. These unlawful rebate models would create compliance difficulties for HRSA and covered entities and would severely disrupt the 340B savings of academic health systems and ultimately their ability to invest these savings into the programs and specialized health care services provided uniquely by academic health systems. We would be happy

---

[9] 340B Health. Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals. July 11, 2023. Note that this figure underestimates the true impact of these restrictions, because it was based on 21 drug manufacturers' restrictions. The number of manufacturers that have imposed limitations now stands at 37.

Administrator Johnson
December 16, 2024
Page 5

to work with HRSA on any of the issues discussed or other topics related to the 340B program. If you have questions regarding our comments, please feel free to contact my colleague Shahid Zaman (szaman@aamc.org).

Sincerely,

Jonathan Jaffery, M.D., M.S., M.M.M., F.A.C.P.
Chief Health Care Officer

cc: David Skorton, M.D., AAMC President and Chief Executive Officer
    Chantelle Britton, Director, HRSA Office of Pharmacy Affairs
    Rear Admiral Krista M. Pedley, Director, HRSA Office of Special Health Initiatives

340B_REBATES_000645

hnorris@salinahealth.org

---

From:       hnorris@salinahealth.org
Sent:       Wed Jan 15 2025 13:01:44
To:         340bpricing@hrsa.gov
Subject:    340B Pricing Unavailable HRSA Notification

This is another notification to HRSA of continued issues accessing 340B pricing for drugs shipped to our contract pharmacies. Of note, we are very concerned about restrictive purchasing policies put out by three generic drug manufacturers - Cosette Pharmaceuticals, Kaleo, and Woodward Pharma Services. If policies such as these are not stopped, it could turn into an impossible operational task for covered entities to purchase 340B drugs from potentially hundreds of different sources dictated by drug manufacturers. Many other manufacturer restrictions including Merck, AstraZeneca, GSK, Bausch Health, Gilead, Eli Lilly, BI, BMS, Amgen, Sumitomo, Alkermes, Sobi, Novo Nordisk, Sanofi, Bausch & Lomb, EMD Serono, Bayer. AbbVie, UCB, Viatris, and Organon are also affecting our organization as a whole.

In addition, we need you to understand that the newly introduced credit rebate models from various drug manufacturers such as Sanofi, Eli Lilly, Bristol Myers Squibb, and Johnson & Johnson will have *significant* negative impacts on our health center's ability to care for our patients and comply with necessary billing requirements. This model will prevent us from passing along savings directly to our eligible patients as required by the 330-health center program because there will be no way for our pharmacy software to know the 340B price from our wholesaler catalog. Many patients rely on the discount we extend to them to afford their medications, and our patients' health and wellbeing are at stake. Not having the 340B purchase price in our pharmacy software will also cause CMS to pay more for fee-for-service (FFS) Medicaid prescriptions because the acquisition price billed for FFS Medicaid prescriptions will become the higher retail price, we are forced to pay instead of the lower 340B discounted price. This model also creates significant cash flow issues for health centers due to having to purchase drugs at the higher retail price initially versus the upfront 340B price. An analysis of our entity-owned pharmacy purchases showed this will be a 280% increase that will take up over 35% of our annual budget as opposed to less than 10% at the 340B price. Additionally, we will be forced to redirect considerable resources and money from patient care to staff who will be needed to submit purchase and claims data to various rebate platforms for clinic-administered drugs, entity-owned pharmacy, and contract pharmacies. Not only are there multiple rebate platforms to navigate, but each manufacturer has their own refund process requirements such as which of their drugs are affected, what data elements are required, and the timing of when data submission is required, making it very cumbersome to operationalize. A credit rebate model would be devasting for health centers, our patients, and our healthcare system.

We continue to appreciate HRSA doing all that it can to defend the 340B Drug Pricing Program. These unlawful restrictions are having real-world consequences for health centers and our patients.

Thank you!
Hali Norris



**Salina Family Healthcare Center &
Smoky Hill Family Medicine
Residency Program**
651 E. Prescott Rd
Salina, KS 67401

 785-825-7251 Ext 526



**Hali Norris, CPhT, 340B ACE**
340B Pharmacy Program Analyst
salinahealth.org
smokyhillfmrp.org

785-825-1625 Fax
hnorris@salinahealth.org



*Our mission: serve our community at the cross roads of compassionate healthcare and profes sional education*

**Confidentiality Notice:** *This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confid ential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, pleas e contact the sender by reply e-mail and destroy all copies of the original message.*

Attachments:
01-07-2025 - SHEF - AbbVie 340B ceiling price unavailable HRSA notification.pdf (327.05 KB)
01-07-2025 - SHEF - AstraZeneca 340B ceiling price unavailable HRSA notification.pdf (326.98 KB)
01-07-2025 - SHEF - Bausch & Lomb 340B ceiling price unavailable HRSA notification.pdf (327 KB)
01-07-2025 - SHEF - Alkermes 340B ceiling price unavailable HRSA notification.pdf (344.96 KB)
01-07-2025 - SHEF - Amgen 340B ceiling price unavailable HRSA notification.pdf (344.98 KB)
01-07-2025 - SHEF - Bausch 340B ceiling price unavailable HRSA notification.pdf (327.22 KB)
01-07-2025 - SHEF - Bayer 340B ceiling price unavailable HRSA notification.pdf (326.72 KB)
01-07-2025 - SHEF - BMS 340B ceiling price unavailable HRSA notification.pdf (312.12 KB)
01-07-2025 - SHEF - Boehringer Ingelheim 340B ceiling price unavailable HRSA notification.pdf (312.26 KB)
01-07-2025 - SHEF - Cossette Pharmaceuticals 340B ceiling price unavailable HRSA notification.pdf (311.83 KB)
01-07-2025 - SHEF - Eli Lilly 340B ceiling price unavailable HRSA notification.pdf (327.25 KB)
01-07-2025 - SHEF - EMD Serono (EMDS) 340B ceiling price unavailable HRSA notification.pdf (312.05 KB)
01-07-2025 - SHEF - Gilead 340B ceiling price unavailable HRSA notification.pdf (311.64 KB)
01-07-2025 - SHEF - GlaxoSmithKline 340B ceiling price unavailable HRSA notification.pdf (345.73 KB)
01-07-2025 - SHEF - Kaleo 340B ceiling price unavailable HRSA notification.pdf (311.31 KB)
01-07-2025 - SHEF - Merck 340B ceiling price unavailable HRSA notification.pdf (312.13 KB)
01-07-2025 - SHEF - Novo Nordisk 340B ceiling price unavailable HRSA notification.pdf (311.81 KB)
01-07-2025 - SHEF - Organon 340B ceiling price unavailable HRSA notification.pdf (312.05 KB)
01-07-2025 - SHEF - Sanofi 340B ceiling price unavailable HRSA notification.pdf (330.5 KB)
01-07-2025 - SHEF - Sobi 340B ceiling price unavailable HRSA notification.pdf (308.4 KB)
01-07-2025 - SHEF - Sumitomo 340B ceiling price unavailable HRSA notification.pdf (326.67 KB)
01-07-2025 - SHEF - UCB 340B ceiling price unavailable HRSA notification.pdf (312.05 KB)
01-07-2025 - SHEF - Viatris 340B ceiling price unavailable HRSA notification.pdf (312.06 KB)
01-07-2025 - SHEF - Woodward 340B ceiling price unavailable HRSA notification.pdf (311.25 KB)